**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **BRIAN CARRICO; KACIE CARRICO;** | ) |
| **DON GATLIN; and DORA GATLIN;** | ) |
| **individually and on behalf of all others** | ) |
| **similarly situated,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| | ) |
| **vs.** | ) **NO. 3:23-CV-00497** |
| | ) **JUDGE RICHARDSON** |
| **UPONOR, INC.;** | ) **MAGISTRATE JUDGE** |
| **UPONOR NORTH AMERICA, INC.;** | ) **FRENSLEY** |
| **UPONOR CORPORATION; and** | ) |
| **DOES 1 through 100, inclusive, whose** | ) **JURY DEMAND** |
| **true names are unknown,** | ) |
| | ) |
| **Defendants.** | ) |

**SECOND AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Plaintiffs Brian Carrico, Kacie Carrico, Don Gatlin, and Dora Gatlin, (collectively hereinafter "Plaintiffs"), on behalf of themselves and all persons similarly situated ("the Class"), by and through their attorneys, hereby file this Second Amended Complaint and allege as follows.

**I. INTRODUCTION**

1. This is a class action for damages and other relief asserted pursuant to Federal Rule of Civil Procedure 23 on behalf of all persons similarly situated related to blue and red colored cross-linked polyethylene tubing ("PEX") manufactured and/or distributed by Defendants Uponor, Inc., Uponor North America, Inc., and Uponor Corporation (collectively "Uponor" or "Defendants") which suffers from design and/or manufacturing defects that cause premature damage, degradation, deterioration, and failure (hereinafter "Uponor PEX").

## II. THE PARTIES

2.      Plaintiffs Brian Carrico and Kacie Carrico (collectively hereinafter "Carrico Plaintiffs") are individuals residing at all relevant times at 1203 Center Point Road, Hendersonville, Tennessee 37075 ("Carrico Plaintiffs' Home").   Carrico Plaintiffs are citizens and residents of Tennessee.

3.      Plaintiffs Don Gatlin and Dora Gatlin (collectively hereinafter "Gatlin Plaintiffs") are individuals residing at all relevant times at 1543 Anderson Road, Hendersonville, Tennessee 37075 ("Gatlin Plaintiffs' Home").  Gatlin Plaintiffs are citizens and residents of Tennessee.

4.      Carrico Plaintiffs' Home and Gatlin Plaintiffs' Home are collectively hereinafter referred to as "Plaintiffs' Homes."

5.      Defendant Uponor, Inc. ("Uponor Inc.") is an Illinois corporation with its principal place of business located at 5925 148th Street West, Apple Valley, Minnesota 55124.

6.      Defendant Uponor North America, Inc. ("Uponor NA") is a Delaware corporation with its principal place of business located at 5925 148th Street West, Apple Valley, Minnesota 55124.

7.      Defendant Uponor Corporation ("Uponor Corp.") is a Finnish corporation with its principal place of business located at Ilmalantori 4, 00240 Helsinki, Finland.  Uponor Corp. also has a corporate office at Äyritie 20 01510 Vantaa, Finland.

8.      Defendants shall be referred to collectively as "Uponor."

## III. JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action in which the matter in controversy exceeds $5 million, exclusive of interest and costs, and members of the Class are citizens of states different than Defendants.

10. This Court has personal jurisdiction over Defendants because, among other things, Defendants conduct substantial business in Tennessee, have sufficient minimum contacts in Tennessee, and intentionally avail themselves of the consumers and markets within Tennessee through the promotion, advertising/marketing, partnership agreements, supply agreements, sales, and distribution of its products, including Uponor PEX.

11. At all relevant times herein, Uponor designed, manufactured, marketed/advertised, sold, and/or distributed Uponor PEX for use in water plumbing systems in residences and other structures throughout the United States, including Tennessee, by and through their entities, employees, agents, predecessors-in-interest, and/or other representatives.

12. The Court has jurisdiction of Uponor Corp., Uponor NA, and Uponor Inc. because Uponor Corp. is the ultimate parent company for both Uponor NA and Uponor Inc. Uponor Inc. operates as an extension of the business of Uponor Corp. and Uponor NA. Uponor Inc. is a subsidiary of Uponor NA, which is a subsidiary of Uponor, NA Holding, Inc., and Uponor, NA Holding, Inc. is a subsidiary of Uponor Corp. *See* Business Entity Disclosure Form for Uponor, Inc. (ECF #15). Each company in the chain wholly owns the company beneath it. Thus, there is no dilution in ownership between Uponor Corp., Uponor NA, and Uponor Inc.

13. Uponor Corp.'s 2022 Annual Review Report ("Report") demonstrates that the Uponor entities view themselves as a single enterprise divided by geographic reporting regions, with Uponor Corp. at the head. In its Report, Uponor Corp. refers to itself and its subsidiaries as the "Uponor Group," a single business enterprise engaged in selling plumbing and infrastructure products worldwide. Uponor Corp. treats North America as simply one region of its worldwide plumbing business called "Building Solutions—North America."

14. The Uponor Corp. Report

   (i)    outlines "Group strategy" (p. 2);

(ii)    states that Uponor Group (not individual companies) "employs about 4,000 professionals in 26 countries in Europe and North America" (p. 4);

(iii)   states that "In Building Solutions—North America, we [Uponor Corp.] continued to make inroads into the commercial market and to leverage on our global offerings and brought new, innovative products to the local market" (pp. 6 & 10);

(iv)   states that Uponor "aims to create a new Uponor-wide operating model" (p. 7);

(v)   states that "Uponor has two manufacturing facilities in North America, making it one of Uponor's manufacturing strongholds" (p. 15);

(vi)   highlights Uponor Group work (including PEX piping) at a high-rise project in Orlando, Florida called Society Orlando (p. 16);

(vii)  states that Uponor Corp. has on its executive committee the "President, Building Solutions—North America" and not an officer of Uponor NA or Uponor Inc. (p. 20);

(viii) states that "the President and CEO [of Uponor Corp.] *is in charge of the Group's day-to-day management*" (p. 28);

(ix)   states that "The [Uponor] Group *aims to embed control in the daily operations" of all Uponor companies* (p. 32);

(x)   states that "Assessment of risks regarding financial reporting is part of the Group's overall internal control and risk management framework" (p. 33);

(xi)   states that "Uponor is a global company that employs 4214 professionals in 27 countries in Europe and North America" (p. 40);

(xii)  states regarding Personnel that "the Uponor Group" had 4234 employees in full-time employment as of the end of December 2021 (p. 49);

(xiii) refers to Uponor in North America as a division of Uponor Corp. by saying that "The Building Solutions—North America *division* serves local markets with PEX plumbing" (p. 50);

(xiv) states that "Common people, brand, technology, sustainability, innovation, R&D and IT matters *are managed at Group level* in order to benefit from global presence and maximum global synergies" (p. 53);

(xv)  states that *Uponor Group* "has 16 manufacturing facilities in Europe and North America, *which exposes the company [Uponor Corp.]* to possible environmental risks" and that "Approximately 60% of Uponor's net sales were generated in countries other than the euro" (p. 56); and

(xvi) refers to "Uponor's segments" as its "reporting divisions . . . Building Solutions—Europe, Building Solutions—North America and Uponor Infra" (p. 75).

(emphasis added). Uponor Corp. claims Building Solutions-North America's sales, profits, and liabilities as its own. Report at 46-47. In 2022, Uponor Corp. claimed that 35% of its net sales and 57% of its operating profits were from its Building Solutions—North America division. *Id.*

15.    The website for Uponor Corporation is [www.uponorgroup.com](www.uponorgroup.com). The address for Uponor Group at the website is Uponor Corporation, Ilmalantori 4, 00240 Helsinki, Finland. The domain name for emails of employees of Uponor Corp., Uponor NA, and Uponor Inc. is uponor.com.

16.    The employee handbook for Uponor employees in the United States provides that "Uponor Corporation . . . is a publicly traded company and operates throughout Europe and the North America."

17.    In addition to Florida, Uponor Corp. has written promotions (e.g., press releases or statements to stockholders) of it being involved in and working on projects in other states including California and Nevada.

18.    The Court has jurisdiction over Uponor Corp., Uponor NA, and Uponor Inc. because Uponor Corp. exercises a sufficient degree of control and domination over Uponor Inc. through Uponor NA to meet personal jurisdiction standards. Uponor Corp. conducts its United States operations through Uponor NA and Uponor Inc. as Uponor Corp.'s "Building Solutions—North America" division. The presence and activities of a subsidiary in a forum confers jurisdiction on a parent company if the parent company exerts so much control over the subsidiary that the two essentially operate as one entity. Jurisdiction over Uponor Corp. is directly related to Uponor NA and Uponor Inc.'s activities in Tennessee. Uponor Inc. and Uponor NA function as Uponor Corp.'s representatives and agents in that Uponor Inc. and Uponor NA perform services

5

that are significantly important to Uponor Corp. such that if Uponor Corp. did not have Uponor Inc. and Uponor NA to perform them, Uponor Corp. would undertake to perform substantially similar services itself. It certainly would do so given that its Building Solutions—North America division generates 57% of Uponor Corp.'s operating profits.

19.     Other federal courts have exercised personal jurisdiction over Uponor Corp. in other actions in the United States including *George v. Uponor Corp.*, 988 F. Supp.2d 1056 (D. Minn. 2013), and *Slaughter v. Uponor Corp.*, 2:08-CV-01223 (D. Nev.), Order of 11/19/09. In that Order entered in the Slaughter case, Judge Jones found that "Uponor Corp.'s connection to Uponor, Inc. is more than investment or licensing of its trademark . . . . Uponor Corp. has purposely sold, through its subsidiaries, products in Nevada such that it should reasonably be expected to be hauled into a Nevada court if those activities result in alleged harm."

20.     Uponor NA is part of Uponor Corp.'s Building Solutions—North America division. The Court has jurisdiction over Uponor NA through Uponor Corp. as well as through Uponor NA's own activities.

21.     Uponor NA has admitted in judicial pleadings in courts in the United States that it—Uponor North America, Inc.—manufactures, markets, and sells various plumbing products including PEX piping for residential and commercial spaces throughout the United States including in Tennessee.

22.     Uponor NA has admitted in judicial pleadings in courts in the United States that it is subject to personal jurisdiction in various states, including Tennessee, Alabama, Oklahoma, California, Minnesota, Nevada, Pennsylvania, and Colorado, by not challenging the exercise of personal jurisdiction over it in those states. This includes a very similar case to this one filed in Colorado federal court against Uponor NA and Uponor Inc. in 2021 styled *Matzdorf v. Uponor North America, Inc. and Uponor, Inc.*, D. Col. Case No. 21-cv-2157.

23.    Uponor NA has obtained and secured commercial general liability (CGL) insurance for the operations of itself and its subsidiaries throughout the United States, including in Tennessee, to cover activities including the manufacture, marketing, distribution, and sale of plumbing piping.  The CGL policy is issued to Uponor North America, Inc. as the named insured. The CGL policy provides coverage for Bodily Injury and Property Damage Liability as well as Products/Completed Operations.  Indeed, a declaration (both ECF #10-2 & #13-1) has been submitted by Defendants in this action from Stacey Beissel as the "Manager, Claims, Risk and Insurance, for Uponor North America, Inc. and its subsidiaries, including Uponor, Inc."  That declaration is by a Uponor NA employee and alleges facts about the marketing and sale of PEX piping and operations of Uponor related to such PEX piping.  Ms. Beissel is a Uponor NA employee who is the person proffered by Defendants as having knowledge of the PEX piping marketing, warranty, and sale operations of Uponor.  This confirms that Uponor NA does work regarding the marketing, distribution, and sale of Uponor PEX.

24.    At Uponor North America's section of the Uponor Corporation website located at www/uponor.com/en-us, Uponor NA makes repeated admissions of its actions in marketing and selling plumbing products throughout the United States.  At that website, Uponor NA (i) admits that it was asked to help with the design and guidance of a project in California; (ii) states that "Uponor North America has manufacturing in Apple Valley [Minn] as well as Hutchison, Minn"; (iii) states that "[i]n late November 2021, Uponor North America reached a staffing milestone at its Hutchison, Minn. production facility"; (iv) states that the address "where to buy" Uponor products is "Uponor North America, 5925 148th Street West, Apple Valley, MN  55124"; (v) states that Uponor NA owns part of a joint venture that designs PEX products in California; and (vi) states at the bottom of the webpage that the webpage and copyright owner is "Uponor North America."

25.     The above allegations make a *prima facie* showing that personal jurisdiction exists over Uponor Corp., Uponor NA, and Uponor Inc.  Defendants have purposefully availed themselves of the privilege of marketing, distributing, and selling PEX piping in Tennessee (and profiting from such sales), Plaintiffs' claims arise from Defendants' activities in marketing, distributing, and selling PEX piping in Tennessee, and Defendants' actions of marketing, distributing, and selling PEX piping in Tennessee has a substantial enough connection with Tennessee to make the exercise of jurisdiction over the Uponor Defendants reasonable.

26.     Venue is proper in this Court because at all relevant time Plaintiffs resided in Sumner County, Tennessee, and pursuant to 28 U.S.C. § 1391(a)(2) a substantial part of the acts giving rise to Plaintiffs' claims occurred within Sumner County, Tennessee.

## IV.  NATURE OF DEFENDANTS' TRADE AND COMMERCE

27.     Defendants designed, manufactured, advertised/marketed, distributed, and/or sold Uponor PEX for use in water plumbing systems in residences and structures throughout the United States, including but not limited to Plaintiffs' Homes, the homes and other structures owned by other members of the Class, and all other similarly situated homes and structures.

28.     Defendants designed, manufactured, advertised/marketed, distributed, and/or sold Uponor PEX for use in potable water plumbing systems throughout the United States.

29.     PEX stands for cross-linked polyethylene.  PEX is a popular product because of its purported flexibility and ease of installation.  PEX tubing is commonly either blue or red to make it readily identifiable once installed as either a cold (blue) or hot (red) water line.

30.     Defendants have repeatedly represented that consumers should trust Defendants to provide the highest quality PEX tubing because the company has many years of industry experience and is an industry leader in the manufacture of PEX tubing.

8

31.     Until     approximately     2021,     Defendants     designed,     manufactured, advertised/marketed, distributed, and/or sold the Uponor PEX at issue.  Defendants' sales catalog advertised that, *inter alia*, its Uponor PEX was the highest quality PEX tubing available, and that its cross chemical bonding process gave it "superior characteristics."

32.     At     the     following     link,     https://www.uponor-usa.com/en/customer-support/faq#:~:text=Uponor%20PEX%20will%20not%20corrode,fit%20that%20type%20of%20connection, Defendants represented that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion."

33.     As of 2016, Defendants represented that they had produced over five billion feet of Uponor PEX and were responsible for approximately one-third of all PEX sold in the United States.  Defendants, on information and belief, were responsible for approximately one-third of all PEX sold in the United States between 2016 and 2021.

34.     As of 2016, Defendants did business with all of the top ten homebuilders in the United States and had exclusivity agreements with three of them.  Defendants, on information and belief, did business with all of the top ten homebuilders in the United States and had exclusivity agreements with some of them between 2016 and 2021.

35.     As of 2016, among the top ten homebuilders in the United States, Defendants claimed to have a 60% share of the plumbing installed in those homebuilders' housing starts. Defendants, on information and belief, claim to have a 60% share of the plumbing installed in the housing starts of the top ten homebuilders between 2016 and 2021.

## V.  FACTUAL ALLEGATIONS

36.     Carrico Plaintiffs' Home was built by Hannah Custom Homes, LLC, was substantially completed in February of 2017, and was originally constructed with Uponor PEX in the potable water plumbing system.

9

37.     Gatlin Plaintiffs' Home was built by Hannah Custom Homes, LLC, was substantially completed in June of 2014, and was originally constructed with Uponor PEX in the potable water plumbing system.

38.     The Uponor PEX in Plaintiffs' Homes has prematurely degraded and deteriorated and, as a result, has failed, and continues to fail, and suffers from microcracking causing water leaks from the Uponor PEX which results in damages to other property in Plaintiffs' Homes.

39.     The initial leaks in the Carrico Plaintiffs' Home were in 2021 and the initial leaks in the Gatlin Plaintiffs' Home were in 2019, although Plaintiffs did not know that Defendants were the cause of the leaks until just prior to filing the initial complaint. Other leaks have occurred in the Plaintiffs' Homes since the initial leaks, and leaks continue to occur in Plaintiffs' Homes from failures of the Uponor PEX. The leaks in the Uponor PEX in Plaintiffs' Homes have caused substantial damages to Plaintiffs' Homes other than the leaking PEX itself, which have caused Plaintiffs to pay substantial sums to repair such damages. Such damages continue to occur because the Uponor PEX in Plaintiffs' Homes continues to have leaks.

40.     Unlike Uponor, most PEX manufacturers add red or blue color pigment, along with antioxidant stabilizers, to the plastic formulation during the extrusion process (when the tubing is formed) and prior to cross-linking, which adds color evenly throughout the tubing wall and does not degrade the PEX.

41.     Antioxidant stabilizers are necessary to achieve the flexibility of PEX tubing, maintain ductility, and protect against embrittlement and cracking.

42.     Unlike other PEX manufacturers, Defendants manufactured PEX tubing and then, after extrusion, added a blue or red coating to the tubing's outside surface. Coatings do not stick to PEX, so Defendants patented a process to color coat their PEX tubing. Defendants' patented process involves conveying the PEX tubing "through an oxidizing step in which at least the outer

surface of the base pipe is oxidized, through a coating step in which a pre-polymer system is applied to the outer surface of the base pipe and through a curing step in which the pre-polymer is cured to form a layer of the pipe." Uponor Innovation AB, Fristad (SE), Appl. No. 12/572,683, Filed Oct. 2, 2009.

43.     This means that in order to get the coating to stick to the outside surface of the Uponor PEX tubing, Defendants run the tubing through a furnace/flame treatment that oxidizes/burns the outside of the pipe. While the furnace/flame treatment improves adhesion qualities of polymers prior to the application of coatings and adhesives, it is an oxidation process that destroys the antioxidants from the outside of the Uponor PEX tubing, subjecting the tube to actual damage and premature failure in the form of, among other things, oxidative degradation, microcracking, cracking, through-wall cracking, and leaks, which leaks cause substantial property damage to other property in the structures where the Uponor PEX tubing is used.

44.     The below photograph depicts the difference between Uponor PEX, displaying the coating only on the tube's exterior surface, and other manufacturers' PEX, displaying the color through the entire tube.



45.     Because the outside surface of Uponor PEX is depleted of antioxidants after the flame treatment, the outside surface prematurely becomes brittle and develops microcracks when the tubing is expanded during installation. The embrittlement and microcracks constitute damage

to the tubing and the cracks continue to grow and spread over time, eventually propagating through the PEX, causing resultant leaks, significant damage to other property, loss of use of the plumbing system, and/or preventing the plumbing system from functioning as intended.

46.    Contrary to the affirmative statements made by Defendants as set out in Section IV above, Uponor PEX suffers from design and/or manufacturing defects causing damages.

47.    Specifically, and as a result of such defects, Uponor PEX is predisposed to premature oxidative failure, microcracking, through-wall cracking, leaks, loss of use, and other failures and damages. These defects cause the Uponor PEX to crack, fail to perform when put to its intended use, leak, and substantially reduce its normal useful life.

48.    Pieces of Uponor PEX piping manufactured by Defendants which have failed have been inspected and tested by experts in PEX piping, and the microcracking caused by the Defendants' furnace/flame treatment process has been documented as the cause of the failure and leaks of the PEX piping.

49.    Before designing, manufacturing, advertising/marketing, distributing, and/or selling Uponor PEX, Defendants failed to take appropriate steps to ensure that its products were safe for their intended use.

50.    Defendants failed to disclose this material information about defects in Uponor PEX to Plaintiffs, other members of the Class, and the public.

51.    Defendants knew or should have known that Uponor PEX was not suitable for use within water plumbing systems and that Uponor PEX suffered from the defects and caused damages as alleged herein.

52.    The Uponor PEX has caused damage to, and failure of, plumbing systems, which has caused and will continue to cause Plaintiffs and the Class to incur damages to their homes and structures as alleged herein through no fault of their own.

53.     Damages caused by leaks from defects in Defendants' Uponor PEX to property at Plaintiffs' homes include, but are not limited to, the following:

- Destruction or damages of plywood, various types of flooring (including hardwood, carpet, and vinyl areas), and subflooring;

- destruction of substantial amounts of insulation;

- destruction or damages of molding and baseboards;

- destruction or damages of structural wood;

- destruction or damages of ceiling areas including coffered ceilings;

- destruction or damages to other property including shelving and gas fireplaces;

- water infiltration and saturation of property located in areas that are difficult to see or reach including behind walls and in crawl spaces, which has caused fungus or mold in walls and crawl spaces, and, after discovery of the leak, required substantial and difficult drying and fungus/mold removal activities; and

- loss of use of plumbing systems or prevention of plumbing systems from functioning properly or as intended.

Other Class members have also suffered similar damages to property in their homes and other structures.

54.     Beginning in or around 2021, Defendants discontinued their manufacture, distribution, and sale of the defective Uponor PEX because of the defects with the product. However, Defendants misrepresented that the defective Uponor PEX was being "suspended," not "discontinued," and instead concealed that Uponor discontinued the product due to the defects and premature failures and damages. On information and belief, the new PEX produced and sold by Defendants since 2021 is not manufactured using the furnace/flame treatment and, because such treatment is not used, does not suffer the same oxidative deterioration, degradation, microcracking, failures, and leaks as the defective Uponor PEX manufactured between 2009 and 2021.

13

55.     Even though Defendants discontinued their manufacture, distribution, and sale of the defective Uponor PEX in or around 2021 because of the defects with the product, Defendants failed to (1) notify Plaintiffs, other members of the Class or the public of any defects or problems with Uponor PEX, or (2) fully or adequately compensate property owners, including, but not limited to, Plaintiffs and other members of the Class, who have been injured from leaks as a result of the defective Uponor PEX.

56.     At no time did Defendants or any of their agents, dealers or other representatives inform Plaintiffs, other members of the Class or the public of Defendants' acts and/or omissions related to defects in Uponor PEX.

57.     Plaintiffs have suffered an ascertainable loss as a result of Defendants' acts and/or omissions associated with Uponor PEX, including Defendants' non-disclosures about the product defects and discontinuing/suspending the manufacture, distribution, and sale of the defective Uponor PEX.

58.     Plaintiffs seek relief for damages alleged herein sustained by Plaintiffs and the other Class members that Defendants' proximately caused by the use of Defendants' Uponor PEX in Plaintiffs' and Class members' homes and other structures.

59.     Plaintiffs seek relief to remedy Defendants' strict products liability violations and negligence.

## VI. DAMAGES WERE CAUSED BY DEFECTIVE UPONOR PEX

60.     The Uponor PEX in Plaintiffs' Homes and the homes and structures owned by other members of the Class has malfunctioned, cracked, leaked, and caused damages to property of Plaintiffs and the other members of the Class other than the defective PEX itself.

61.     Plaintiffs and other members of the Class have suffered actual and substantial damages to property in their homes and other structures, other than the Uponor PEX itself, caused

by leaks from the Uponor PEX in the potable water systems in Plaintiffs' Homes and the homes and structures owned by other members of the Class.

62.     Damages caused by leaks from defects in Defendants' Uponor PEX to property at Plaintiffs' homes include, but are not limited to, the following:

- Destruction or damages of plywood, various types of flooring (including hardwood, carpet, and vinyl areas), and subflooring;

- destruction of substantial amounts of insulation;

- destruction or damages of molding and baseboards;

- destruction or damages of structural wood;

- destruction or damages of ceiling areas including coffered ceilings;

- destruction or damages to other property including shelving and gas fireplaces;

- water infiltration and saturation of property located in areas that are difficult to see or reach including behind walls and in crawl spaces, which has caused fungus or mold in walls and crawl spaces, and, after discovery of the leak, required substantial and difficult drying and fungus/mold removal activities; and

- loss of use of plumbing systems or prevention of plumbing systems from functioning properly or as intended.

Other Class members have also suffered similar damages to property in their homes and other structures.

63.     As a result of Defendants' conduct, Plaintiffs and the putative Class have suffered ascertainable losses in the form of damages to their homes and other structures caused by leaks from the defective Uponor PEX.

64.     The leaks and damages in Plaintiffs' Homes and in the homes and structures owned by other members of the Class were caused solely by the defects in the Uponor PEX discussed

15

above. The furnace/flame treatment used by Defendants destroyed the antioxidants from the outside of the Uponor PEX tubing, subjecting the tube to actual damage and premature failure in the form of, among other things, oxidative degradation, microcracking, cracking, through-wall cracking, and leaks, which leaks cause substantial property damage to other property in the structures where the Uponor PEX tubing is used.

65. Pieces of Uponor PEX piping manufactured by Defendants which have failed have been inspected and tested by experts in PEX piping, and the microcracking caused by the Defendants' furnace/flame treatment process has been documented as the cause of the failure and leaks of the PEX piping.

66. Defendants' acts and omissions as alleged herein caused Plaintiffs' and other Class members' injuries, including the amount of out-of-pocket losses from damages to Plaintiffs' and the other Class members' homes and other structures, businesses, and personal property from water leaks including the cost to repair or replace personal and/or real property damaged from the leaks from the defective Uponor PEX.

67. Uponor's manufacturing process caused inherent defects in the Uponor PEX, including but not limited to oxidative degradation, microcracking, cracking, through-wall cracking, leaks, and other damages to the PEX, which has caused premature degrading, deteriorating, and/or failing plumbing systems in Plaintiffs' Homes and in the homes and structures owned by other members of the Class which have resulted in leaks and damages in those homes and structures.

68. Defects in the Uponor PEX and Defendants' related acts and omissions have proximately caused and/or will cause substantial damages to property other than the PEX piping itself in the homes and other structures of Plaintiffs and other Class members.

## VII.  STATUTES OF LIMITATIONS/REPOSE TOLLING

69.     Plaintiffs' claims and all Class members' claims are brought within the applicable statutes of limitations for product liability and negligence claims.

70.     Plaintiffs' and Class members' claims are not barred by any statute of limitation or statute of repose because Defendants actively and fraudulently concealed from the public including Plaintiffs and other Class members (i) the defects in the PEX piping, (ii) Defendants' actions in creating the defect, and (iii) the cause of Plaintiffs' and other Class members' injuries.

71.     Plaintiffs did not know or learn of Plaintiffs' claims and could not reasonably have known of such claims until the leaks and damages occurred and Plaintiffs learned that Defendants' actions and inactions caused the leaks.  Plaintiffs did not discover that Defendants' actions and inactions caused the leaks until shortly before the filing of their initial Complaint.

72.     Defendants knowingly, affirmatively, and actively concealed and failed to disclose relevant information to Plaintiffs and members of the Class related to the defective nature of Uponor PEX.

73.     Defendants affirmatively concealed the injuries to Plaintiffs and other Class members by concealing that Uponor PEX has defects that cause leaks and/or failing to disclose material facts regarding the defects in the PEX piping when Defendants had a duty to disclose such information to the public who was reasonably expected to have plumbing installed in their homes or structures and/or to builders and plumbers who were reasonably expected to use such Uponor PEX, based on (1) Defendants' superior and sole knowledge related to the defects, and (2) Defendants' continuous statements to the public, builders, and plumbers about the quality of Uponor PEX as set forth in Section IV above.

74.     Between 2009 and 2021, Defendants made public statements and publicly maintained that Uponor PEX was the highest quality PEX tubing available, that its cross chemical

bonding process gave it "superior characteristics," that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion," and that consumers should trust Defendants to provide the highest quality PEX tubing because the company has many years of industry experience and is an industry leader in the manufacture of PEX tubing. These statements to the public were affirmative acts of concealment of the defects in the Uponor PEX, of which Defendants were aware.

75. Defendants knew that the Uponor PEX was defective and caused leaks and damages between 2009 and 2021. Defendants knew that property owners were being injured by the defects in Uponor PEX piping not long after Defendants started using the furnace/flame treatment process in 2009. Defendants knew that they were the wrongdoer who created the defects in Uponor PEX piping.

76. Defendants fraudulently concealed the information about the defects in Uponor PEX that was known by Defendants. Defendants engaged in a scheme to cover up evidence of premature deterioration and failure of Uponor PEX by making spot repairs of the Uponor PEX when leaks were reported and not notifying all potentially affected persons of such deterioration and failure of Uponor PEX.

77. Between 2009 and 2021, Defendants did not notify the public of defects in the Uponor PEX, but affirmatively conducted a plan to conceal claims of property owners. Defendants conducted a plan to (i) continue making public statements about the Uponor PEX being of highest quality, and (ii) do repairs of faulty and failed Uponor PEX on a case-by-case basis only when a failure was reported instead of notifying potential owners, builders, and plumbers of the defects in the Uponor PEX.

78.     Defendants' actions and statements concealed the fact of the defects in the Uponor PEX and were intended by Defendants to exclude suspicion and prevent inquiry regarding defects in the Uponor PEX.

79.     Plaintiffs and other Class members had no way to know of the defects in the Uponor PEX because the PEX piping and its defects are latent by being within the Uponor PEX piping which is itself behind the walls of the homes and other structures of Plaintiffs and other Class members.

80.     Plaintiffs and other Class members could not have discovered the defects or the identity of the wrongdoer once the leaks occurred despite reasonable care and diligence because the leaks were in PEX piping not visible by Plaintiffs and other Class members. Because the defects in Uponor PEX are latent, Plaintiffs and members of the Class could not have reasonably discovered the true nature of the defects or the cause of the leaks until shortly before the filing of the initial Complaint.

81.     Defendants concealed material information about the existence of the defects in the PEX piping from Plaintiffs and other Class members by withholding information from Plaintiffs and other Class members in order to exclude suspicion of Uponor PEX as being defective and to prevent inquiry by Plaintiffs and other Class members.

82.     Defendants knew, but covered up, the defects in the PEX piping when Defendants were aware of such defects and that such defects cause leaks and damages in homes and other structures and concealed from the public, including Plaintiffs and other Class members, the Uponor PEX defects and Defendants' knowledge of such defects in an attempt to avoid liability for damages caused by the defective Uponor PEX.

83.     Accordingly, the actions of the Defendants were actions that would deceive a reasonably diligent plaintiff and did deceive the Plaintiffs and other Class members, and any

applicable statute of limitation or statute of repose, including without limitation Tennessee Code Annotated Section 47-2-725, was tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.

## VIII.  CLASS ACTION ALLEGATIONS

84.     This action is brought on behalf of Plaintiffs, individually and as a class action, pursuant to FED. R. CIV. P. 23(a), 23(b)(1), 23(b)(2), and/or 23(b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

85.     Plaintiffs assert these claims individually and on behalf of a class of owners of homes and other structures in Tennessee with Uponor PEX produced by Defendants between 2009 and 2021 (the "Class"). Specifically, the Class consists of:

> **All persons or entities who own or owned homes, businesses, or other structures in Tennessee with Uponor PEX used as the lines and components of a potable water plumbing system where the Uponor PEX was produced between 2009 and 2021 who suffer damages or injuries from leaks from the Uponor PEX.**

86.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

87.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Fed. R. Civ. P. 23.

88.     **Numerosity (Fed. R. Civ. P. 23(a)(1)).** The members of the class defined herein are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs own homes with Uponor PEX in Tennessee.  Plaintiffs seek to assert the claims as alleged in this Second Amended Complaint that are typical of the claims that would be asserted by the members

20

of the Class. Plaintiffs are informed and believe and thereon allege that the proposed Class contains thousands of individuals and entities who own or owned homes or other structures in Tennessee with Uponor PEX produced between 2009 and 2021 who suffer damages or injuries from leaks from the PEX. The disposition of the class members' rights with respect to the alleged defects, as described in this Second Amended Complaint, is a benefit to all parties and to the Court.

89. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23 (b)(3)).** This action has been brought and may be properly maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is numerous and ascertainable, and the common questions of law and fact predominate over any questions affecting solely individual members of the Class.

90. **Typicality (Fed. R. Civ. P. 23(a)(3)).** Plaintiffs' claims are typical of the claims of the Class relating to Uponor PEX. Plaintiffs and the Class have been injured by the same wrongful practices of Defendants. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of the Class and are based on the same legal theories.

91. **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)).** Plaintiffs will fairly and adequately represent the interests of all members of the Class. Plaintiffs own homes with Uponor PEX in Tennessee and are adequate representatives of the Class as they have no interests which are adverse to the interests of the Class that they seek to represent. Plaintiffs have retained attorneys that have substantial experience in the prosecution of defective product consumer protection class action litigation. The interests of the Class will be fairly and adequately represented and protected by Plaintiffs and their counsel.

92. **Class Action Status (Fed. R. Civ. P. 23(b)(1)).** Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interest.

93.    **Declaratory and Injunctive Relief (Fed. R. Civ. P. 23(b)(2)).**  Certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

94.    **Superiority (Fed. R. Civ. P. 23(b)(3)).**  A class action is superior to other available means of fair and efficient adjudication of this controversy.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  The disposition of their claims in this case and as part of a single class action lawsuit, rather than thousands of individual lawsuits, will benefit the parties and greatly reduce the aggregate judicial resources that would be spent if this matter were handled as hundreds or thousands of separate lawsuits.  Furthermore, given the potential for extraordinary expenses and burdens in conducting the discovery and presentation of evidence regarding the inherent defects in Uponor PEX, the burden of individual litigation would make it extremely difficult, if not impossible, for individual members of the Class to redress the wrongs asserted herein, while an important public interest will be served by addressing the matter as a class action.  Moreover, separate prosecution by thousands of individual members of the Class would likely establish inconsistent standards of conduct for the Defendants and result in the

impairment of and potential harm to the Class members' rights and the disposition of their interests through actions to which they were not parties.

95. Individualized litigation would also undermine judicial economy and raise the prospect of inconsistent or contradictory judgments, increase the likelihood of delay, and generate additional expenses for all parties and the court system. The class action device, on the other hand, presents far fewer management challenges and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

96. Plaintiffs have adequately and objectively defined the Class so the Court will be able to use the class definition to determine the class members. Defendants' records, as well as public records searches and records of third parties, will reveal the identities of Class members. A brief inspection will show which homes and other structures have lines and components of the potable water plumbing system with Uponor PEX. Therefore, the putative class is ascertainable.

97. Common questions of law and fact exist as to the members of the Class, including but not limited to:

i. Is Uponor PEX that was manufactured between 2009 and 2021 defective?

ii. Was Uponor PEX that was manufactured between 2009 and 2021 defectively designed and/or defectively manufactured for its intended purpose as the plumbing for potable water systems in homes and other structures?

iii. Is Uponor PEX that was manufactured between 2009 and 2021 prematurely failing, degrading, and/or deteriorating?

iv. Is Uponor PEX that was manufactured between 2009 and 2021 subject to premature failure, degradation, and/or deterioration?

v. At the time the Uponor PEX left the control of Defendants, was it defective in design and manufacture and unreasonably dangerous to Plaintiffs and the other members

of the Class who might reasonably be expected to use it in the plumbing systems in their homes and other structures?

vi.     Did Defendants know or should they have known that Uponor PEX that was manufactured between 2009 and 2021 is inherently defective and substantially certain to malfunction during its useful life?

vii.    Did Defendants fail to warn consumers that Uponor PEX that was manufactured between 2009 and 2021 is subject to premature failure, degradation, and/or deterioration?

viii.   Did Defendants make misleading statements in connection with the advertising/marketing and/or sale of Uponor PEX that was manufactured between 2009 and 2021?

ix.     Did Defendants omit material information when they advertised/marketed and/or sold Uponor PEX that was manufactured between 2009 and 2021?

x.      Did Defendants owe a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, advertising/marketing, distribution, and/or sale of Uponor PEX that was manufactured between 2009 and 2021?

xi.     Did Defendants exercise reasonable care in the design, testing, manufacture, advertising/marketing, distribution, and/or sale of Uponor PEX that was manufactured between 2009 and 2021?

xii.    Did Defendants breach their duties to Plaintiffs and the Class?

xiii.   Did Defendants cause damages to the homes and structures of Plaintiffs and the Class from leaks in the Uponor PEX?

xiv.    Are Defendants liable to Plaintiffs and the Class to repair damages caused by leaks in the Uponor PEX that was manufactured between 2009 and 2021?

xv.     Did Defendants violate other Tennessee laws?

xvi. Did Defendants' conduct constitute willful misconduct and/or fraudulent concealment such that statutes of limitation and statutes of repose are tolled during the pendency of such conduct?

These and other common questions of law and fact predominate over any questions affecting solely individual members of the Class.

98. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

99. Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final relief with respect to the Class as a whole.

## IX. CLARIFICATION OF RELIEF NOT SOUGHT

100. In the claims made herein and the causes of action pled below, Plaintiffs are not making any express or implied warranty claim and are not seeking any relief or remedy provided for in Defendants' alleged express warranty or under an implied warranty claim. This is consistent with that fact that Plaintiffs never knew of any alleged express warranty until after this action was filed and only learned of it because Defendants made defensive allegations about it. Plaintiffs note that Uponor's alleged express warranty does not apply to them because they never knew of it or made any claims under it and are not making any implied warranty claim. Plaintiffs further note that this Second Amended Complaint makes no request or demand for any remedy of repair or replacement of the defective PEX including no request for actual replacement of the defective PEX or for costs of replacement of the defective PEX. Plaintiffs, if successful in this action, will not request that the judgment include any requirement that Defendants replace the defective Uponor PEX in Plaintiffs' homes and the homes and structures of putative Class members or pay any costs related to such replacement.

## X. CAUSES OF ACTION

## COUNT I - STRICT PRODUCT LIABILITY
**(Plaintiffs, on behalf of themselves and all others similarly situated, Against All Defendants)**

101.    Plaintiffs repeat and re-allege all prior and subsequent paragraphs and incorporate them as if repeated in full herein.

102.    At all times material to this action, Defendants were in the process of designing, engineering, developing, testing, approving, manufacturing, fabricating, equipping, inspecting, repairing, labeling, advertising, promoting, marketing, distributing, selling, and supplying Uponor PEX throughout the United States, including Tennessee.

103.    At the time the Uponor PEX left the control of Defendants, it was defective in design and manufacture and unreasonably dangerous to Plaintiffs and the other members of the Class who might reasonably be expected to use it in the plumbing systems in their homes and other structures.  These defects include, but are not limited to, the conditions described in this Second Amended Complaint.

104.    The Uponor PEX was expected by Defendants to reach, and did reach, property owners/end users without substantial change in the condition in which it was placed on the market and was expected to be installed in the homes and other structures of Plaintiffs and other members of the Class.

105.    Plaintiffs and the other members of the Class are persons and entities who would reasonably be expected to be owners who have Uponor PEX as a water plumbing system installed in their homes and other structures.  This reasonable expectation of Plaintiffs and other Class members to be potential owners of homes or other structures in which builders and plumbers might install Uponor PEX does not mean—and Plaintiffs do not admit—that Plaintiffs and other Class members (i) knew of Defendants' existence or that Defendants made PEX piping at the times the

26

homes and other structures were built, (ii) knew what PEX piping was at the times their homes or other structures were built, (iii) knew that PEX piping was used in their homes or other structures, (iv) entered into any contract with any of the Defendants at any time, (v) knew that any contract related to Uponor PEX piping existed related to the construction of their homes or other structures, (vi) were third-party beneficiaries of any contract related to Uponor PEX piping, (vii) knew of the existence of any alleged warranty related to Uponor PEX piping at the times their homes or other structures were built, (viii) visited or even knew of any website related to Uponor PEX piping at the time their homes or other structures were built, (ix) assented to any part of an alleged warranty at the time their homes or other structures were built, or (x) asserted any warranty claim related to the Uponor PEX piping at any time.

106. The defects in Uponor PEX caused by Defendants were a direct and proximate cause of damages suffered by Plaintiffs and the other members of the Class, which damages include costs to repair damages to the homes and other structures and property of Plaintiffs and the Class caused by the leaks.

107. Defendants are strictly liable to Plaintiffs and the Class for the damages alleged herein caused by the defects and inadequacies in the design and manufacturer of Uponor PEX.

### COUNT II - STRICT PRODUCT LIABILITY FOR DESIGN DEFECT
**(Plaintiffs, on behalf of themselves and all others similarly situated, Against All Defendants)**

108. Plaintiffs repeat and re-allege all prior and subsequent paragraphs and incorporate them as if repeated in full herein.

109. Defendants are liable to Plaintiffs and the Class for the injuries and damages alleged herein sustained by Plaintiffs and the Class pursuant to Tennessee common law and/or the Tennessee Product Liability Act due to the defective design and/or formulation of Uponor PEX.

110.     At all times material to this action, Defendants designed, formulated, manufactured, distributed, supplied, and/or sold Uponor PEX.

111.     Defendants, as the designers and manufacturers of Uponor PEX, are held to the level of knowledge of an expert in the field of the design and manufacture of PEX plumbing including any cracking, microcracking, oxidative degradation, deterioration, weakening, failure or leaks caused by a furnace/flame treatment and/or the application of coatings and adhesives to the PEX.

112.     The Uponor PEX used in the homes and other structures of Plaintiffs and other members of the Class was defective in design and/or formulation in the following respects.

113.     Between 2009 and 2021, in order to get a red or blue coating to stick to the outside surface of the Uponor PEX tubing, Defendants ran the tubing through a furnace/flame treatment that oxidizes/burns the outside of the pipe.  While the furnace/flame  treatment improves adhesion qualities of polymers prior to the application of coatings and adhesives, it is an oxidation process that destroys the antioxidants from the outside of the Uponor PEX tubing, subjecting the tube to actual damage and premature failure in the form of, among other things, oxidative degradation, microcracking, cracking, through-wall cracking, and leaks, which leaks cause substantial property damage to real and personal property in the structures where the Uponor PEX tubing is used.

114.     At the time the Uponor PEX left the control of Defendants, it was defective in design and manufacture and unreasonably dangerous to Plaintiffs and the members of the Class who might reasonably be expected to use it in the plumbing systems in their homes and other structures.  These defects include, but are not limited to, the conditions described in this Second Amended Complaint.

115.     The Uponor PEX installed in the homes and structures of Plaintiffs and the other members of the Class was installed therein without any change in the condition of the Uponor PEX from its condition when it left the control of Defendants.

116.     Plaintiffs and the other members of the Class were persons who would be expected to use PEX as the potable water systems in their homes and other structures.

117.     The defects in the Uponor PEX used in the homes and other structures of Plaintiffs and the other members of the Class were a direct and proximate cause of the injuries and damages alleged herein sustained by Plaintiffs and the members of the Class.

## COUNT III - NEGLIGENCE
### (Plaintiffs, on behalf of themselves and all others similarly situated, Against All Defendants)

118.     Plaintiffs repeat and re-allege all prior and subsequent paragraphs and incorporate them as if repeated in full herein.

119.     Defendants owed Plaintiffs and the other members of the Class a duty to exercise reasonable and ordinary care in the testing, design, manufacture, distribution, advertising/marketing, and/or sale of the Uponor PEX.

120.     Defendants negligently, carelessly, tortiously, and/or wrongfully failed to use reasonable care in the testing, design, manufacture, distribution, advertising/marketing, and/or sale of the Uponor PEX in the homes and other structures owned by Plaintiffs and the other members of the Class.

121.     Defendants knew or should have known that owners of homes and other structures with Uponor PEX, including Plaintiffs and the other members of the Class, would be substantially damaged thereby, as alleged herein.

29

122.    The use of Uponor PEX has resulted in or will result in foreseeable damage as alleged herein which damages include costs to repair damages to the homes, businesses, and other structures of Plaintiffs and the Class caused by leaks.

123.    Defendants were under a duty to exercise ordinary care to avoid reasonably foreseeable injury to users and purchasers of homes and other structures, and knew or should have foreseen with reasonable certainty that purchasers and/or end users would suffer the damages set forth herein if Defendants failed to perform their duty to cause the Uponor PEX to be tested, designed, manufactured, distributed, advertised/marketed, and/or sold in a non-defective manner.

124.    Defendants failed and neglected to properly test, design, manufacture, distribute, advertise/market, and/or sell Uponor PEX in that each Defendant so negligently, carelessly and in an unworkmanlike manner performed the aforesaid work such that Uponor PEX was tested, designed, manufactured, distributed, advertised/marketed, and/or sold improperly, negligently, carelessly and/or in a defective and unworkmanlike manner.

125.    Plaintiffs and the other members of the Class are lay people and lack the knowledge, understanding, and ability to inspect their homes or other structures for Uponor PEX and understand whether the lines and components of the plumbing systems have any defects.  Plaintiffs and the other members of the Class lack the ability to test the Uponor PEX to know whether a defect exists.

126.    Defendants' negligence is a substantial factor in causing the damages as alleged herein.

127.    As a direct and proximate result of the conduct described herein, Plaintiffs and the members of the Class have suffered damages, including damages to property other than the Uponor PEX, in an amount precisely unknown, but believed to be within the jurisdiction of this Court as

alleged in this Second Amended Complaint and incorporated herein, and according to proof at trial.

128.    As a direct and proximate result of Defendants' negligence, carelessness, and breaches of their duty of reasonable and ordinary care, Plaintiffs and the Class have been caused to suffer losses and damages, including damage to their homes, businesses, and personal property due to leakage from the defective Uponor PEX, interruption of their businesses and home life, and other incidental and consequential expenses associated with the failure of Uponor PEX, all of which damages were foreseeable by Defendants.

## XI.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request, on behalf of themselves and members of the Class, that this Court:

A.    determine that the claims alleged herein may be maintained as a class action under Rule 23(a), (b)(1), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, and/or under Tennessee law, and issue an order certifying the Class as defined above and designating Plaintiffs' counsel as counsel for the Class;

B.    award all actual general, special, incidental, statutory, punitive, and/or consequential damages to which Plaintiffs and the other members of the Class are entitled and seek in this action;

C.    award pre-judgment and post-judgment interest on such monetary relief;

D.    award all costs of suit, costs of notice, forensic investigation and analysis costs, and fees of experts, including engineering, design, formulation, PEX, testing, and construction experts;

E.    award attorney fees and costs as provided for by any applicable statute or law; and

31

F.      grant such further and other relief that this Court deems appropriate. This relief may include, without limitation, any remediation, inspection, notice, and/or other necessary steps to be undertaken with respect to putative Class members and Class members.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the Class members, demand a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Andrew J. Pulliam*

Andrew J. Pulliam (Tenn. BPR No. 016863)
James C. Bradshaw III (Tenn. BPR No. 013170)
J. Graham Matherne (Tenn. BPR No. 011294)
Ann Weber Langley (Tenn. BPR No. 038070)
**WYATT, TARRANT & COMBS, LLP**
333 Commerce Street, Suite 1050
Nashville Tennessee 37201
Telephone: (615) 244-0020
Fax: (615) 256-1726

Email: apulliam@wyattfirm.com

Email: jbradshaw@wyattfirm.com

Email: gmatherne@wyattfirm.com

Email:  alangley@wyattfirm.com

*Attorneys for Plaintiffs and Class Representatives, on behalf of themselves and all others similarly situated*

## CERTIFICATE OF SERVICE

I hereby certify that on April ___, 2024, a true and correct copy of the foregoing was served

via the Court's ECF System on the following:

M. Andrew Pippenger, Esq.
PURYEAR LAW GROUP
735 Broad Street, Suite 214
Chattanooga, TN 37402

 

_____
Andrew J. Pulliam

101502628.4