**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **BRIAN CARRICO; KACIE CARRICO; DON GATLIN; and DORA GATLIN; individually and on behalf of all others similarly situated,**<br><br>        **Plaintiffs,**<br><br>**v.**<br><br>**UPONOR, INC.; UPONOR NORTH AMERICA, INC.; DOES 1 through 100, inclusive, whose true names are unknown,**<br><br>        **Defendants.** | **Case No. 3:23-CV-00497**<br><br>**District Judge Eli Richardson**<br><br>**Magistrate Judge Jeffrey S. Frensley** |

**DEFENDANT UPONOR, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION OR, ALTERNATIVELY, TO (1) DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT AND CLASS ALLEGATIONS; AND (2) STRIKE CLASS ALLEGATIONS**

Defendant, Uponor, Inc., ("Uponor") pursuant to Federal Rules of Civil Procedure 12(b)(6), 12(f), 23(c)(1)(A), and 23(d)(1)(D), along with the Federal Arbitration Act ("FAA"), submits this Memorandum in Support of its Motion to Compel Arbitration or, Alternatively to (1) Dismiss Plaintiffs' Second Amended Complaint and Class Allegations; and (2) Strike Class Allegations, and in support of same states as follows:

I.      **INTRODUCTION**

The Second Amended Complaint ("SAC") – the third bite at the apple for Plaintiffs Brian and Kacie Carrico as well as Don and Dora Gatlin (individually the "Carricos" and "Gatlins", together the "Plaintiffs") since they filed this putative class action in May 2023 – is dispositive confirmation that Plaintiffs have no legitimate basis for proceeding in this Court against any of the named Defendant entities they are pursuing in this matter, including the instant Movant Uponor. Specifically: (i) Plaintiffs' claims against Uponor must be compelled to binding arbitration on an

1

individual, non-class, basis pursuant to the applicable Uponor warranty covering the product at issue; and (ii) in the event the Court declines to compel arbitration, then dismissing the SAC and striking its class allegations are still legally required.

This putative class action allegedly concerns the design and manufacture of blue and red colored cross-linked polyethylene tubing ("PEX") purportedly installed as part of the potable water plumbing systems present in Plaintiffs' homes in Hendersonville, Tennessee (the "Properties"). Plaintiffs now have winnowed their asserted claims in this matter to strict liability and negligence claims against Uponor, on the professed grounds that it manufactured the PEX installed in the Properties' potable water plumbing systems, and that certain – but not all – of the installed PEX has purportedly experienced performance issues in the form of leaks. As explained below, Plaintiffs cannot legally proceed in this Court with even their now streamlined, yet just as speculative, theory of liability.

At the most basic level, Plaintiffs must individually arbitrate their claims against Uponor on a non-class basis in accordance with the written express limited warranty applicable to and governing the PEX purportedly manufactured/sold by Uponor and installed in the Properties (the "Warranty"). In substance, Plaintiffs seek relief because they apparently believe the Uponor PEX did not perform in the manner, or for the period of time, expected pursuant to the Uponor warranty. However, the applicable Uponor Warranty: (i) mandates arbitration of any and all claims between Uponor and Plaintiffs that cannot be informally resolved; and also (ii) prohibits Plaintiffs from maintaining any class action. (*See* concurrently filed Declaration of Stacey Beissel ("Beissel Decl.") ¶ 6 and Ex. 1).[1] Consistent with this Warranty, as well as the FAA and the case law

---

[1] Uponor has resubmitted the previously filed version of the Beissel Declaration, which was filed in support of Uponor's Motion to Dismiss the First Amended Complaint ("FAC"), and may be found at Docket Entry No. 24-2. The SAC does not contain any new allegations related to the requirement that Plaintiffs arbitrate the claims with Uponor, as they have now elected to simply omit their claim for breach of the implied warranty in a futile attempt to

2

applying it, Plaintiffs must arbitrate their claims on an individual basis and cannot maintain this, or any other putative, class action related to the PEX at issue in this Court. While Plaintiffs' SAC now strategically omits the claim for breach of implied warranty that was previously asserted— and highlighted by Uponor, in each of their prior pleadings, this tactical move does not override Plaintiffs prior admissions of privity of contract with Uponor with respect to the PEX, nor does it relieve Plaintiffs of the obligation to arbitrate their claims.

Should the Court decline to apply the plain language of the Warranty and compel this matter to arbitration, then the following alternative issues mandate the dismissal/striking of Plaintiffs' individual claims and class allegations at the pleading stage.

<u>First</u>, Plaintiffs' remaining claims should be dismissed because they are barred by Tennessee's economic loss rule ("**ELR**"), which forbids non-contract claims when, as here: (a) Plaintiffs seek recovery for economic losses purportedly resulting from damage to various parts of an integrated product – namely, their homes; and (b) there are no allegations of any personal injury resulting from the Uponor PEX. *See Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 489 (Tenn. 2009) (adopting *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 868-71 (1986)); *Tenn. Farmers Mut. Ins. Co. v. Ford Motor Co.*, No. W2001-00046-COA-R3-CV, 2002 Tenn. App. LEXIS 429, at *14-20 (Ct. App. June 17, 2002). Plaintiffs have now had no less than *three* opportunities to plead non-conclusory facts showing that they experienced personal injury, or damage to "other property" within the meaning of the ELR. What's more, Plaintiffs have had the benefit of Uponor's extensive briefing on the ELR issue, which clearly establishes that Plaintiffs' claims for property damage are not actionable in tort. Once again, however, Plaintiffs' tort claims exclusively seek to recovery purely economic losses

---

avoid arbitration. As set forth herein, that attempt fails as Plaintiffs are bound by their prior judicial admissions, and thus, the prior Beissel Declaration is equally operative against, and comprehensively applies to, the SAC as well.

172253007v3

(i.e., damage to their homes and associated repair costs). Because Plaintiffs have now abandoned their warranty claim, and they are instead only pursuing tort claims that seek legally prohibited relief, the ELR is fatal to the entire SAC and mandates the dismissal of this lawsuit.

Second, Plaintiffs' claims for strict liability and negligence must also be dismissed because the SAC still fails to plead facts establishing the essential element of causation. Specifically, Plaintiffs have failed to set forth any non-conclusory facts substantiating their speculative theory that the supposed color-coating process for the PEX (i) generally causes red and blue PEX to experience "microcracks" and "prematurely" degrade, and (ii) specifically caused the alleged leak(s) in Plaintiffs' Properties. In particular, Plaintiffs fail to plead any facts supporting their supposition that the alleged leak(s) in the PEX at the Properties were caused by the theorized color-coating process for the PEX, rather than by any of the obviously possible alternatives, such as: (i) faulty installation of the PEX by the person or entity who installed the homes' potable water plumbing system; (ii) improper disinfection of the PEX after installation but prior to being placed into service; or (iii) operational/maintenance deficiencies in other aspects of the Properties' potable water plumbing systems that may have subjected the PEX to conditions that adversely impacted its service life such as excessive system pressures.

Third, Plaintiffs' proposed class definition – "All persons or entities who own or owned homes, businesses, or other structures in Tennessee with Uponor PEX used as the lines and components of a potable water plumbing system where the Uponor PEX was produced between 2009 and 2021 who suffer damages or injuries from leaks from the Uponor PEX" – is overbroad, not ascertainable on its face, and should be stricken in its entirety, because: (i) the class includes property owners whose leaks were not actually caused by Uponor's alleged negligence or any purported defect in the PEX, and thus, identifying appropriate class members will necessitate

fact-specific and individualized mini-trials regarding the cause of each owner's supposed leaks and damages; and worse yet (ii) Uponor does not directly sell its PEX to property owners, nor is the presence of Uponor PEX in any structure readily ascertainable absent invasive destructive work – thus, there is no administratively feasible way to identify class members.

In sum, the Court should compel this action to arbitration or, in the alternative, dismiss the SAC and all claims and class allegations therein as to Uponor.

## II.    THE SAC'S ALLEGATIONS AGAINST UPONOR

Plaintiffs allegedly own homes located in Hendersonville, Tennessee that Hannah Custom Homes, LLC ("Hannah") built and substantially completed in June 2014 and February 2017. (SAC ¶¶ 2-3, 36-37). Plaintiffs allege that Uponor PEX was installed as part of their Properties' "potable water plumbing system" during the original construction process. (*Id.* ¶¶ 36-37). While Plaintiffs assert that the PEX in the Properties "has prematurely degraded and deteriorated" and "suffers from microcracking causing water leaks" from the PEX, they fail to describe how they arrived at that alleged conclusion or identify any facts otherwise substantiating their supposition. (*Id.* ¶ 38).

According to Plaintiffs, the PEX in the Properties experienced performance issues in 2019 and 2021, and unspecified "leaks" have occurred since then that have caused "substantial" – but unidentified – "damages" to the Properties. (*Id.* ¶ 39). Plaintiffs do not allege that they provided notice to any manufacturer, distributer, seller or installer, including any Uponor related entity or Hannah, of any performance issues or damages involving the PEX prior to filing this lawsuit.

Plaintiffs speculate that alleged water leaks in their home resulted from the process by which the color coating was purportedly applied to the PEX pipes. (*Id.* ¶¶ 40-47). Specifically, the SAC alleges that this process includes "an oxidizing step in which at least the outer surface of the base pipe is oxidized, through a coating step in which a pre-polymer system is applied to the

outer surface of the base pipe and through a curing step in which the pre-polymer is cured to form a layer of the pipe." (*Id.* ¶ 42 (citation omitted)). Plaintiffs further contend that Uponor uses a "furnace/flame treatment" to condition the outer coating of the piping to better allow the color pigment to adhere to the piping, and Plaintiffs assume – in conclusory fashion, and without citing any data, evidence, or other factual support any kind – that this process "destroys the antioxidants" on the outside of the tubing and causes the PEX to "prematurely become[] brittle and develop[] microcracks when the tubing is expanded during installation," which can purportedly lead to leaks and property damage. (*Id.* ¶¶ 43, 45).

While Plaintiffs further allege that: (i) an unspecified Uponor "sales catalog" states that Uponor's PEX was "the highest quality PEX tubing available, and that its cross-chemical bonding process gave it 'superior characteristics,'" (*id.* ¶ 31), and (ii) a link on Uponor's website states that its PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion", (*id.* ¶ 32), Plaintiffs do not allege that they, – their builder, or anyone else involved in the selection, purchase, installation, and/or construction of their homes' plumbing systems – actually saw or considered, much less relied upon, these purported statements.

In making the foregoing allegations, Plaintiffs omit the fact that the Uponor PEX allegedly in the Properties is subject to, and governed by, an express written Warranty that, among other things, contains the following mandatory arbitration provision covering any and all claims and disputes between Uponor and Plaintiffs as to the PEX:

**Warranty Claim Dispute Process:**

In the event claimant and Uponor are unable to resolve a claim through informal means, the parties shall submit the dispute to the American Arbitration Association or its successor (the "Association") for arbitration, and any arbitration proceedings shall be conducted before a single arbitrator in the Minneapolis, Minnesota metropolitan area. NOTWITHSTANDING THE FOREGOING, NEITHER THE CLAIMANT NOR UPONOR, INC. SHALL BE ENTITLED TO ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS, AND

6

NEITHER THE CLAIMANT NOR UPONOR SHALL BE ENTITLED TO JOIN OR CONSOLIDATE CLAIMS WITH ANY OTHER PARTIES IN ARBITRATION OR IN LITIGATION BY CLASS ACTION OR OTHERWISE.

(Beissel Decl., ¶ 6 and Ex. 1 at p. 2, "Warranty Claim Dispute Process"). The Warranty also expressly disclaims all other warranties, express and implied:

THIS LIMITED WARRANTY IS THE FULL EXTENT OF EXPRESS WARRANTIES PROVIDED BY UPONOR, AND UPONOR HEREBY DISCLAIMS ANY WARRANTY NOT EXPRESSLY PROVIDED HEREIN, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PRODUCTS COVERED HEREUNDER.

(*Id.* p. 2, "Miscellaneous").

Based on the allegations in the SAC, Plaintiffs assert three causes of action against Uponor for strict product liability (Count 1), strict product liability for design defect (Count 2), and negligence (Count 3). (SAC ¶¶ 101-128).

## III.    ARGUMENT REGARDING ARBITRATION

### A.    Legal Standard

Plaintiffs' pursuit of a class action in this Court fails for a myriad of reasons, beginning with the Warranty applicable to, and governing, the PEX allegedly installed in Plaintiffs' Properties. That is because the Warranty not only (1) mandates the arbitration of all claims between Plaintiffs and Uponor related to the PEX, but also (2) expressly prohibits Plaintiffs from serving as the representatives of, or otherwise maintaining, a class action.

Both the FAA and Tennessee law reflect a strong public policy supporting arbitration as a means of settling differences and thereby avoiding litigation, in accordance with ordinary contract principles. *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 497-99 (6th Cir. 2004); *see also Morgan Keegan & Co., Inc. v. Smythe*, 401 S.W.3d 595, 603 (Tenn. 2013) (describing arbitration agreements in private contracts as "now favored in Tennessee both by statute and existing

7

caselaw"). Thus, agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *Cooper*, 367 F.3d at 499. In particular, the FAA – which governs disputes involving interstate commerce and applies here since Plaintiff alleges Uponor, an Illinois corporation with its principal place of business in Minnesota sold plumbing products used in the Tennessee Properties (Compl. ¶¶ 2-3, 5, 18-19) – "leaves no place for the exercise of discretion" and "instead mandates that" courts "shall direct the parties to proceed to arbitration on issues as to which" an agreement to arbitrate exists. *KPMG LLP v. Cocchi*, 565 U.S. 18, 22 (2011).

As such, under the FAA, courts must determine: (1) whether a valid agreement to arbitrate exists and, if it does; (2) whether the agreement encompasses the dispute at issue. *Anderson v. Amazon.com, Inc.*, 478 F. Supp. 3d 683, 691 (M.D. Tenn. 2020). If the response is affirmative on both counts, then the FAA requires the court to enforce the arbitration agreement in accordance with its terms. *Id.* Consistent with these governing rules, the Court here must compel arbitration because a valid agreement to arbitrate exists covering Plaintiffs' claims in this action.

### B.      Plaintiffs Are Bound by the Warranty's Arbitration Provision

The Warranty binds Plaintiffs as "the owner[s] of the applicable real property" involved in this matter. (*See* Beissel Decl. ¶ 6 and Ex. 1 at p. 1). That includes the agreement to arbitrate contained in the Warranty. (*Id.*, at p. 2, "Warranty Claim Dispute Process"). All PEX sold by Uponor in the United States between October 15, 2012 and the completion of Plaintiffs' Properties in February 2017 and June 2014 is subject to and governed by the Warranty, including the PEX that was allegedly installed in Plaintiffs' Properties. (Beissel Decl. ¶ 6 and Ex. 1 at p. 1). During that same period of time, the Warranty was continuously published and publicly available on Uponor's website. (*Id.* ¶ 7); *see also Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 756 (N.D.

Cal. 2019) (buyers were charged with notice of, and bound by, limitations contained in a warranty that was publicly available on the defendant's website). Thus, Plaintiffs are legally and contractually bound by its terms, including its mandatory arbitration provision. *See Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003) ("non-signatories may be bound to an arbitration agreement under ordinary contract and agency principle," including under third-party beneficiary and assignment theories) (citing *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir.1990)).

<u>First</u>, Plaintiffs are beneficiaries of the Warranty since both Uponor and Hannah clearly understood and intended for the Warranty to transfer and inure to the benefit of Plaintiffs, as the purported owners of the subject home after its construction. Indeed, Plaintiffs have once-again judicially admitted in the SAC that they were persons and entities who would reasonably be expected to use, consume and/or be affected by Uponor's PEX. (SAC ¶¶ 103-105). By itself, this binding concession mandates a finding that Plaintiffs are beneficiaries of the Warranty and bound by its terms. *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000) ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them") (quoting *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir.1983)).

Moreover, the Warranty's plain language makes clear that it was intended to cover and govern homeowners who purchase real property from builders responsible for the initial installation of the PEX. Specifically, the Warranty contemplates and expressly provides that it may be transferred and assigned by the "original owner" of the real property to a new owner within 10 years after installation. (Beissel Decl. ¶ 6 and Ex. 1 at p. 2, "Transferability"). Consistent with that plain language, Uponor understands and intends that its Warranty will ultimately cover, and

inure to the benefit of, owners who acquire homes containing PEX from builders.  (*Id.* ¶¶ 8-12).

It also is axiomatic that builders, like Hannah, intend for the PEX Warranty to benefit subsequent

home purchasers/owners – indeed, this very business model is predicated on building and then

selling homes, together with all installed components and their corresponding warranties, such as

PEX pipes.  (SAC ¶¶ 103-105).  Under these circumstances, Plaintiffs are third-party beneficiaries

of the Warranty,[2] and Tennessee law is clear that "an arbitration provision in a contract is

enforceable against a third-party beneficiary who has filed a cause of action seeking to enforce a

contract." *Benton v. Vanderbilt Univ.*, 137 S.W.3d 614, 616 (Tenn. 2004) (an arbitration provision

in a contract is applicable to actions brought by a third-party beneficiary of the contract containing

the arbitration agreement); see also *Swift Enter., LLC v. Trunorth Warranty Plans of N. Am., LLC*,

2022 U.S. Dist. LEXIS 240986, at *24 (E.D. Tenn. Sept. 30, 2022) (compelling third-party

beneficiary to arbitrate because its claims could not "reasonably [be] construe[d] . . . as anything

other than an attempt to recover amounts allegedly owing under the terms of the warranties.").

Here, Plaintiffs' claims related to the PEX seek recovery for nothing more than the PEX's

supposed failure to perform as warranted.  Thus, holding Plaintiffs to the Warranty's arbitration

clause is manifestly appropriate and required under Tennessee law.

Second, in their first two iterations of the Complaint, Plaintiffs alleged claims for breach

of implied warranty which legally and factually required, and thus necessarily presumed,

---

[2] *Owner-Operator Indep. Drivers Ass'n v. Concord Efs*, 59 S.W.3d 63, 70 (Tenn. 2001) ("A third party is an intended third-party beneficiary of a contract, and thus is entitled to enforce the contract's terms, if (1) The parties to the contract have not otherwise agreed; (2) Recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties; and (3) The terms of the contract or the circumstances surrounding performance indicate that either: (a) the performance of the promise will satisfy an obligation or discharge a duty owed by the promisee to the beneficiary; or (b) the promisee intends to give the beneficiary the benefit of the promised performance.").

10

contractual privity between Plaintiffs and Uponor.  (Dkt. No. 1 at ¶¶ 86-90 and Dkt. No. 19 at ¶¶ 119-123).  *Americoach Tours, Inc. v. Detroit Diesel Corp.*, No. 04-2016 B/V, 2005 WL 2335369, at *8 (W.D. Tenn. Sept. 23, 2005) ("The Court has found no opinion in which a Tennessee court has held that in the absence of privity a plaintiff could bring a claim for breach of an implied warranty to recover only economic damages").  By asserting a claim requiring contractual privity, and by further asserting claims arising out of the contractual relationship, Plaintiffs must be deemed contractually bound by the Warranty applicable to the PEX.  *See Benton*, 137 S.W.3d at 618.

In a transparent gambit to disavow their prior judicial admissions and avoid arbitration, Plaintiffs have now filed a SAC which glaringly omits any claim for breach of implied warranty. But, Plaintiffs have not offered any explanation for this proposed change other than the obvious one – i.e., to circumvent arbitration under the Warranty.  While Plaintiffs now proclaim that they do not seek the repair and replacement remedies prescribed by the Warranty, (SAC ¶¶ 100), they nonetheless (i) fail to explain how or why they repeatedly asserted implied warranty claims that depend on privity of contract with respect to the Uponor PEX, and (ii) fail to identify any other applicable contract governing the Uponor PEX, other than the Warranty.  Because it is well-established that a plaintiff cannot negate its prior judicial admissions, nor avoid arbitration, simply by amending its pleading to 'clarify' the claims brought", or by "removing" allegations and "tweaking the wording" of a complaint, Plaintiffs' effort to do so here must fail.  *Ntch W.-Tenn, Inc. v. ZTE USA, Inc.,* No. 111 CV 01169JDBEGB, 2011 WL 13147425, at *2 (W.D. Tenn. Dec. 29, 2011); see also *see also Haynes v. Uponor, Inc.*, 2022 U.S. Dist. LEXIS 31877, at * 8 (N.D. Cal. Feb. 23, 2022) (finding that "plaintiffs judicially admitted to being subject to the PEX warranty" because (i) they "asserted claims for breach of implied warranty against defendants, and

such claims require a privity of contract," and (ii) the plaintiffs "failed to provide an explanation for removing their implied warranty claims in subsequent complaints, and therefore failed to remedy their judicial admissions.").[3]

Third, it is the regular practice of home builders to assign the warranties of products incorporated into newly constructed homes to the home purchasers – including product, material, and component warranties – as part of the completion of the delivery of the home from the builder to the buyer of the home. This is particularly the case where Hannah, as a custom builder, constructed the Properties for the express benefit of Plaintiffs. Accordingly, Plaintiffs are also bound by the Warranty as assignees of that document. *See, e.g., Martin v. Cavalry SPV I, LLC*, 2014 U.S. Dist. LEXIS 43293, at *22-23 (E.D. Ky. Mar. 31, 2014) ("despite the fact that Cavalry is a non-signatory to the original agreement, courts have allowed similar arbitration agreements to be enforced by or against a non-signatory when the non-signatory succeeded to the rights and obligations of the signatory assignor."); *Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671-72 (Tenn. 2013) ("Generally, contractual rights can be assigned" where an agreement contains no limitation on the rights of either party to assign the agreement).

---

[3] Other courts are in accord with these dispositive principles. *See, e.g., Valdiviezo v. Phelps Dodge Hidalgo Smelter, Inc.,* 995 F. Supp. 1060, 1065–66 (D. Ariz. 1997) (Plaintiff's "abandonment of her breach of contract claim"does not obviate the binding nature of a "judicial admission" unless there is a credible explanation for the change in the amendment or other pleading) (citing *Sicor Ltd. v. Cetus Corp.,* 51 F.3d 848 (9th Cir.1995); *American Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir.1988)); *Kilkenny v. L. Off. of Cushner & Garvey, L.L.P.,* No. 08-CV-588 KMK, 2012 WL 1638326, at *5 (S.D.N.Y. May 8, 2012) (collecting cases and stating that, "There is authority supporting the notion that a court may disregard amended pleadings when they directly contradict facts that have been alleged in prior pleadings."); *Rubinstein v. Keshet Inter Vivos Tr.,* No. 17-61019-CIV, 2018 WL 8899230, at *5 (S.D. Fla. Oct. 17, 2018) ("while courts must liberally construe and accept as true allegations of fact in a complaint, we need not accept factual claims, which run counter to facts of which the court can take judicial notice.") (cleaned up).

172253007v3

### C. The Warranty's Arbitration Provision Covers Plaintiffs' Claims

The Warranty's broad arbitration provision plainly covers and requires arbitration of Plaintiffs' claims in this action on an individual, not class, basis. In determining whether claims are covered by an arbitration clause, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Thus "where [a] contract contains an arbitration clause, there is a presumption of arbitrability in the sense that [an] order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986). Consistent with this law, the Court must find in the instant case that the Warranty covers Plaintiffs' claims, all of which exclusively arise out of and concern the performance of the PEX allegedly installed in the Properties.

Here, the Uponor Warranty provides that if Uponor and a property owner cannot informally resolve any dispute regarding an Uponor product (including PEX), then such dispute, or "any other claim or dispute between the parties in any way regarding the design, manufacture, sale, distribution or condition of any product, whether such claim or dispute is based on contract, warranty, tort or otherwise," are subject to arbitration, and the owner and Uponor "must arbitrate any and all claims which in any way relate to Uponor's products . . . whether based on contract, warranty, tort, or otherwise." (Beissel Decl. ¶ 6 and Ex. 1 at pp. 1-2 ). This broad language encompasses, and mandates, the arbitration of Plaintiffs' alleged claims against Uponor, all of which relate to the design, manufacture, condition, and performance of PEX allegedly sold by Uponor and installed in the Properties. That is particularly true where the Warranty provides an

172253007v3

owner's "exclusive remedies" with respect to products sold by Uponor that have allegedly 'failed" or are "defective." (*Id.* at p. 1). To that end, the Warranty's arbitration provision does not exclude any claims from its ambit, and the Warranty instead broadly governs "any claims arising from breach of contract, breach of warranty, tort, or any other claim arising from the sale or use of Uponor's products. (*Id.* at p. 2, "Miscellaneous"); *Anderson*, 478 F. Supp. 3d at 699 (reviewing whether an arbitration agreement encompasses a dispute by reading the terms of the agreement).

When presented with similar arbitration clauses, courts in the Sixth Circuit have compelled arbitration. *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004) (when faced with a broad arbitration clause, such as one covering any dispute arising out of an agreement, a court should follow the presumption of arbitration and resolve doubts in favor of arbitration). And, it is equally clear that compelling arbitration of Plaintiffs' claims on an individual, not class, basis is legally proper as well. *Williams v. Dearborn Motors 1, LLC*, No. 20-1351, 2021 WL 3854805, at \*5 (6th Cir. Aug. 30, 2021) (class action waivers contained within arbitration agreements are valid and enforceable) (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011)); *see also Am. Express v. Italian Colors Rest.*, 570 U.S. 228, 233-238 (2013). Accordingly, the Court must compel arbitration in this case.

## IV. ALTERNATIVE ARGUMENTS SUPPORTING MOTION TO DISMISS AND TO STRIKE

### A. The ELR Bars Plaintiff's Negligence and Strict Liability Claims

Dismissal of Plaintiffs' only remaining claims for negligence and strict liability is mandated by Tennessee's economic loss rule, which forbids tort claims that exclusively seek to

recover damages based upon a product allegedly failing to perform as expected, absent any actual damage to a person or property **other than** the supposedly defective product itself.

The economic loss doctrine "precludes recovery in tort when a product damages itself without causing personal injury or damage to other property." *See Lincoln*, 293 S.W.3d at 489-93 (adopting standard set forth in *East River*, 476 U.S. at 868-71 (1986)). In particular, "[u]nder *East River*, as followed by Tennessee courts, the lynchpin for defining the 'product itself' . . . is whether the item is part of an integrated package" that was "supplied" to the plaintiff "as a single unit." *Americoach*, 2005 U.S. Dist. LEXIS 40182, at *11. Consistent with this formulation of the rule, which multiple other courts throughout the country have adopted, "the 'product' is the product purchased by the plaintiff," *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 155-156 (Ind. 2005), and "the product" means "the finished product bargained for by the buyer rather than components furnished by a supplier." *Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F.2d 925, 928-930 (5th Cir. 1987) (economic loss rule barred tort claims against both a ship builder and the supplier of a defective steering system because the completed "vessels . . . must be considered 'the product' rather than the individual components that make up the vessels"); *see also King v. Hilton-Davis*, 855 F.2d 1047, 1051-1053 (3d Cir. 1988) ("one must look to the [end] product purchased by the plaintiff[,]" and there is "no principled basis for affording the purchaser of a defective product greater relief against the manufacturer of a component part that has rendered a product defective than against the manufacturer of the assembled defective product.")

In accordance with this reasoning, it is well-established that damage to another part of the integrated package is treated as damage to "the product itself" and cannot be recovered via a tort claim. *See, e.g.*, *Americoach Tours*, 2005 WL 2335369, at *3 (economic loss rule barred a plaintiff from seeking tort damages against manufacturer of electrical components installed in a bus that

was destroyed by a faulty heater because "the entire bus," which was "assembled . . . from component parts," was "the product itself[,]" and "all electrical or mechanical components of the heater were 'supplied . . . as part of an integrated package . . . properly regarded as a single unit.'"); *Tenn. Farmers Mut. Ins. Co.*, 2002 Tenn. App. LEXIS 429, at *14-20 (recognizing that "[w]hen the unit is damaged by a defective part, the result is economic loss" that cannot be recovered in tort, and holding that economic loss doctrine precluded recovery in tort for vehicle destroyed by defective component part because the entire vehicle "constituted 'the product itself'").

More specifically, in the construction defect context, the Sixth Circuit has applied the *East River* approach and held that: (1) a defective component or material installed in a structure constitutes only one part of an integrated product (namely, the structure itself); and therefore (2) a defective component or material does not cause damage to "other property" simply because it damages other portions of the structure. *See Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 850 (6th Cir. 2002) (holding under Kentucky's economic loss doctrine that the wood used in a nursing home was not the "product," and instead, the "entire nursing home" was the product for the purpose of the economic loss rule).[4]

Various other courts following *East River* have similarly held that the owner of a structure – including a **residential** structure – cannot maintain a tort claim against the supplier of an allegedly defective component that was installed during the construction process and subsequently caused damage to other parts of the same structure..[5]

---

[4] Kentucky's and Tennessee's economic loss rules are substantially identical. *Compare Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 738 (Ky. 2011) (adopting the *East River* holding regarding the applicability of the economic loss doctrine); *with Lincoln*, 293 S.W.3d at 489-93 (adopting same standard under Tennessee law).

[5] *See, e.g., Ass'n of Apt. Owners v. Venture 15, Inc.*, 115 Haw. 232, 285-297 (2007) (holding that economic loss rule barred condominium association's tort claim against subcontractor who

Here – in violation of this law – Plaintiffs assert claims for strict product liability, strict product liability for design defect, and negligence, against Uponor based on allegations that the Properties' plumbing systems were constructed using supposedly defective PEX which was installed in the Properties and purportedly caused damage to various other parts of the Properties. (SAC ¶¶ 53, 62, ¶¶ 102-128). However, as a matter of law, the Properties themselves constitute a single integrated product purchased by Plaintiffs, and thus, any damage to various aspects of the Properties **<u>cannot</u>** satisfy the "other property" exception to the economic loss rule. Try as they may, Plaintiffs cannot avoid that result, based upon nothing more than boilerplate and conclusory assertions that the Uponor PEX has caused damage to unspecified "property . . . other than the

---

manufactured property's concrete floor slabs where the slabs allegedly caused damage to floor tiling, walls, door jambs and windows); *Casa Clara Condo. Ass'n v. Charley Toppino & Sons*, 620 So. 2d 1244, 1247 (Fla. 1993) ("We refuse to hold that homeowners are not subject to the economic loss rule."); *Pugh v. Gen. Terrazzo Supplies, Inc.*, 243 S.W.3d 84, 90-95 and n. 9 (Tex. App. 2007) (dismissing claims against supplier of insulation that caused damage to other parts of home, and collecting cases supporting that result); *Higginbotham v. Dryvit Sys.*, 2003 U.S. Dist. LEXIS 4530, at *7-18 (M.D.N.C. Mar. 20, 2003) (dismissing tort claims against manufacturer of stucco system that caused damage to other portions of home, and collecting cases rejecting a homeowner exception to the economic loss rule); *Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors*, 659 A.2d 267, 271 (Me. 1995) ("Whether a product has injured only itself may, of course, be a difficult question to answer. We follow the approach taken by those courts when considering facts analogous to those before us, and look to the product purchased by the plaintiff, as opposed to the product sold by the defendant, to determine whether a product has injured only itself. The plaintiffs here purchased finished condominium units, not individual components of the units. Because the windows were integrated into the finished product purchased by the plaintiffs, the damages caused by any defects in the windows [to the structure] constituted damage only to the product itself, not damage to 'other property.' Plaintiffs' claim for economic damages . . . are properly addressable under a warranty theory." (citations omitted)); *Wash. Courte Condo. Ass'n-Four v. Wash.-Golf Corp.*, 150 Ill. App. 3d 681, 686-687 (1986) (economic loss rule barred tort claims for damages to insulation, walls, ceiling, floors, and electrical outlets resulting from supposedly defective windows and sliding glass doors); *Bay Breeze Condo. Ass'n v. Norco Windows*, 257 Wis. 2d 511, 527-528 (Ct. App. 2002) ("We hold that the economic loss doctrine applies to building construction defects when, as here, the defective product is a component part of an integrated structure or finished product" because "component parts that cause damage to an integrated product [such as a structure] [] result[] in only economic loss" – thus, "[a]lthough the condominium units may have suffered incidental damage as a result of the failed windows, this does not take a commercial dispute outside the economic loss doctrine.").

defective PEX itself," including to unidentified "property in their homes and other structures . . . ." (*Id.* ¶¶ 60-62, 66-67). A plaintiff cannot "skirt the economic loss rule with a single, conclusory allegation that it suffered 'personal and property damages as a result of [the defendant's] negligence[,]'" *Dana Ltd. v. Aon Consulting, Inc.*, 984 F. Supp. 2d 755, 767 (N.D. Ohio 2013), and that principle is dispositive here – especially where Plaintiffs have now failed, on three separate occasions, to plead any facts capable of overcoming the economic loss rule.

In sum, Plaintiffs' tort-based construction defect claims are precisely the type of claim the economic loss rule forbids because Plaintiffs do not allege any damage to "other property," nor any personal injury caused by the PEX. (SAC ¶¶ 53, 62 (listing various ways in which the PEX supposedly damaged other physical aspects of the Properties themselves)).

**B.  The Court Should Dismiss Plaintiffs' Claims for Strict Liability and Negligence Because They Fail to Adequately Plead Causation**

The Court should also dismiss Plaintiffs' claims for strict product liability, strict product liability for design defect, and negligence, as well as dismiss/strike the SAC's related class allegations, because Plaintiffs have failed to adequately plead causation in support of these claims. Causation is a necessary element in strict liability just as it is in a "negligence" claim. *Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 686, 704 (Tenn. 2011) (causation is an essential element of any products liability action); *Parsons v. Wilson Cnty.*, No. M201400521COAR3CV, 2015 WL 5178601, at *5 (Tenn. Ct. App. Sept. 3, 2015) (to prevail in a negligence action, plaintiff must establish causation in fact as well as proximate cause).

In disregard of this fundamental pleading requirement, the SAC impermissibly: (i) speculates that Uponor's supposed color-coating process generally causes the PEX to experience "microcracks" and "prematurely" degrade; and then (ii) baldly presumes that this alleged color-coating process specifically caused the PEX in Plaintiffs' Properties to leak. (SAC

¶¶ 38-47). The Court cannot credit Plaintiffs' speculative conclusions and unsupported theory of causation, even at the pleading stage. *Tilden v. Gen. Elec. Co.*, No. 3:11-CV-628, 2012 WL 1023617, at *5 (E.D. Tenn. Mar. 26, 2012) (dismissing complaint where there were no facts permitting the court to infer a causal connection between the alleged defect and the alleged injury).

This is particularly true because the Supreme Court has made clear that "[t]he plausibility standard . . . asks for more than a sheer possibility" of liability[,]" and "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Tilden*, 2012 WL 1023617, at *1. Indeed, courts within the Sixth Circuit agree that factual allegations that are merely consistent with a defendant's liability do not satisfy the pleading standard, "as mere consistency does not establish plausibility of entitlement to relief even if it supports the possibility of relief." *JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*, 615 F. Supp. 3d 750, 759 (M.D. Tenn. 2022).

Accordingly, Plaintiffs' bare speculation that Uponor's alleged color-coating process caused the alleged leak in their PEX is patently incapable of sustaining the SAC's strict liability and negligence claims, as Plaintiffs fail to even account for – let alone plead facts excluding – obvious alternative explanations for the purported leak, such as faulty installation of the PEX during the construction process, operational conditions beyond the design parameters of the PEX, as well as the mean/methods used to disinfect the PEX after installation and before being placed into service. *Maness v. Bos. Sci.*, 751 F. Supp. 2d 962, 969 (E.D. Tenn. 2010) (granting motion to dismiss and noting that the fact that plaintiff allegedly suffered an injury from the device does not show that the device was defective); *King v. Danek Med., Inc.*, 37 S.W.3d 429, 435 (Tenn. Ct. App. 2000) (recognizing that "the failure or malfunction of the device, without more, will not make

19

the defendant liable") (citing *Harwell v. Am. Med. Sys., Inc.*, 803 F.Supp. 1287, 1298 (M.D.Tenn.1992)); *Allen v. Am. Med. Sys., Inc.*, 1989 WL 105626 (Tenn. Ct. App. Sept. 15, 1989) (declining to find liability based upon the fact that the device did not function).

## C. Plaintiffs' Proposed Class is Overbroad and Not Ascertainable

Federal courts may dismiss or strike class allegations at the pleading stage, and the Sixth Circuit has expressly affirmed the propriety of doing so. *Pilgrim v. Univ. Health Card, LLC*, 660 F.3d 943, 946-950 (6th Cir. 2011) (affirming order striking class allegations where the plaintiffs "would need to make particularized showings" since "defendants' program did not operate" in a uniform way and "the plaintiffs suffered distinct injuries as a result."); *see also Tietsworth v. Sears, Roebuck and Co.*, 720 F. Supp. 2d 1123, 1145–46 (N.D. Cal. 2010) ("Under Rules 23(c)(1)(A) and 23(d)(1)(D), as well as pursuant to Rule 12(f), this Court has authority to strike class allegations prior to discovery if the complaint demonstrates that a class action cannot be maintained.").

In the present case, Plaintiffs' proposed class definition – "All persons or entities who own or owned homes, businesses, or other structures in Tennessee with Uponor PEX used as the lines and components of a potable water plumbing system where the Uponor PEX was produced between 2009 and 2021 who suffer damages or injuries from leaks from the Uponor PEX" – suffers from multiple defects that warrant striking the proposed class.

<u>First</u>, the class includes current and former property owners who have experienced leaks regardless of whether the leaks in their properties were actually caused by the negligence or other wrongdoing of Uponor – thus, on its face, it encompasses a significant number of owners who have no cognizable claim or injury traceable to Uponor. As a result, parsing out class members whose leaks can actually be attributed to alleged negligence by Uponor, or to any actionable defect in the PEX, will require fact-intensive, individualized inquiries. However, a "class definition must

be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class. If 'mini-trials' become necessary to determine who is in and who is out, the class-action vehicle imposes inefficiencies rather than ameliorates them." *Tarrify Props., LLC v. Cuyahoga Cnty.*, 37 F.4th 1101, 1106 (6th Cir. 2022) (quotations omitted).

Here, it is not possible to ascertain the members of any class or hypothetical sub-class without a deep-dive into the unique condition of each owner's PEX and property, as well as the nature of each owner's interactions, if any, with Uponor. Because the Court would have to engage in extensive, individualized mini-trials to arrive at a potentially valid class, the proposed class is not ascertainable, nor do common issues predominate over individual ones. Thus, striking the class is warranted. *See In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 88496, at *17-20 (N.D. Ga. June 8, 2017) (proposed class of current and former property owners who replaced allegedly defective shingles was not ascertainable, nor did common issues predominate, because "even if the Plaintiff could prove a uniform defect" in the shingles, "individual issues" would predominate because "there are numerous reasons a roof may fail" or why "a shingle may blister, crack, or suffer from granule loss," and thus, "the causation determination for most putative class members [would] involve individualized evidence."); *PB Prop. Mgmt. v. Goodman Mfg. Co.*, 2016 U.S. Dist. LEXIS 97520, at *61-70 (M.D. Fla. 2016) (class of all property owners in Florida with a leaking heating system that contained the defendant's evaporator coil was not ascertainable because "[t]he class must be limited to those individuals who suffered damages caused by" a specific defect in the coil, and it was "impossible to see how Plaintiffs can identify [such] class members in reference to objective criteria."); *City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 640-642 (S.D. Fla. 2010) (denying class

certification in action involving supposedly defective fuel containment pipes that leaked, because 'each class member will likely have encountered different installation, maintenance, and environmental conditions in using FlexPipie," and "there are 'no set of operative facts establishing liability and no single proximate cause [that] equally applies to each potential class member'" because "even if Plaintiffs were able to demonstrate that FlexPipie had a general defect, it would not assist Plaintiffs in meeting their burden of showing that the particular defect was the legal cause of each class member's harm."); *Colley v. P&G*, 2016 U.S. Dist. LEXIS 137725, at *24-25 (S.D. Ohio Oct. 4, 2016) (striking class where "[t]he only way to distinguish" injured and uninjured class members would be "individualized fact-finding").

Second, the presence of Uponor PEX in a structure's potable water plumbing system – which is typically concealed as part of the installation behind walls, ceilings and floors – is not readily known to or observable by property owners, especially where: (i) the PEX is not typically sold directly to property owners; rather it is acquired by builders or their contractors from third-party retailers, and then installed in structures which are later sold; and thus (ii) there are no reliable records or other methods for identifying properties with Uponor PEX installed other than conducting invasive/destructive work on a residence-by-residence basis. For these additional reasons, the proposed class is not ascertainable or administratively feasible. *See Adams Pointe I, L.P. v. True-Flex Metal Hose Corp.*, 2020 U.S. Dist. LEXIS 128055, at *18-25 (W.D. Pa. July 17, 2020) (class of property owners with defective pipes was not ascertainable because (i) the defendant sold pipes to retailers who then re-sold the pipes to installers, and (ii) it was not enough for "putative class members [to] look in their attic or basement" for the pipes, since "precedent caution[s] against the use of consumer affidavits"), *aff'd* 2021 U.S. App. LEXIS 24315 (3d Cir. Aug. 16, 2021); *Lee-Bolton v. Koopers Inc.*, 319 F.R.D. 346, 383 (N.D. Fla. 2017) (no

ascertainable class where it was necessary to individually test every home to determine if toxic dust exceeded standard levels); *In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 88496, at *8 (proposed class was not administratively feasible or ascertainable because the "Defendant usually did not sell the Shingles directly to homeowners" and "a large number of class members' Shingles [would] need to be individually examined to determine whether they are" the shingles implicated by the lawsuit).

## V.    **CONCLUSION**

For each of the foregoing reasons, the Court should: (i) grant Uponor's Motion, and (ii) enter an Order: either (a) compelling the parties to address any remaining viable claims of Plaintiffs through individual arbitration or (b) dismissing the SAC and dismissing Uponor from this action with prejudice

Dated:    June 13, 2024

By /s/ M. Andrew Pippenger
M. Andrew Pippenger, BPR 018183
PURYEAR LAW GROUP
104 Woodmont Boulevard
Woodmont Centre, Suite 201
Nashville, TN 37205
Tel: (615) 630-6601
Fax: (615) 630-6602
apippenger@puryearlawgroup.com

*Attorney for Defendant*
*Uponor, Inc.*

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that on June 13, 2024, the foregoing pleading was electronically filed with the Clerk of Court using the CM/ECF filing system which automatically sends email notifications of such filing to the following attorneys of record:

Andrew J. Pulliam (Tenn. BPR No. 016863)
James C. Bradshaw III (Tenn. BPR No. 013170)
J. Graham Matherne (Tenn. BPR No. 011294)
Ann Weber Langley (Tenn. BPR No. 038070)
WYATT, TARRANT & COMBS, LLP
333 Commerce Street, Suite 1050
Nashville Tennessee 37201
Telephone: (615) 244-0020
Fax: (615) 256-1726
Email: apulliam@wyattfirm.com
Email: jbradshaw@wyattfirm.com
Email: gmatherne@wyattfirm.com
Email: alangley@wyattfirm.com

*Attorneys for Plaintiffs*

　　　/s/ M. Andrew Pippenger　　
M. Andrew Pippenger