**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **BRIAN CARRICO; KACIE CARRICO; DON GATLIN; and DORA GATLIN; individually and on behalf of all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UPONOR, INC.; UPONOR NORTH AMERICA, INC.; DOES 1 through 100, inclusive, whose true names are unknown,**<br><br>**Defendants.** | **Case No. 3:23-CV-00497**<br><br>**District Judge Eli Richardson**<br><br>**Magistrate Judge Jeffrey S. Frensley** |

**SPECIALLY APPEARING DEFENDANT UPONOR NORTH AMERICA, INC.'S**
**MEMORANDUM IN SUPPORT OF ITS DISMISSAL MOTION**

Specially appearing Defendant, Uponor North America, Inc. ("UNA") submits this Memorandum in Support of its Motion to Dismiss for Lack of Personal Jurisdiction or, Alternatively to (1) Compel Arbitration; (2) Dismiss Plaintiffs' Second Amended Complaint and Class Allegations; and (3) Strike Class Allegations.

## I.    INTRODUCTION

The Second Amended Complaint ("SAC") submitted on behalf of Plaintiffs Brian  and Kacie Carrico as well as Don  and Dora Gatlin (individually the "Carricos" and "Gatlins", together, "Plaintiffs"), representing yet a *third* attempt to advance claims against UNA following their abandonment of the original and First Amended Complaint, lays bare and confirms they have no legitimate basis for proceeding against UNA – an out-of-state holding company without any relevant forum contacts in Tennessee.  Plaintiffs assert three causes of action against UNA related to the design and manufacture of blue and red colored cross-linked polyethylene tubing ("PEX") allegedly installed as part of the potable water plumbing system in two properties located in

1

Hendersonville, Tennessee (the "Properties"). Plaintiffs, without factual foundation, assert UNA designed, manufactured, marketed/advertised, sold and/or distributed PEX, and the PEX thereafter prematurely degraded and deteriorated, causing water damage to the Properties. However, the truth is UNA is simply a holding company incorporated in Delaware and headquartered in Minnesota which (i) does not have contacts with Tennessee generally, and which (ii) did not design, manufacture, market, advertise, sell, or distribute the PEX allegedly at issue in this lawsuit. (*See* concurrently filed Declaration of John R. Schleiter ("Schleiter Decl.") ¶¶ 3-11).[1] As such, this Court does not have personal jurisdiction over UNA.

Alternatively, should the Court decline to dismiss the SAC as to UNA for lack of personal jurisdiction, it should either compel arbitration or dismiss/strike Plaintiffs' individual and class allegations. With regard to these alternative grounds, Plaintiffs are required--pursuant to the written warranty applicable to the PEX products at issue--to individually arbitrate any claims involving the PEX (the "Warranty"). (*See* Dkt. Nos. 10-2, 24-2, 67-2 for the concurrently filed Declaration of Stacey Beissel, ("Beissel Decl.") ¶ 6 and Ex. 1). Consistent with this Warranty, as well as the FAA and the case law applying it, Plaintiffs cannot maintain this or any other putative class action related to the PEX in this Court.

Finally, should the Court decline to dismiss this matter on jurisdictional grounds or compel this matter to arbitration, then the following issues mandate the dismissal/striking of Plaintiffs' individual claims and class allegations: First, Plaintiffs' tort claims for strict liability and negligence are barred by Tennessee's economic loss rule ("ELR") because Plaintiffs only seek recovery for economic losses purportedly resulting from damage to various parts of an integrated

---

[1] UNA has re-submitted the version of the Schleiter Declaration which was previously filed in support of UNA's Motion to Dismiss the First Amended Complaint ("FAC"), and may be found at Docket Entry No. 25-3. The SAC does not contain any new jurisdictional allegations against UNA, and thus, the prior Schleiter Declaration is equally operative against, and comprehensively refutes, the SAC as well.

172439764v3

product – namely, their homes.  Second, Plaintiffs' claims for strict liability and negligence also must be dismissed because the SAC fails to plead facts establishing the essential element of causation.  Plaintiffs have failed to set forth any non-conclusory facts substantiating their speculative theory that the supposed color-coating process for the PEX: (i) generally causes the PEX to experience "microcracks" and "prematurely" degrade, and (ii) specifically caused the claimed leak(s) in the  Properties.  In particular, the SAC is devoid of any facts supporting Plaintiffs' supposition that the alleged leak(s) in the Properties were caused by the theorized color-coating process.  Finally, Plaintiffs' proposed class is overbroad, not ascertainable on its face, and should be stricken.

## II.    FACTUAL BACKGROUND

### A.    UNA is an Out-of-State Holding Company Lacking Tennessee Contacts

UNA is an out-of-state holding company without Tennessee contacts in general, much less related to Plaintiffs' allegations in this action.  (Schleiter Decl. ¶¶ 3-11).  Specifically: (i) UNA is incorporated in Delaware and headquartered in Minnesota; (ii) UNA does not manufacture, sell, or provide a warranty for, any products; (iii) UNA does not design, install, manufacture, construct, assemble, inspect, distribute, supply, ship, or sell PEX, or any other products, directly or indirectly in and/or into Tennessee; (iv) UNA is not authorized, licensed, qualified, registered, or chartered to transact any business in Tennessee.  UNA does not transact business in Tennessee, and it has never paid taxes to the State of Tennessee; (v) UNA does not have offices, employees or bank accounts in Tennessee, and UNA has never employed any agents to solicit business, sell, or manufacture products in Tennessee; (vi) UNA has never had any place of business in Tennessee and has never established, or sought to establish, a physical presence in Tennessee; (vii) UNA has no assets in Tennessee, has never owned, leased or possessed any real estate in Tennessee, and has never maintained a post office box, mailing address, telephone listing or bank account in

Tennessee; (viii) UNA is a separate and distinct corporation from Co-Defendant Uponor, Inc. ("UI"), the latter of which is a company that distributes and/or sells certain PEX products in the United States; (ix) UNA does not own the assets or property of UI; (x) Officers and employees of UI are responsible for its day-to-day operations, and UNA does not make corporate decisions for UI; (xi) there are separate books and records maintained for UNA and UI; and (xii) UNA did not design, manufacture, construct, assemble, inspect, distribute, supply, sell, or warrant the PEX allegedly installed in the Properties giving rise to this lawsuit, *i.e.*, Plaintiffs' properties located in Hendersonville, Tennessee. (Schleiter Decl. ¶¶ 4-11).

### B. The SAC's Allegations Against UNA

Plaintiffs allegedly own homes in Hendersonville, Tennessee that Hannah Custom Homes, LLC ("Hannah") built and substantially completed in June 2014 and February 2017. (SAC ¶¶ 2-3, 36-37). Plaintiffs allege PEX was installed as part of their Properties' "potable water plumbing system" during original construction. (*Id.* ¶¶ 36-37). Plaintiffs assert that PEX in the Properties "has prematurely degraded and deteriorated" and "suffers from microcracking causing water leaks" from the PEX. (*Id.* ¶ 38). According to Plaintiffs, the PEX in the Properties experienced performance issues in 2019 and 2021, followed by unspecified "leaks" which have occurred since then and caused "substantial" – but unidentified – "damages" to the Properties. (*Id.* ¶ 39).

Plaintiffs speculate that the referenced leaks in their home resulted from the process by which the color coating was purportedly applied to the PEX pipes. (*Id.* ¶¶ 40-47 ). Specifically, the SAC alleges that this process includes "an oxidizing step in which at least the outer surface of the base pipe is oxidized, through a coating step in which a pre-polymer system is applied to the outer surface of the base pipe and through a curing step in which the pre-polymer is cured to form a layer of the pipe." (*Id.* ¶ 42). Plaintiffs contend UNA uses a "furnace/flame treatment" to

4

condition the outer coating of the piping to better allow the color pigment to adhere to the piping, and Plaintiffs assume – in conclusory fashion, and without citing data, evidence, or other factual support – that this process "destroys the antioxidants" on the outside of the tubing and causes the PEX to "prematurely become[] brittle and develop[] microcracks when the tubing is expanded during installation," which can purportedly lead to leaks and property damage. (*Id.* ¶¶ 43, 45).

In making the foregoing allegations, Plaintiffs tactically omit the fact that the PEX allegedly installed in the Properties is subject to, and governed by, an express written Warranty that, among other things, contains the following mandatory arbitration provision covering any and all claims and disputes relating to the PEX:

**Warranty Claim Dispute Process:**

In the event claimant and Uponor are unable to resolve a claim through informal means, the parties shall submit the dispute to the American Arbitration Association or its successor (the "Association") for arbitration, and any arbitration proceedings shall be conducted before a single arbitrator in the Minneapolis, Minnesota metropolitan area. NOTWITHSTANDING THE FOREGOING, NEITHER THE CLAIMANT NOR UPONOR, INC. SHALL BE ENTITLED TO ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS, AND NEITHER THE CLAIMANT NOR UPONOR SHALL BE ENTITLED TO JOIN OR CONSOLIDATE CLAIMS WITH ANY OTHER PARTIES IN ARBITRATION OR IN LITIGATION BY CLASS ACTION OR OTHERWISE.

(Dkt. Nos. 10-2, 24-2, 67-2, Beissel Decl., ¶ 6 and Ex. 1 at p. 2, "Warranty Claim Dispute Process"). The Warranty also expressly disclaims all other warranties, express and implied:

THIS LIMITED WARRANTY IS THE FULL EXTENT OF EXPRESS WARRANTIES PROVIDED BY UPONOR, AND UPONOR HEREBY DISCLAIMS ANY WARRANTY NOT EXPRESSLY PROVIDED HEREIN, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PRODUCTS COVERED HEREUNDER.

(*Id.* p. 2, "Miscellaneous").

5

Based on the allegations in the SAC, Plaintiffs assert four causes of action for strict product liability (Count 1), strict product liability for design defect (Count 2), , and negligence (Count 3). (*Id.* ¶¶ 101-128).

## III. ARGUMENT REGARDING PERSONAL JURISDICTION

### A. Legal Standard

Personal jurisdiction exists if the defendant is amenable to service of process under the forum state's long-arm statute and if the exercise of personal jurisdiction would not deny the defendant due process. *Air Prod. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 550 (6th Cir. 2007) (citation omitted). Tennessee's long-arm statute is "'coterminous with the limits on personal jurisdiction imposed' by the Due Process Clause of the United States Constitution and thus, 'the jurisdictional limits of Tennessee law and of federal constitutional law of due process are identical.'" *Intera Corp. v. Henderson*, 428 F.3d 605, 616 (6th Cir. 2005) (citation omitted). "The plaintiff bears the burden of making a prima facie showing of the court's personal jurisdiction over the defendant." *Id.* at 615. But, "in the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). Personal jurisdiction can be general or specific. *Third Nat'l Bank v. Wedge Grp., Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989). "General jurisdiction exists when a defendant's "contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state." *Intera*, 428 F.3d at 615 (citation omitted). Specific personal jurisdiction is claim-specific and may be established only where the cause of action arises from the defendant's contacts with the forum state. *Id.* Both forms of personal jurisdiction are lacking here.

## B. The Court Does Not Have General Jurisdiction Over UNA

"[O]nly a limited set of affiliations with a forum will render a defendant amenable to all-purpose [general] jurisdiction[,]" and "the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction" over a corporation. *Daimler AG v. Bauman,* 571 U.S. 117, 137 (2014). If neither paradigm situation is present, a corporation is subject to general jurisdiction only in an "exceptional" case in which its "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Id.* at 138-139 & n. 19. Courts in the Sixth Circuit closely follow and rigorously enforce this exacting standard. *Glob. Force Ent., Inc. v. Anthem Sports & Ent. Corp.*, 385 F. Supp. 3d 576, 582 (M.D. Tenn. 2019); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018).

Here, there is no conceivable basis for finding that UNA is subject to general jurisdiction in Tennessee because: (i) UNA is incorporated in Delaware, not Tennessee; (ii) UNA is headquartered in Minnesota, not Tennessee; (iii) UNA does not manufacture, sell, or provide a warranty for, any products; (iv) UNA does not design, install, manufacture, construct, assemble, inspect, distribute, supply, ship, or sell the PEX, or any other products, directly or indirectly in and/or into Tennessee; (v) UNA does not transact business in Tennessee, and UNA is not authorized, licensed, qualified, registered, or chartered to do so; (vi) UNA does not have offices, employees, bank accounts, assets, a mailing address, or any physical presence in Tennessee; (vii) UNA does not employ any agents to do business in Tennessee; (viii) to the extent UI distributes and/or sells any type of PEX, UNA is a separate and distinct company from UI; and (ix) UNA does not own the assets or property of UI (*i.e.*, the entity that actually sells/distributes PEX products in Tennessee), and UI's own officers and employees are responsible for its day-to-day operations and corporate decision making. (*See* Schleiter Decl., ¶¶ 3-11).

7

Under these circumstances, this is not a "paradigm" case of general jurisdiction, nor is it an "exceptional" case in which UNA is "essentially at home" in Tennessee due to extensive and continuous contacts with this State. *Daimler AG*, 571 U.S. at 136-139 (Daimler was not subject to general jurisdiction in California based on its manufacture of vehicles abroad that were subsequently distributed in the state via its American subsidiary, where neither Daimler, nor its subsidiary, were incorporated in California or had its principal place of business in the state); *see also Glob. Force Ent.*, 385 F. Supp. 3d at 582-585.

## C.     The Court Does Not Have Specific Jurisdiction Over UNA

In contrast to general jurisdiction, specific jurisdiction is a defendant-focused inquiry, with an emphasis on the relationship among the defendant, the forum, and the litigation. *Fortis Corporate Ins. v. Viken Ship Mgmt.*, 450 F.3d 214, 218 (6th Cir. 2006). To establish specific jurisdiction, a plaintiff must satisfy a three-part test in the Sixth Circuit: (1) the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state; (2) the cause of action must arise from the defendant's activities there; and (3) the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *S. Mach. Co. v. Mohasco Indus., Inc*., 401 F.2d 374, 381 (6th Cir. 1968). However, the Supreme Court has made clear that a "plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 571 U.S. 277, 285-286 (2014).

The factors required for specific jurisdiction are clearly missing here. First, as established by the concurrently filed Schleiter Declaration, UNA has not "purposefully availed itself" of the benefits of doing business in Tennessee, in any way, shape or form. To the contrary, UNA: (i) is not licensed to conduct business in Tennessee; (ii) does not directly or indirectly conduct business

in Tennessee; and (iii) does not maintain any offices, employees, bank accounts, mailing addresses, or any physical presence in Tennessee. (Schleiter Decl., ¶¶ 6-9). These undeniable facts are legally irreconcilable with a finding of purposeful availment. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985) (a defendant only purposefully avails itself of a forum state by "deliberately" engaging in "significant" activities in that state, or by creating "continuing obligations" between itself and forum residents); *MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 901 (6th Cir. 2017) (plaintiffs must do more than claim a defendant's actions affected them in the forum).

Second, Plaintiffs' allegations against UNA lack any conceivable nexus to UNA's non-existent contacts with Tennessee. UNA does not design, manufacture, sell, or distribute the PEX or other products at all, much less the specific PEX purportedly installed at the Properties. (Schleiter Decl., ¶¶ 6, 11). In addition, UNA does not own the property or assets of UI or control UI's operations and decision making. (*Id.* ¶ 10). Thus, "[w]hat is needed – and what is missing here – is a connection between the forum and the specific claims at issue" directed against UNA by Plaintiffs. *Bristol-Myers Squibb Co. v. Super. Ct.*, 582 U.S. 255, 265 (2017).

Third, given the absence of "minimum contacts" capable of justifying the exercise of specific jurisdiction here, it would be manifestly unreasonable and inconsistent with substantial justice to subject UNA to litigation in this forum. Plaintiffs have no legitimate interest in pursuing any causes of action against an entity that did not design, manufacture, install, assemble, inspect, distribute, supply, or sell the PEX allegedly installed as part of the Properties. (Schleiter Decl., ¶ 11). Accordingly, this factor also militates against specific jurisdiction. *Glob. Force Ent.*, 385 F. Supp. 3d at 582-585; *Chapman v. Lawson*, 89 F. Supp. 3d 959, 968 (S.D. Ohio 2015) (same).

172439764v3

### D.    Plaintiffs' Other Alleged Theories of Personal Jurisdiction Also Fail

Apparently recognizing that UNA itself does not have any relevant forum contacts capable of supporting personal jurisdiction, Plaintiffs assert--for the first time in the SAC--that: (i) UNA has consented to personal jurisdiction because it did not raise jurisdictional challenges in certain **other matters** in Tennessee and other forums; and (ii) UNA is supposedly part of a "single enterprise" with UC and UI, and the forum contacts of any "enterprise" member should allegedly be imputed to UNA as well.  (SAC ¶¶ 22 and 12-20, 23-24).  Neither theory withstands scrutiny.

To begin, it is well recognized that a defendant <u>does not</u> forfeit its ability to contest personal jurisdiction in a case by foregoing a jurisdictional challenge **in a previous lawsuit**.  To the contrary, "there is nothing inherently contradictory" about challenging jurisdiction "in one case and not another," and "[t]hat is especially true in light of the well-settled principle that a defendant can consent to personal jurisdiction in a particular lawsuit" without impairing that same defense in future cases.  *Eight Mile Style, LLC v. Spotify USA Inc.*, No. 3:19-CV-0736, 2020 WL 1640425, at *4 (M.D. Tenn. Apr. 2, 2020).  <u>Thus, "[a] party's consent to jurisdiction in one case [] extends to that case alone.  It in no way opens that party up to other lawsuits in the same jurisdiction,"</u> <u>much less in a different forum</u>.  *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 50 n. 5 (2d Cir. 1991) (emphasis added).[2]  Accordingly, Plaintiffs' "consent" theory of personal jurisdiction is patently untenable and ignores well-established federal law.[3]

---

[2] *See also Lynch v. Olympus Am., Inc.*, Civil Action No. 18-cv-00512-NYW, 2018 U.S. Dist. LEXIS 185595, at *11-12 (D. Colo. Oct. 30, 2018); *In re Atrium Med. Corp. C-Qur Mesh Prods. Liab. Litig. Mdl No. 2753*, 299 F. Supp. 3d 324, 330 n. 1 (D.N.H. 2017); *Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 13, 37 n.10 (D.D.C. 2014).

[3] In a similar vein, Plaintiffs cite two inapposite cases regarding personal jurisdiction over <u>UC</u> in Minnesota and Nevada.  (SAC ¶ 19).  But, on their face, those cases have nothing to do with the propriety of exercising jurisdiction over a <u>different</u> entity (<u>UNA</u>) in a <u>different</u> forum (<u>Tennessee</u>).  Specifically, in *George v. Uponor Corp.*, 988 F. Supp. 2d 1056, 1067 (D. Minn. 2013), the district

Equally baseless is Plaintiffs' "single enterprise" theory that seeks to lump UC, UI, and UNA together and impute each entity's forum contacts to the others. As a threshold matter, "the Sixth Circuit and the Tennessee Supreme Court have never explicitly adopted" a "single enterprise theory" of personal jurisdiction, *Hilani v. Greek Orthodox Archdiocese of Am.*, 863 F. Supp. 3d 711, 720 (W.D. Tenn. 2012), and other federal courts addressing the issue have rejected this expansive approach to jurisdiction. *Iconlab Inc. v. Valeant Pharm. Int'l Inc.*, No. 8:16-cv-01321-JLS-KES, 2017 U.S. Dist. LEXIS 222574, at *18-19 (C.D. Cal. Apr. 25, 2017) (rejecting "exotic theories of imputing contacts" such as "single enterprise"), *aff'd* 828 Fed. App'x 363 (9th Cir. 2020).

Moreover, to the extent Plaintiffs' "single enterprise" theory is a stealth invocation of the "alter ego" doctrine, it also fails. "Parent and subsidiary corporations are presumed to be separate

---

court did not make any finding with respect to UNA, and instead—applying law that is not binding or applicable under the facts and circumstances involved here, concluded only that UI's forum contacts in Minnesota could be imputed to UC because UI's location in Minnesota purportedly served as UC's base of operations in the United States. Then, in a subsequent order, the district court clarified that its ruling **was Minnesota-specific**, and that "[f]inding personal jurisdiction over Uponor Corp. in Minnesota . . . [would] not broadly expose [it] to jurisdiction in any state where [UI] conducts business." *George v. Uponor Corp.*, 988 F. Supp. 2d 1056, 1079 (D. Minn. 2014). Likewise, in *Slaughter v. Uponor, Inc.*, No. 2:08-CV-1223-RCJ-GWF, 2009 WL 10693807, at *4-6 (D. Nev. Nov. 19, 2009), the district court did not make any ruling with respect to UNA at all, and instead, almost 15 years ago, **under now superseded law**, exclusively focused on whether UC was subject to jurisdiction in Nevada based on its relationship with UI. However, in doing so, the district court expressly relied upon the Ninth Circuit's agency test which the Supreme Court **subsequently overruled and discredited in** *Daimler*. *Id.* Even more compelling--after *Slaughter*--the Nevada Supreme Court in denying the presence of personal jurisdiction over UC in Nevada, held it was **legally improper for a trial court to exercise jurisdiction over UC based on its subsidiary's forum contacts** without evidence showing that UC "has moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's day-to-day operations in carrying out that policy." *Uponor Corp. v. Eighth Judicial Dist. Ct.*, 130 Nev. 1257 (2014). Accordingly, the foregoing cases lend no support to Plaintiffs' jurisdictional assertions here and, in fact, the holding of the Neveda Supreme Court in *Uponor Corp. v. Eighth Judicial Dist. Ct.*, makes clear that there is no basis to extend jurisdiction over UNA in the present case.

11

and distinct legal entities. Thus, jurisdiction over a parent corporation does not automatically establish jurisdiction over a subsidiary corporation. Likewise, jurisdiction over a subsidiary corporation does not automatically establish jurisdiction over a parent corporation. Each corporation's contacts with the forum state must be assessed individually[,]" and Tennessee "courts are reluctant to disregard the separate existence of related corporations" and "have consistently given substantial weight to a presumption of corporate separateness." *Gordon v. Greenview Hosp., Inc.*, 300 S.W. 635, 651 (Tenn. 2009) (citations omitted). To that end, "the presumption of corporate separateness" can only be "overcome by demonstrating that the parent corporation 'exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.'" *Id.* at 653; *see also Univ. of the South v. South Univ., LLC*, 2009 U.S. Dist. LEXIS 146729, at *8 (E.D. Tenn. Nov. 20, 2009) ("personal jurisdiction [over] a subsidiary does not lead to automatic personal jurisdiction [over] a parent corporation unless there is evidence that the parent acts as an alter ego of the subsidiary."). "Total ownership and shared management personnel alone are insufficient to establish" an alter ego relationship; instead, the parent must exercise "pervasive control over the subsidiary . . . from broad policy decisions to routine matters of day-to-day operation." *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 848-849 (6th Cir. 2017) (citation and quotation omitted). Here, the SAC is devoid of any well-pleaded facts supporting such an alter ego relationship involving UNA. Specifically:

a) Plaintiffs purport to quote from cherry-picked hearsay portions of UC's Annual Review Report, which allegedly refer to UC and its related entities using the collective term "Uponor Group" and also allude to certain "Uponor-wide" operations, strategies, divisions, and limited areas of overlapping management or personnel. (SAC ¶¶ 13-17). But, UC is incorporated

12

and headquartered in <u>Finland</u>, (*id.* ¶ 7), and the SAC does not allege that <u>UC</u> itself has any Tennessee contacts that can or should be imputed to UNA under an alter ego theory.  Furthermore, federal courts have repeatedly rejected attempts to establish an alter ego relationship based on SEC filings, press releases, shared websites, or other similar materials that colloquially refer to various entities as a single unified company for marketing purposes or convenience.  *Doe v. Unocal*, 248 F.3d 915, 928 (9th Cir. 2011) ("references in the parent's annual report to subsidiaries or chains of subsidiaries as divisions of the parent company do not establish the existence of an alter ego relationship").[4]

---

[4] *See, e.g.*, *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998) (statements in annual report referring to "our global operations" and "the company as a whole" did not "show[] the pervasive control over the subsidiary" required for an alter ego finding); *Pitt v. Metro. Tower Life Ins. Co.*, No. 18-cv-06609-YGR, 2020 U.S. Dist. LEXIS 58352, at *11-12, 17-18 (N.D. Cal. Apr. 1, 2020) (rejecting alleged alter ego relationship and explaining that: (i) "the fact that MLI publicly represented itself as 'Metlife,' 'we,' or 'our' [is not] inherently suspect" because "entities present[ing] themselves as 'one integrated company' for marketing purposes does not, on its own, establish that companies are alter egos"; and (ii) "filings with state governments and agencies" that do not "indicat[e] [a parent's] control over day-to-day operations" are insufficient); *Sivilli v. Wright-Med. Tech., Inc.*, 2019 U.S. Dist. LEXIS 105416, at *12-13 (S.D. Cal. June 24, 2019) (rejecting alter ego theory based on SEC filings, and collecting cases holding that "corporate entities presenting themselves as one online does not rise to the level of unity of interests required to show companies are alter egos," and "consolidating the activities of a subsidiary into the [parent company's] reports is a common business practice" that does not create an alter ego relationship); *MacQueen v. Union Carbide Corp.*, Civil Action No. 13-831-SLR-CJB, 2014 U.S. Dist. LEXIS 167609, at *26 (D. Del. Dec. 3, 2014) ("a parent corporation [] in some way consolidating by description its subsidiary's efforts and its own [] is not atypical, and certainly does not suggest that, via fraud or its equivalent, the parent corporation has become indistinguishable from the subsidiary."); *Roberts v. Wells Fargo Bank, N.A.*, No. 4:12-cv-200, 2013 U.S. Dist. LEXIS 44545, at *18 (S.D. Ga. Mar. 27, 2013) ("While Assurant's use of the personal pronouns 'we' and 'our' in their annual report and Form 10-K superficially seems to indicate the company's involvement in lender-placed insurance, that description alone is not dispositive.  [Assurant] is a mere holding company, a corporation designed only to own other corporations and profit from that ownership. Isolated references to 'we' and 'ours' in public disclosures simply do not rebut that."); *Hickory Travel Sys. v. Tui Ag*, 213 F.R.D. 547, 554 (N.D. Cal. 2003) ("The crux of Plaintiff's alter ego argument is based on the facts that TUI AG wholly owns its subsidiaries, refers to them as divisions and not separate companies, reports their earnings in annual statements, boasts of corporate integration, and has made decisions about restructuring the businesses of some of those

13

b)     It is similarly irrelevant that UC or UNA may be involved in the management of UI at a macro-level, or that the entities may have certain overlapping personnel.  (SAC ¶¶ 13, 23). *See, e.g.*, *Gordon*, 300 S.W.3d at 651-652 ("A parent corporation's general involvement with the subsidiary corporation's performance, finance and budget decisions, and general policies and procedures does not provide a basis for attributing one corporation's contacts with the forum to the other for the purposes of personal jurisdiction.")  Even assuming, *arguendo*, that is the case, no alter ego finding is legally possible because "[a] parent corporation's general involvement with the subsidiary corporation's performance, finance and budget decisions, and general policies and procedures does not provide a basis for attributing one corporation's contacts with the forum to the other for the purpose of personal jurisdiction."  Accordingly, no alter ego finding is possible. *Hilani*, 863 F. Supp. 2d at 720-722 (no alter ego finding where "Plaintiff has[d] not proven that [parent] [wa]s a sham or dummy corporation" or that the parent "ha[d] complete control over the day-to-day affairs or operations" of the subsidiary by "approv[ing] every decision must less direct[ing] every action of the" subsidiary "from its headquarters").[5]

c)     Plaintiffs also point to alleged information on UC's website that purportedly reflects UNA's presence in Minnesota and participation in California projects involving PEX.

_____

subsidiaries. All of these assertions are relevant to alter ego status, but even in combination they do not suffice to make a prima facie case of alter ego relationships.").

[5] *See also United States v. Bestfoods*, 542 U.S. 51, 69 (1998) ("it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts."); *Anwar*, 877 F.3d at 849-850 (no alter ego relationship despite evidence that (i) parent and subsidiary "shared board membership" and "some managers," (ii) the parent "provide[d] a source of funding to all of its" related companies, and (iii) the companies shared "a common website and engagement in a common enterprise," because these facts only showed "possible macro-management" by the parent); *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1074-1075 (9th Cir. 2015) ("A parent corporation may be directly involved in the financial and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego").

172439764v3

(SAC ¶ 24).  But, as explained above, statements on a company website carry little if any weight in the alter ego/personal jurisdiction context.  It is worthy of note that Plaintiffs  intentionally ignore the fact that a California court recently found it lacked jurisdiction over UNA despite having been presented with the same alleged website "evidence" Plaintiffs now cite – information which UNA's counsel provided to Plaintiffs' counsel before UNA responded to the original Complaint, and which Plaintiff's counsel has ignored.  (*See* concurrently filed Request for Judicial Notice ("RJN"), Ex. 1).  As a matter of law, these materials are not even indicia, much less proof, of an alter ego relationship.  *See Anwar*, 877 F.3d at 849-850 (a "common website" used to engage in a "common enterprise" was insufficient to support an alter ego finding); *Torres v. Liberto Mgf. Co.*, 2002 U.S. Dist. LEXIS 14694, at *15-16 (N.D. Tex. Aug. 8, 2002) (parent company's creation of "a single employee handbook to be utilized by each of its subsidiaries does not evidence the kind of extreme control by a parent corporation over the operations of its subsidiaries so as to render it and the subsidiary a single" entity).

d)      Finally, under Tennessee and Sixth Circuit law, "fraud or similar injustice must be demonstrated[,]" and "mere dominance, standing alone," will not suffice absent "[u]se of [that] control to commit fraud or wrong[.]"  *Se. Tex. Inns, Inc. v. Prime Hosp. Corp.*, 462 F.3d 666, 673-675 (6th Cir. 2006) ("Tennessee law still requires an element of fraud in order to pierce a corporate veil."); *see also Anwar*, 876 F.3d at 849 (citing *Ranza*, 703 F.3d at 1073, and confirming plaintiff must show "fraud or injustice" to pierce the corporate veil); *Dochnal v. Thomson Reuters Corp.*, 2018 U.S. Dist. LEXIS 178458, at *11 (E.D. Tenn. Oct. 17, 2018) (no jurisdiction based on alter ego theory where there was no risk that dismissing a foreign parent company would "substantially affect" the "ability to recover damages.").  Here, there is no allegation or evidence that UNA used UI to perpetrate any "fraud or similar injustice" involving the PEX, nor would dismissing UNA

cause Plaintiffs "injustice" since they have already named, and are already proceeding against UI, *i.e.*, the proper defendant from the standpoint of personal jurisdiction.

In sum, UNA does not have Tennessee contacts at all, let alone sufficient contacts to establish personal jurisdiction; UNA has not consented/waived its challenge to personal jurisdiction; and UNA does not pervasively dominate or control the day-to-day affairs of UI – thus, UI's forum contacts cannot legally be imputed to UNA. Accordingly, dismissal is required.[6]

## IV. ALTERNATIVE ARGUMENT REGARDING ARBITRATION[7]

### A. Plaintiffs Are Bound by the Warranty's Arbitration Provision

The Warranty binds Plaintiffs as "the owner[s] of the applicable real property" involved in this matter. (*See* Dkt. Nos. 10-2, 24-2, 67-2 (Beissel Decl. ¶ 6 and Ex. 1 at p. 1)). That includes the agreement to arbitrate contained in the Warranty. (*Id.*, at p. 2, "Warranty Claim Dispute Process"). All PEX sold by Uponor in the United States between October 15, 2012, and the completion of Plaintiffs' Properties in February 2017 and June 2014 is subject to and governed by the Warranty, including the PEX that was allegedly installed in Plaintiffs' Properties. (*Id.*, at p. 1). During that same period of time, the Warranty was continuously published and publicly available on Uponor's website. (*Id.* ¶ 7); *see also Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 756 (N.D. Cal. 2019) (buyers were charged with notice of, and bound by, limitations in a warranty that was publicly available on the defendant's website). Thus, Plaintiffs are legally and

---

[6] Plaintiffs also allege UNA maintains commercial general liability insurance coverage in its own name, (SAC ¶ 23). However, separate insurance coverage serves only to confirm that UNA is a separate and distinct corporate entity. *Cement Masons' Pension Tr.-Fund v. McCarthy*, No. 04-CV-74006-DT, 2006 U.S. Dist. LEXIS 17008, at *20 (E.D. Mich. Mar. 24, 2006) (rejecting alter ego finding where "[t]he two companies maintain[ed] . . . separate insurance policies").

[7] The following alternative arguments mirror those set forth in UI's concurrently filed Motion to Compel Arbitration and Dismiss. To avoid repetition and ensure compliance with the 25-page limit prescribed by this Court's Local Rules, UNA has truncated these arguments, including by shortening or omitting citations to certain authorities also referenced in UI's Motion.

16

contractually bound by its terms, including its mandatory arbitration provision. *See Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003) ("non-signatories may be bound to an arbitration agreement under ordinary contract and agency principles," including under third-party beneficiary and assignment theories (citation omitted)).

First, Plaintiffs are beneficiaries of the Warranty since both Uponor and Hannah clearly understood and intended for the Warranty to transfer and inure to the benefit of Plaintiffs, as the purported owners of the subject home after its construction. Indeed, Plaintiffs have once-again judicially admitted that they were persons and entities who would reasonably be expected to use, consume and/or be affected by the PEX. (SAC ¶¶ 103-105). By itself, this binding concession mandates a finding that Plaintiffs are beneficiaries of the Warranty and bound by its terms. *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000). . Moreover, the Warranty's plain language makes clear that it was intended to cover and govern homeowners who purchase real property from builders responsible for the initial installation of the PEX. Specifically, the Warranty contemplates and expressly provides that it may be transferred and assigned by the "original owner" of the real property to a new owner within 10 years after installation. (Dkt. Nos. 10-2, 24-2, 67-2, Beissel Decl. ¶ 6 and Ex. 1 at p. 2, "Transferability"). Consistent with that plain language, Uponor understands and intends that its Warranty will ultimately cover, and inure to the benefit of, owners who acquire homes containing PEX from builders. (*Id.* ¶¶ 8-12). It also is axiomatic that builders, like Hannah, intend for the PEX Warranty to benefit subsequent home purchasers/owners – indeed, this very business model is predicated on building and then selling homes, together with all installed components and their corresponding warranties, such as PEX pipes. (SAC ¶¶ 103-105 (admitting Plaintiffs and the members of the Class were persons who might reasonably be expected to use the PEX in the plumbing systems in

172439764v3

their homes)).  Under these circumstances, Plaintiffs are third-party beneficiaries of the Warranty, and Tennessee law is clear that "an arbitration provision in a contract is enforceable *against* a third-party beneficiary who has filed a cause of action seeking to enforce a contract."  *Benton v. Vanderbilt Univ.*, 137 S.W.3d 614, 616 (Tenn. 2004); *see also Swift Enter., LLC v. Trunorth Warranty Plans of N. Am., LLC*, 2022 U.S. Dist. LEXIS 240986, at *24 (E.D. Tenn. Sept. 30, 2022).  Here, Plaintiffs' claims related to the PEX seek recovery for nothing more than the PEX's supposed failure to perform as warranted.  Thus, holding Plaintiffs to the Warranty's arbitration clause is manifestly appropriate and required under Tennessee law.

Second, in the first two iterations of the Complaint, Plaintiffs alleged claims for breach of implied warranty which legally and factually required, and thus necessarily presumed, contractual privity between Plaintiffs and UNA.  (Dkt. No. 1 at ¶¶ 86-90 and Dkt. No. 19 at ¶¶ 119-123). *Americoach Tours, Inc. v. Detroit Diesel Corp.*, No. 04-2016 B/V, 2005 WL 2335369, at *8 (W.D. Tenn. Sept. 23, 2005).  By asserting a claim requiring contractual privity and by further asserting claims arising out of the contractual relationship, Plaintiffs are bound by the Warranty applicable to the PEX.  *See Benton*, 137 S.W.3d at 618.

As set forth in UI's concurrently filed Motion, there is no basis for Plaintiffs' current attempt to avoid arbitration by tactically deleting their implied warranty allegations and admissions from the SAC.  Plaintiffs offer no explanation for this proposed change other than the obvious one – i.e., to circumvent arbitration under the Warranty.  While Plaintiffs proclaim they do not seek the repair and replacement remedies prescribed by the Warranty, (SAC ¶¶ 100), they nonetheless (i) fail to explain how or why they previously asserted implied warranty claims that depend on privity of contract with respect to the Uponor PEX, and (ii) fail to identify any other applicable contract governing the Uponor PEX, other than the Warranty.  It is well-established a

18

plaintiff cannot negate its prior judicial admissions, nor avoid arbitration, simply by amending its pleading to 'clarify' the claims brought", or by "removing" allegations and "tweaking the wording" of a complaint, and Plaintiffs' effort to do so here must fail. *Ntch W.-Tenn, Inc. v. ZTE USA, Inc.,* No. 111 CV 01169JDBEGB, 2011 WL 13147425, at *2 (W.D. Tenn. Dec. 29, 2011).[8]

<u>Third</u>, it is the regular practice of home builders to assign the warranties of products incorporated into newly constructed homes to the home purchasers – including product, material, and component warranties – as part of the completion of the delivery of the home from the builder to the buyer of the home. This is particularly the case where Hannah, as a custom builder, constructed the Properties for the express benefit of Plaintiffs. Accordingly, Plaintiffs are also bound by the Warranty as assignees of that document. *See, e.g., Martin v. Cavalry SPV I, LLC*, 2014 U.S. Dist. LEXIS 43293, at *22-23 (E.D. Ky. Mar. 31, 2014) (arbitration may be compelled against a non-signatory assignee); *Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671-72 (Tenn. 2013) (contractual rights and obligations can be assigned).

### B. The Warranty's Arbitration Provision Covers Plaintiffs' Claims

The Warranty's broad arbitration provision plainly covers and requires arbitration of Plaintiffs' claims in this action on an individual, not class, basis. In determining whether claims are covered by an arbitration clause, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Thus "where [a] contract contains an arbitration clause, there is a presumption of arbitrability in the sense that [an] order to arbitrate the particular grievance should

---

[8] Other courts are in accord with these dispositive principles. *See, e.g., Haynes v. Uponor, Inc.*, 2022 U.S. Dist. LEXIS 31877, at * 8 (N.D. Cal. Feb. 23, 2022); *Valdiviezo v. Phelps Dodge Hidalgo Smelter, Inc.*, 995 F. Supp. 1060, 1065–66 (D. Ariz. 1997); *Kilkenny v. L. Off. of Cushner & Garvey, L.L.P.,* No. 08-CV-588 KMK, 2012 WL 1638326, at *5; *Rubinstein v. Keshet Inter Vivos Tr.,* No. 17-61019-CIV, 2018 WL 8899230, at *5 (S.D. Fla. Oct. 17, 2018).

not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986).

Here, the Warranty provides that if UI and a property owner cannot informally resolve any dispute regarding an UI product (including PEX), then such dispute, or "any other claim or dispute between the parties in any way regarding the design, manufacture, sale, distribution or condition of any product, whether such claim or dispute is based on contract, warranty, tort or otherwise," are subject to arbitration, and the owner and UI "must arbitrate any and all claims which in any way relate to Uponor's products . . . whether based on contract, warranty, tort, or otherwise." (Dkt. Nos. 10-2, 24-2, 67-2 (Beissel Decl.) ¶ 6 and Ex. 1 at pp. 1-2). This broad language encompasses, and mandates, the arbitration of Plaintiffs' alleged claims against UNA, all of which relate to the design, manufacture, condition, and performance of PEX allegedly sold by Uponor and installed in the Properties. That is particularly true where the Warranty provides an owner's "exclusive remedies" with respect to products sold by UI that have allegedly 'failed" or are "defective." (*Id.* at p. 1). To that end, the Warranty's arbitration provision does not exclude any claims from its ambit, and the Warranty instead broadly governs "any claims arising from breach of contract, breach of warranty, tort, or any other claim arising from the sale or use of Uponor's products. (*Id.* at p. 2, "Miscellaneous"). When presented with similar arbitration clauses, courts in the Sixth Circuit have compelled arbitration,[9] and the Court must likewise compel arbitration in this case on an individual, not class, basis. *See Am. Express v. Italian Colors Rest.*, 570 U.S. 228, 233-238 (2013) (recognizing the enforceability of class action waivers in arbitration agreements).

---

[9] *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004).

172439764v3

## V. ALTERNATIVE ARGUMENTS FOR MOTION TO DISMISS AND TO STRIKE

### A. The ELR Bars Plaintiff's Negligence and Strict Liability Claims

The economic loss doctrine "precludes recovery in tort when a product damages itself without causing personal injury or damage to other property." *Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 489 (Tenn. 2009) (adopting *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 868-71 (1986)). The lynchpin for defining "the product" is whether the allegedly defective item is part of an integrated package. *Americoach Tours, Inc.*, 2005 WL 2335369, at *3; *East River*, 476 U.S. at 870. If so, then damage to another part of the integrated package is treated as damage to "the product itself" and cannot be recovered via a tort claim. *Americoach Tours*, 2005 WL 2335369, at *3 (economic loss rule barred a plaintiff from seeking tort damages against manufacturer of electrical components installed in a bus that was destroyed by a faulty heater because "the entire bus" was "the 'product itself[,]" and "all electrical or mechanical components of the heater were 'supplied . . . as part of an integrated package . . . properly regarded as a single unit'"); *Tenn. Farmers Mut. Ins. Co. v. Ford Motor Co.*, No. W2001-00046-COA-R3-CV, 2002 Tenn. App. LEXIS 429, at *14-20 (Ct. App. June 17, 2002).[10] A contrary approach would eviscerate "the distinction between warranty and strict products liability." *East River*, 476 U.S. at 867-68.

The Sixth Circuit has applied the economic loss rule in construction defect cases and held that: (1) a defective component or material installed in a structure constitutes only one part of an integrated product (namely, the structure itself); and therefore (2) a defective component or

---

[10] Consistent with *East River*'s formulation of the rule, which multiple other courts throughout the country have adopted, "the 'product' is the product purchased by the plaintiff," *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 155-156 (Ind. 2005), and "the product" means "the finished product bargained for by the buyer rather than components furnished by a supplier." *Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F.2d 925, 928-930 (5th Cir. 1987); *see also King v. Hilton-Davis*, 855 F.2d 1047, 1051-1053 (3d Cir. 1988).

172439764v3

material does not cause damage to "other property" simply because it damages other portions of the structure. *See Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 850 (6th Cir. 2002) (wood used in a nursing home was not the "product," and instead, the "entire nursing home" was the product for the purpose of the economic loss rule). Several other courts addressing the issue have applied *East River* and reached the same conclusion in the construction defect context, holding that the owner of a structure – including a **residential** structure – cannot maintain a tort claim against the supplier of an allegedly defective component installed during the construction process that subsequently caused damage to other parts of the same structure.[11]

Here – in violation of this law – Plaintiffs assert claims for strict product liability and negligence, against UNA based on allegations that supposedly defective PEX in the Properties' plumbing systems has purportedly caused damage to various other parts of the Properties. (SAC ¶¶ 53, 62, ¶¶ 102-128). As a matter of law, the Properties themselves constitute a single integrated product purchased by Plaintiffs, and any damage to various aspects of the Properties **cannot** satisfy the "other property" exception to the ELR. While Plaintiffs assert boilerplate and conclusory allegations about how the PEX allegedly caused damage to unspecified "property . . . other than the defective PEX itself," (*id.* ¶¶ 60-62, 66-67), this is patently insufficient to overcome the economic loss rule, especially after multiple pleading attempts. *See Dana Ltd. v. Aon Consulting, Inc.*, 984 F. Supp. 2d 755, 767 (N.D. Ohio 2013). Plaintiffs' tort-based construction

---

[11] *Ass'n of Apt. Owners v. Venture 15, Inc.*, 115 Haw. 232, 285-297 (2007); *Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors*, 659 A.2d 267, 271 (Me. 1995); *Wash. Courte Condo. Ass'n-Four v. Wash.-Golf Corp.*, 150 Ill. App. 3d 681, 686-687 (1986); *Bay Breeze Condo. Ass'n v. Norco Windows*, 257 Wis. 2d 511, 527-528 (Ct. App. 2002); *Casa Clara Condo. Ass'n v. Charley Toppino & Sons*, 620 So. 2d 1244, 1247 (Fla. 1993); *Pugh v. Gen. Terrazzo Supplies, Inc.*, 243 S.W.3d 84, 90-95 and n. 9 (Tex. App. 2007); *Higginbotham v. Dryvit Sys.*, 2003 U.S. Dist. LEXIS 4530, at *7-18 (M.D.N.C. Mar. 20, 2003).

defect claims are precisely what the ELR forbids, especially where Plaintiffs also do not allege damage to "other property," nor personal injury purportedly caused by the PEX. (SAC ¶¶ 53, 62).

## B. The Court Should Dismiss Plaintiffs' Claims for Strict Liability and Negligence Because They Fail to Adequately Plead Causation

The Court should also dismiss Plaintiffs' claims for strict product liability, strict product liability for design defect, and negligence, as well as dismiss/strike the SAC's related class allegations, because Plaintiffs have failed to adequately plead causation in support of these claims. *Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 686, 704 (Tenn. 2011); *Parsons v. Wilson Cnty.*, No. M201400521COAR3CV, 2015 WL 5178601, at *5 (Tenn. Ct. App. Sept. 3, 2015). In disregard of this fundamental pleading requirement, the SAC: (i) speculates that UNA's supposed color-coating process generally causes the PEX to experience "microcracks" and "prematurely" degrade; and then (ii) baldly presumes that this alleged color-coating process specifically caused the PEX in Plaintiffs' Properties to leak. (SAC ¶¶ 38-47). The Court cannot credit Plaintiffs' speculative conclusions and unsupported theory of causation, even at the pleading stage. *Tilden v. Gen. Elec. Co.*, No. 3:11-CV-628, 2012 WL 1023617, at *5 (E.D. Tenn. Mar. 26, 2012). This is particularly true because the Supreme Court has made clear that "[t]he plausibility standard . . . asks for more than a sheer possibility" of liability[,]" and "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Tilden*, 2012 WL 1023617, at *1. Courts in the Sixth Circuit agree that "mere consistency does not establish plausibility of entitlement to relief even if it supports the possibility of relief." *JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*, 615 F. Supp. 3d 750, 759 (M.D. Tenn. 2022).

Accordingly, Plaintiffs' bare speculation that the PEX's alleged color-coating process caused the purported leaks in their Properties is patently incapable of sustaining the SAC's strict

liability and negligence claims, as Plaintiffs fail to even account for – let alone plead facts excluding – obvious alternative explanations for the purported leak, such as faulty installation of the PEX during the construction process, operational conditions beyond the design parameters of the PEX, as well as the mean/methods used to disinfect the PEX after installation and before being placed into service. *Maness v. Bos. Sci.*, 751 F. Supp. 2d 962, 969 (E.D. Tenn. 2010); *King v. Danek Med., Inc.*, 37 S.W.3d 429, 435 (Tenn. Ct. App. 2000).

### C.      Plaintiffs' Proposed Class is Overbroad and Not Ascertainable

Federal courts may dismiss or strike class allegations at the pleading stage, and the Sixth Circuit has expressly affirmed the propriety of doing so. *Pilgrim v. Univ. Health Card, LLC*, 660 F.3d 943, 946-950 (6th Cir. 2011); *see also Tietsworth v. Sears, Roebuck and Co.*, 720 F. Supp. 2d 1123, 1145–46 (N.D. Cal. 2010). Here, the proposed class definition – "All persons or entities who own homes, businesses, or other structures in Tennessee with Uponor PEX used as the lines and components of a potable water plumbing system" – is overbroad and not ascertainable on its face. <u>First</u>, the members of any class or hypothetical sub-class could only be ascertained with a deep-dive into the unique condition of each owner's PEX and property, as well as the nature of each owner's interactions, if any, with any one of the Uponor entities. Because the Court would have to engage in extensive, individualized mini-trials to arrive at a potentially valid class, the proposed class is not ascertainable, nor do common issues predominate over individual ones. Case law uniformly holds that these types of individualized determinations warrant striking the class.[12] <u>Second</u>, the presence of Uponor PEX in a structure's potable water plumbing system – which is typically concealed as part of the installation behind walls, ceilings and floors – is not readily

---

[12] *See In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 88496, at *17-20 (N.D. Ga. June 8, 2017) *PB Prop. Mgmt. v. Goodman Mfg. Co.*, 2016 U.S. Dist. LEXIS 97520, at *61-70 (M.D. Fla. 2016); *Colley v. P&G*, 2016 U.S. Dist. LEXIS 137725, at *24-25 (S.D. Ohio Oct. 4, 2016).

known to or observable by property owners, especially where: (i) the PEX is not typically sold directly to property owners; rather it is acquired by builders or their contractors from third-party retailers, and then installed in structures which are later sold; and thus (ii) there are no reliable records or other methods for identifying properties with Uponor PEX installed other than conducting invasive/destructive work on a residence-by-residence basis. For these additional reasons, the proposed class is not ascertainable or administratively feasible.

## VI. CONCLUSION

For the foregoing reasons, the Court should: (i) grant UNA's Motion, and (ii) enter an Order: (a) dismissing UNA with prejudice; or alternatively, (b) to the extent any of the Plaintiff's claims are deemed viable by the Court, compelling individual arbitration of those remaining claims.

Dated:     June 13, 2024

By: /s/ M. Andrew Pippenger
M. Andrew Pippenger, BPR 018183
PURYEAR LAW GROUP
104 Woodmont Boulevard
Woodmont Centre, Suite 201
Nashville, TN 37205
Tel: (615) 630-6601
Fax: (615) 630-6602
apippenger@puryearlawgroup.com

*Attorney for Specially Appearing Defendant*
*Uponor North America, Inc.*

172439764v3

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that on June 13, 2024, the foregoing pleading was electronically filed with the Clerk of Court using the CM/ECF filing system which automatically sends email notifications of such filing to the following attorneys of record:

Andrew J. Pulliam (Tenn. BPR No. 016863)
James C. Bradshaw III (Tenn. BPR No. 013170)
J. Graham Matherne (Tenn. BPR No. 011294)
Ann Weber Langley (Tenn. BPR No. 038070)
WYATT, TARRANT & COMBS, LLP
333 Commerce Street, Suite 1050
Nashville Tennessee 37201
Telephone: (615) 244-0020
Fax: (615) 256-1726
Email: apulliam@wyattfirm.com
Email: jbradshaw@wyattfirm.com
Email: gmatherne@wyattfirm.com
Email: alangley@wyattfirm.com

*Attorneys for Plaintiffs*

_____/s/ M. Andrew Pippenger_____
M. Andrew Pippenger

172439764v3