**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| BRIAN CARRICO; KACIE CARRICO; DON GATLIN; and DORA GATLIN; individually and on behalf of all others similarly situated, | |
| **Plaintiffs,** | Case No. 3:23-CV-00497 |
| v. | District Judge Eli Richardson |
| UPONOR, INC.; UPONOR NORTH AMERICA, INC.; DOES 1 through 100, inclusive, whose true names are unknown, | Magistrate Judge Jeffrey S. Frensley |
| **Defendants.** | |

**SPECIALLY APPEARING DEFENDANT UPONOR CORPORATION'S**
**MEMORANDUM IN SUPPORT OF ITS DISMISSAL MOTION**

**I.      INTRODUCTION**

Neither Plaintiffs Brian and Kacie Carrico nor Plaintiffs Don and Dora Gatlin (individually the "Carricos" and "Gatlins", or collectively, "Plaintiffs") have any legitimate basis for attempting to pursue the remaining claims alleged in their Second Amended Complaint ("SAC") against Uponor Corporation ("UC"). Plaintiffs now streamlined SAC asserts three causes of action against UC related to the design and manufacture of blue and red colored cross-linked polyethylene tubing ("PEX") allegedly installed as part of the potable water plumbing system in their respective homes located in Hendersonville, Tennessee (the "Properties"). According to Plaintiffs, the PEX allegedly installed in the Properties prematurely degraded/deteriorated following installation, and caused water damage to the Properties. However, the truth is that UC is simply a foreign holding company incorporated in Finland and headquartered in Helsinki, Finland, which did not design, manufacture, market, advertise, sell, or distribute the PEX allegedly at issue in this lawsuit. Indeed, UC has no relevant forum contacts in Tennessee. Apparently recognizing this fact, Plaintiffs resort to the regularly rejected assertion that jurisdiction is present

1

with regard to UC because it "is the ultimate parent company" that supposedly exercises "control and dominion" over both Uponor North America, Inc. ("UNA") and Uponor, Inc. ("UI") – the former of which is yet-another out-of-state holding company without any relevant forum contacts, and the latter of which is the entity that actually manufactures and sells PEX in the United States. Notwithstanding Plaintiffs' attempts to bootstrap jurisdiction over UC in Tennessee, UC cannot legally be subject to personal jurisdiction in this Court based on the forum contacts of UI because: (i) UC is a separate and distinct entity from UI that does not participate in the manufacturing operations of UI, nor does UC control UI's day-to-day business activities; and (ii) UC and UI respect all required corporate formalities and they correspondingly maintain separate books and records, bank accounts, assets, board members, and officers. (*See* concurrently filed Declaration of Michael Rauterkus ("Rauterkus Decl."), ¶¶ 1-25).[1]  Under these circumstances, U.S. Supreme Court precedent is clear that any forum contacts in Tennessee that UI may be found to have cannot legally be imputed to UC at all, much less for the purpose of conferring personal jurisdiction where no other basis for jurisdiction over UC exists.

Alternatively, should the Court decline to dismiss UC from this matter for lack of personal jurisdiction, it should compel arbitration of Plaintiffs' claims on a non-class/individual basis. Plaintiffs are required – pursuant to the written warranty applicable to the PEX products at issue – to individually arbitrate any claims involving the PEX (the "Warranty"). (*See* Dkt. Nos. 10-2, 24-2, 67-2 for the concurrently filed Declaration of Stacey Beissel ("Beissel Decl.") at ¶ 6 and Ex. 1). Consistent with this Warranty, as well as the FAA and the case law applying it, Plaintiffs cannot

---

[1] UC has re-submitted the version of the Rauterkus Declaration which was previously filed in support of UC's Motion to Dismiss the First Amended Complaint ("FAC"), and may be found at Docket Entry No. 36-1. The SAC does not contain any new jurisdictional allegations against UC, and thus, the prior Rauterkus Declaration is equally operative against, and comprehensively refutes, the SAC as well. UC notes, however, that paragraph 15 of the Rauterkus Declaration refers to paragraph 87 of the FAC, in which Plaintiffs identify the relevant class period (2009 through 2021). In the SAC, Plaintiffs allege that same class period in paragraph 85, not paragraph 87. The other paragraphs of the FAC referenced in the Rauterkus Declaration maintain the same numbering in the SAC.

2

maintain this or any other putative class action related to the PEX in this Court.

Finally, should the Court decline to dismiss this matter on jurisdictional grounds or compel this matter to arbitration, then the following issues mandate the dismissal/striking of Plaintiffs' individual claims and class allegations: First, Plaintiffs' tort claims for strict liability and negligence are barred by Tennessee's economic loss rule ("ELR") because Plaintiffs only seek recovery for economic losses purportedly resulting from damage to various parts of an integrated product – namely, their homes. Second, Plaintiffs' claims for strict liability and negligence also must be dismissed because the SAC fails to plead facts establishing the essential element of causation. Plaintiffs have failed to set forth any non-conclusory facts substantiating their speculative theory that the supposed color-coating process for the PEX: (i) generally causes the PEX to experience "microcracks" and "prematurely" degrade, and (ii) specifically caused the claimed leak(s) in the  Properties. In particular, the SAC is devoid of any facts supporting Plaintiffs' supposition that the alleged leak(s) in the Properties were caused by the theorized color-coating process. Finally, Plaintiffs' proposed class is overbroad, not ascertainable on its face, and should be stricken.

## II.    FACTUAL BACKGROUND

### A.    UC is a Finnish Holding Company Lacking Tennessee Contacts

UC is a Finnish holding company without Tennessee contacts in general, much less related to Plaintiffs' allegations in this action. (Rauterkus Decl. ¶¶ 1-25). Specifically: (i) UC is incorporated in Finland and headquartered in Helsinki, Finland; (ii) UC does not design, install, manufacture, construct, assemble, inspect, distribute, supply, ship, or sell PEX, or any other products, directly or indirectly in and/or into Tennessee; (iii) UC is not authorized, licensed, qualified, registered, or chartered to transact any business in Tennessee; (iv) UC does not transact

3

business in Tennessee, and it has never paid taxes to the State of Tennessee; (v) UC does not have offices, employees or bank accounts in Tennessee, and UC has never employed any agents to solicit business, sell, or manufacture products in Tennessee; (vi) UC has never had any place of business in Tennessee and has never established, or sought to establish, a physical presence in Tennessee; and (vii) UC has no assets in Tennessee, has never owned, leased or possessed any real estate in Tennessee, and has never maintained a post office box, mailing address, telephone listing or bank account in Tennessee.  (*Id.* ¶¶ 4-13).

UC is the direct and indirect parent company of various other entities, including UI and UNA which, together with UC, are at times collectively all referred to as the "Uponor Group". Uponor Group is not an entity itself, but is simply how UC refers to the collective group of Uponor-related subsidiary companies for convenience, marketing purposes, and in various written materials.  (*Id.* ¶¶ 4, 6).  UC is a separate and distinct corporate entity from UI and UNA, both of which are indirect and remote subsidiaries of UC.  Between 2009 and the present, neither UC, nor its predecessors, have ever controlled, directed or managed the operations of UI or UNA and at all times relevant to the homes of the named Plaintiffs as referenced in paragraphs 36 and 37 of the SAC, UC never held a direct ownership interest in UI or UNA.  (*Id.* ¶ 15).  More specifically: (i) UI and UNA enter into contracts and agreements with other business entities without the involvement of UC; (ii) UC does not pay UI's or UNA's payroll and benefits, or fund their retirement plans; (iii) additionally, (a) officers and employees of UI and UNA are responsible for the day-to-day operations of those companies, (b) UC does not make or control the day-to-day decision-making or operations of UI or UNA, or control those companies' internal affairs, (c) UC does not make corporate decisions for UI or UNA, (d) UC does not participate in the manufacturing operations of UI, and (e) had no involvement in the implementation of the techniques or processes

4

allegedly used by UI in the manufacture of red and blue PEX products as referred to in the SAC; (iv) UC maintains separate corporate books and records from those maintained by UI and UNA; (v) UC maintains separate bank accounts from those of UI and UNA; (vi) the overall assets of UC are maintained separately from those of UI and UNA; (vii) UC maintains all corporate formalities, including those related to subsidiaries, as required by appropriate accounting rules and procedures; (viii) (a) the Board of Directors of UC does not have the same membership as the Boards of UI and UNA, and (b) the officers of UC are not the same as the officers of UI and UNA; and (ix) UI does not perform any service, or engage in any activities, in Tennessee on behalf of UC. (*Id.* ¶¶ 15-24).

### B.     The SAC's Allegations Against UC

Plaintiffs allegedly own homes in Hendersonville, Tennessee that Hannah Custom Homes, LLC ("Hannah") built and substantially completed in June 2014 and February 2017. (SAC ¶¶ 2-3, 36-37). Plaintiffs allege PEX was installed as part of their Properties' "potable water plumbing system" during original construction. (*Id.* ¶¶ 36-37). Plaintiffs assert that PEX in the Properties "has prematurely degraded and deteriorated" and "suffers from microcracking causing water leaks" from the PEX. (*Id.* ¶ 38). According to Plaintiffs, the PEX in the Properties experienced performance issues in 2019 and 2021, followed by unspecified "leaks" that have occurred since then which have caused "substantial" – but unidentified – "damages" to the Properties. (*Id.* ¶ 39).

Plaintiffs speculate that the referenced performance issues in their respective homes resulted from the process by which the color coating was purportedly applied to the PEX tubes. (*Id.* ¶¶ 40-47). Specifically, the SAC claims that this process includes "an oxidizing step in which at least the outer surface of the base pipe is oxidized, through a coating step in which a pre-polymer system is applied to the outer surface of the base pipe and through a curing step in which the pre-

polymer is cured to form a layer of the pipe." (*Id.* ¶ 42). Plaintiffs contend UI uses a "furnace/flame treatment" to condition the outer coating of the piping to better allow the color pigment to adhere to the tubing, and Plaintiffs assume – in conclusory fashion, and without citing data, evidence, or other factual support – that this process "destroys the antioxidants" on the outside of the tubing and causes the PEX to "prematurely become[] brittle and develop[] microcracks when the tubing is expanded during installation," which can purportedly lead to leaks and property damage. (*Id.* ¶¶ 43, 45). In making these allegations, Plaintiffs tactically omit the fact that the PEX allegedly installed in the Properties is subject to, and governed by, an express written Warranty that contains the following mandatory arbitration provision covering any and all claims and disputes relating to the PEX which are not informally resolved:

> **Warranty Claim Dispute Process:**
>
> In the event claimant and Uponor are unable to resolve a claim through informal means, the parties shall submit the dispute to the American Arbitration Association or its successor (the "Association") for arbitration, and any arbitration proceedings shall be conducted before a single arbitrator in the Minneapolis, Minnesota metropolitan area. NOTWITHSTANDING THE FOREGOING, NEITHER THE CLAIMANT NOR UPONOR, INC. SHALL BE ENTITLED TO ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS, AND NEITHER THE CLAIMANT NOR UPONOR SHALL BE ENTITLED TO JOIN OR CONSOLIDATE CLAIMS WITH ANY OTHER PARTIES IN ARBITRATION OR IN LITIGATION BY CLASS ACTION OR OTHERWISE.

(Dkt Nos. 10-2, 24-2, 67-2 (Beissel Decl.) at ¶ 6 and Ex. 1 at p. 2). The Warranty also expressly disclaims all other warranties, express and implied:

> THIS LIMITED WARRANTY IS THE FULL EXTENT OF EXPRESS WARRANTIES PROVIDED BY UPONOR, AND UPONOR HEREBY DISCLAIMS ANY WARRANTY NOT EXPRESSLY PROVIDED HEREIN, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PRODUCTS COVERED HEREUNDER. (*Id.* p. 2).

## III.  ARGUMENT REGARDING PERSONAL JURISDICTION

### A.  Legal Standard

6

Personal jurisdiction exists if the defendant is amenable to service of process under the forum state's long-arm statute and if the exercise of personal jurisdiction would not deny the defendant due process. *Air Prod. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 550 (6th Cir. 2007) (citation omitted). The "jurisdictional limits of Tennessee law and of federal constitutional law of due process are identical.'" *Intera Corp. v. Henderson*, 428 F.3d 605, 616 (6th Cir. 2005) (citation omitted). "The plaintiff bears the burden of making a prima facie showing of the court's personal jurisdiction over the defendant." *Id.* at 615. But, "in the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). Personal jurisdiction can be general or specific. *Third Nat'l Bank v. Wedge Grp., Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989). Both are lacking here.

### B. The Court Does Not Have General Jurisdiction Over UC

"[O]nly a limited set of affiliations with a forum will render a defendant amenable to all-purpose [general] jurisdiction[,]" and "the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction" over a corporation. *Daimler AG v. Bauman,* 571 U.S. 117, 137 (2014). If neither paradigm situation is present, a corporation is subject to general jurisdiction only in an "exceptional" case in which its "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Id.* at 138-139 & n. 19. Courts in the Sixth Circuit closely follow and rigorously enforce this exacting standard. *Glob. Force Ent., Inc. v. Anthem Sports & Ent. Corp.*, 385 F. Supp. 3d 576, 582 (M.D. Tenn. 2019); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018).

Here, there is no conceivable basis for finding that UC is subject to general jurisdiction in Tennessee because: (i) UC is incorporated in Finland, not Tennessee; (ii) UC is headquartered in Helsinki, Finland, not Tennessee; (iii) UC does not design, install, manufacture, construct,

7

assemble, inspect, distribute, supply, ship, or sell the PEX, or any other products, directly or indirectly in and/or into Tennessee; (iv) UC does not transact business in Tennessee, and UC is not authorized, licensed, qualified, registered, or chartered to do so; (v) UC does not have offices, employees, bank accounts, assets, a mailing address, or any physical presence in Tennessee; (vi) UC does not employ any agents to do business in Tennessee; (vii) to the extent UI distributes and/or sells any type of PEX, UC is a separate and distinct company from UI; and (viii) UC does not own the assets or property of either UNA or UI (the latter of which is the entity that actually sells/distributes PEX products which may make their way into Tennessee), and the companies respect corporate formalities, with each having its own officers and employees who are responsible for their day-to-day operations and corporate decision making. (Rauterkus Decl., ¶¶ 4-25).

Under these circumstances, this is not a "paradigm" case of general jurisdiction, nor is it an "exceptional" case in which UC is "essentially at home" in Tennessee. *Daimler AG*, 571 U.S. at 136-139 (Daimler was not subject to general jurisdiction in California based on its manufacture of vehicles abroad that were subsequently distributed in the state of California via its American subsidiary, where neither Daimler, nor its subsidiary, were incorporated in California or had its principal place of business in the state); *see also Glob. Force Ent.*, 385 F. Supp. 3d at 582-585.

## C. The Court Does Not Have Specific Jurisdiction Over UC

In contrast to general jurisdiction, specific jurisdiction is a defendant-focused inquiry, with an emphasis on the relationship among the defendant, the forum, and the litigation. *Fortis Corporate Ins. v. Viken Ship Mgmt.*, 450 F.3d 214, 218 (6th Cir. 2006). To establish specific jurisdiction, a plaintiff must satisfy a three-part test in the Sixth Circuit: (1) the defendant must purposefully avail itself of the privilege of acting in the forum state or causing a consequence in the forum state; (2) the cause of action must arise from the defendant's activities there; and (3) the

172391888v2

acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). However, the Supreme Court has made clear that a "plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 571 U.S. 277, 285-286 (2014). The factors required for specific jurisdiction are clearly missing here.

First, UC has not "purposefully availed itself" of the benefits of doing business in Tennessee in any way, shape, or form. To the contrary, and as described above, UC: (i) is not licensed to conduct business in Tennessee; (ii) does not directly or indirectly conduct business in Tennessee; and (iii) does not maintain any offices, employees, bank accounts, mailing addresses, or any physical presence in Tennessee. (Rauterkus Decl., ¶¶ 7-13). These undeniable facts are legally irreconcilable with a finding of purposeful availment. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985) (a defendant only purposefully avails itself of a forum state by "deliberately" engaging in "significant" activities in the state, or by creating "continuing obligations" with forum residents); *MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 901 (6th Cir. 2017) (plaintiffs must do more than claim a defendant's actions affected them in the forum).

Second, the SAC's allegations lack any conceivable nexus to UC's non-existent contacts with Tennessee. UC does not design, manufacture, sell, or distribute the PEX or other products at all, much less the specific PEX purportedly installed at the Properties. (Rauterkus Decl., ¶¶ 8, 14, 18). In addition, UC does not own the property or assets of either UNA or UI, does not control their operations and decision making, maintains separate corporate books and records, and maintains corporate formalities and separate corporate boards. (*Id.* ¶¶ 15-23). Thus, "[w]hat is needed – and what is missing here – is a connection between the forum and the specific claims at

9

issue" directed against UC. *Bristol-Myers Squibb Co. v. Super. Ct.*, 582 U.S. 255, 265 (2017).

Third, given the absence of "minimum contacts" capable of justifying the exercise of specific jurisdiction here, it would be manifestly unreasonable and inconsistent with substantial justice to subject UC to litigation in this forum. Plaintiffs have no legitimate interest in pursuing any causes of action against an entity that did not design, manufacture, install, assemble, inspect, distribute, supply, or sell the PEX allegedly installed as part of the Properties. (Rauterkus Decl., ¶ 8). Accordingly, this factor also militates against specific jurisdiction. *Glob. Force Ent.*, 385 F. Supp. 3d at 582-585; *Chapman v. Lawson*, 89 F. Supp. 3d 959, 968 (S.D. Ohio 2015) (same).

### D. Plaintiffs' Other Alleged Theories of Personal Jurisdiction Also Fail

Apparently recognizing that UC itself does not have any relevant forum contacts capable of supporting personal jurisdiction, Plaintiffs attempt to salvage their bid to claim personal jurisdiction with respect to UC by asserting that it is subject to personal jurisdiction because it "is the ultimate parent company for both" UNA and UI, the latter of which supposedly "operates as an extension of the business of" UC and UNA. (SAC ¶ 12). Thus, according to Plaintiffs, UC "exercises a sufficient degree of control and domination over" UI and UNA "to meet personal jurisdiction standards[,]" and UI and UNA "perform services that are significantly important to" UC which UC would allegedly "undertake to perform . . . itself" were it not for the presence of those entities. (*Id.* ¶ 18). Relying on these unfounded/unsupported suppositions regarding the interactions between UC, UNA, and UI, Plaintiffs postulate that "the Uponor entities view themselves as a single enterprise . . . with [UC] at the head." (*Id.* ¶ 13). As established below, this theory – which essentially seeks to impute UI's forum contacts to UC – does not withstand scrutiny legally or factually.

First, there is no legal basis for Plaintiffs' "single enterprise" theory that tries to lump UC,

172391888v2

UI, and UNA together and impute one entity's alleged forum contacts to others which lack any such contacts. "[T]he Sixth Circuit and the Tennessee Supreme Court have never explicitly adopted" a "single enterprise theory" of personal jurisdiction, *Hilani v. Greek Orthodox Archdiocese of Am.*, 863 F. Supp. 3d 711, 720 (W.D. Tenn. 2012), and other federal courts have rejected this expansive approach to jurisdiction. *Iconlab Inc. v. Valeant Pharm. Int'l Inc.*, No. 8:16-cv-01321-JLS-KES, 2017 U.S. Dist. LEXIS 222574, at *18-19 (C.D. Cal. Apr. 25, 2017) (rejecting "exotic theories of imputing contacts" such as "single enterprise"), *aff'd* 828 Fed. App'x 363 (9th Cir. 2020).

Second, to the extent Plaintiffs' "single enterprise" theory is an attempt at a stealth invocation of the "alter ego" doctrine, it also fails. "Parent and subsidiary corporations are presumed to be separate and distinct legal entities. Thus, jurisdiction over a parent corporation does not automatically establish jurisdiction over a subsidiary corporation. Likewise, jurisdiction over a subsidiary corporation does not automatically establish jurisdiction over a parent corporation. Each corporation's contacts with the forum state must be assessed individually[,]" and Tennessee "courts are reluctant to disregard the separate existence of related corporations" and "have consistently given substantial weight to a presumption of corporate separateness." *Gordon v. Greenview Hosp., Inc.*, 300 S.W. 635, 651 (Tenn. 2009) (citations omitted). To that end, "the presumption of corporate separateness" can only be "overcome by demonstrating that the parent corporation 'exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.'" *Id.* at 653; *see also Univ. of the South v. South Univ., LLC*, 2009 U.S. Dist. LEXIS 146729, at *8 (E.D. Tenn. Nov. 20, 2009) ("personal jurisdiction [over] a subsidiary does not lead to automatic personal

jurisdiction [over] a parent corporation unless there is evidence that the parent acts as an alter ego of the subsidiary."). "Total ownership and shared management personnel alone are insufficient to establish" an alter ego relationship; instead, the parent must exercise "pervasive control over the subsidiary . . . from broad policy decisions to routine matters of day-to-day operation." *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 848-849 (6th Cir. 2017) (citation and quotation omitted). Here, the SAC is devoid of any well-pleaded facts supporting such an alter ego relationship involving UC. Specifically:

a) Plaintiffs state UI "operates as an extension of the business" of both UC and UNA. However, UC, UI, and UNA are, and operate as, separate companies, and the day-to-day business operations of UI and UNA are conducted and controlled by those companies' officers and employees – including UI's manufacturing operations. (Rauterkus Decl. ¶¶ 14-25(a));

b) Plaintiffs allege – purportedly based on cherry-picked hearsay portions of UC's 2022 Annual Review Report – that "the Uponor entities view themselves as a single enterprise divided by geographic reporting regions," because UC "refers to itself and its subsidiaries as 'the Uponor Group,' a single business enterprise engaged in selling plumbing and infrastructure products worldwide." (SAC ¶¶ 13-14). But, federal courts have repeatedly **rejected** attempts to establish an alter ego relationship based on SEC filings, press releases, marketing materials, shared websites, or other similar materials that colloquially refer to various entities as a single unified company for marketing purposes or convenience. *Doe v. Unocal*, 248 F.3d 915, 928 (9th Cir. 2011) ("references in the parent's annual report to subsidiaries or chains of subsidiaries as divisions of the parent company do not establish the existence of an alter ego relationship").[2]

---

[2] *See also Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998) (statements in annual report referring to "our global operations" and "the company as a whole" did not "show[] the

172391888v2

Moreover, the phrase "Uponor Group" is a short-hand reference to collectively refer to "Uponor" related entities in marketing materials, as well as in documents such as its Annual Review Report. Collectively referring to the companies in this manner is convenient and consistent with the fact that "Uponor" related corporate entities world-wide are separate but affiliated entities. It remains true that UC, UI, and UNA are separate and distinct companies, each of which observes corporate formalities and is independently responsible for its day-to-day operations – with neither UC nor UNA involved in the actual manufacture of the PEX products involved in this matter. Statements by an "Uponor" entity about sharing a common culture, values, or management strategies, do not

---

pervasive control over the subsidiary" required for an alter ego finding); *Pitt v. Metro. Tower Life Ins. Co.*, No. 18-cv-06609-YGR, 2020 U.S. Dist. LEXIS 58352, at *11-12, 17-18 (N.D. Cal. Apr. 1, 2020) (rejecting alleged alter ego relationship and explaining that: (i) "the fact that MLI publicly represented itself as 'Metlife,' 'we,' or 'our' [is not] inherently suspect" because "entities present[ing] themselves as 'one integrated company' for marketing purposes does not, on its own, establish that companies are alter egos"; and (ii) "filings with state governments and agencies" that do not "indicat[e] [a parent's] control over day-to-day operations" are insufficient); *Sivilli v. Wright-Med. Tech., Inc.*, 2019 U.S. Dist. LEXIS 105416, at *12-13 (S.D. Cal. June 24, 2019) (rejecting alter ego theory based on SEC filings, and collecting cases holding that "corporate entities presenting themselves as one online does not rise to the level of unity of interests required to show companies are alter egos," and "consolidating the activities of a subsidiary into the [parent company's] reports is a common business practice" that does not create an alter ego relationship); *MacQueen v. Union Carbide Corp.*, Civil Action No. 13-831-SLR-CJB, 2014 U.S. Dist. LEXIS 167609, at *26 (D. Del. Dec. 3, 2014) ("a parent corporation [] in some way consolidating by description its subsidiary's efforts and its own [] is not atypical, and certainly does not suggest that, via fraud or its equivalent, the parent corporation has become indistinguishable from the subsidiary."); *Roberts v. Wells Fargo Bank, N.A.*, No. 4:12-cv-200, 2013 U.S. Dist. LEXIS 44545, at *18 (S.D. Ga. Mar. 27, 2013) ("While Assurant's use of the personal pronouns 'we' and 'our' in their annual report and Form 10-K superficially seems to indicate the company's involvement in lender-placed insurance, that description alone is not dispositive. [Assurant] is a mere holding company, a corporation designed only to own other corporations and profit from that ownership. Isolated references to 'we' and 'ours' in public disclosures simply do not rebut that."); *Hickory Travel Sys. v. Tui Ag*, 213 F.R.D. 547, 554 (N.D. Cal. 2003) ("The crux of Plaintiff's alter ego argument is based on the facts that TUI AG wholly owns its subsidiaries, refers to them as divisions and not separate companies, reports their earnings in annual statements, boasts of corporate integration, and has made decisions about restructuring the businesses of some of those subsidiaries. All of these assertions are relevant to alter ego status, but even in combination they do not suffice to make a prima facie case of alter ego relationships.").

13

alter the actual facts regarding UC's, UI's, and UNA's organizational structure, management, operations, and finances, all of which are separate and distinct. (Rauterkus Decl. ¶ 25(b)).

c)   Any attempts by Plaintiffs to insinuate that UC may be involved at a macro-level in the affairs of UI or UNA, are also irrelevant. (SAC ¶¶ 13, 20). "A parent corporation's general involvement with the subsidiary corporation's performance, finance and budget decisions, and general policies and procedures does not provide a basis for attributing one corporation's contacts with the forum to the other for the purposes of personal jurisdiction." *Gordon*, 300 S.W.3d at 651-652. Indeed, normal activities of a parent corporation include "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures." *U.S. v. Bestfoods*, 524 U.S. 51, 72 (1998). Here, the officers and employees of UI and UNA are responsible for the day-to-day operations of those companies, and UC does not make or control the day-to-day decisions, operations, or affairs of UI or UNA. (Rauterkus Decl. ¶ 18). Accordingly, no alter ego finding is possible. *Hilani*, 863 F. Supp. 2d at 720-722 (no alter ego finding where "Plaintiff ha[d] not proven that [parent] [wa]s a sham or dummy corporation" or that the parent "ha[d] complete control over the day-to-day affairs or operations" of the subsidiary by "approv[ing] every decision must less direct[ing] every action of the" subsidiary "from its headquarters").[3]

d)   Plaintiffs refer to certain statements from the website www.uponorgroup.com and an employee handbook, which supposedly indicate that UC and related companies may operate as

---

[3] *See also Anwar*, 877 F.3d at 849-850 (no alter ego relationship despite evidence that (i) parent and subsidiary "shared board membership" and "some managers," (ii) the parent "provide[d] a source of funding to all of its" related companies, and (iii) the companies shared "a common website and engagement in a common enterprise," because these facts only showed "possible macro-management" by the parent); *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1074-1075 (9th Cir. 2015) ("A parent corporation may be directly involved in the financial and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego").

172391888v2

a single enterprise. (SAC ¶¶ 15-16). However, the referenced statements are not intended to, nor do they, communicate in detail the organizational structure, management personnel, operations, or finances of UC and other "Uponor" entities. Instead, these materials are intended to provide general information to customers and employees in a convenient, easy-to-understand, and accessible manner. (Rauterkus Decl. ¶ 25(c)). As a matter of law, these materials are not even indicia, much less proof, of an alter ego relationship. *See Anwar*, 877 F.3d at 849-850 (a "common website" used to engage in a "common enterprise" was insufficient to support an alter ego finding); *Torres v. Liberto Mfg. Co.*, 2002 U.S. Dist. LEXIS 14694, at *15-16 (N.D. Tex. Aug. 8, 2002) (parent company's creation of "a single employee handbook to be utilized by each of its subsidiaries does not evidence the kind of extreme control by a parent corporation over the operations of its subsidiaries so as to render it and the subsidiary a single" entity).

e)  Finally, under Tennessee and Sixth Circuit law, "fraud or similar injustice must be demonstrated[,]" and "mere dominance, standing alone," will not suffice absent "[u]se of [that] control to commit fraud or wrong[.]" *Se. Tex. Inns, Inc. v. Prime Hosp. Corp.*, 462 F.3d 666, 673-675 (6th Cir. 2006) ("Tennessee law still requires an element of fraud in order to pierce a corporate veil."); *see also Anwar*, 876 F.3d at 849 (a plaintiff must show "fraud or injustice" to pierce the corporate veil); *Dochnal v. Thomson Reuters Corp.*, 2018 U.S. Dist. LEXIS 178458, at *11 (E.D. Tenn. Oct. 17, 2018) (no jurisdiction based on alter ego theory where there was no risk that dismissing a foreign parent company would "substantially affect" the "ability to recover damages."). Here, there is no allegation – nor evidence – that UC somehow used UNA or UI to perpetrate any "fraud or similar injustice" involving the PEX, nor would dismissing UC cause Plaintiffs "injustice" since they have already named, and are already proceeding against, UI.

<u>Third</u>, it appears Plaintiffs also seek to impute UI's forum contacts to UC under an

"agency" theory, based on the SAC's assertion that UI and UNA "function as" UC's "representatives and agents" by "perform[ing] services that are significantly important to" UC, "such that if [UC] did not have [UI] and [UNA] to perform them, [UC] would undertake to perform substantially similar services itself." (SAC ¶ 18). However, the U.S. Supreme Court has unequivocally **rejected** the use of such an "agency" test to establish jurisdiction.[4] Accordingly, this Court should decline Plaintiffs' invitation to flout well-established precedent.[5]

---

[4] *Daimler AG*, 571 U.S. at 134-136 (rejecting Ninth Circuit's "agency test" for general jurisdiction which asked "whether the subsidiary 'performs services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services[,]'" because that test improperly "stacks the deck, for it will always yield a pro-jurisdiction answer"); *see also Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1024 (9th Cir. 2017) (concluding that, **for both general and specific personal jurisdiction**, *Daimler AG* "applies with equal force" and precludes the use of an "agency" test which asks whether a subsidiary performs "sufficiently important" services for a parent entity); *Apple Inc. v. Allan & Assocs. Ltd.*, 445 F. Supp. 3d 42, 56 (N.D. Cal. 2020) ("to the extent the agency theory remains viable in the specific personal jurisdiction context, it operates like the alter ego test" and requires "pervasive control" over a subsidiary's "internal affairs or daily operations").

[5] Plaintiffs cite two inapposite cases regarding personal jurisdiction over UC in Minnesota and Nevada. (SAC ¶ 19). But, on their face, those cases have nothing to do with the propriety of exercising jurisdiction over UC **here**, in a **different** forum (**Tennessee**), especially where those cases were decided without the benefit of the subsequent decisions referenced by UC herein. Specifically, in *George v. Uponor Corp.*, 988 F. Supp. 2d 1056, 1067 (D. Minn. 2013), the district court applied law that is not binding or applicable under the facts and circumstances involved here and concluded only that UI's forum contacts **in Minnesota could be imputed to UC because UI's location in Minnesota** purportedly served as UC's base of operations in the United States. Then, in a subsequent order, the district court clarified that its ruling **was Minnesota-specific**, and that "[f]inding personal jurisdiction over Uponor Corp. in Minnesota . . . [would] not broadly expose [it] to jurisdiction in any state where [UI] conducts business." *George v. Uponor Corp.*, 988 F. Supp. 2d 1056, 1079 (D. Minn. 2014). Likewise, in *Slaughter v. Uponor, Inc.*, No. 2:08-CV-1223-RCJ-GWF, 2009 WL 10693807, at *4-6 (D. Nev. Nov. 19, 2009), the district court made findings, **under non-superseded law**, exclusively focused on whether UC was subject to jurisdiction in Nevada based on its relationship with UI. However, in doing so, the district court expressly relied upon the Ninth Circuit's agency test which the Supreme Court **subsequently overruled and discredited in *Daimler* AG**. *Id.* Even more compelling – after the District Court's decision in *Slaughter*, the Nevada Supreme Court denied the presence of personal jurisdiction over UC in Nevada and held that it was legally **improper for a trial court to exercise jurisdiction over UC based on UI's forum contacts** without evidence showing that UC "has moved beyond

16

## IV. ALTERNATIVE ARGUMENT REGARDING ARBITRATION

### A. Plaintiffs Are Bound by the Warranty's Arbitration Provision

The Warranty binds Plaintiffs as "the owner[s] of the applicable real property" involved in this matter. (*See* Dkt. Nos. 10-2, 24-2, 67-2 (Beissel Decl.) ¶ 6 and Ex. 1 at p. 1). That includes the agreement to arbitrate contained in the Warranty. (*Id.*, at p. 2, "Warranty Claim Dispute Process"). All PEX sold by Uponor in the United States between October 15, 2012 and the completion of Plaintiffs' Properties in February 2017 and June 2014 is subject to and governed by the Warranty, including the PEX that was allegedly installed in Plaintiffs' Properties. (*Id.* ¶ 6 and Ex. 1 at p. 1). During that same period of time, the Warranty was continuously published and publicly available on UI's website. (*Id.* ¶ 7); *see also Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 756 (N.D. Cal. 2019) (buyers were charged with notice of, and bound by, limitations in a warranty that was publicly available on the defendant's website). Thus, Plaintiffs are legally and contractually bound by its terms, including its mandatory arbitration provision. *See Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003) ("non-signatories may be bound to an arbitration agreement under ordinary contract and agency principles," including beneficiary and assignment theories).

First, Plaintiffs are beneficiaries of the Warranty since it was clearly understood and intended for the Warranty to transfer and inure to the benefit of Plaintiffs, as the purported owners of the subject home after its construction. Indeed, Plaintiffs have once-again judicially admitted

---

the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's day-to-day operations in carrying out that policy." *Uponor Corp. v. Eighth Judicial Dist. Ct.*, 130 Nev. 1257 (2014). Accordingly, these cases lend no support to Plaintiffs' jurisdictional assertions here, and in fact, the holding of the Neveda Supreme Court in *Uponor Corp. v. Eighth Judicial Dist. Ct*., makes clear that there is no basis to extend jurisdiction over UC in the present case.

172391888v2

that they were persons and entities who would reasonably be expected to use, consume and/or affected by the PEX. (SAC ¶¶ 103-105). By itself, this binding concession mandates a finding that Plaintiffs are beneficiaries of the Warranty and bound by its terms. *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000). Moreover, the Warranty's plain language makes clear that it was intended to cover and govern homeowners who purchase real property from builders responsible for the initial installation of the PEX. Specifically, the Warranty contemplates and expressly provides that it may be transferred and assigned by the "original owner" of the real property to a new owner within 10 years after installation. (Dkt. Nos. 10-2, 24-2, 67-2 (Beissel Decl.) ¶ 6 and Ex. 1 at p. 2, "Transferability"). Consistent with that plain language, it is understood that the Warranty will ultimately cover, and inure to the benefit of, owners who acquire homes containing PEX from builders. (*Id.* ¶¶ 8-12). It also is axiomatic that builders, like Hannah, intend for the PEX Warranty to benefit subsequent home purchasers/owners – indeed, this very business model is predicated on building and then selling homes, together with all installed components and their corresponding warranties, such as PEX pipes. (SAC ¶¶ 103-105). Under these circumstances, Plaintiffs are third-party beneficiaries of the Warranty, and Tennessee law is clear that "an arbitration provision in a contract is enforceable *against* a third-party beneficiary who has filed a cause of action seeking to enforce a contract." *Benton v. Vanderbilt Univ.*, 137 S.W.3d 614, 616 (Tenn. 2004) (emphasis added); *see also Swift Enter., LLC v. Trunorth Warranty Plans of N. Am., LLC*, 2022 U.S. Dist. LEXIS 240986, at *24 (E.D. Tenn. Sept. 30, 2022). Here, Plaintiffs' claims related to the PEX seek recovery for nothing more than the PEX's supposed failure to perform as warranted. Thus, holding Plaintiffs to the Warranty's arbitration clause is manifestly appropriate.

Second, in their first two iterations of the Complaint, Plaintiffs alleged claims for breach

of implied warranty which legally and factually required, and thus necessarily presumed, contractual privity. (Dkt. No. 1 at ¶¶ 86-90 and Dkt. No. 19 at ¶¶ 119-123). *Americoach Tours, Inc. v. Detroit Diesel Corp.*, No. 04-2016 B/V, 2005 WL 2335369, at *8 (W.D. Tenn. Sept. 23, 2005). By asserting a claim requiring privity and by further asserting claims arising out of the contractual relationship, Plaintiffs are bound by the Warranty. *See Benton*, 137 S.W.3d at 618.

As set forth in UI's concurrently filed Motion, there is no basis for Plaintiffs' current attempt to avoid arbitration by tactically deleting their implied warranty allegations and admissions from the SAC. Plaintiffs offer no explanation for this proposed change other than the obvious one – i.e., to circumvent arbitration under the Warranty. While Plaintiffs proclaim they do not seek the repair and replacement remedies prescribed by the Warranty, (SAC ¶¶ 100), they nonetheless (i) fail to explain how or why they previously asserted implied warranty claims that depend on privity of contract with respect to the Uponor PEX, and (ii) fail to identify any other applicable contract governing the Uponor PEX, other than the Warranty. It is well-established a plaintiff cannot negate its prior judicial admissions, nor avoid arbitration, simply by amending its pleading to 'clarify' the claims brought", or by "removing" allegations and "tweaking the wording" of a complaint, and Plaintiffs' effort to do so here must fail. *Ntch W.-Tenn, Inc. v. ZTE USA, Inc.,* No. 111 CV 01169JDBEGB, 2011 WL 13147425, at *2 (W.D. Tenn. Dec. 29, 2011).[6]

<u>Third</u>, it is the regular practice of home builders to assign the warranties of products incorporated into newly constructed homes to the homes' purchasers – including product, material, and component warranties – as part of the completion of the delivery of the home from the builder

---

[6] Other courts are in accord with these dispositive principles. *See, e.g., Haynes v. Uponor, Inc.*, 2022 U.S. Dist. LEXIS 31877, at * 8 (N.D. Cal. Feb. 23, 2022); *Valdiviezo v. Phelps Dodge Hidalgo Smelter, Inc.,* 995 F. Supp. 1060, 1065–66 (D. Ariz. 1997); *Kilkenny v. L. Off. of Cushner & Garvey, L.L.P.,* No. 08-CV-588 KMK, 2012 WL 1638326, at *5; *Rubinstein v. Keshet Inter Vivos Tr.,* No. 17-61019-CIV, 2018 WL 8899230, at *5 (S.D. Fla. Oct. 17, 2018).

19

to the buyer of the home. This is particularly the case where Hannah, as a custom builder, constructed the Properties for the express benefit of Plaintiffs. Accordingly, Plaintiffs are also bound by the Warranty as assignees of that document. *See, e.g., Martin v. Cavalry SPV I, LLC*, 2014 U.S. Dist. LEXIS 43293, at *22-23 (E.D. Ky. Mar. 31, 2014) (arbitration may be compelled against a non-signatory assignee); *Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671-72 (Tenn. 2013) (contractual rights and obligations can be assigned).

### B. The Warranty's Arbitration Provision Covers Plaintiffs' Claims

In determining whether claims are covered by an arbitration clause, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Thus "where [a] contract contains an arbitration clause, there is a presumption of arbitrability in the sense that [an] order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986). Here, the Warranty provides that if UI and a property owner cannot informally resolve any dispute regarding an UI product (including PEX), then such dispute, or "any other claim or dispute between the parties in any way regarding the design, manufacture, sale, distribution or condition of any product, whether such claim or dispute is based on contract, warranty, tort or otherwise," are subject to arbitration, and the owner and UI "must arbitrate any and all claims which in any way relate to Uponor's products . . . whether based on contract, warranty, tort, or otherwise." (Dkt. Nos. 10-2, 24-2, 67-2 (Beissel Decl.) ¶ 6 and Ex. 1 at pp. 1-2). This broad language encompasses, and mandates, the arbitration of Plaintiffs' alleged claims against UC, all of which relate to the design, manufacture, condition, and performance of PEX allegedly sold by UI and installed in the Properties. That is

20

particularly true where the Warranty provides an owner's "exclusive remedies" with respect to products sold by UI that have allegedly 'failed" or are "defective." (*Id.* at p. 1). To that end, the Warranty's arbitration provision does not exclude any claims from its ambit, and the Warranty instead broadly governs "any claims arising from breach of contract, breach of warranty, tort, or any other claim arising from the sale or use of Uponor's products. (*Id.* at p. 2, "Miscellaneous"). When presented with similar arbitration clauses, courts in the Sixth Circuit have compelled arbitration,[7] and the Court must likewise compel arbitration in this case on an individual, not class, basis. *See Am. Express v. Italian Colors Rest.*, 570 U.S. 228, 233-238 (2013) (recognizing the enforceability of class action waivers in arbitration agreements).

## V.     ALTERNATIVE ARGUMENTS FOR MOTION TO DISMISS AND TO STRIKE

### A.     The ELR Bars Plaintiffs' Negligence and Strict Liability Claims

The economic loss doctrine "precludes recovery in tort when a product damages itself without causing personal injury or damage to other property." *Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 489 (Tenn. 2009) (adopting *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 868-71 (1986)). The lynchpin for defining "the product" is whether the allegedly defective item is part of an integrated package. *Americoach Tours, Inc.*, 2005 WL 2335369, at *3; *East River*, 476 U.S. at 870. If so, then damage to another part of the integrated package is treated as damage to "the product itself" and cannot be recovered via a tort claim. *Americoach Tours*, 2005 WL 2335369, at *3 (ELR barred a plaintiff from seeking tort damages against manufacturer of electrical components installed in a bus that was destroyed by a faulty heater because "the entire bus" was "the 'product itself[,]" and "all electrical or mechanical components of the heater were 'supplied . . . as part of an integrated package . . .

---

[7] *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004).

properly regarded as a single unit'"); *Tenn. Farmers Mut. Ins. Co. v. Ford Motor Co.*, No. W2001-00046-COA-R3-CV, 2002 Tenn. App. LEXIS 429, at *14-20 (Ct. App. June 17, 2002).[8] A contrary approach would eviscerate "the distinction between warranty and strict products liability." *East River*, 476 U.S. at 867-68.

The Sixth Circuit has applied the ELR in construction defect cases and held that: (1) a defective component or material installed in a structure constitutes only one part of an integrated product (namely, the structure itself); and therefore (2) a defective component or material does not cause damage to "other property" simply because it damages other portions of the structure. *See Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 850 (6th Cir. 2002) (wood used in a nursing home was not the "product," and instead, the "entire nursing home" was the product for the purpose of the ELR. Several other courts addressing the issue have applied *East River* and reached the same conclusion in the construction defect context, holding that the owner of a structure – including a **residential** structure – cannot maintain a tort claim against the supplier of an allegedly defective component installed during the construction process that subsequently caused damage to other parts of the same structure.[9]

Here – in violation of this law – Plaintiffs assert claims for strict product liability and

---

[8] Consistent with *East River*'s formulation of the rule, which multiple other courts throughout the country have adopted, "the 'product' is the product purchased by the plaintiff," *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 155-156 (Ind. 2005), and "the product" means "the finished product bargained for by the buyer rather than components furnished by a supplier." *Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F.2d 925, 928-930 (5th Cir. 1987); *see also King v. Hilton-Davis*, 855 F.2d 1047, 1051-1053 (3d Cir. 1988).

[9] *Ass'n of Apt. Owners v. Venture 15, Inc.*, 115 Haw. 232, 285-297 (2007); *Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors*, 659 A.2d 267, 271 (Me. 1995); *Wash. Courte Condo. Ass'n-Four v. Wash.-Golf Corp.*, 150 Ill. App. 3d 681, 686-687 (1986); *Bay Breeze Condo. Ass'n v. Norco Windows*, 257 Wis. 2d 511, 527-528 (Ct. App. 2002); *Casa Clara Condo. Ass'n v. Charley Toppino & Sons*, 620 So. 2d 1244, 1247 (Fla. 1993); *Pugh v. Gen. Terrazzo Supplies, Inc.*, 243 S.W.3d 84, 90-95 and n. 9 (Tex. App. 2007); *Higginbotham v. Dryvit Sys.*, 2003 U.S. Dist. LEXIS 4530, at *7-18 (M.D.N.C. Mar. 20, 2003).

172391888v2

negligence, against UC based on allegations that supposedly defective PEX in the Properties' plumbing systems has purportedly caused damage to various other parts of the Properties. (SAC ¶¶ 53, 62, ¶¶ 102-128). As a matter of law, the Properties themselves constitute a single integrated product purchased by Plaintiffs, and any damage to various aspects of the Properties **cannot** satisfy the "other property" exception to the ELR. While Plaintiffs assert boilerplate and conclusory allegations about how the PEX allegedly caused damage to unspecified "property . . . other than the defective PEX itself," (*id*. ¶¶ 60-62, 66-67), this is patently insufficient to overcome the economic loss rule, especially after multiple pleading attempts. *See Dana Ltd. v. Aon Consulting, Inc.*, 984 F. Supp. 2d 755, 767 (N.D. Ohio 2013). Plaintiffs' tort-based construction defect claims are precisely what the ELR forbids, especially where Plaintiffs also do not allege damage to "other property," nor personal injury purportedly caused by the PEX. (SAC ¶¶ 53, 62).

### B. The Court Should Also Dismiss Plaintiffs' Tort Claims For Lack of Causation

The Court should also dismiss Plaintiffs' claims for strict product liability, strict product liability for design defect, and negligence, as well as dismiss/strike the SAC's related class allegations, because Plaintiffs have failed to adequately plead causation in support of these claims. *Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 686, 704 (Tenn. 2011); *Parsons v. Wilson Cnty.*, No. M201400521COAR3CV, 2015 WL 5178601, at *5 (Tenn. Ct. App. Sept. 3, 2015). In disregard of this fundamental pleading requirement, the SAC: (i) speculates that the supposed color-coating process generally causes the PEX to experience "microcracks" and "prematurely" degrade; and then (ii) baldly presumes that this alleged color-coating process specifically caused the PEX in Plaintiffs' Properties to leak. (SAC ¶¶ 38-47). The Court cannot credit Plaintiffs' speculative conclusions and unsupported theory of causation, even at the pleading stage. *Tilden v. Gen. Elec. Co.*, No. 3:11-CV-628, 2012 WL 1023617, at *5 (E.D. Tenn. Mar. 26, 2012). This is particularly

true because the Supreme Court has made clear that "[t]he plausibility standard . . . asks for more than a sheer possibility" of liability[,]" and "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Tilden*, 2012 WL 1023617, at *1. Courts in the Sixth Circuit agree that "mere consistency does not establish plausibility of entitlement to relief even if it supports the possibility of relief." *JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*, 615 F. Supp. 3d 750, 759 (M.D. Tenn. 2022).

Accordingly, Plaintiffs' bare speculation that the PEX's alleged color-coating process caused the purported leaks in their Properties is patently incapable of sustaining the SAC's strict liability and negligence claims, as Plaintiffs fail to even account for – let alone plead facts excluding – obvious alternative explanations for the purported leak, such as faulty installation of the PEX during the construction process, operational conditions beyond the design parameters of the PEX, as well as the mean/methods used to disinfect the PEX after installation and before being placed into service. *Maness v. Bos. Sci.*, 751 F. Supp. 2d 962, 969 (E.D. Tenn. 2010); *King v. Danek Med., Inc.*, 37 S.W.3d 429, 435 (Tenn. Ct. App. 2000).

### C. Plaintiffs' Proposed Class is Overbroad and Not Ascertainable

Federal courts may dismiss or strike class allegations at the pleading stage, and the Sixth Circuit has expressly affirmed the propriety of doing so. *Pilgrim v. Univ. Health Card, LLC*, 660 F.3d 943, 946-950 (6th Cir. 2011); *see also Tietsworth v. Sears, Roebuck and Co.*, 720 F. Supp. 2d 1123, 1145–46 (N.D. Cal. 2010). Here, the proposed class definition – "All persons or entities who own homes, businesses, or other structures in Tennessee with Uponor PEX used as the lines and components of a potable water plumbing system" – is overbroad and not ascertainable on its face. First, the members of any class or hypothetical sub-class could only be ascertained with a

deep-dive into the unique condition of each owner's PEX and property, as well as the nature of each owner's interactions, if any, with any one of the Uponor entities.  Because the Court would have to engage in extensive, individualized mini-trials to arrive at a potentially valid class, the proposed class is not ascertainable, nor do common issues predominate over individual ones.  Case law uniformly holds that these types of individualized determinations warranty striking the class.[10] Second, the presence of Uponor PEX in a structure's potable water plumbing system – which is typically concealed as part of the installation behind walls, ceilings and floors – is not readily known to or observable by property owners, especially where: (i) the PEX is not typically sold directly to property owners; rather it is acquired by builders or their contractors from third-party retailers, and then installed in structures which are later sold; and thus (ii) there are no reliable records or other methods for identifying properties with Uponor PEX installed other than conducting invasive/destructive work on a residence-by-residence basis.  For these additional reasons, the proposed class is not ascertainable or administratively feasible.[11]

## VI.  CONCLUSION

For the foregoing reasons, the Court should: (i) grant UC's Motion, and (ii) enter an Order: (a) dismissing UC with prejudice; or alternatively, (b) to the extent any of the Plaintiffs' claims are deemed viable by the Court, compelling individual arbitration of those remaining claims, or (c) if the Court declines to order arbitration, dismiss the claims for the reasons set forth above.

---

[10] See In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig., 2017 U.S. Dist. LEXIS 88496, at *17-20 (N.D. Ga. June 8, 2017) PB Prop. Mgmt. v. Goodman Mfg. Co., 2016 U.S. Dist. LEXIS 97520, at *61-70 (M.D. Fla. 2016); Colley v. P&G, 2016 U.S. Dist. LEXIS 137725, at *24-25 (S.D. Ohio Oct. 4, 2016).
[11] See Lee-Bolton v. Koopers Inc., 319 F.R.D. 346, 383 (N.D. Fla. 2017); In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig., 2017 U.S. Dist. LEXIS 88496, at *8.

172391888v2

Dated:     June 13, 2024

By: /s/ M. Andrew Pippenger

M. Andrew Pippenger, BPR 018183
PURYEAR LAW GROUP
104 Woodmont Boulevard
Woodmont Centre, Suite 201
Nashville, TN 37205
Tel: (615) 630-6601
Fax: (615) 630-6602
apippenger@puryearlawgroup.com

*Attorney for Specially Appearing Defendant*
*Uponor Corporation*

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that on June 13, 2024, the foregoing pleading was electronically filed with the Clerk of Court using the CM/ECF filing system which automatically sends email notifications of such filing to the following attorneys of record:

Andrew J. Pulliam (Tenn. BPR No. 016863)
James C. Bradshaw III (Tenn. BPR No. 013170)
J. Graham Matherne (Tenn. BPR No. 011294)
Ann Weber Langley (Tenn. BPR No. 038070)
WYATT, TARRANT & COMBS, LLP
333 Commerce Street, Suite 1050
Nashville Tennessee 37201
Telephone: (615) 244-0020
Fax: (615) 256-1726
Email: apulliam@wyattfirm.com
Email: jbradshaw@wyattfirm.com
Email: gmatherne@wyattfirm.com
Email: alangley@wyattfirm.com

*Attorneys for Plaintiffs*

            /s/ M. Andrew Pippenger
            M. Andrew Pippenger

26