**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **BRIAN CARRICO; KACIE CARRICO; DON GATLIN; and DORA GATLIN; individually and on behalf of all others similarly situated,** ) ) ) ) | |
| **Plaintiffs,** ) ) | |
| **vs.** ) ) ) | |
| **UPONOR, INC.;** ) **UPONOR NORTH AMERICA, INC.;** ) **UPONOR CORPORATION; and** ) **DOES 1 through 100, inclusive,** ) ) | **NO. 3:23-CV-00497** **JUDGE RICHARDSON** **MAGISTRATE JUDGE FRENSLEY** **JURY DEMAND** |
| **Defendants.** ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
SPECIALLY APPEARING DEFENDANT UPONOR CORPORATION'S
MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION [ECF #69]**

## I. INTRODUCTION

At all relevant times, Uponor Corporation ("UC"), Uponor North America, Inc. ("UNA"), and Uponor, Inc. ("UI") designed, manufactured, marketed, sold, and distributed defective piping ("PEX") for use in plumbing systems in residences and other structures throughout the United States. The defective PEX caused water leaks and damages to property owners in Tennessee. UC is subject to personal jurisdiction in Tennessee and its alternative arguments are unavailing.[1] UC's Motion (ECF #69; "Motion"), therefore, should be denied. Alternatively, the Court should allow discovery regarding the issues raised by the Motion and presentation of facts to the Court.

---

[1] UC's alternative arguments in ECF #69 (*i.e.*, Alternative Motion To (1) Compel Arbitration; (2) Dismiss Plaintiffs' Second Amended Complaint and Class Allegations; and (3) Strike Class Allegations) are the same arguments made in UI's Motion to Compel Arbitration or, Alternatively, To (1) Dismiss Plaintiffs' Second Amended Complaint and Class Allegations; and (2) Strike Class Allegations (ECF #67; "UI's Motion"). Thus, Plaintiffs respond to such alternative arguments within Plaintiffs' response to UI's Motion (filed simultaneously herewith).

## II. STATEMENT OF FACTS

**A.    UC Admits That—Through Its Building Solutions—North America Division—It Markets, Distributes, and Sells PEX In Tennessee**

The Court may exercise jurisdiction over UC based on its own admissions and activities including that it operates in the United States through its Building Solutions—North America division, which division includes co-defendants Uponor NA and Uponor, Inc.

UC is the ultimate parent company for both UNA and UI  *See* Business Entity Disclosure Form for Uponor, Inc. (ECF #15).  UI is a subsidiary of UNA, which is a subsidiary of Uponor, NA Holding, Inc., and Uponor, NA Holding, Inc. is a subsidiary of UC.  *Id.*  Each company in the chain wholly owns the company beneath it.  *George v. Uponor Corp.*, 988 F. Supp.2d 1056, 1065 (D. Minn. 2013).  Thus, there is no dilution in ownership between UC, UNA, and UI.  *Id.  See also* SAC ¶ 12.

UC's 2022 Annual Review Report ("Report") demonstrates that the Uponor entities view themselves as a single enterprise called "Uponor Group" that is divided by geographic divisions with UC at the head.  Report[2] at *passim*.  In its Report, UC refers to itself and its subsidiaries as "the Group," a single business enterprise engaged in selling plumbing products in more than 80

---

[2]    The Report is attached as Exh. 11 to the Declaration of Andrew Pulliam ( "Pulliam Dec.") submitted with Plaintiffs' Response in Opposition to Specially Appearing Defendant Uponor North America, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction ("UNA Motion Resp.") filed herewith.  *See* Exh. 11.  The Report also can be found at www.uponorgroup.com/en-en/investors/reports-and-presentations/annual-publications.    Plaintiffs incorporate herein the Pulliam Dec. as well as all of the exhibits filed with that Declaration.  Plaintiffs have requested that the Court take judicial notice of, or at least admit for consideration as evidence, the exhibits to the Pulliam Dec.  *See* Request to Take Judicial Notice filed with UNA Motion Resp.  Courts routinely find that statements on a party's website are considered an admission by a party opponent under FRE 801(d)(2)(A) and business records under FRE 803(6).  *See, e.g., Aug. v. Boyd Gaming Corp.*, 135 Fed.Appx. 731, 733 (5th Cir. 2005); *Bouton v. Ocean Props., Ltd*, 2017 WL 4792488, at *28 (S.D. Fla. Oct. 23, 2017); *BP Exploration & Prod'n Inc. v. Cashman Equipment Corp.*, 2016 WL 1387907, at *11 (S.D. Tex. Apr. 8, 2016); *DePaola v. Nissan Hosp. Am., Inc.*, 2005 WL 2122265, at *7 (M.D. Ala. Aug. 29, 2005).

countries. *Id.* at p. 2, 4, 68. UC treats North America as one division of its worldwide plumbing business called Building Solutions—North America. *Id.* at pp. 3, 15. *See also* FAC ¶ 13. The Report:

(i)     outlines "Group strategy" (p. 2);

(ii)    ***states that Uponor Group (not individual companies) "employs about 4,000 professionals in 26 countries in Europe and North America"*** (p. 4);

(iii)   ***states that "In Building Solutions—North America, we [Uponor Corp.] continued to make inroads into the commercial market and to leverage on our global offerings and brought new, innovative products to the local market"*** (pp. 6 & 10);

(iv)    ***states that Uponor "aims to create a new Uponor-wide operating model"*** (p. 7);

(v)     states that "Building Solutions-North America . . . serve[s] the United States and Canadian markets with PEX plumbing," states that "in North America, Uponor is a premium brand with an attractive positioning, especially in the PEX sector," and states that "***Uponor has two manufacturing facilities in North America, making it one of Uponor's manufacturing strongholds***" (p. 15);

(vi)    highlights Uponor Group work (including PEX piping) at a high-rise project in Orlando, Florida called "Society Orlando" (p. 16);

(vii)   states that Uponor Corp. has on its executive committee the "President, Building Solutions—North America" (p. 20);

(viii)  states that "***the President and CEO [of Uponor Corp.] is in charge of the Group's day-to-day management***" (p. 28);

(ix)    states that "***The Group aims to embed control in the daily operations" of all Uponor companies*** (p. 32);

(x)     states that "Assessment of risks regarding financial reporting is part of the Group's overall internal control and risk management framework" (p. 33);

(xi)    ***states that "Uponor is a global company that employs 4214 professionals in 27 countries in Europe and North America"*** (p. 40);

(xii)   states regarding Personnel that "the Uponor Group" had 4234 employees in full-time employment as of the end of December 2021 (p. 49);

(xiii) provides a "Review by business division" (as opposed to a review of subsidiary performance) and refers to Uponor in North America as a division of Uponor Corp. by saying that "***The Building Solutions—North America division serves local markets with PEX plumbing*** . . . ." (p. 50);

(xiv) states that "***Common people, brand, technology, sustainability, innovation, R&D and IT matters are managed at Group level*** in order to benefit from global presence and maximum global synergies" (p. 53);

(xv) states that ***Uponor Group*** "***has 16 manufacturing facilities in Europe and North America, which exposes the company [Uponor Corp.] to possible environmental risks***" and that "Approximately 60% of Uponor's net sales were generated in countries other than the euro" (p. 56); and

(xvi) ***refers to "Uponor's segments" as its "reporting divisions . . . Building Solutions—Europe, Building Solutions—North America*** and Uponor Infra" (p. 75).

(emphasis added). UC claims its Building Solutions—North America division's sales, profits, and liabilities as its own. Report at 46-47. In 2022, UC claimed that ***35% of its net sales*** and ***57% of its operating profits*** were from its Building Solutions—North America division. *Id. See also* SAC ¶ 14. In fact, Uponor's Report describes net sales for the Uponor Group as one unit and not by subsidiary, stating that "the 10 largest countries were as follows: the USA 30.3[%], Germany 10.7%, Sweden 10.5%, Finland 10.2%, Canada 4.5%, the Netherlands 4.3%, Denmark 4.3%, Poland 3.7%, Spain 2.7. and Norway 2.4%." Report at 46.

Uponor does not have its 2023 Annual Report posted at its website. However, Uponor has posted its "Uponor Corp. Financial Statements Bulletin for January-December 2023" ("Bulletin").[3] The Bulletin confirms UC's factual admissions from the Report about its divisions as its alter egos and agents by stating as follows:

> i. "Uponor Group's net sales for 2023 reached . . . $1,386.2 million . . . ." The Building Solutions—North America Division had 44% of those net sales for the Group. (p. 9)

---

[3]     Attached to Pulliam Dec. as **Exhibit 12**.

ii.     "Measured in terms of reported net sales and their respective share of Group net sales, the largest countries were as follows:  the U.S. 35.5%, Germany 10.9%, Sweden 9.7%, Finland 7.8%, Canada 5.3%, the Netherlands 4.6%, Poland 3.5%, Denmark 3.2%, Spain 3.05, and Norway 2.4%."  (p. 9; cleaned up)

iii.     The Building Solutions—North America Division generated 73.5% of Uponor Group's operating profits for 2023.  (p. 9)

iv.     "***Uponor Group's profitable growth strategy centres around maximising the core, a step-change in innovation, a People First agenda to drive an engaged, performance-based culture*** and leading the construction industry towards net zero while at the same time improving the resiliency of the company."  (p. 11; emphasis added)

v.     "Throughout the year, strong momentum was maintained in the execution of Uponor's Transformation programme.  ***The Transformation actions have included investing into R&D, rationalising product portfolios, simplifying organisational structures, improving productivity, and driving globally harmonised processes and systems.*** . . ." (p. 11; emphasis added)

vi.     "At the end of 2023, ***Uponor Group had 3527 . . . employees in full-time equivalent (FTE) terms.  The decrease in the number of employees is related to the ongoing Uponor-wide Transformation programme***, the sale of Uponor Infra's district energy business as well as workforce reductions due to weakened market conditions.  The average number of employees (FTE) for January-December 2023 was 3703[.]"  (p. 11; emphasis added)

vii.     Review by business division at pages 13-15.

viii.     "The Building Solutions—North America division serves local markets with PEX plumbing . . . .  The division has production in the United States."  (p. 14)

Bulletin at 9, 11, 13-15.

The website for the Uponor Group is www.uponorgroup.com ("Website").  Report at 40, 117.  The address for Uponor Group at the website is Uponor Corporation, Ilmalantori 4, 00240 Helsinki, Finland.  *See* Website (at bottom).  The domain name for emails of employees of UC, UNA, and UI is uponor.com.  *See id.  See also* SAC ¶ 15.

An employee handbook for Uponor employees provides under the heading "Uponor of Today" that "***Uponor Corporation***, based in Helsinki, Finland, is a publicly traded company and

***operates throughout Europe and North America***.  Uponor's operations are organized into four regions – Uponor North America, Uponor Nordic, Uponor Central Europe, and Uponor Europe WES (West, East, and South)."  Uponor Employment Handbook at ii (emphasis added).[4]  *See also* SAC ¶ 16.

Further evidence shows that UC is specifically subject to personal jurisdiction in Tennessee through UNA's actions.  In *State Farm Fire & Casualty Co. v. Uponor North America, Inc.*, Hamilton County Circuit Court Case No. 19C1335 (filed December 2, 2019; "*State Farm* case"), UNA, as the head of UC's Building Solutions—North America division, admitted in a judicial pleading filed in Tennessee that it—***Uponor North America, Inc.***—markets and sells various plumbing products including PEX piping for residential and commercial spaces in Tennessee.  Pulliam Dec. Exh. 1 Complaint & Answer ¶¶ 2 & 3.[5]  *See also* SAC ¶ 21.

This shows that there is direct evidence that UC, through UNA and UI, intentionally markets and sells PEX in Tennessee.  In an effort to avoid the consequences of the harm and damages caused by their defective PEX, Defendants try to have the Court ignore this direct evidence supporting jurisdiction over UC by making disingenuous arguments about such evidence.  Even though UNA admitted that it markets and sells PEX in Tennessee in Paragraphs 2 and 3 of its Answer in the *State Farm* case, UNA asserted in its Reply In Support of Its Dismissal Motion (ECF #41; "UNA Reply") that it "**did NOT admit [the] jurisdictional allegations in its answer.**"

---

[4]      Attached as Exhibit 13 to the Pulliam Dec.

[5]      State Farm's Complaint and Uponor North America, Inc.'s Answer to the Complaint in the *State Farm* case are attached as Collective Exh. 1 to the Pulliam Dec.  Moreover, UC admits that UNA does this.  UC's Memorandum in Support of Its Dismissal Motion (ECF #69-1; "Memo") relies on Stacey Beissel's original declaration which admits that UNA sells PEX in the United States.  *See* Memo at 6.  Ms. Beissel's original declaration (ECF #10-2 & #13-1), which was filed in support of UNA's original motion (ECF #10) and UI's original motion (ECF #13), included UNA in the definition of Uponor and admitted that Uponor (including UNA) sells PEX in the United States.  *Id.* ¶ 2, 6.

*Id.* at 2-3 (citing Answer ¶ 16) (emphasis in original). That is incorrect. In *State Farm*, Complaint ¶ 16 alleged that UNA "is subject to the Tennessee Long-Arm statute, and a Tennessee court's jurisdiction over this cause of action, because it was purposefully engaging in business activities in Tennessee that caused Plaintiff its damages[.]" UNA's Answer ¶ 16 ***did not deny the jurisdictional allegations*** but only said as its total response that UNA "denies that ***it caused damages*** as alleged in Paragraph 16 of the Complaint." *Id.* (emphasis added). UNA's Answer did not deny that it is subject to jurisdiction in Tennessee or deny that it purposefully engaged in business activities in Tennessee. To the contrary, UNA admitted that it markets and sells PEX in Tennessee. *Id.* ¶¶ 2 & 3.

UC has further admitted that it and UNA provide products and work on projects in other states, thereby confirming UC's activities in the United States:

- The Report highlights Uponor Group's work (including PEX piping) at a 1.5 million-square-foot high-rise project in Florida's Central Business District in Orlando, Florida called "Society Orlando." Report at p. 16.

- A January 28, 2009 Stock Exchange Release by Uponor Corp. states that "Uponor is a leading supplier of plumbing and heating systems for the residential and commercial building markets across Europe and North America[.]" Uponor Corp. Stock Exchange Release 28 Jan. 2009 (attached as Exhibit 17 to the Pulliam Dec.).

- UNA designed plumbing systems at UCLA's Wasserman Eye institute in California and provided its products on other California projects such as the Exploratorium at Pier 15 in San Francisco and the Wilshire Grand in Los Angeles. *See* Pulliam Dec. Exhibit 14: https://www.uponor.com/en-us/r/ucla-wasserman-eye; Pulliam Dec. Exhibit 15: https://www.uponor.com/en-us/case-studies?state=73.

- UNA partnered with Belkin International to form a joint venture named Phyn to design a system that detects leaks and shuts off the system. The below-referenced website states that: "Uponor North America, through a joint venture named Phyn, might have come up with the solution." ""We are really excited,' said **Bill Gray, president of Uponor North America**." *See* Exhibit 16 to the Pulliam Dec.: https://www.startribune.com/uponorjoint-venture-produces-device-to-let-you-know-if-there-is-a-leak-in-yourpipes/472384393/?refresh=true (emphasis added).

**B.      Other Federal Courts Have Found Facts Establishing That UC Is Subject to Personal Jurisdiction In The United States**

Other federal courts have exercised personal jurisdiction over UC in other states. *See, e.g.*, (1) *George v. Uponor Corp.*, 988 F. Supp.2d 1056 (D. Minn. 2013); (2) *Slaughter v. Uponor Corp.*, 2:08-CV-01223 (D. Nev.), Order of 11/19/09 (ECF #259); and (3) *Hartmann v. Uponor Corp et al.*, 2014 WL 12781339 (D. Nev. Mar. 6, 2014).[6]  *See also* SAC ¶ 19.  In the *George* case, the court set forth facts showing that UC and UI—with the companies between them—are in a symbiotic relationship that allowed the exercise of personal jurisdiction over UC and its subsidiaries in the U.S. by finding that (i) there was no dilution of ownership between UC and UI, (ii) UI operates as an extension of UC's Business – a single enterprise divided by geographic reporting regions, (iii) the "Uponor-About Us" webpage further suggested a symbiotic relationship between the companies, (iv) UC claimed North American profits and liabilities as its own, and (v) UC and UI's relationship went beyond "mere ownership" and more closely resembles the sort of symbiotic relationship discussed in *Anderson v. Dassault Aviation*, 361 F.3d 449, 455 (8th Cir. 2004).  *George*, 988 F. Supp.2d at 1065-67 (factual documents cited by the court are available via the ECF system and are incorporated herein).

Similarly, in *Edwin K. Slaughter et al., v. Uponor, Inc. et al.* (Case 2:08-cv-1223-RCJ-GWF), the District Court for the District of Nevada issued an Order on November 19, 2009, which denied UC's Motion to Dismiss for Lack of Personal Jurisdiction.  In the Order, Judge Jones found

---

[6]      The opinions/order from the *George*, *Slaughter*, and *Hartmann* cases are attached as Collective Exhibit 18 to the Pulliam Dec.  *See* Pulliam Dec. Exh. 18.  The Court can consider facts from other cases finding that there is personal jurisdiction over UC in other states as evidence in assisting Plaintiffs to make a *prima facie* case that there is jurisdiction over UC here.   "The [foreign] judgment is admissible in evidence to prove that it was rendered and as *prima facie* evidence of the facts adjudicated."  *United States v. Garland*, 991 F.2d 328, 332-33 (6th Cir. 1993); *see also Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 553 n.2 (6th Cir. 2012).

that grandparent UC was subject to personal jurisdiction in Nevada because (i) UC admitted that it controlled grandchild company UI, (ii) UC is in the same line of business as UI, (iii) Uponor Group is not just a group of companies owned for investment or trademark licensing purposes, but those companies are owned in order to engage in a common line of business, (iv) Uponor Group employed 4,100 employees globally, and (v) Uponor Group operated in 20 countries throughout the world at that time. *Slaughter*, 11/19/09 Order at 6-11 (factual documents cited by the court in that order are available via the ECF system and are incorporated herein).[7]

## III. LEGAL ANALYSIS

### A. The Court May Exercise Personal Jurisdiction Over UC

The allegations in the Second Amended Class Action Complaint (ECF #65; "SAC") and the evidence submitted with Plaintiffs' UNA Motion Resp. and this response make a *prima facie* showing that personal jurisdiction exists over UC. UC has purposefully availed itself of the privilege of marketing, distributing, and selling PEX piping in Tennessee (and profiting from such sales), Plaintiffs' claims arise from UC's activities in Tennessee, and UC's actions of marketing, distributing, and selling PEX piping in Tennessee have a substantial enough connection with Tennessee to make the exercise of jurisdiction reasonable.

#### 1. Standard for Determining Personal Jurisdiction

When deciding a personal jurisdiction motion, the Court may: (1) rule on the motion on the basis of the affidavits and other evidence; (2) permit discovery related to the motion; or (3) conduct an evidentiary hearing on the motion. *Hilani v. Greek Orthodox Archdiocese of America*,

---

[7] The Business Entity Disclosure Form for Uponor, Inc. (ECF #15), Uponor's 2022 Annual Report (Pulliam Dec. Exh. 11), and Uponor's 2023 Bulletin (Pulliam Dec. Exh. 12) confirm that these facts are still true and accurate now but with higher numbers in some areas such as Uponor Group operating in 80 countries now.

863 F. Supp.2d 711, 718 (W.D. Tenn. 2012). When both sides submit competing evidence, but no request for discovery is made, the Court may address the jurisdictional issues on the basis of declarations and other evidence presented. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). "***A plaintiff's burden is 'relatively slight' when establishing personal jurisdiction based on written submissions and affidavits.*** Viewing the facts in favor of the plaintiff, the plaintiff must make only a *prima facie* showing that personal jurisdiction exists." *AMB Media, LLC v. ONEMB, LLC*, Slip Copy, 2023 WL 3766597, at *2 (E.D. Tenn. June 1, 2023) (citations and quotations omitted) (emphasis added). "The pleadings and affidavits submitted must be viewed in a light most favorable to the plaintiff, and ***the district court should not 'consider facts proffered by the defendant that conflict with those offered by the plaintiff.*'**" *Hilani*, 863 F. Supp.2d at 718 (quoting *PT Pukuafu Indah v. U.S. Sec. & Exch. Comm'n*, 661 F.3d 914, 920 (6th Cir. 2011)) (emphasis added).

### 2. UC. Is Subject To Specific Personal Jurisdiction In Tennessee

UC is subject to specific personal jurisdiction in Tennessee based on several grounds. Specific jurisdiction "grants jurisdiction only to the extent that a claim arises out of or relates to a defendant's contacts in the forum state." *Karri v. BMW (US) Holding Corp.*, 2023 WL 3131990, at *9 (M.D. Tenn. Apr. 27, 2023). As discussed in detail below, UC is subject to specific personal jurisdiction based on (1) Tennessee's Long-Arm Statute, (2) UC's purposeful availment in Tennessee through its Building Solutions—North America division; (3) UC's alter ego United States subsidiaries UNA and UI, and (4) UNA and UI acting as UC's agents in marketing, selling, and distributing PEX in Tennessee.

### a.     Tennessee's Long-Arm Statute Supports a Finding of Specific Personal Jurisdiction

Tennessee's Long-Arm Statute provides statutory bases for the exercise of specific personal jurisdiction over UC including that it "[t]ransacted any business in this state;" "[c]aused tortious injury by an act or omission in this state;" and "[c]aused tortious injury in this state by an act or omission outside this state."  Tenn. Code Ann. § 20-2-223(a)(1), (3), (4).  The "use of the word 'any' [in Long-Arm "transacted any business" statutes] establishes that even the slightest transaction is sufficient to bring a corporation within [a forum's] long-arm jurisdiction." *Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 504-05 (6th Cir. 2014).

As admitted by UC in various documents including the Report and Bulletin, UC transacted business in Tennessee and caused tortious injury here through the activities of its Building Solutions—North America division.  UC realized **57% of its 2022 operating profits (30% of net sales)** and **73% of its 2023 operating profits (44% of net sales)** from its Building Solutions—North America division's sales.  Report at 46-47; Bulletin at 9, 14.  That same division—through UNA—admits that it sells PEX into Tennessee.  Pulliam Dec. Exh. 1.  Here, there is much more than a relatively slight transaction by UC in the United States and Tennessee.

### b.     UC Is Subject to Specific Personal Jurisdiction Because It  Purposefully Availed Itself of the Privilege of Doing Business in Tennessee

In evaluating a claim of specific jurisdiction, the Court must apply a three-part test.  First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State. *Ford Motor Co. v. Montana Eighth Judicial District Ct.*, 592 U.S. 351, 359 (2021).  Second, the plaintiffs' claims must "arise out of or relate to" the defendant's activities in the forum State. *Bristol-Myers Squib.*

11

*Co. v. Superior Court*, 582 U.S. 255, 262 (2017).  Third, the exercise of jurisdiction must be reasonable under the circumstances.  *Id.* at 272.

As shown by the following, the three-part specific jurisdiction test is satisfied here.

### (1)     UC Admits That It Has Purposefully Availed Itself of the Privilege of Doing Business in Tennessee

Regarding the purposeful availment part of the test, "[t]he relevant inquiry is whether the defendant has engaged in some overt actions connecting the defendant with the forum state." *Karri*, 2023 WL 3131990, at *10 (citations and quotations omitted).  "Put another way, the question is whether a defendant has followed a course of conduct directed at the society or economy within the jurisdiction of a given sovereign."  *Id.* (citations and quotations omitted). Intentionally cultivating contacts with a forum is sufficient to exercise personal jurisdiction. *Johnson v. Griffin*, 85 F.4th 429, 432-33 (6th Cir. 2023).

UC—via its Building Solutions—North America division—has intentionally directed Uponor PEX into the Tennessee economy.  UC admits in its Report and Bulletin that—through its Building Solutions—North America division—it markets and sells its PEX products throughout the United States.  Report at 6, 10, 50; Bulletin at 9, 11, 13-15.  The SAC also alleges that UC does so.   SAC ¶¶ 12-18.  UC admits that it "operates throughout . . . North America," has a manufacturing stronghold in the U.S., and serves local U.S. markets with PEX.  Report at 6, 10, 15, 50; SAC ¶ 14.  UC also admits that it works on, and has provided Uponor products to, projects in other states.  Report at 16; Pulliam Dec. Exhs. 14-17.  UC further admits that it reaps the profit of sales in the United States and purposefully derives benefits from its activities in Tennessee. Report at 46-47.  Indeed, the Building Solutions—North America division generated 57% of the Uponor Group's operating profits in 2022 and 73% of those profits in 2023.  *Id.*; Bulletin at 9, 14.

12

*Mott v. Schelling & Co.*, 1992 WL 116014 (6th Cir. May 29, 1992), supports a finding that UC purposefully availed itself of the privilege of doing business in Tennessee. In *Mott*, the Sixth Circuit ruled that "even a single act can support jurisdiction as long as it creates the required relationship with the forum state." *Id.* at *4. The court found that Schelling, an Austrian-based saw manufacturing company, was subject to jurisdiction in Michigan even though the defective saw was sold to Schelling's agent in Alabama, because

> Schelling knew its saws were being sold in the United States. The company actively cultivated its market here, and benefited from numerous U.S. sales, including the one in this case, over many years. Clearly Schelling cannot reasonably expect to sell a potentially dangerous product into the United States, exact its price, and then shirk any obligations that arise when its machine goes awry. Due process does not require us to allow Schelling to exploit this country's vast, rich markets and at the same time avoid the jurisdiction of our courts. Under any formulation of the test, the district court properly exercised personal jurisdiction over Schelling.

*Id.* at *6. This analysis applies to UC here to show that it is subject to personal jurisdiction in Tennessee for the same reasons Schelling was subject to personal jurisdiction in Michigan. UC knows that its PEX is being sold in the United States via manufacture at Uponor Group's Minnesota manufacturing facility, *see* Report at 15, 56, and then sold to distributors in Tennessee. UC—through its North America division—actively cultivates its U.S. market and benefits from numerous U.S. sales. UC cannot be allowed to sell a defective product in Tennessee and then shirk its obligations when that defect causes injuries to many Tennesseans. It would be unjust to allow UC to exploit U.S. markets and then avoid the jurisdiction of U.S. courts.

### (2) Plaintiffs' Claims Relate to Defendants' Activities in Tennessee

Regarding the second part of the test, a strict causal relationship between the plaintiff's injuries and the defendant's activities in the forum is not required. A plaintiff's actions need only be related to the defendant's activities in the forum in order for the forum to exercise jurisdiction.

*Ford*, 141 S. Ct. at 1026. Specific jurisdiction attaches "when a company . . . serves a market for a product in the forum state and the product malfunctions there." *Id.* at 1027. The "arise out of or relate to" standard is "***a 'lenient standard' and . . . the cause of action need not 'formally' arise from defendant's contacts.***" *Sanders v. Allenbrooks Nursing & Rehab. Ctr., LLC*, Slip Copy, 2020 WL 5651675, at *5 (W.D. Tenn. Sept. 22, 2020) (citations omitted) (emphasis added).

As pled in the SAC, the defective PEX was supplied by Defendants and installed in Plaintiffs' Homes. SAC ¶¶ 27, 36, 37. UC's activities of selling and distributing PEX in Tennessee through its Building Solutions—North America division are exactly what led to the PEX leaking and causing damages to the homes and other structures of Plaintiffs and other putative Class members. *Id.* ¶¶ 38, 39, 48, 52, 53, 60-68.

>    **(3)    It is Reasonable for this Court to Exercise Jurisdiction as the Conduct Giving Rise to this Action Occurred in Tennessee**

Regarding the third factor, it is reasonable for the Court to exercise jurisdiction over UC. The PEX plumbing which failed was purchased and installed in Plaintiffs' Homes and the structures of putative Class members, and the damages caused by such failures are located in Tennessee. Most of the witnesses and putative Class members are in Tennessee and all of the damaged properties are in Tennessee. Defendants conduct business throughout the United States and profit from such business. Thus, it would not be burdensome for them to litigate this action in Tennessee. Finally, Tennessee has a significant interest in "providing [its] residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Ford*, 141 S. Ct. at 1030.

>    **c.    The Court Should Exercise Jurisdiction Over UC Because UNA and UI Are the Alter Egos of UC**

The Court has jurisdiction over UC because it exercises a sufficient degree of control and dominion over UNA and UI as its Building Solutions—North America division such that UNA

and UI are the alter egos of UC. UC's alter ego is its Building Solutions—North America division that brought in over 70% of its operating profits last year. *See* Bulletin at 9, 14. UC cannot avoid its admitted operations in the U.S. by trying to separate itself from UI and UNA who it admits are its Building Solutions—North America division.

UC's Memo argues that the Sixth Circuit and Tennessee have not adopted a "single enterprise" theory of personal jurisdiction. Memo at 10-11. However, "[t]he Sixth Circuit has applied the alter ego theory . . . to decide whether general personal jurisdiction exist[s] over a parent corporation based on the presence and activities of a subsidiary in the forum." *Hilani*, 863 F. Supp.2d at 720. "[T]he Sixth Circuit has 'endorsed the use of the alter-ego theory to exercise personal jurisdiction.'" *Ramsbottom v. Ashton*, Slip Copy, 2022 WL 106733, at *18 (M.D. Tenn. Jan. 11, 2022) (quoting *Est. of Thomson ex rel Est. of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008)). "'It is compatible with due process for a court to exercise personal jurisdiction over an entity that would not ordinarily be subject to personal jurisdiction when the entity is substantively legally related to another entity that is subject to personal jurisdiction.'" *Id.* (quoting *Sanders*, 2020 WL 5651675, at *7, in turn quoting 4A Charles A. Wright et al., Fed. Practice & Procedure § 1069.4 (4th ed. 2020)). Other Sixth Circuit cases confirm that the alter ego theory can establish personal jurisdiction. *See Anwar v. Dow Chemical Co.*, 876 F.3d 841, 849 (6th Cir. 2017); *Valentine v. SSC Newport Operating Co., LLC*, Slip Copy, 2020 WL 7018265, at *4-*5 (E.D. Tenn. Mar. 30, 2020).

In *Toyota Motor Corp. Worldwide*, the Sixth Circuit applied Ohio law to hold that the presence of a subsidiary in a forum confers jurisdiction on a parent "if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same." *Toyota Motor Corp. Worldwide*, 545 F.3d at 362-63. Tennessee law is the same. In

*Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 651-52 (Tenn. 2009), "the Tennessee Supreme Court held that actions of one corporation may serve as a basis for personal jurisdiction over a related corporate entity '(1) when one corporation is acting as an agent for the other or (2) ***when the two corporations are essentially alter egos of each other***.'  In either event, both relationships must be characterized by the parent corporation's control of the subsidiary corporation's internal affairs or daily operations."  *Hilani*, 863 F. Supp.2d at 721 (quoting *Gordon*, 300 S.W.3d at 653) (emphasis added).

A federal court in Minnesota has found personal jurisdiction over UC on this precise basis. In the *George* case, the court found that the U.S. Supreme Court "expressly acknowledged the existence of the more 'rigorous' alter ego theory of jurisdiction . . . ."  *George*, 988 F. Supp.2d at 1079.  The court rejected UC's motion for reconsideration, finding that "***Uponor Corp. so 'controlled and dominated' Uponor, Inc. that exercising personal jurisdiction comported with due process.***"  *Id.* at 1079-80 (citations omitted) (emphasis added).  The court's ruling was not limited to finding personal jurisdiction over UC in Minnesota because UI has operations there, but found that specific jurisdiction could be found over UC based on the alter ego theory of jurisdiction.  *Id.*

This shows that the alter ego basis of personal jurisdiction applies here.  The pertinent facts show that UC is subject to personal jurisdiction in Tennessee.  UC conducts its United States operations through UNA and UI as UC's Building Solutions—North America division.  Report at 3, 6, 10, 15; Bulletin at 9, 11, 13-15.  Jurisdiction over UC is directly related to UNA and UI's activities in Tennessee.  UC (a) admits that it markets, distributes, and sells Uponor PEX throughout the United States including in Tennessee; (b) admits employing employees in the United States who manufacture, market, and sell the Uponor PEX; (c) admits that it operates in

the United States through its Building Solutions—North America division and admits that it controls the day-to-day operations of its companies; (d) manages common people and actions at Group level; and (e) does projects in which it designs and provides plumbing systems in other states.  Report at 4, 6, 7, 10, 16, 28, 32, 40, 49, 50, 53, 56, 75.  *See also* Bulletin at 9, 11, 13-15

UNA and UI are alter egos of UC. as shown by the work done by both organizations on behalf of UC.  This interconnected work is reflected in the SAC, the Report, the Bulletin, and the other evidence set forth in the STATEMENT OF FACTS section above.  UC dominates and controls UNA and UI's internal affairs and daily operations as expressly admitted by the Report:

> "***the President and CEO [of Uponor Corp.] is in charge of the Group's day-to-day management***" (p. 28);

> "***The [Uponor] Group aims to embed control in the daily operations*** " *of all Uponor companies* (p. 32);

> "***Common people, brand, technology, sustainability, innovation, R&D and IT matters are managed at Group level*** in order to benefit from global presence and maximum global synergies" (p. 53); and

> *Uponor Group* "***has 16 manufacturing facilities in Europe and North America, which exposes the company [Uponor Corp.] to possible environmental risks***" and that "Approximately 60% of Uponor's net sales were generated in countries other than the euro" (p. 56).

Report at 28, 32, 53, 56 (emphasis added).  Defendants argue that "UC's alleged oversight or management of its subsidiaries at a macro-level is legally insufficient to justify an alter ego finding."  UNA Reply (ECF #41) at 8.  However, the evidence shows that UC's control and management is not just at a macro level, but that UC ***"aims to embed control in the daily operations"*** of all of its companies including UNA and UI.  Report at 32.

UC's relationship with UNA and UI goes beyond "mere ownership," and more closely resembles the sort of "symbiotic" relationship discussed in *George*.  The Report and Bulletin show that UC exerts so much control over UNA and UI that the companies do not exist as separate

entities but are one and the same. Therefore, there is jurisdiction over UC sufficient to satisfy due process.

Similar cases support such holding. In *Valentine*, the court found that the plaintiff alleged that defendant SavaSeniorCare "sits at the top of the several SavaSeniorCare companies and dominates them." *Valentine*, 2020 WL 7018265, at *5. The facts showed that SavaSeniorCare controlled the monies taken in by the operating companies, the companies shared email address domain and websites, the companies shared employees who perform work for the multiple companies, and the companies worked together to provide services to their customers at skilled nursing facilities. *Id.* "These facts and allegations, in the light most favorable to Plaintiff, show that the companies do not operate as separate entities but work together to operate nursing facilities. The subsidiaries act like divisions of their parent company, SavaSeniorCare, and treating them separately now, when SavaSeniorCare does not treat them separately itself, would create an injustice. For these reasons, this Court has personal jurisdiction over SavaSeniorCare, LLC." *Id.*

The same facts are present here. UC controls the monies taken in by the operating companies UI and UNA, UC controls the daily activities of its subsidiaries, the companies share an email address domain and websites, UC has a manufacturing stronghold in the U.S., the companies share employees in 80 countries who perform work for the multiple companies, the companies work together to manufacture, distribute, and sell the same potable water plumbing parts and services, and UC expressly refers to UI and UNA as its Building Solutions—North America division. UI and UNA do more than just "act like" a division of their parent company UC; they are expressly stated to be a division of UC. "[T]reating them separately now, when [UC] does not treat them separately itself, would create an injustice." *Id.*

Likewise, in *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894 (6th Cir. 2017), the Sixth Circuit ruled that allegations that defendant Rainer Schmückle—the chief executive officer of affiliated companies called the MAG Group—had global authority over the affiliated companies' operations, including those in Michigan, by directing and controlling those operations. The facts were sufficient to make a *prima facie* showing that he purposefully availed himself of the benefits of doing business in Michigan. *Id.* at 901-05. The allegations against UC are the same. Although Schmückle was the CEO of the MAG Group, UC is in a similar position as the lead corporation of the Uponor Group who directs and controls the operations of its affiliated companies in the U.S. This confirms jurisdiction over UC.

Similarly, in *Hooper v. Safety-Kleen Systems, Inc.*, 2016 WL 7212586 (W.D. Pa. Dec. 13, 2016), the court held that evidence supported finding alter ego personal jurisdiction over the parent company when the parent indirectly owned all the stock in its subsidiaries, the companies used a common marketing image, the parent held itself out in its Annual Report as one entity with 13,000 employees, the parent conducted the entirety of its business through its subsidiaries, all subsidiaries used the same name and logo, and numerous corporate services (finance, legal, risk management, HR, Health & Safety, etc.) were provided to all entities by one or more of the companies collectively. *Id.* at *7. The exact same facts exist here. UC indirectly owns all of the stock of UNA and UI. The companies use the same Uponor marketing image, name, and logo, UC holds itself out in its Annual Report as one entity with 4000 employees and 16 manufacturing facilities worldwide, UC conducts the entirety of its business through its subsidiaries, and numerous corporate services are provided to all entities by one or more of the companies collectively. *See* Report at 4, 53 ("***Common people, brand, technology, sustainability, innovation, R&D and IT***

*matters are managed at Group level* in order to benefit from global presence and maximum global synergies").[8]

Finally, UC's Memo is in error that the alter ego or agency bases for personal jurisdiction requires that "fraud or similar injustice must be demonstrated." Memo at 15. The Sixth Circuit 's test for finding agency or alter ego personal jurisdiction does not include that factor. *See Anwar*, 876 F.3d at 849 (listing seven factors for determining alter ego theory of personal jurisdiction and fraud/injustice is not one of them). That test does not include a requirement to show fraud or injustice. *Id. See also Hilani* 863 F. Supp.2d at 721 (stating similar test without fraud or injustice factor). But even if there was such a requirement, there would be injustice from UC conducting business throughout North America via its Building Solutions—North America division while itself avoiding jurisdiction for its defective products. *Valentine*, 2020 WL 7018265, at *5 ("The subsidiaries act like divisions of their parent company, SavaSeniorCare, and treating them separately now, when SavaSeniorCare does not treat them separately itself, would create an injustice."); *Mott*, 1992 WL 116014, at *6 ("Due process does not require us to allow Schelling to exploit this country's vast, rich markets and at the same time avoid the jurisdiction of our courts.").

> ### d.   The Court Should Exercise Jurisdiction Over UC Because UNA and UI Are the Agents of UC

The Supreme Court has noted that "[a]gency relationships, we have recognized, may be relevant to the existence of *specific* jurisdiction." *Daimler AG*, 571 U.S. at 135 n.13 (emphasis in

---

[8]     *See also Flynn v. Greg Anthony Constr. Co.*, 95 F. App'x 726, 736-37 (6th Cir. 2003) (ruling that three companies were the alter egos of each other when the companies were in the same industry, used the same address, used each other's letterhead, used each other's equipment, worked on the same projects together, and employees of one company would offer services from another company). Conversely, the cases cited in the Memo at 12 & 12-13 n.2 are not applicable because they are not from within the Sixth Circuit and did not involve the same facts as present here including especially UC's admissions. Instead, this case is the same as or very similar to the *George*, *Slaughter*, *Hartmann*, *Mott*, *Valentine*, *MAG IAS Holdings*, *Hooper*, and *Flynn* cases.

original).  "[A]ctions of one corporation may serve as a basis for personal jurisdiction over a related corporate entity '(1) ***when one corporation is acting as an agent for the other***[.]'"  *Hilani*, 863 F. Supp.2d at 721 (quoting *Gordon*, 300 S.W.3d at 653) (emphasis added).  Agency principles can be an independent basis of establishing personal jurisdiction.  *Oasis Entertainment Complex, Inc. v. Lawrence*, 181 F.3d 102 at *2 (6th Cir. 1999); *Ramsbottom*, 2022 WL 106733, at *19; *Estate of Pressma v. ITM TwentyFirst Svcs, LLC*, 2022 WL 4110317, at *7 (W.D. Ky. Sept. 8, 2022).  "A corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there."  *Iconlab, Inc. v. Valeant Pharms, Int'l, Inc.*, 2017 WL 7240856, at *6 (C.D. Cal. Apr. 25, 2017) (citing *Daimler*, 134 S.Ct. at 759).[9]

Cases have specifically held that UC is subject to personal jurisdiction in the United States based on the agency relationship of UNA and UI with UC.  In *Slaughter v. Uponor Corp.*, 2:08-CV-01223 (D. Nev.), Order of 11/19/09 (ECF #259), the court found as follows:

> . . .  It seems clear that the "Uponor Group of companies" (#214-3 ¶ 5) is not simply a group of companies owned for investment purposes, but in order to engage in a common line of business.  ***Uponor Corp. is not simply an investment company.  Uponor is a worldwide group of companies engaging in the plumbing and climate control business***. . . .
>
> . . . .
>
> Although Uponor [Corp.] denies personally selling the Wirsbo fittings at issue in this case, it does not deny that Uponor, Inc. sold them in Nevada, it admits that Uponor, Inc. is its second-order subsidiary, and Uponor Corp. itself is clearly in the same substantive business as Uponor, Inc.  It appears, and more importantly, Plaintiffs claim, that Uponor Corp.'s connection to Uponor, Inc. is more than investment or licensing of its trademark.  Plaintiffs claim that Uponor Corp. controls the activities of Uponor, Inc. (*Id.* at 2 ("Uponor Corporation has its hand in the American market.  Uponor, Inc. is merely one of its fingers."))  . . . .

---

[9]     The cases cited in footnote 4 at page 16 of UC's Memo do not show that the Supreme Court or the Sixth Circuit has "unequivocally **rejected** the use of an agency test to establish jurisdiction." Memo at 16 n.4 (emphasis in original).  The Supreme Court in *Daimler* said the exact opposite regarding specific jurisdiction.  *Daimler AG*, 571 U.S. at 135 n.13.

*Plaintiffs have sufficiently alleged personal jurisdiction over Uponor in Nevada. They have alleged corporate control over subsidiaries conducting the same business as the parent company, which are in fact arms of the same organization, and that the products at issue were purposely introduced into the stream of commerce in Nevada for use therein. This is sufficient to satisfy the minimum contacts test.* If Plaintiff's claims are true, Uponor [Corp.] has certainly purposefully availed itself of the privilege of conducting activities in Nevada. The claims here arise out of such activity. The exercise of personal jurisdiction here is also reasonable. Uponor Corp. has purposely sold, through its subsidiaries, products in Nevada such that it should reasonably be expected to be haled into a Nevada court if those activities result in alleged harm. . . .

*Id.* at 8-11 (emphasis added). Plaintiffs allege the exact same actions by UI and UNA as agents for UC regarding PEX piping. *See* SAC ¶¶ 12-18. UC has purposely sold, through its subsidiaries, products in our state such that it should reasonably be expected to be haled into a Tennessee court.

In *Hartmann v. Uponor,* 2014 WL 12781339 (D. Nev. Mar. 6, 2014), the court ruled that "[t]o establish an agency relationship, Plaintiffs must show that Uponor [Inc.] functions as Uponor Corp.'s representative in that it performs services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Id.* at *4 (quotations, brackets, and citations omitted). The court relied on the *Slaughter* case and held that "as this Court has noted before there is agency jurisdiction over Uponor Corp." *Id.* at *3 (citing *Slaughter* Order of 11/19/09. UC asked the court to reconsider its ruling that there was personal jurisdiction over UC in Nevada because it argued that *Daimler AG* eliminated the agency theory of personal jurisdiction. The court ruled that while the "agency formulation in the context of *general* jurisdiction is no longer valid after *Daimler AG*[,]" the Supreme Court "clearly found the existence of *specific* jurisdiction based on this same agency formulation, which escaped *Daimler AG* (a general jurisdiction case) unscathed and very much intact." *Id.* at *3-*5 (emphasis added). "Plaintiffs

have met their burden in establishing that specific personal jurisdiction is proper over Uponor Corp. Consequently, the motion to reconsider based on *Daimler AG* is DENIED." *Id.* at *5.[10]

Here, the same as in *Slaughter* and *Hartmann*, UI and UNA function as UC's agents in that UI and UNA perform services that are significantly important to UC such that if UC did not have UI and UNA to perform them, UC would undertake to perform substantially similar services itself. It certainly would do so given that its Building Solutions—North America division generated 73% of UC's operating profits in 2023 and 57% in 2022. Report at 46-47; Bulletin at 9, 14.

### e. The Rauterkus Declaration Does Not Prevent Jurisdiction Over UC

The Court should reject the Memo's attempts to make UC sound very different than UC has admitted. The Memo asserts that UC (i) is merely a holding company that did not design, manufacture, market, advertise, sell or distribute the PEX, (ii) does not make corporate decisions for UI or UNA, (iii) does not control UI or UNA's internal affairs, (iv) does not participate in the manufacturing operations, and (v) does not control, direct or manage the decision making, business activities or operations of UI or UNA. Memo at 1, 2, 4-5, 10, & 13-14. UC's admissions in its 2022 Annual Report and 2023 Bulletin contradict such assertions. Report at 2, 4, 6, 7, 10, 15, 16, 20, 28, 32, 33, 40, 49, 50, 53, 56, 75; Bulletin at 9, 11, 13-15. For example, UC admits in the Report that "***Uponor is a global company that employs 4214 professionals in 27 countries in Europe and North America.***" *Id.* at p. 40 (emphasis added). It also admits that "***Uponor has two***

---

[10]     UC asserts that the Nevada Supreme Court overruled the *Hartmann* order in *Uponor Corp. v. Eighth Judicial District Court of State of Nevada*, 130 Nev. 1257 (Nev. 2014). *See* Memo at 16 n.5. However, the Nevada Supreme Court said that "in order to assert jurisdiction over the foreign parent corporation, a plaintiff must . . . show that the parent has moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's day-to-day operations in carrying out that policy." *Id.* at *1 (citations and quotations omitted). Tennessee law is the same. *Hilani*, 863 F. Supp.2d at 721 (citing *Gordon*, 300 S.W.3d at 653). The facts as admitted by UC and as set forth above show that these requirements are satisfied.

*manufacturing facilities in North America, making it one of Uponor's manufacturing strongholds,*" and that Uponor Group "*has 16 manufacturing facilities in Europe and North America, which exposes the company [Uponor Corp.] to possible environmental risks.*" Report at 15, 56 (emphasis added). UC also admits that it manages and directs the day-to-day operations of the Uponor Group. *Id.* at 28, 32, 53, 56. *See also supra* at p. 17 (quoting Report admissions).

UC's Memo says that, for alter ego jurisdiction to be found, "the parent must exercise 'pervasive control over the subsidiary . . . from broad policy decisions to routine matters of day-to-day operation.'" Memo at 12 (quoting *Anwar*, 876 F.3d at 848-49). UC admits both of these facts exist here. (1) <u>Broad policy decisions</u>: "*Common people, brand, technology, sustainability, innovation, R&D and IT matters are managed at Group level* in order to benefit from global presence and maximum global synergies" Report at p. 53 (emphasis added); *"In Building Solutions—North America, [Uponor Corp.] continued to make inroads into the commercial market and to leverage on our global offerings and brought new, innovative products to the local market"* Report at pp. 6 & 10 (emphasis added); Uponor Corp. *"aims to create a new Uponor-wide operating model."* Report at p. 7 (emphasis added). (2) <u>Routine matters of day-to-day operation</u>: "[T]he President and CEO [of Uponor Corp.] *is in charge of the Group's day-to-day management*" Report at p. 28 (emphasis added); and "*The Group aims to embed control in the daily operations*" of all Uponor companies. Report at p. 32 (emphasis added).

The only "evidence" UC presents in support of the Motion is its own interested employee's self-serving declaration. *See* Declaration of Michael Rauterkus (ECF #69-2; "Rauterkus Dec."). However, "the district court should not 'consider facts proffered by the defendant that conflict with those offered by the plaintiff.'" *Hilani*, 863 F. Supp.2d at 718 (quoting *PT Pukuafu Indah*, 661 F.3d at 920). That Declaration also must be disregarded because it is contradictory to other

statements by UC.[11]  Mr. Rauterkus's assertions that UC "does not design, install, manufacture, construct, assemble, inspect, distribute, supply, ship, or sell blue and red colored [PEX] . . . into Tennessee," Rauterkus Dec. ¶ 8, are contradicted by UC's admissions that its Building Solutions—North America division manufactures, markets, distributes, and sells Uponor PEX in the United States via UC (1) having a manufacturing stronghold in the United States, (2) having 16 manufacturing facilities in the U.S. and Europe, and (3) making inroads into local U.S. commercial markets.  Report at pp. 6, 10, 15, 56.  Its agent UNA admits that it markets and sells PEX in Tennessee.  Pulliam Dec. Exh. 1.  Mr. Rauterkus's assertion that UC does not participate in the daily management of UI and UNA, Rauterkus Dec. ¶ 18, is contradicted by the Report's statements that UC is in charge of day-to-day management of all Uponor Group companies.  Report at pp. 28, 32.  These and other conflicts with the Report and Bulletin further require that the Rauterkus Dec. not be considered. Even if that Declaration were considered, the legally creditable information, viewed in a light most favorable to Plaintiffs, shows a *prima facie* case that UC is subject to jurisdiction.   That evidence certainly meets the relatively slight burden to establish jurisdiction.

### 3. Request for Discovery If UC's Motion Is Not Denied.

If the Court does not deny UC's Motion, Plaintiffs request to be allowed to take discovery regarding whether UC is subject to personal jurisdiction in Tennessee.  Discovery would be needed regarding UC and UNA's activities directed to the United States regarding the design, manufacture, distribution, marketing, and sales of PEX.  Those facts are expected to show that UC and UNA are themselves involved in the design, manufacture, distribution, marketing, warranting, insuring, and/or sales of the defective PEX in the United States, including Tennessee.

---

[11]      A court may disregard self-serving statements when they are blatantly contradicted by the record.  *Helphenstine v. Lewis County, Kentucky*, 60 F.4th 305, 314 (6th Cir. 2023).

## IV. CONCLUSION

For all of these reasons, the Court should exercise jurisdiction over UC and deny UC's Motion.

Respectfully submitted,

*/s/Andrew J. Pulliam*
Andrew J. Pulliam (Tenn. BPR No. 016863)
James C. Bradshaw III (Tenn. BPR No. 013170)
J. Graham Matherne (Tenn. BPR No. 011294)
Ann Weber Langley (Tenn. BPR No. 038070)
**WYATT, TARRANT & COMBS, LLP**
333 Commerce Street, Suite 1050
Nashville Tennessee 37201
Telephone: (615) 244-0020
Fax: (615) 256-1726
Email:apulliam@wyattfirm.com
Email:jbradshaw@wyattfirm.com
Email:gmatherne@wyattfirm.com
Email:alangley@wyattfirm.com

*Attorneys for Plaintiffs and Class Representatives, on behalf of themselves and all others similarly situated*

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2024, a true and correct copy of the foregoing was served via the Court's ECF System on the following:

M. Andrew Pippenger, Esq.
PURYEAR LAW GROUP
735 Broad Street, Suite 214
Chattanooga, TN 37402

*/s/Andrew J. Pulliam*
Andrew J. Pulliam

101648083.1