# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| BRIAN CARRICO; KACIE CARRICO; DON GATLIN; and DORA GATLIN; individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UPONOR, INC.; UPONOR NORTH AMERICA, INC.; DOES 1 through 100, inclusive, whose true names are unknown,<br><br>Defendants. | Case No. 3:23-CV-00497<br><br>District Judge Eli Richardson<br><br>Magistrate Judge Jeffrey S. Frensley |

**DEFENDANT UPONOR, INC.'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION OR, ALTERNATIVELY, TO (1) DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT AND CLASS ALLEGATIONS; AND <u>(2) STRIKE CLASS ALLEGATIONS</u>**

I.      **THE COURT SHOULD COMPEL ARBITRATION**

Plaintiffs try to avoid arbitration on the alleged grounds that: (a) Plaintiffs did not agree to arbitrate their claims and mutual assent is lacking; (b) Plaintiffs are not third-party beneficiaries of the Warranty; (c) Plaintiffs are not bound by their previously-pleaded implied warranty claim, which necessitates contractual privity with Uponor; and (d) their homebuilder did not assign the Warranty to them. (Opp. at 2-19). These are non-sequiturs that largely ignore relevant case law.

**First**, Plaintiffs' reliance on traditional contract formation principles is misplaced because Uponor has moved to compel arbitration under beneficiary and estoppel theories, which "prevent a non-signatory to an arbitration agreement from avoiding arbitration with a signatory to the agreement[,]" *Blue Water Bay at Ctr. Hill, LLC v. Hasty*, 2017 Tenn. App. LEXIS 763, at *28 (Nov. 27, 2017), "when the non-signatory seeks a direct benefit from the contract while disavowing the arbitration provision." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 629 (2003). Here, Plaintiffs have (1) expressly admitted in three separate pleadings that they are persons and entities who would reasonably be expected to use the Uponor PEX,[1] and have (2) alleged a breach of implied warranty claim in their first two complaints – a claim which legally and factually requires, and admits, privity with Uponor. (Dkt. No. 1 at ¶¶ 86-90; Dkt. No. 19 at ¶¶ 119-123).

Thus, it is irrelevant whether Plaintiffs executed the Uponor Warranty or otherwise expressly assented to its terms, because the law prevents parties from selectively benefitting from a contract with a mandatory arbitration provision while simultaneously avoiding arbitration. (Mot. at 10-11, citing *Benton v. Vanderbilt Univ.*, 137 S.W.3d 614, 616 (Tenn. 2004); *Swift Enter., LLC v. Trunorth Warranty Plans of N. Am., LLC*, 2022 U.S. Dist. LEXIS 240986, at *24 (E.D. Tenn. Sept. 30, 2022). Indeed, as the Third Circuit has aptly explained, a non-signatory cannot

---

[1] SAC ¶¶ 103-105; *see also* Dkt. No. 1. at ¶¶ 86-90; Dkt. No. 19 at ¶¶ 119-123.

"seek[] to enforce" or "assert[] claims based on" a contract, and then "turn[] its back on the portions of the contract such as an arbitration clause that it finds distasteful." *Sanford v. Bracewell & Guiliani LLP*, 618 Fed. App'x 114, 118 (3d Cir. 2015). Consistent with these principles, Plaintiffs' contract-formation arguments fall flat. Moreover, it is axiomatic that "a decision is authority for the point or points decided, and nothing more[,]" *Shousha v. Matthews Drivurself Services, Inc.*, 210 Tenn. 384 (1962), and Plaintiffs' cited authorities are therefore inapposite insofar as they fail to address the estoppel and beneficiary issues Uponor has raised (and is relying upon) here.[2, 3]

**Second**, Plaintiffs fail to offer any credible justification for ignoring their prior judicial admissions simply because they have made the tactical decision to abandon an implied warranty claim in the current version of their pleading. (Mot. at 11-12). Plaintiffs falsely contend that the Court – by virtue of its prior order granting them leave to file the SAC – has already "rejected" Uponor's "argument" that Plaintiffs cannot side-step arbitration by abandoning their implied warranty claim and disavowing contractual privity with Uponor as to the PEX in their homes. (Opp. at 18, citing Dkt. No. 64). However, nothing in the Court's prior order condoned, let alone decided, that Plaintiffs can successfully resort to this tactic to avoid arbitration. **To the contrary, the Court expressly found that "it would be a better exercise of its discretion to allow the amendment to proceed," so that Plaintiffs' gambit could "be tested" by Uponor "by way of a motion" filed "before the District Judge."** (Dkt. No. 64 at p. 10 (emphasis added)). That is

---

[2] *See Capps v. Adams Wholesale Co.*, 2015 WL 2445970 (Tenn. App. May 21, 2015) (no mention of estoppel); *Brown v. Quince Nursing & Rehab. Ctr., LLC*, 2020 WL 4673471 (W.D. Tenn. Aug. 12, 2020) (contract signed by surrogate not binding because of decedent's capacity; rejecting third-party beneficiary enforcement based on Tennessee law limiting when "a nursing home contract signed by a family member who did not have authority to act on behalf of the resident create[s] a contract between the family member and the nursing home").

[3] Accordingly, Declarations filed by Plaintiffs and a plumber, which purport to show Plaintiffs were unaware of/did not consent to the Warranty, are irrelevant to the precedent Uponor relies on.

precisely the approach Uponor is taking, consistent with case law from multiple federal courts confirming a plaintiff **cannot** nullify its prior judicial admissions, nor avoid arbitration, by restyling or abandoning claims set forth in an amended pleading. *See, e.g.*, *Ntch W.-Tenn, Inc. v. ZTE USA, Inc.,* No. 111 CV 01169JDBEGB, 2011 WL 13147425, at *2 (W.D. Tenn. Dec. 29, 2011); *Haynes v. Uponor, Inc.*, 2022 U.S. Dist. LEXIS 31877, at *8 (N.D. Cal. Feb. 23, 2022); *Valdiviezo v. Phelps Dodge Hidalgo Smelter, Inc.,* 995 F. Supp. 1060, 1065–66 (D. Ariz. 1997).[4]

Plaintiffs repeatedly asserted implied warranty claims that, as a matter of law, depend on the existence of contractual privity with Uponor as to the PEX. *Americoach Tours, Inc. v. Detroit Diesel Corp.*, at *8 (W.D. Tenn. Sept. 23, 2005). Plaintiffs could not, in accordance with Rule 11, have asserted such claims unless they believed those claims were legally warranted **and also factually supported**. Fed. R. Civ. P. 11(b). Plaintiffs have never offered any credible explanation for how or why they attempted to assert implied warranty claims on two prior occasions if, as they now profess, they have no contractual relationship with Uponor as to the PEX. Plaintiffs instead try to dodge the issue by baldly asserting they are no longer interested in obtaining certain warranty-related remedies – **a position which only confirms that, in Plaintiffs' earlier pleadings, they did seek to benefit from the Uponor Warranty**. (Mot. at 11, citing SAC ¶ 100).

Under these circumstances, Plaintiffs are not allowed to walk-back and avoid the consequences of their repeated admissions regarding a contractual relationship with Uponor

---

[4] Plaintiffs argue asserting a cause of action does not constitute a judicial admission of facts prerequisite to stating a valid claim for relief under the asserted theory. However, in *Haynes* and *Valdiviezo*, courts rejected this notion and found that, by previously interposing contract-based claims, plaintiffs could not reverse course and deny the existence of a contract when convenient. Furthermore, Federal Rule of Civil Procedure 11 prohibits parties from asserting a claim without a legal and factual basis, and it is unclear how Plaintiffs could in good faith repeatedly assert an implied warranty claim – which depends on the existence of contractual privity – without believing they were in privity with Uponor with respect to the PEX allegedly installed in their homes.

involving the PEX supposedly installed at their homes.[5] Rather, Plaintiffs should be compelled to arbitrate their claims on an individual, non-class basis, consistent with the broad language of the Warranty that encompasses the matters alleged in the SAC with respect to the PEX. (Mot. at 11).

## II. ALTERNATIVELY, THE COURT SHOULD DISMISS/STRIKE THE SAC

### A. The Court Should Dismiss the SAC's Strict Liability and Negligence Claims

Plaintiffs have had three opportunities to show their tort claims (i) are not barred by the ELR, and (ii) are supported by non-conclusory facts showing causation. Plaintiffs fail to do so.

**First**, with respect to the ELR, Plaintiffs claim it "does not apply" because, per the Tennessee Products Liability Act ("TPLA"), they "can recover for property damage caused by the defective product." (Opp. at 20-21). This is a red herring. The TPLA creates no exception to the ELR because, as the Tennessee Supreme Court has made clear, the "Act does not afford the right to recover purely economic losses" – rather, it allows for recovery of "damage to property other than the defective product," which Plaintiffs fail to show. *Lincoln*, 293 S.W.3d at 491.

---

[5] Plaintiffs ask the Court to ignore prior implied warranty claims as a judicial admission of contractual privity because, per Tennessee law, privity of contract is not a prerequisite for an implied warranty claim if a plaintiff only seeks damages for personal injury or property damage. (Opp. at 16-18). However, privity **is required** if a plaintiff seeks recovery for economic losses such as repair and replacement costs. *See Hatley v. Crossville BNRV Sales, LLC*, 2015 U.S. Dist. LEXIS 181425, at *15 (E.D. Tenn. Nov. 20, 2015) ("Additionally, because the parties are not in privity of contract, the plaintiff may not recover damages solely classified as 'economic loss.' Tennessee has modified its uniform commercial code to abolish the privity requirement for a beach of implied warranty claim only where the plaintiff seeks damages for personal injury or property damage."); *Smith v. Nissan N. Am., Inc.*, 2018 U.S. Dist. LEXIS 166816, at *7 (W.D. Tenn. Sep. 27, 2018) (same); *see also Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 489 (Tenn. 2009) ("Direct economic loss may be measured by the defective product's cost of repair and replacement."). Plaintiffs previously sought economic losses, (FAC ¶¶ 66, 68, 70, 107, 128, 134, 119-123), confirming those prior claims required, and presumed, privity with Uponor. Plaintiffs now disavow their prior implied warranty claims and request for repair and replacement, but do not explain how they could pursue those claims absent privity.

**Second**, Plaintiffs cite various authorities that purportedly preclude application of the ELR in this case. However, none of those authorities are on-point, and in several instances, they actually support the dismissal of the SAC's tort claims in this action. Specifically:

1) Plaintiffs cite *SPO Go Holdings, Inc. v. W&O Constr., Inc.*, 187 F. Supp. 3d 887 (M.D. Tenn. 2016), wherein the complaint alleged that (i) the defendant entered a contract with the city to construct a sewer line extension parallel to a golf course owned by the plaintiff, and (ii) in performing that work, the defendant caused damage to the golf course. *Id*. at 889-890, 892-893. The court found the ELR did not apply because there was no allegation the defendant supplied a defective product – **instead, the plaintiff's claim involved only a services contract that was negligently performed**. *Id.* Here, by contrast, the gravamen of Plaintiffs' claim is that Uponor should be held liable for an allegedly defective product that caused damage to the integrated package (i.e. their homes) in which the product was installed. Thus, *SPO* is clearly inapposite.

2) Plaintiffs also cite *Commercial Painting Co. v. Weitz Co. LLC*, 676 S.W.3d 527 (Tenn. 2023), wherein the Tennessee Supreme Court confirmed that the ELR does not apply to **services contracts**, and confirmed it is confined to "product liability action[.]" *Id.* at *533. Here, Plaintiffs expressly allege claims for "**Strict Product Liability**" with respect to the PEX, and have similarly alleged that the PEX was negligently designed and manufactured. (SAC ¶¶ 102-128). These are classic "product liability" claims subject to the ELR.

3) Plaintiffs then cite *Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457 (Tenn. App. 2003), in which the Tennessee Court of Appeals found the ELR did not apply where plaintiff purchased contaminated carbon dioxide and feedgas manufactured by defendant which subsequently damaged separate property of the plaintiff (*i.e.*, uncontaminated cardon dioxide). *Id.* at 466. However, the plaintiff in *Messer* acquired the contaminated materials

5

173069582v2
Case 3:23-cv-00497   Document 79   Filed 07/08/24   Page 6 of 15 PageID #: 2786

**before** they were combined with the plaintiff's uncontaminated carbon dioxide. *Id*. at 461, 466. Here, by contrast: (i) Plaintiffs acquired the PEX **after** it was **already** installed in the finished integrated "products" which Plaintiffs bargained for and purchased – their homes; and (ii) Plaintiffs only seek recovery for damages to those **same** integrated structures. Thus, the facts in *Messer* are readily distinguishable from those alleged by Plaintiffs in the SAC.

4) Plaintiffs also rely on the Supreme Court's decision in *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875 (1997), which found: (i) a ship built with a defective component – **and not the component itself** – was "the product" under the ELR; and (ii) when the ship malfunctioned and caused damage to extra equipment the original owner added to the vessel, the damage to that equipment was "other property" that could be pursued in tort. Leaving aside the fact that *Saratoga* did not address whether the owner could pursue the component supplier for damage to the vessel (which is what Plaintiffs are trying to do here), *Saratoga* confirms that Plaintiffs' entire homes are the "product," and not the PEX components installed therein. Indeed, Plaintiffs do not allege they added anything "extra" to their homes after purchase, nor that any such "extra" equipment was damaged by the PEX; instead, the gravamen of their tort claims is that the PEX installed in their homes has damaged other portions of the integrated product Plaintiffs purchased – i.e., their homes. Furthermore, courts have rejected the notion that *Saratoga* allows a property owner to pursue tort relief against the supplier of an allegedly defective component based on damage to the structure. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 85-51 (6th Cir. 2002); *Longport Ocean Plaza Condo., Inc. v. Robert Cato & Assocs.*, 2002 U.S. Dist. LEXIS 4609, at *15-18 (E.D. Pa. Mar. 18, 2002).

5) Plaintiffs also cite *Ratner v. Norcold, Inc.*, 2011 U.S. Dist. LEXIS 50239 (M.D. Tenn. May 9, 2011), which declined to apply the ELR to claims related to an exploding refrigerator

in an RV that damaged "Plaintiffs' personal property" as well as "personal injuries" *Id*. at *8. Here, the SAC lacks any non-conclusory allegation of personal injury or damage to specific items of personal property, and *Ratner* is facially inapposite. (*See also* Mot. at 14-18, citing *Dana Ltd. v. Aon Consulting, Inc.*, 984 F. Supp. 2d 755, 767 (N.D. Ohio 2013)). Furthermore, *Ratner* – which has not been cited by any court since it was decided 12-years ago – has dubious persuasive value since it omits any discussion of the integrated-product analysis mandated by *East River*.

6) Plaintiffs ask the Court to: (i) ignore the authority cited in the Motion from other jurisdictions, which hold the ELR bars tort claims for damages to an integrated structure caused by the structure's component parts; and instead (ii) follow the approach reflected in *Vacaville Qual Run v. Gable Plastics, Inc.*, 2002 WL 120808 (Cal. Ct. App. Jan. 30, 2002) (Opp. at 27-28) – a 22 year old unpublished California Court of Appeal decision lacking precedential authority. However, *Vacaville* is an outlier in its outcome, and fundamentally, **is not citable, nor considered precedential, in California**. *Jensen v. Kenneth I. Mullen Co.*, 211 Cal. App. 3d 653, 658 (1989) (unpublished case "cannot be cited as precedent and is of no legal import."). This Court should not elevate *Vacaville* to precedential status or ignore the approach followed in other jurisdictions.

**Third**, Plaintiffs claim the ELR does not apply because "there was no contract for sale of goods" with Uponor. (Opp. at 22-23). But, Plaintiffs ignore that Tennessee courts have repeatedly held that the ELR applies **absent privity of contract**. *Acuity v. McGhee Eng'g, Inc.*, 297 S.W.3d 718, 734 (Tenn. App. 2008) ("The economic loss rule provides that, absent privity of contract, one may not recover in negligence where there is no injury to person or [other] property."); *Hasler*

*Aviation, L.L.C. v. Aircenter, Inc.*, 2007 U.S. Dist. LEXIS 56856, at *24 (E.D. Tenn. Aug. 3, 2007) (same). Plaintiffs cite no Tennessee case holding otherwise.[6]

**Fourth**, Plaintiffs contend the ELR is limited to commercial transactions and does not cover "consumers" who own residential structures. (Opp. at 24-28). This argument lacks any credibility as: (i) the proposed class here includes non-residential structures, (SAC ¶ 88), and (ii) Tennessee law is clear that "**[t]he economic loss rule applies to consumer transactions**" as well as commercial arrangements. *McLean v. Bourget's Bike Works, Inc.*, 2005 Tenn. App. LEXIS 645, at *19 (Oct. 7, 2005) (emphasis added); *see also Tenn. Farmers Mut. Ins. Co. v. Ford Motor Co.*, 2002 Tenn. App. LEXIS 429, at *12-13 (June 17, 2002) ("the reasoning" of the economic loss rule "applies with equal force to cases involving consumer transactions.").[7]

**Fifth**, Plaintiffs claim the PEX is the relevant "product" under the ELR because Uponor placed the PEX into the "stream of commerce" before it was installed in their homes. (Opp. at 24-28). This assertion is untenable because, "[u]nder *East River*, as followed by Tennessee courts, the lynchpin for defining the 'product itself' . . . is whether the item is part of an integrated package" that was "supplied" to the plaintiff "as a single unit." *Americoach*, 2005 U.S. Dist.

---

[6] Plaintiffs argue that since some cases applying the ELR involved a contract for the sale of goods, it only applies in that context, but cite no supporting authority and do not rebut dispositive case law cited in Uponor's Motion.

[7] In *Mt. Lebanon Personal Care Home, Inc.*, 276 F.3d 845, the Sixth Circuit found a product installed in a structure does not damage "other property" by damaging the structure. Plaintiffs note the Sixth Circuit predicted the Kentucky Supreme Court may not extend this to cases involving residential structures, based on *Real Estate Marketing, Inc. v. Franz*, 885 S.W.2d 921 (Ky. 1994). Thereafter, the Kentucky Supreme Court explained *Franz* does **not** limit the economic loss rule to commercial transactions, and it remarked it is "notabl[e]" that "the Restatement (Third) of Torts: Products Liability makes no distinction between products produced for commercial customers and those produced for consumers." *Giddings & Lewis, Inc. v. Indus. Risk. Insurers*, 348 S.W.3d 729, 737 n. 5 (Ky. 2011). The Kentucky Court of Appeals recently cited the ELR to dismiss tort claims involving a consumer transaction. *Leeper v. Coad Auto Sales*, 2023 Ky. App. Unpub. LEXIS 612, at *7-8 (Ky. App. Oct. 20, 2023).

LEXIS 40182, at *11. Thus, "the 'product' is the product purchased by the plaintiff," *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 155-156 (Ind. 2005), and "the product" means "the finished product bargained for by the buyer rather than components furnished by a supplier." *Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F.2d 925, 928-930 (5th Cir. 1987).[8] **That is precisely why courts throughout the country applying the *East River* analysis to the ELR have held the owner of a <u>residential</u> structure cannot maintain a tort claim against the supplier of an allegedly defective component that was installed during construction and subsequently caused damage to other aspects of the structure – <u>in such a case, the relevant "product" is the integrated structure the owner purchased, not each component part</u>**. (*See discussion and authorities cited in Motion at 14-16 and n. 5*). Here, the "products" Plaintiffs admittedly bargained for and purchased from Hannah were fully-constructed homes – **not** the hundreds or thousands of separate component parts and sub-parts installed throughout the finished structures. (SAC ¶ 36-37). Indeed, Plaintiffs disavow any involvement in the decision to purchase or install PEX. (Dkt. Nos. 27-1 through 27-4). Accordingly, Plaintiffs cannot legally pursue tort claims against Uponor for damage to their homes supposedly caused by the PEX integrated into those structures.

**Finally**, as to causation, Plaintiffs suggest they have pled sufficient facts based on their allegation that unspecified "experts in PEX piping" have conducted unspecified "test[s]" which purportedly show: (i) Uponor uses a "furnace/flame treatment process" to apply color to the PEX; (ii) this process "caused" microcracking; and (iii) "microcracking" then caused the "failure and leaks" of the PEX in Plaintiffs' homes. (Opp. at 28-29). However, non-specific references to

---

[8] *See also King v. Hilton-Davis*, 855 F.2d 1047, 1051-1053 (3d Cir. 1988) (under *East River*, "one must look to the [end] product purchased by the plaintiff[;]" "no [] basis for affording the purchaser of a defective product greater relief against the manufacturer of a component part that has rendered a product defective than against the manufacturer of the assembled defective product.").

"expert" testing are not a substitute for well-pleaded facts.[9] Moreover, Plaintiffs cannot even get their professed story straight. In earlier pleadings, Plaintiffs admitted alleged "microcracking" in the PEX "occurred at the time of manufacture" before it was installed in their homes, (Dkt. No. 1 at ¶¶ 66, 71, 82), which confirms that: (a) "microcracking" is not an immediate cause of leaks; (b) the PEX performed properly for years regardless of "microcracking", and (c) there is no reason to presume leaks resulted from long-present "microcracking" rather than obvious and equally-plausible alternatives, like poor maintenance. Having seen Uponor's arguments, Plaintiffs now abandon this theory and instead speculate that degradation of the PEX piping actually occurs over time. (Dkt. No. 65 at ¶ 45). However, even if this type of tactical about-face were permitted, it fails to cure the glaring defect with the SAC – namely, Plaintiffs have only alleged a speculative theory that is merely "consistent" with potential liability, in violation of *Iqbal*. (Mot. at 19).

### B. The Court Should Strike the SAC's Class Allegations

Plaintiffs contend striking class allegations now is virtually impossible. (Opp. at 31-36). Sixth Circuit precedent holds otherwise. *Pilgrim v. Univ. Health Card, LLC*, 660 F.3d 943, 946-950 (6th Cir. 2011) (class allegations struck where plaintiffs "would need to make particularized showings" since "defendants' program did not operate" uniformly and therefore "plaintiffs suffered distinct injuries[]."). Plaintiffs' proposed class definition suffers from multiple defects that warrant striking the proposed class and class allegations – specifically: (1) the class includes property owners who have experienced leaks irrespective of whether such leaks were caused by any product defect or negligence by Uponor; and (2) there is no reliable, administratively feasible

---

[9] *Varela v. Gonzalez*, 773 F.3d 704, 710 (5th Cir. 2014) (complaint that contained expert opinions was insufficient because "opinions cannot substitute for facts."); *Vega v. Am. Home Mortg. Servicing, Inc.*, 2011 U.S. Dist. LEXIS 65841, at *4-6 (D. Ariz. June 20, 2011) (reference in complaint to expert that would "establish" the defendant's wrongdoing was a "mere legal conclusion[]" that did "not constitute facts sufficient to state a claim for relief.").

way to ascertain the class since: (i) variations exist in how PEX is installed; (ii) variations exist in the operating and maintenance conditions of PEX after installation; and (iii) there is no reliable information related to the presence and location of PEX in owners' structures since Uponor does not sell directly to consumers. (Mot. at 20-23). These defects require individual mini-trials to determine class members, in violation of well-established law. (*Id.*) Plaintiffs have no credible response to these points.

**First**, Plaintiffs claim the proposed class excludes members whose leaks were "not caused by Uponor PEX" since they propose only including members who have experienced a leak "from Uponor PEX" that was "manufactured between 2009 and 2021." (Opp. at 34). But this linguistic sleight of hand does not withstand scrutiny. Owners who have experienced a leak "**from**" their PEX – meaning an escape of water out of the piping – have not necessarily suffered a leak "**because of**" any wrongdoing by Uponor involving the PEX, such as a product defect or negligence. There are multiple obvious reasons why pipes could leak that have nothing to do with Uponor's manufacturing process, including, for example, faulty installation, maintenance, operating conditions which change over time since installation, and/or plumbing work. Indeed, the only way to determine why any given owner's PEX leaked – and thus, whether it can state a cognizable claim against Uponor, and be included within a proposed class – is to conduct an individualized mini-trial regarding the condition, performance, installation, operating conditions, and maintenance history of that particular owner's PEX. That, of course, is precisely what the law forbids, which is why courts have repeatedly **rejected** proposed product liability classes in similar circumstances (including when there is a plausible claim of a product-wide defect, because by itself, the presence of such a defect **still does not prove causation** as to any individual class member). (*See, e.g.*, Mot. at 21-23, citing *In re Atlas Roofing Corp. Chalet Shingle Prods. Liab.*

*Litig.*, 2017 U.S. Dist. LEXIS 88496, at *17-20 (N.D. Ga. June 8, 2017); *PB Prop. Mgmt. v. Goodman Mfg. Co.*, 2016 U.S. Dist. LEXIS 97520, at *61-70 (M.D. Fla. 2016); *City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 640-642 (S.D. Fla. 2010); *Colley v. P&G*, 2016 U.S. Dist. LEXIS 137725, at *24-25 (S.D. Ohio Oct. 4, 2016)).

Thus, contrary to Plaintiffs' disingenuous assertion, "the determination" of causation is **not** "simple," and instead requires consideration of far more facts than just "[d]id the owner's leak come from Uponor PEX manufactured between 2009 and 2021." (Opp. at 34). *See also In re Atlas Roofing Corp.*, 2017 U.S. Dist. LEXIS 88496, at *17-20 ("even if the Plaintiff could prove a uniform defect" in the shingles, "individual issues" would predominate because "there are numerous reasons a roof may fail" or why "a shingle may blister, crack, or suffer from granule loss," and thus, "the causation determination for most putative class members [would] involve individualized evidence."); *City of St. Petersburg*, 265 F.R.D. at 640-642 ("even if Plaintiffs were able to demonstrate that FlexPipie had a general defect, it would not assist Plaintiffs in meeting their burden of showing that the particular defect was the legal cause of each class member's harm.").

**Second**, Plaintiffs argue "Class members know of their leaks" and a "brief inspection" will "show that the leaking PEX" was manufactured by Uponor. (Opp. at 33-34). This overly-simplistic approach ignores that the term "leaks" encompasses a range of water escapements, ranging from (i) undetected drip leaks that have an invisible impact on walls, ceilings, or floors; to (ii) obviously catastrophic failures. Because the proposed class covers all "leaks," its size and scope cannot be ascertained unless every potential member investigates whether: (a) there is any "leak" of any size in the plumbing system; (b) that leak has caused "damage"; and (c) the "leak" involves Uponor PEX. Furthermore, to perform the investigation, each property owner would

need to engage in invasive/destructive demolition work, since pipes are typically installed behind walls, ceilings, and floors. Similarly, operating conditions such as system pressures, temperatures and water flow rates need to be measured, as excessive levels can adversely impact the performance of PEX. Courts have repeatedly held this onerous, individualized process is antithetical to the class action procedure – especially when, as here, Uponor **does not** sell PEX directly to retail consumers, and Uponor **does not** have any records showing the location of PEX installed in any structure. *See Adams Pointe I, L.P. v. True-Flex Metal Hose Corp.*, 2020 U.S. Dist. LEXIS 128055, at *18-25 (W.D. Pa. July 17, 2020), *aff'd* 2021 U.S. App. LEXIS 24315 (3d Cir. Aug. 16, 2021); *Lee-Bolton v. Koopers Inc.*, 319 F.R.D. 346, 383 (N.D. Fla. 2017); *In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 88496, at *8.

Plaintiffs fail to credibly address, or refute, these defects, which render the proposed class unascertainable and prevent a finding of commonality or predominance. *See also Pilgrim v. Universal Health Card., LLC*, 2010 U.S. Dist. LEXIS 28298, at *11 (N.D. Ohio Mar. 25, 2010) (no predominance where it was "clear" from complaint "that a member-by-member inquiry would be required for each putative class member"), *aff'd Pilgrim,* 660 F.3d at 945-950.[10]

Dated: July 8, 2024  By:    /s/ M. Andrew Pippenger
                                                  M. Andrew Pippenger, BPR 018183
                                                  104 Woodmont Centre, Suite 201
                                                  Nashville, TN 37205
                                                  423-521-1201 (phone)
                                                  apippenger@ppclaw.com

---

[10] *See also Adams*, 2021 U.S. App. LEXIS 24315, at *8-12 (no predominance where: "Some plaintiffs have experienced physical damage, whereas others allege an economic injury from the diminution in value of their home, repair costs, or increased insurance costs. Some may have no injury or their injury may depend on the condition of the pipes and manner of installation. Each claim will require individualized property assessments and will raise different causation issues."); *PB Prop. Mgmt.*, 2016 U.S. Dist. LEXIS 97520, at *85-91 (no predominance where "the question of whether and why a particular coil failed are individual questions that will be unique to each class member and would overwhelm the litigation[,]" and it was "undisputed that copper evaporator coils can fail for a number of reasons").

# CERTIFICATE OF SERVICE

  I, the undersigned attorney, do hereby certify that the foregoing pleading was electronically filed with the Clerk of Court using the CM/ECF filing system which automatically sends email notifications of such filing to the following attorneys of record:


Andrew J. Pulliam (Tenn. BPR No. 016863)
James C. Bradshaw III (Tenn. BPR No. 013170)
J. Graham Matherne (Tenn. BPR No. 011294)
Ann Weber Langley (Tenn. BPR No. 038070)
WYATT, TARRANT & COMBS, LLP
333 Commerce Street, Suite 1050
Nashville Tennessee 37201
Telephone: (615) 244-0020
Fax: (615) 256-1726
Email: apulliam@wyattfirm.com
Email: jbradshaw@wyattfirm.com
Email: gmatherne@wyattfirm.com
Email: alangley@wyattfirm.com

*Attorneys for Plaintiffs*

                /s/ M. Andrew Pippenger
                M. Andrew Pippenger