IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| BRIAN CARRICO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | NO. 3:23-cv-00497 |
| | ) | |
| UPONOR, INC., et al., | ) | JUDGE RICHARDSON |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is the "Motion to Compel Arbitration or, Alternatively, to (1) Dismiss Plaintiffs' Second Amended Complaint and Class allegations, and (2) Strike Class Allegations," filed by Defendant Uponor, Inc. ("UI") (Doc. No. 67, "UI's Motion"). Also pending is the "Motion to Dismiss for Lack of Personal Jurisdiction or, Alternatively, to (1) Compel Arbitration, (2) Dismiss Plaintiffs' Second Amended Complaint and Class Allegations, and (3) Strike Class Allegations," filed by Defendant Uponor North America, Inc. ("UNA") (Doc. No. 68, "UNA's Motion"). Also pending is the "Motion to Dismiss for Lack of Personal Jurisdiction or, Alternatively, to (1) Compel Arbitration, (2) Dismiss Plaintiffs' Second Amended Complaint and Class Allegations, and (3) Strike Class Allegations," filed by Defendant Uponor Corporation ("UC," and, collectively with UI and UNA, "Defendants") (Doc. No. 69, "UC's Motion," and, collectively with UI's Motion and UNA's Motion, "Defendants' Motions"). Plaintiffs have filed responses in opposition to all three Motions (Doc. No. 72, Doc. No. 73, and Doc. No 75, respectively, each an "Opposition" and, collectively, "Oppositions"), and Defendants have filed

replies (Doc. No. 79, Doc. No 80, and Doc. No. 81, respectively, each a "Reply" and, collectively, "Replies").[1]

For the reasons discussed herein, the Court will Deny Defendants' Motions.

BACKGROUND[2]

This case is a putative class action arising out of allegedly defective polyethylene tubing ("PEX"). (*See generally* Doc. No. 65). Plaintiffs are residents of Tennessee. (*Id.* ¶¶ 2–3). Defendant UI is an Illinois corporation with its principal place of business in Minnesota. (*Id.* ¶ 5). Defendant UNA is a Delaware corporation with its principal place of business in Minnesota. (*Id.* ¶ 6). Defendant UC is a Finnish corporation with its principal place of business in Finland. (*Id.* ¶ 7). UC is the parent company of both UNA and UI; more specifically, UC wholly owns UNA, which wholly owns UI. (*Id.* ¶ 12).

The Second Amended Complaint ("SAC") alleges that Defendants "manufactured, advertised/marketed, distributed, and/or sold . . . PEX for use in water plumbing systems in residences and structures throughout the United States, including but not limited to Plaintiffs'

---

[1] Also pending before the Court is UNA's request for judicial notice of a California opinion in support of UNA's Motion (Doc. No. 68-2) ("UNA's RJN"), to which Plaintiffs have filed a response (Doc. No. 74), and UNA has filed a reply (Doc. No. 82). The subject of UNA's RJN is an opinion from the Superior Court (for San Francisco County) of California in which the court fund that it lacked jurisdiction over UNA. (*See generally* Doc. No. 68-2). Plaintiffs argue that the Court may not take judicial notice of the opinion because whether this Court has personal jurisdiction over UNA in Tennessee is disputed. (*See generally* Doc. No. 74). But Plaintiffs miss the point. UNA's RJN asks the Court take judicial notice of the opinion itself, the existence of which cannot reasonably be disputed. And, as UNA points out, Plaintiffs' arguments also rely on opinions from other courts that exercised personal jurisdiction over UNA. (*See* Doc. 82 at 2). The Court will therefore grant UNA's RJN.

[2] The facts in this section are, except as otherwise indicated, taken from the Second Amended Complaint ("SAC") (Doc. No. 65) and as discussed below, are taken as true for the purposes of the Court's analysis under Fed. R. Civ. P. 12(b)(6). For the arguments under Rule 12(b)(2) and those regarding arbitration, additional facts taken from the respective Motions, Oppositions, and Replies will be considered by the Court, as also discussed below. Because of the numerous exhibits and related requests for judicial notice submitted by the parties in relation to these issues, these facts will be noted in the corresponding subsections. However, the Court will discuss the appropriate consideration of the facts on a Fed. R. Civ. P. 12(b)(2) motion in the Standard section of this opinion.

Homes[.]" (*Id.* ¶ 27). The SAC further alleges that Defendants, whose market share in the United States was approximately one-third between 2016 and 2021, represented to consumers that its PEX was of the "highest quality." (*Id.* ¶¶ 30–31, 33). However, according to the SAC, Defendants' distinctive manufacturing process, which involved "oxidiz[ing]/burn[ing] the outside" of the PEX pipes at a high temperature, damaged the outer layer of the pipes by altering its chemical structure, thereby subjecting the tube to actual damage and premature failure. (*Id.* ¶ 43). Specifically, Defendants' high-temperature manufacturing process "subject[ed] the [PEX] to actual damage and premature failure in the form of, among other things, oxidative degradation, microcracking, cracking, through-wall cracking, and leaks, which leaks cause[d] substantial property damage to other property in the structures where the Uponor PEX tubing [was] used." (*Id.* ¶ 43). According to the SAC, Defendants "discontinued their manufacture, distribution, and sale of the defective Uponor PEX in or around 2021 because of the defects with the product," (*id.* ¶ 50, 55), and yet "failed to disclose this material information about defects in Uponor PEX" and failed to notify or compensate owners of properties with PEX. (*Id.* ¶¶ 50, 55).

Plaintiffs' homes were built by a contractor ("Contractor") who used Defendants' PEX. (*Id.* ¶¶ 36–37). The PEX in Plaintiffs' homes "has prematurely degraded and deteriorated and, as a result, has failed and continues to fail, and suffers from microcracking causing water leaks . . . result[ing] in damages" to Plaintiffs' homes and "other property" therein. (*Id.* ¶¶ 38–39, 62). Defendants knew of the defects and "affirmatively concealed" the defects in the PEX and related leaks despite their "duty to disclose such information to the public who was reasonably expected to have plumbing installed in their homes or structures and/or to builders and plumbers who were reasonably expected to use such . . . PEX based on (1) Defendants' superior and sole knowledge related to the defects, and (2) Defendants' continuous statements to the public, builders, and

plumbers about the quality of Uponor PEX . . . ." (*Id.* ¶¶ 72–75). Specifically, Defendants

"fraudulently concealed the information about the defects" and implemented a plan to conceal

claims by property owners and prevent inquiries regarding defects by making continuous

statements that the PEX was of the "highest quality" and conducting repairs "on a case-by-case

basis only when a failure was reported instead of notifying potential owners." (*Id.* ¶¶ 75–83). The

purpose of this concealment was to prevent inquiry by owners of affected properties and thereby

avoid liability. (*Id.* ¶¶ 78–83). Plaintiffs could not have discovered the defects, because of these

concealment measures and because "the PEX piping and its defects [we]re latent by being . . .

behind the walls of the homes and other structures of Plaintiffs[.]" (*Id.*). As such, "Plaintiffs did

not know or learn of [their] claims and could not reasonably have known of such claims until the

leaks and damages occurred and Plaintiffs learned that [Defendants'] actions and inactions caused

the leaks," which occurred "shortly before the filing" of the original complaint in this case. (*Id.* ¶¶

70–72).

Based on the above (alleged) facts, the SAC brings claims for strict products liability

(Count I), strict products liability for design defect (Count II), and negligence (Count III). The

SAC also contains class allegations, including the following class definition:

> All persons or entities who own or owned homes, businesses, or other structures in
> Tennessee with Uponor PEX used as the lines and components of a potable water plumbing
> system where the Uponor PEX was produced between 2009 and 2021 who suffer damages
> or injuries from leaks from the Uponor PEX.

(*Id.* at 85). The FAC alleges that this case should proceed as a class action because (i) there are

"thousands of individuals and entities who own or owned homes or other structures in Tennessee

with Uponor PEX produced between 2009 and 2021 who suffer damages or injuries from leaks

from the PEX" (*id.* ¶ 88); (ii) Plaintiffs' claims are typical of those of the class because they "arise

from the same practices and conduct . . . and are based on the same legal theories" (*id.* ¶ 90); (iii)

"[c]ommon questions of law and fact exist," including whether PEX manufactured between 2009 and 2021 is defective and/or defectively designed and subject to premature failure and/or unreasonably dangerous; whether Defendants knew or should have known of the alleged defects and/or failed to warn consumers or made misleading statements; whether Defendants exercised reasonable care and/or breached their duties towards Plaintiffs and the putative class; whether Defendants caused damages to the homes and/or structures of Plaintiffs and the putative class members; whether Defendants are liable for such damages; and whether Defendants acted willfully or fraudulently so to render the tolling of the applicable statutes of limitations proper (*Id.* ¶ 97); (iv) Plaintiffs and their counsel are adequate representatives, inasmuch as (allegedly) they have no interests adverse to the putative class and are experienced in prosecuting similar class actions, respectively (*id.* ¶ 91); (iv) separate actions by putative members could be dispositive of or have an effect on other class members' interests (*id.* ¶ 92); (v) Defendants "acted or refused to act on grounds generally applicable to the [putative class], thereby making" certification appropriate under Rule 23(b)(2) in particular (*id.* ¶¶ 93, 99); and (iv) a class action is superior to other available means of fair and efficient adjudication of this controversy, thus making certification appropriate under Rule 23(b)(3) in particular, inasmuch as proceeding as a class action (allegedly) would streamline the litigation and safeguard party and judicial resources (*id.* ¶¶ 94–96).

<u>LEGAL STANDARD</u>

A. <u>Rule 12(b)(2)</u>

UNA and UC filed their Motions in part pursuant to Fed. R. Civ. P. 12(b)(2), which provides for dismissal of a claim for "lack of personal jurisdiction." A plaintiff bears the burden of establishing personal jurisdiction. *Elcan v. FP Assocs. LTD*, Case No. 3:19-cv-01146, 2020 WL 2769993, at *3 (M.D. Tenn. May 28, 2020); *Ever-Seal, Inc. v. DuraSeal, Inc.*, No. 3:22-CV-00365,

2022 WL 3599519, at *6 (M.D. Tenn. Aug. 23, 2022). On a 12(b)(2) motion to dismiss, district courts have discretion to either decide the motion on affidavits alone, permit discovery on the issue, or conduct an evidentiary hearing. *Elcan* 2020 WL 2769993 at *3 (citing *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991)). Where, as here, the court rules without conducting an evidentiary hearing, the plaintiff's burden of proof is "relatively slight." *Id.* (citing *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 899 (6th Cir. 2017)).

Nevertheless, "[i]n response to a [Rule 12(b)(2)] motion to dismiss, the plaintiff may not stand on his pleadings, but must show the specific facts demonstrating that the court has jurisdiction." *Ramsey v. Greenbush Logistics, Inc.*, 263 F. Supp. 3d 672, 676 n.1 (M.D. Tenn. 2017) (quoting *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678 (6th Cir. 2012)). "In other words, a 'plaintiff [faced with a Rule 12(b)(2) motion] may not simply rest on the bare allegations of the complaint. But uncontroverted allegations must be taken as true, and conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor.'" *Johansen v. HomeAdvisor, Inc.*, 218 F. Supp. 3d 577, 583 (S.D. Ohio 2016) (quoting *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015)).

Moreover, when a district court rules on a motion to dismiss under Rule 12(b)(2) without conducting an evidentiary hearing, the court must consider the pleadings and affidavits in a light most favorable to the plaintiff. *Elcan*, 2020 WL 2769993 at *3. The Sixth Circuit has held that a court disposing of a Rule 12(b)(2) motion without an evidentiary hearing should not weigh the controverting assertions of the party seeking dismissal, because "we want to prevent non-resident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996) (citation and quotation marks omitted). "Dismissal in this procedural posture is proper only if all the specific

facts which the plaintiff . . . alleges collectively fail to state a prima facie case for jurisdiction." *Id.* "In this procedural posture [without an evidentiary hearing], the court does not weigh the facts disputed by the parties but may consider the defendant's undisputed factual assertions." *Camps v. Gore Capital, LLC*, No. 3:17-cv-1039, 2019 WL 2763902, at *4 (M.D. Tenn. July 2, 2019).

"It is not necessarily easy to reconcile all of the above-referenced rules with one another, because, at least superficially, they could be understood to say different things about the extent to which the district court must accept as true the allegations of the complaint. But the Court believes that they can be reconciled. And the upshot seems to be this: in opposing a motion to dismiss for lack of personal jurisdiction, a plaintiff cannot rely on mere allegations in the complaint, unless they are uncontroverted by the defendant-movant—in which case they can be accepted as true, as can the averments in the plaintiff's declarations or attachments thereto (even if contradicted) and the defendant's undisputed factual assertions." *Ever-Seal*, 2022 WL 3599519 at *7; *Corl v. Kenan Advantage Grp. Inc.*, No. 3:20-CV-00503, 2022 WL 2232195, at *4 (M.D. Tenn. June 21, 2022) (same).

Because, in the Court's discretion, there has been (and will be) no evidentiary hearing with regard to UNA's and UC's Motions, the Court will determine whether Plaintiffs have demonstrated this Court's personal jurisdiction over UNA and UC under a *prima facie* standard, rather than the heavier preponderance of the evidence standard. *Camps*, 2019 WL 2763902 at *4–5. "'A *prima facie* showing means that the plaintiff has produced admissible evidence, which if believed, is sufficient to establish the existence of personal jurisdiction.'" *Reyes v. Freedom Smokes, Inc.*, No. 5:19-CV-2695, 2020 WL 1677480, at *2 (N.D. Ohio Apr. 6, 2020) (quoting *Death v. Mabry*, No. C18-5444 RBL, 2018 WL 6571148, at *2 (W.D. Wash. Dec. 13, 2018)).

B. <u>Personal Jurisdiction</u>

"In a diversity action, the law of the forum state dictates whether personal jurisdiction exists, subject to constitutional limitations." *Intera Corp. v. Henderson*, 428 F.3d 605, 615 (6th Cir. 2005). "Tennessee's long-arm statute . . . provides that a Tennessee court may exercise jurisdiction over an out-of-state defendant on '[a]ny basis not inconsistent with the constitution of this state or of the United States.'" *Simplex Healthcare, Inc. v. Marketlinkx Direct, Inc.*, 761 F. Supp. 2d 726, 729 (M.D. Tenn. 2011) (quoting Tenn. Code Ann. § 20–2–214(6)). "Accordingly, the long-arm statute has been consistently construed to extend to the limits of federal due process." *Id.* (quoting *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 645 (Tenn. 2009); *and Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 477 (6th Cir. 2003)). "Where a state's long-arm statute extends to the limits of the Due Process Clause, the two inquiries merge, and the court need only determine whether exercising personal jurisdiction violates [the defendant]'s due process rights." *Env't 360, Inc. v. Walker*, 713 F. Supp. 3d 442, 446 (M.D. Tenn. 2024) (quoting *Pearl Recs., Inc. v. Conner*, No. 3:22-CV-00096, 2023 WL 351203, at *3 (M.D. Tenn. Jan. 20, 2023)).

Personal jurisdiction comes in two forms: general and specific. *Bristol-Myers Squibb Co. v. Superior Court of Cal., S.F. Cnty.*, 552 U.S. 255, 262 (2017). General jurisdiction, which is not at issue here, allows a plaintiff to sue a defendant on all claims regardless of the connection between the claim and the forum. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).[3]

---

[3] For the Court to have general jurisdiction over a corporation, there must be continuous and systematic contacts such that a corporation is "essentially at home" in the forum state. *Daimler*, 571 U.S. at 138–39. With respect to a corporation, the place of incorporation and principal place of business are the paradigm bases for general jurisdiction. *Id.* General jurisdiction may exist even where the forum state is neither the place of incorporation nor the principal place of business; however, these cases are truly exceptional and must be based on more than just sizeable sales. *See id.* at 139; *TailGate Beer, LLC v. Boulevard Brewing Co.*, 2019 WL 2366948, at *2 (M.D. Tenn. June 5, 2019) (same).

In contrast, specific jurisdiction, which is at issue here, must arise out of or relate to the defendant's contacts with the forum—principally an activity or occurrence that takes place in the forum state. *Bristol-Myers*, 552 U.S. at 262. Under the constitutional due process analysis, for specific jurisdiction to exist: (1) the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state; (2) the cause of action must arise from the defendant's activities there; and (3) the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of personal jurisdiction over the defendant reasonable. *Means v. United States Conference of Catholic Bishops*, 836 F.3d 643, 649 (6th Cir. 2016) (quoting *Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)); *TailGate Beer* 2019 WL 2366948 at *2 (same). "If a court finds that the plaintiff has established the first two prongs of the specific-jurisdiction inquiry, the burden shifts to the defendant to present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Santoni v. Mueller*, No. 3:20-CV-00975, 2022 WL 97049, at *6 (M.D. Tenn. Jan. 10, 2022) (citing *TailGate Beer*, 2019 WL 2366948 at *6). "'[A]n inference of reasonableness arises'" and "'only the unusual case will not meet this third criteria.'" *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 554 (6th Cir. 2007) (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1461 (6th Cir. 1991)). "The burden on the defendant to meet this prong is high." *Id.* In determining reasonableness, we examine three factors: (1) the burden on the defendant; (2) the forum state's interest; and (3) the plaintiff's interest in obtaining relief." *Bulso v. O'Shea*, 730 F. App'x 347 (6th Cir. 2018).

C.  Motion to Compel Arbitration

Both federal law and Tennessee law reflect a strong policy in favor of arbitration. *See Morgan Keegan & Co. v. Smythe*, 401 S.W.3d 595, 603 (Tenn. 2013). "[A]ny doubts regarding

arbitrability must be resolved in favor of arbitration." *Anderson v. Amazon.com, Inc.*, 478 F. Supp. 3d 683, 691 (M.D. Tenn. 2020). However, "arbitration is a 'matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit.'" *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). "Because arbitration agreements are fundamentally contracts, we review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Id.* When considering a motion to dismiss and compel arbitration under the FAA, such as Defendants' Motions here, a court has as many as four tasks— one or more of which the court may not need to reach in a particular case, depending on the case-specific outcome of the preceding task(s):[4]

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Anderson*, 478 F. Supp. 3d 683 at 691 (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000)).

"In evaluating motions to compel arbitration, courts treat the facts as they would in ruling on a summary judgment." *Id.* (citing *Yaroma v. Cashcall, Inc.*, 130 F. Supp. 3d 1055, 1062 (E.D. Ky. 2015) (internal quotation marks omitted)). "Therefore, the party opposing arbitration bears the burden of 'showing a genuine issue of material fact as to the validity of the agreement to arbitrate.'" *Id.* (citing *Great Earth Companies, Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002)). Thus, the court views "all facts and inferences drawn therefrom in the light most favorable" to the party

---

[4] For example, if the Court concludes pursuant to the first task there is no agreement between the parties, then obviously the Court need not engage in the remaining tasks.

opposing arbitration and "determine[s] whether the evidence presented is such that a reasonable finder of fact could conclude that no valid agreement to arbitrate exists." *Id.*; *see also Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000) (stating that the party challenging arbitration has the burden of proving that the claims at issue are not arbitrable).

D.  Rule 12(b)(6)

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. A legal conclusion, including "[one] couched as a factual allegation[,] need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010); *accord Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018); *see also Iqbal*, 556 U.S. at 679. Moreover, factual allegations that are merely consistent with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish plausibility of entitlement to relief even if it supports the possibility of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be

appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id.* at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

E.  Rules 12(f) and 23(d)(1)(D)

Federal Rule of Civil Procedure 12(f) authorizes the Court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The function of the motion [to strike] is to 'avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with' them early in the case." *Operating Eng'rs Local 324 Health Care Plan v. G&W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015) (quoting *Kennedy v. City of Cleveland*, 797 F.2d 297, 305 (6th Cir. 1986)).

A motion to strike class allegations under Rule 12(f) may be treated as a motion to deny class certification under Rule 23. *See Bearden v. Honeywell Int'l, Inc.*, 720 F. Supp. 2d 932, 942 (M.D. Tenn. 2010). Rule 23 allows the Court to "require that the pleadings be amended to eliminate allegations about representation of absent persons [*i.e.*, putative unnamed class members]," Fed. R. Civ. P. 23(d)(1)(D), and requires the Court to determine "[a]t an early practicable time ... whether to certify the action as a class action," Fed. R. Civ. P. 23(c)(1)(A). "Read together, Rules 12(f), 23(d)(1)(D), and 23(c)(1)(A) grant the Court 'authority to strike class allegations prior to discovery if the complaint demonstrates that a class action cannot be maintained.'" *Fishon v. Mars*

*Petcare US, Inc.*, 501 F. Supp. 3d 555, 575 (M.D. Tenn. 2020) (quoting *Hovsepian v. Apple, Inc.*, No. 08-5788, 2009 WL 5069144, at *2 (N.D. Cal. Dec. 17, 2009)).

"The moving party has the burden of demonstrating from the face of the . . . complaint that it will be impossible to certify the class as alleged, regardless of the facts plaintiffs may be able to prove." *Id.* (quoting *Schilling v. Kenton Cnty*, No. 10-143-DLB, 2011 WL 293759, at *4 (E.D. Ky. Jan. 27, 2011) (citation omitted)). "The [C]ourt should defer decision on certification pending discovery if the existing record is inadequate for resolving the relevant issues" (*In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1086 (6th Cir. 1996) (citation omitted)), unless the Court is "convinced that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim[s]" succeed in class action form. *Fishon*, 501 F. Supp. 3d at 575 (quoting *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 990 (N.D. Cal. 2009)).

<u>DISCUSSION</u>

## I. <u>Overview of Analysis</u>

Because Defendants' Motions are, in part, based on overlapping arguments applicable to multiple defendants, and because Plaintiffs' Oppositions and Defendants' Replies incorporate each other by reference on certain issues,[5] the Court will address the motions together and issue by issue in the interest of judicial efficiency. *See, e.g., E.E.O.C. v. New Breed Logistics*, 962 F. Supp. 2d 1001, 1008 (W.D. Tenn. 2013), *aff'd*, 783 F.3d 1057 (6th Cir. 2015) (in the interest of judicial efficiency, addressing overlapping motions together and issue by issue); *Daniel v. Harper*, 2017 WL 6522090, at *2 (W.D. Ky. Dec. 19, 2017) (same); *United States v. Rodgers*, No. 2:08-CR-56,

---

[5] Given the overlap of the arguments therein, the Court will not examine at this time whether these filings run afoul of Local Rule 7.01, insofar as they incorporate by reference different filings of one or both other defendants and thereby dozens of pages of additional arguments. Still, the Court will not always be so generous with its time and cautions the parties to seek leave of Court before engaging in any similar maneuvers in the future.

2009 WL 3498801, at *1 (W.D. Mich. Oct. 26, 2009) (same). For the reasons stated herein, the Court will exercise personal jurisdiction over UNA and UC. However, the Court will deny the jurisdictional arguments without prejudice so to allow UNA and UC to renew them after discovery. Additionally, the Court will not compel arbitration, or dismiss the complaint under Rule 12(b)(6), or strike class allegations at this juncture, despite finding that the class definition is overbroad.

## II. __Personal Jurisdiction__[6]

In their respective Motions, UNA and UC argue that the Court lacks general or specific jurisdiction (Doc. No. 68-1 at 7–16; Doc. No. 69-11 at 7–16). In their Oppositions, Plaintiffs do not invoke general jurisdiction but rather counter that the Court has specific jurisdiction over UNA and UC based on various theories. Specifically, Plaintiffs argue that the Court has specific jurisdiction because: (A) UNA and UC availed themselves of the privilege of conducting business activities in Tennessee; and (B) UNA and UC are alter egos and/or agents of UI (which has not made a personal-jurisdiction challenge). (Doc. No. 73 at 10–25; Doc. No. 75 at 13–30). In the alternative, Plaintiffs request that the Court allow discovery on the issue of personal jurisdiction. (Doc. No. 73 at 31; Doc. No. 75 at 25). The Court will address these arguments in turn.[7]

_____

[6] Plaintiffs request that the Court take judicial notice of 24 exhibits in support of their personal jurisdiction arguments. (*See generally* Doc. No. 73-1). These exhibits consist of court filings from various jurisdictions and statements by UNA and/or UC on publicly accessible sources, including websites and social media. Defendants do not oppose this request; nor do they dispute the authenticity of the exhibits. The Court will therefore judicially notice these exhibits under Federal Rule of Evidence 201. *See United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012) (taking judicial notice of court documents); *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, No. 5:13-CV-2145, 2015 WL 7575937, at *7 (N.D. Ohio Nov. 25, 2015), *aff'd*, 842 F.3d 430 (6th Cir. 2016) (taking judicial notice of press releases and disclosures on publicly accessible websites).

[7] As a preliminary matter, the Court will address the declarations that UNA and UC filed in support of their respective Motions, namely, the declarations of UNA's CEO and UC's Vice President of Legal Affairs, respectively. Relying on these declarations, UNA and UC argue that the Court has no personal jurisdiction over them because they are not licensed to do business in Tennessee, do not directly or indirectly conduct business in Tennessee, and "do not maintain offices, employees, bank accounts, mailing addresses, or any physical presence in Tennessee"; because they do not "design, manufacture, sell, or distribute the PEX or

A.  Purposeful Availment

Because Plaintiffs make different arguments regarding UNA and UC, the Court will conduct a separate analysis for each entity.

1.  UNA

Plaintiffs argue that the Court may exercise jurisdiction over UNA based on its answer to a complaint filed in Tennessee state court ("the State Farm Complaint"). (*See* Doc. No. 73 at 14–15). Specifically, Plaintiffs rely on UNA admitting the following allegations in its answer to the State Farm Complaint:

> Defendant [UNA] manufactures, warrants, markets, and sells various plumbing products, including [PEX] pipe for . . . residential and commercial spaces around the globe . . . ."
>
> Among the many plumbing products [UNA] manufactures, warrants, and sells under in its own name throughout the United States, including Hamilton County, Tennessee, is a ¾ inch tubing supply constituted of [PEX], labeled with Uponor brand and serial number UB08111101, that is intended for use with potable (safe to drink) water.

---

other products [in Tennessee]"; and because they do not own property or assets of UI or control its operations. (Doc. No. 68-1 at 8–9 (citing Doc. No. 25-3 ("UNA's Declaration")); Doc. No. 69-1 at 9 (citing Doc. No. 36-1 ("UC's Declaration))). UNA and UC further contend that, because UNA and UC do not "design, manufacture, install, assemble, inspect, distribute, supply, or sell the PEX allegedly installed [in Plaintiffs' properties]," there are no "minimum contacts" that could make the exercise of personal jurisdiction reasonable. (Doc. No. 68-1 at 9; Doc. No. 69-1 at 10).

These declarations, however, are in direct contradiction with the SAC, which alleges that Defendants, collectively, "conduct substantial business in Tennessee . . . and intentionally avail themselves of the consumers and markets within Tennessee through the promotion, advertising/marketing, partnership agreements, supply agreements, sales, and distribution of its products, including Uponor PEX." (Doc. No. 65 ¶ 10). The FAC further alleges that "[a]t all relevant times herein, [Defendants, collectively,] designed, manufactured, marketed/advertised, sold, and/or distributed Uponor PEX for use in water plumbing systems in residences and other structures throughout the United States, including Tennessee, by and through their entities, employees, agents, predecessors-in-interest, and/or other representatives." (*Id.* ¶ 11).

Under the applicable standard, the Court cannot take as true the controverted portions of these declarations. As such, the Court will not grant their respective 12(b)(2) motions solely based upon them. Conversely, the Court cannot find that Plaintiffs have satisfied their burden with respect to personal jurisdiction based solely on allegations in the SAC that (in addition to arguably being merely conclusory) are controverted.

(Doc. No. 73-2 at 1–2, 20 (admitting allegations)). UNA counters that: (i) consent to jurisdiction in one case does not amount to consent to jurisdiction in another case; (ii) that UNA did not admit jurisdictional allegations in the State Farm Complaint, and (iii) that UNA's Declaration explains and remedies any prior admissions. (*See* Doc. No. 80 at 2–3).

The Court agrees that consent to jurisdiction in one case does not necessarily bind that party in subsequent cases. *See Eight Mile Style, LLC v. Spotify USA Inc.*, No. 3:19-CV-0736, 2020 WL 1640425, at *4 (M.D. Tenn. Apr. 2, 2020) (collecting cases). Nonetheless, the Court can take into consideration evidentiary admissions, such as statements in pleadings from another case, when ruling on a 12(b)(2) motion. *See, e.g.*, *Tyrrell v. BNSF Ry. Co.*, No. 4:17-CV-04120-RAL, 2018 WL 2944529, at *7 (D.S.D. June 12, 2018). A party, however, may controvert or explain non-binding evidentiary admissions. *In re NM Holdings Co.*, LLC, 407 B.R. 232, 285 (Bankr. E.D. Mich. 2009) (summarizing Sixth Circuit law on judicial admissions and evidentiary admissions; collecting cases).

Here, regardless of whether UNA actually consented to Jurisdiction in the Tennessee state court case, the Court finds it relevant that UNA admitted in that case to doing business in Tennessee by "manufactur[ing], warrant[ing], and sell[ing] [PEX] in its own name." The Court also finds it relevant that, with respect to a portion of a paragraph in the State Farm Complaint alleging that UNA "was purposefully engaging in business in Tennessee," UNA's answer asserted no denial. (Doc. No. 73-2 at 4, 21 (denying only a different portion of the relevant paragraph)). Indeed, under Tennessee law, this amounted to an admission. *See* Tenn. R. Civ. P. 8.04 ("[a]verments in a pleading to which a responsive pleading is required are admitted when not denied in the responsive pleading"); *Thomasson v. Thomasson*, 755 S.W.2d 779, 786 (Tenn. 1988) (same). Further, the Court notes that the events mentioned in the State Farm Complaint occurred

between 2013 and 2018, which is within the time period relevant to the present case. (*See* Doc. No. 73-2 at 2–3). Finally, UNA's explanation regarding these admissions in its Reply, *i.e.*, that "UNA chose to resolve the claim, rather than engage in an extended jurisdictional fight that would likely have cost more than the case was worth," explains why explain why UNA chose to consent to jurisdiction in the Tennessee state court case (if UNA indeed did so), but not necessarily the factual admission that UNA does business in Tennessee. (*See* Doc. No. 80 at 3).

Based on the above, the Court finds that Plaintiffs have succeeded in rebutting, at least at this stage, the controverted statements in the UNA's Declaration that UNA does not do business in Tennessee. This is not to say that UNA's answer to the State Farm Complaint is conclusively binding on it, but Plaintiffs have succeeded in making this issue appropriate for discovery. *See In re NM Holdings Co.*, LLC, 407 B.R. at 285–86. Assuming that UNA engaged in the manufacture, warranting, and sale of PEX in Tennessee, the Court also easily finds that UNA availed itself of the privilege of conducting business activities in Tennessee. Likewise, the claims here clearly arise directly from the alleged defects in the PEX. Finally, the Court sees no reason why this would be the unusual case in which exercising jurisdiction would be unreasonable. As such, the Court finds that Plaintiffs have established a showing of jurisdiction under the "relatively slight" *prima facie* standard, sufficient to overcome UNA's 12(b)(2) arguments.

Accordingly, the portion of UNA's Motion based on Rule 12(b)(2) will be denied, although without prejudice to UNA's prerogative to renew its Motion after discovery.[8]

---

[8] Because the Court has rejected UNA's 12(b)(2) motion on these grounds, the Court will not reach UNA's remaining arguments. Indeed, none of the remaining arguments could change the result, considering the grounds underlying the Court's rationale.

2. UC

As for UC, Plaintiffs argue that the Court has specific jurisdiction over it based on UNA and UI's contacts with the United States in general and thereby with Tennessee. (*See* Doc. No. 75 at 10, 18 (mentioning UNA, UI, and "Building Solutions—North America," later defined as UNA and UI)). Specifically, pointing to allegations in the SAC and exhibits in support of their Opposition, Plaintiffs claim that UC "transacted" business in North America "through the activities of its Building Solutions—North America Division," *i.e.*, UNA and UI. (*See id.* at 11). In the same vein, Plaintiffs contend that "UC . . . through its Building Solutions—North America division— markets and sells its PEX products throughout the United States" and that UC manufactures the PEX at issue in Minnesota via UI's facility. (*See id.* at 75 at 12–13 (citing Doc. No. 31-12 at 15, 46–47, 56)). Based on these contentions, Plaintiffs conclude that "UC—via its Building Solutions—North America division—has intentionally directed PEX into the Tennessee economy."[9] (*Id.*). Analogizing to a case about stream of commerce, Plaintiffs conclude that UC thereby purposefully availed itself of the opportunity of transacting business across the United States, including Tennessee. (*See id.* at 13 (citing *Mott v. Schelling & Co.*, 966 F.2d 1453 (6th Cir. 1992) (unpublished))).

Plaintiffs, however, do not make a true stream-of-commerce argument, inasmuch as they do not contend that UC itself manufactures and distributes PEX in Tennessee. *See George v. Uponor Corp.*, 988 F. Supp. 2d 1056, 1064 (D. Minn. 2013) (construing similar arguments against UC as attempting to establish jurisdiction through UC's subsidiaries, not under a stream-of-commerce theory); *see also Nixon v. Bevini, S.R.L.*, No. 3:20-CV-01103, 2022 WL 2311767, at

---

[9] While Plaintiffs mention Tennessee as opposed to the United States in general, the Court was unable to locate a specific mention to the Volunteer State in the attachments Plaintiffs cite. (*See id.* (citing Doc. No. 31-12 at 46–47)).

*5–7 (M.D. Tenn. June 27, 2022) (noting that, under the Sixth Circuit's "stream of Commerce 'plus' approach," simply placing a product into the stream commerce is insufficient; further finding no purposeful availment where the defendant lacked direct contacts with Tennessee). Rather, Plaintiffs' theory is entirely based on *UI's and UNA's* contacts with Tennessee. Likewise, the jurisdictional evidence does not indicate any direct contacts between UC and Tennessee, other than through its subsidiaries. In the absence of a special relationship between UC and its subsidiaries, UC cannot establish purposeful availment solely through contacts between its subsidiaries and the forum state. Indeed, "a company does not purposefully avail itself merely by owning all or some of a corporation subject to jurisdiction." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1274 (6th Cir. 1998); *accord* 4A Charles A. Wright et al., Federal Practice and Procedure § 1069.4 (4th ed. 2020) ("personal jurisdiction over the parent corporation may not be acquired simply on the basis of the local activities of the subsidiary company"). In other words, "[t]he analysis must focus on what the parent corporation has done, not its subsidiary." *Lafarge Corp. v. Altech Env't*, U.S.A., 220 F. Supp. 2d 823, 827 (E.D. Mich. 2002). This rule also applies in the stream-of-commerce setting. *See, e.g.*, *Shirley v. Goodyear Tire & Rubber Co.*, No. 03-2679 B, 2005 WL 8156686, at *4 (W.D. Tenn. Mar. 31, 2005) (in stream-of-commerce case, no jurisdiction over parent company where "Plaintiffs . . . presented no evidence to indicate that [the parent itself, as opposed to the subsidiary] designed its products for the Tennessee market, that it advertised or provided customer service outlets here, or that it marketed goods through a distributor who agreed to serve as its sales agent in Tennessee"; further collecting cases); *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2015 WL 1321882, at *2 (E.D. Mich. Mar. 24, 2015) (same).

Accordingly, the Court finds that the jurisdictional evidence does not support a finding that UC purposely availed itself of the Tennessee market based upon its own activities therein.

B.  <u>Alter Ego & Agency</u>[10]

Plaintiffs next argue that UNA and UI are alter egos[11] and/or agents of UC. (See Doc. No. 75 at 14–20). "[T]he Sixth Circuit has 'endorsed the use of the alter-ego theory to exercise personal jurisdiction,'" including in the context of affiliate corporations. *Ramsbottom v. Ashton*, No. 3:21-CV-00272, 2022 WL 106733, at *18 (M.D. Tenn. Jan. 11, 2022) (citing *Est. of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) (discussing the alter-ego theory of personal jurisdiction in the context of affiliate corporations)); *Hilani v. Greek Orthodox Archdiocese of Am.*, 863 F. Supp. 2d 711, 721 (W.D. Tenn. 2012) ("The Sixth Circuit has applied the alter-ego theory, a related concept of personal jurisdiction also recognized by the Tennessee Supreme Court, to decide whether general personal jurisdiction existed over a parent corporation based on the presence and activities of a subsidiary in the forum."); S*anders v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. 2:20-CV-02001, 2020 WL 5651675, at *7 (W.D. Tenn. Sept. 22, 2020) (it is compatible with due process for a court to exercise jurisdiction under an alter-ego theory over an entity that would otherwise not be subject to personal jurisdiction).

"When analyzing whether the alter-ego theory of personal jurisdiction is satisfied in diversity actions, the Court looks to the forum state's substantive law." *Sanders*, 2020 WL

---

[10] Tennessee law, which is applicable here as discussed below, effectively merges the alter-ego and agency theories of personal jurisdiction. *See Gordon v. Greenview Hosp.*, Inc., 300 S.W.3d 635, 653 (Tenn. 2009) (listing agency as one of the exceptions to corporate separateness for jurisdictional purposes under the alter-ego theory); *accord Valentine v. SSC Newport Operating Co. LLC*, No. 2:19-CV-00147, 2020 WL 7018265, at *4 (E.D. Tenn. Mar. 30, 2020) (same, discussing Tennessee law). Therefore, the Court will analyze them together.

[11] The basic idea of "alter ego," as conceived under the law generally, can be stated succinctly. "Alter ego means 'other self'—where one person or entity acts like, or, for [sic] another to the extent that they may be considered identical." *U.S. v. N. States Invs., Inc.*, 670 F. Supp. 2d 778, 787 (N.D. Ill. 2009) (*quoting United States v. Scherping*, 187 F.3d 796, 801 (8th Cir.1999)). An alter-ego theory is an assertion that "two parties should be treated as the same party" for purposes of liability. *See Church Joint Venture, L.P. v. Blasingame*, 947 F.3d 925, 930 (6th Cir. 2020; *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005) ("[A] contention that A is B's 'alter ego' asserts that A and B are the same entity").

5651675 at *7. "In Tennessee, mere control of a subsidiary corporation by its parent is not sufficient to disregard the presumption of corporate separateness[.]" *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 653 (Tenn. 2009). Furthermore, "[a] parent corporation's general involvement with the subsidiary corporation's performance, finance and budget decisions, and general policies and procedures does not provide a basis for attributing one corporation's contacts with the forum to the other for the purposes of personal jurisdiction." *Id.* at 651–52. "Neither does the fact that the subsidiary is wholly owned by the parent corporation or the fact that the corporations have the same directors and officers suffice to show that the two are alter egos." *Id.* at 652.

> Under Tennessee law, a court has personal jurisdiction over an entity defendant under the alter-ego theory if the plaintiff demonstrates: (1) "that the subsidiary corporation is a sham or dummy"; (2) 'that the two corporations are, in fact, identical and indistinguishable"; or (3) "that the subsidiary corporation is merely an instrumentality, agent, conduit, or adjunct of the parent corporation." [citation] The key inquiry is whether "the parent corporation 'exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.'"

*Sanders*, 2020 WL 5651675 at *8 (quoting *Gordon*, 300 S.W.3d at 653 (quoting *Cont'l Bankers Life Ins. Co. of the S. v. Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979))); *see also Valentine* 2020 WL 7018265 at *4 ("An entity is an instrumentality when the parent company dominates 'finances, policies and practices [so] that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal.'" (quoting *Stigall v. Wickes Mach.*, 801 S.W.2d 507, 511 (Tenn. 1990)); Restatement (Second) of Conflict of Laws § 52 cmt. b (1971) ("Judicial jurisdiction over a subsidiary corporation will . . . give the state judicial jurisdiction over the parent corporation if the parent so controls and dominates the subsidiary as in effect to disregard the latter's independent corporate existence.")). In sum, to disregard the presumption of corporate separateness, under either an alter-ego or agency theory, a

plaintiff must show complete "control of the subsidiary corporation's internal affairs or daily operations." *Hilani v. Greek Orthodox Archdiocese of Am.*, 863 F. Supp. 2d 711, 721 (W.D. Tenn. 2012) (citing *Gordon*, 300 S.W.3d at 653)).

Plaintiffs direct the Court's attention to *George*, a case in which the District of Minnesota has denied a 12(b)(2) motion filed by UC on strikingly similar facts and arguments. There, the court noted that "Plaintiffs' allegations and the evidence suggest [that UC]'s relationship with [UI] goes beyond "mere ownership," and more closely resembles [a] 'symbiotic' relationship[.]"[12] *George*, 988 F. Supp. 2d at 1066. The court further noted that "[t]hroughout the Uponor companies' various statements, [UI] appears to serve as [UC]'s base of operations in the United States." *Id.* Accordingly, the court found that "the record as it has developed thus far indicates [UI] operates as an extension of [UC]' s business." *Id.* at 1065. The court concluded that "Plaintiffs have established a *prima facie* showing of jurisdiction over [UC], because [UC] exercises a sufficient degree of control and domination over [UI] to satisfy due process." *Id.* at 1066. Defendants distinguish *George* by highlighting that its analysis is specific to Minnesota contacts and that the controlling law in our case (Tennessee law) requires a higher degree of control by the parent over the subsidiary than does Minnesota law. (*See* Doc. No. 81 at 1–3, 6–7).

The Court agrees that the *George* case is specific to Minnesota. Indeed, the court made this clear when ruling on UC's motion for reconsideration. *See George*, 988 F. Supp. 2d at 1079 ("[UC]'s subsidiary in this case, [UI], does not simply conduct business in Minnesota. . . . [UI]'s principal place of business is in the forum state, and [UC] conducts much if not most of its American operations, in addition to sales, through [UI]. Finding personal jurisdiction over [UC]

_____

[12] Despite *George's* use of the term "symbiotic," the Court does not view it appropriate to reframe the question of whether one company is the alter ego of another as whether the two companies have a "symbiotic" relationship.

in Minnesota on this basis does not broadly expose the parent company to jurisdiction in any state where it conducts business."). The Court also agrees that Tennessee law requires a high degree of control to support an alter-ego jurisdictional theory. *See Gordon*, 300 S.W.3d at 653 (rejecting alter-ego and agency jurisdictional theories where the record did not demonstrate "complete control" over the "day-to-day operation" of the subsidiary); *Hilani*, 863 F. Supp. 2d at 721 (finding no jurisdiction based on alter-ego or agency where the record did not establish "complete control over the day-to-day affairs or operations" of the subsidiary or that "Defendant approve[d] every decision much less direct[ed] every action" of the subsidiary from its headquarters, despite the "top-down" nature of the organization).

In their respective filings, the parties also discuss a case from the Eastern District of Tennessee, in which the court exercised alter-ego jurisdiction over a parent company that shared with its subsidiary officers, directors, employees, a physical address, an email domain, records, bank accounts, clients, website, and expenses. *See Valentine*, 2020 WL 7018265, at *5. The court noted that the subsidiary acted as a "division" of the parent company and that treating the subsidiary as separate would be unjust. *See id.* The court applied Tennessee law but also considered Sixth Circuit factors to determine whether exercising jurisdiction would comport with the limitations of the U.S. Constitution. *See id.* These factors are: (i) sharing the same employees and corporate officers, (ii) engaging in the same business enterprise, (iii) having the same address and phone lines, (iv) using the same assets, (v) completing the same jobs, (vi) not maintaining separate books, tax returns and financial statements, and (vii) exercising control over the daily affairs of another corporation. *Id.*; *see also Dochnal v. Thomson Reuters Corp.*, No. 2:18-CV-00044, 2018 WL 5045205, at *4 (E.D. Tenn. Oct. 17, 2018) (same) (quoting *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 849 (6th Cir. 2017)).

Here, the SAC alleges that UC "is the ultimate parent company for both [UNA and UC]" and that "[e]ach company in the chain wholly owns the company beneath it." (Doc. No. 65 ¶ 12). The SAC further sets forth a publication in which UC represents itself as a single entity with UI and UNA, "Uponor Group," stating, among other things, that it shares employees across the Group, that it serves the United States market via its Building Solutions, North America division, that it has manufacturing facilities in North America, and that "[c]ommon people, brand, technology, sustainability, innovation, R & D [*i.e.*, research and development] and IT matters are managed at the group level in order to benefit from global presence and maximum global synergies." (See *id*. ¶ 13 (citing Doc. No. 29-12)). The SAC also quotes portions of that publication, pertaining to the financial and risk management of the Group, stating that the Group's "President and CEO is in charge of the Group's day-to-day management" and that the Group "aims to embed control in the daily operations" of the Group. (*Id.*). Plaintiffs further point out that UC has claimed profits from its "Building Solutions—North America division," *i.e.*, UNA and UI, as its own. (Id. ¶ 14; *see also* Doc. No. 75 at 15–17). The SAC also alleges that an employee handbook states that UC "operates throughout Europe and the North America." (Id. ¶ 16). Finally, the SAC alleges that UC, UNA, and UI share the same email domain name. (Doc. No. 65 at ¶ 15).

In response, UC counters that "the phrase 'Uponor Group' is simply a convenient shorthand used to refer to 'Uponor'[-]related entities in various public-facing documents. (*See* Doc. No. 81 at 5 n.4 (citing UC's Declaration)). UC also points to persuasive authority in support of its argument that inclusive references in public documents are insufficient to establish jurisdiction. (See id. at 5 (citing *Surfside Non-Surgical Orthopedics P.A. v. Allscripts Healthcare Sols., Inc.*, No. 18 C 566, 2019 U.S. Dist. LEXIS 93064, at *12 (N.D. Ill. June 4, 2019) ("inclusive references in public filings are common practice" (collecting cases)). The Court was able to locate

an additional case from a sister district, which provides indirect support to this assertion. *See Dochnal v*, 2018 WL 5045205 at \*4 (sharing a logo and other branding materials is insufficient to establish an alter-ego relationship for jurisdictional purposes).

Overall, this case presents a close call. While the record developed so far clearly falls short of establishing jurisdiction under a preponderance standard, the Court finds that it nonetheless satisfies the lower *prima facie* standard. Indeed, the operative allegations and the record, viewed in light most favorable to Plaintiffs, contain indicia of UI operating as a mere "division" or "instrumentality" of UC. For instance, the record indicates that UC is involved with research and development, shares employees and other resources with UI and UNA, does business in North America through them, and—most importantly—has control over at least some aspects of the day-to-day operations of UI and UNA. Although it is unclear at this stage how granular and pervasive UC's control is over UI's and/or UNA's day-to-day operations truly is, especially with respect to the development, manufacturing, and sale of PEX into Tennessee, Plaintiffs have succeeded in making this an issue for discovery. Although the public-facing publications, analogous to marketing materials, on which Plaintiffs rely have little probative value, the Court finds that they raise questions sufficient to warrant discovery. Assuming that Plaintiffs' theory holds water, *i.e.*, that UI is a mere "division" or "instrumentality" of UC without a "separate mind, will or existence of its own," the Court further finds that treating UC and UI as separate entities would be unjust because it would enable UC to avoid answering in Tennessee for actions (and inaction) that it allegedly undertook through UI and/or UNA in Tennessee.

This is, of course, not to say that Plaintiffs will ultimately prevail on showing that the Court has jurisdiction over UC under an alter-ego and/or agency theory. Indeed, it is possible that discovery will reveal that UC's control over UI and/or UNA is simply not pervasive enough,

limited to "performance, finance and budget decisions, and general policies and procedures," or simply unrelated to Plaintiffs' claims. As such, the Court reminds the parties that its ruling on the present motion does not settle the jurisdictional issue but rather allows the parties to develop a more complete record through discovery. *See Valentine*, 2020 WL 7018265 at *6 ("Within the Sixth Circuit, a defendant may 'continue to contest personal jurisdiction by requesting an evidentiary hearing or moving for summary judgment should the evidence suggest a *material variance* from the facts as presented by plaintiffs.'" (quoting *Anwar*, 876 F.3d at 847 (internal quotation omitted)).

Accordingly, UC's arguments based on Rule 12(b)(2) will be denied without prejudice.

### III. <u>Motions to Compel Arbitration</u>[13]

Defendants argue that the SAC's claims are subject to arbitration based on an express written warranty (the "Warranty"), which contains the following arbitration provision:

> In the event claimant and Uponor are unable to resolve a claim through informal means, the parties shall submit the dispute to the American Arbitration Association or its successor (the "Association") for arbitration, and any arbitration proceedings shall be conducted before a single arbitrator in the Minneapolis, Minnesota metropolitan area. NOTWITHSTANDING THE FOREGOING, NEITHER THE CLAIMANT NOR UPONOR, INC. SHALL BE ENTITLED TO ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS, AND NEITHER THE CLAIMANT NOR UPONOR SHALL BE ENTITLED TO JOIN OR CONSOLIDATE CLAIMS WITH ANY OTHER PARTIES IN ARBITRATION OR IN LITIGATION BY CLASS ACTION OR OTHERWISE.

(*See* Doc. No. 67-1 at 6–7; Doc. No. 67-2 at 6). Defendants' argument is significantly hampered by the fact that Defendants do little—beyond merely noting that the Warranty appeared on their

---

[13] Plaintiffs incorporate by reference, into their Oppositions to UNA's and UC's Motions, the arbitration-related arguments from their Opposition to UI's Motion. (*See* Doc. No. 73 at 1–2; Doc. No. 75 at 1). UNA and UC do likewise in their Replies. (*See* Doc. No. 80 at 1 n.1; Doc. No. 81 at 1 n.1). Accordingly, the Court will treat all Defendants as one entity for purposes of ruling on the arbitration-related arguments.

website—to explain where this Warranty would have appeared, who would have signed a document containing it, and so forth.

Defendants make three arguments in support of their contention that the above arbitration provision applies to the SAC's claims. First, they argue that Plaintiffs are third-party beneficiaries of the Warranty and thereby bound by its terms. (Doc. No. 67-1 at 9–10).[14] Second, they contend that Plaintiffs are estopped from arguing that the arbitration provision is inapplicable because two prior iterations of the SAC contain a claim for breach of implied warranty. (*See id.* at 10–11). Third, Defendants contend that Plaintiffs are assignees of the warranty and therefore bound by its terms. (*Id.* at 12). The Court will address these arguments in turn.

A.    Estoppel Based on Third-Party Beneficiary Theory[15]

Defendants' third-party beneficiary argument sounds in estoppel. *See Swift Enterprises, LLC v. TruNorth Warranty Plans of N. Am., LLC*, No. 1:21-CV-146, 2022 WL 19396072, at *7 (E.D. Tenn. Sept. 30, 2022) ("The third-party beneficiary principle articulated in *Benton* and *Cumberland Trust* [*i.e.*, the line of cases on which Defendants rely] is essentially an estoppel theory."); *accord Blue Water Bay at Ctr. Hill, LLC v. Hasty*, No. M201602382COAR3CV, 2017 WL 5665410, at *12 (Tenn. Ct. App. Nov. 27, 2017); *Harvey ex rel. Gladden v. Cumberland Tr. & Inv. Co.*, 532 S.W.3d 243, 268 n.38 (Tenn. 2017). Therefore, the Court will apply estoppel principles.

Under Tennessee law, a third-party beneficiary of a contract containing an arbitration provision may be required to submit to arbitration even if not originally a party to the contract. *See*

_____

[14] Defendants' argument here is significantly hampered by the fact, essentially noted above, that Defendants do not even bother to identify the "first" party to the Warranty or explain how it became a party to (*i.e.*, bound by) the Warranty.

[15] For purposes of this analysis, the Court need not decide whether Plaintiffs were in fact third-party beneficiaries of the Warranty.

*Benton v. Vanderbilt Univ.*, 137 S.W.3d 614, 620 (Tenn. 2004). However, "an arbitration provision in a contract is applicable only to actions brought by a third-party beneficiary seeking to enforce rights under that contract." *Id.*; *see also Denton v. Allenbrooke Nursing & Rehab. Ctr., LLC*, 495 F. Supp. 3d 601, 612 (W.D. Tenn. 2020) ("Courts will enforce arbitration clauses against a third party to a contract only when the third party tries to enforce the contract."). Courts have found that bringing claims grounded in tort and statutory law does not amount to seeking to enforce contractual rights. *See, e.g.*, *Sykes v. Quince Nursing & Rehab. Ctr., LLC*, No. 219CV02602SHLTMP, 2020 WL 7866881, at *4 (W.D. Tenn. Sept. 1, 2020); *Brown v. Quince Nursing & Rehab. Ctr., LLC*, No. 2:18-CV-2740, 2020 WL 4673471, at *10 (W.D. Tenn. Aug. 12, 2020). Moreover, the Tennessee Supreme Court has held that "[a] party should not be compelled to arbitrate claims that are merely "intertwined with" contractual rights that arise from a contract containing a predispute arbitration clause." *Harvey*, 532 S.W.3d at 271 n.39; *accord Swift Enterprises*, 2022 WL 19396072 at *6. Similarly, estoppel does not apply where a claim merely references, presumes the existence of, is intertwined with, or bears a factual relation to the existence of an agreement. *See Blue Water Bay*, 2017 WL 5665410 at *13.

Defendants first contend that Plaintiffs should be compelled to arbitrate because the SAC alleges that they (Plaintiffs) are persons who would reasonably be expected to use Uponor PEX. (*See* Doc. No. 67-1 at 9; Doc. No. 79 at 1). But because estoppel applies only to third-party beneficiaries who seek to enforce rights under the contract at issue, this is an insufficient basis on which to compel Plaintiffs to arbitrate. Second, Defendants point out that prior iterations of the SAC included an implied-warranty claim. (Doc. No. 79 at 1). Defendants appear to argue that asserting such claims amounted to enforcing rights under the Warranty. (*See id.*). However, the Warranty expressly disclaims "any warranty not expressly provided herein, including without

limitation, including the implied warranties of merchantability and fitness for a particular purpose [.]" (Doc. No. 25-2 at 6 (capitalization omitted)). As such, the Court finds that the assertion of the implied-warranty claims was not an attempt to enforce rights under the Warranty. *See Morris v. Mack's Used Cars*, 824 S.W.2d 538, 539 (Tenn. 1992) ("A seller may disclaim all implied warranties pursuant to T.C.A. § 47-2-316[.]") *see also Larsen Leasing, Inc. v. S.M.E. Leasing, Inc.*, No. K85-92-CA9, 1988 WL 489590, at *6 (W.D. Mich. Jan. 25, 1988) (remote buyer of product subject to contractual warranty had no contractual right to pursue implied warranty claims because the contract disclaimed implied warranties of merchantability and fitness). At best, the claims bore a relation to the Warranty, which is insufficient. Therefore, the Court rejects Defendants' third-party beneficiary argument.

B.    Estoppel Based on Judicial Admissions[16]

Defendants also argue that Plaintiffs are estopped from denying the enforceability of the Warranty because the prior two iterations of the SAC contained a claim for breach of the implied warranty of merchantability, which implies privity of contract and therefore the existence of a contractual relationship between the parties. (*See* Doc. No. 67-1 at 10–11). In support of their argument, Defendants cite *Haynes v. Uponor, Inc.*, No. 21-CV-05480-PJH, 2022 WL 541180, at *3 (N.D. Cal. Feb. 23, 2022). There, the court found that the plaintiffs' implied warranty claim against UC in a prior complaint was a judicial admission that privity of contract existed because such privity is required to maintain an implied-warranty claim under California law. *See id.* (citing *Burr v. Sherwin Williams Co.*, 268 P.2d 1041, 1048 (1954)). The Court further found that the

---

[16] Although the parties' filings conflate somewhat this argument with the previous one, it is logically distinct, inasmuch as it invokes estoppel based on purported judicial admissions rather than on a third-party beneficiary theory.

plaintiffs "failed to provide an explanation for removing their implied warranty claims in subsequent complaints, and therefore failed to remedy their judicial admissions." *Id.*

To rule in favor of Defendants, the Court must find that: (1) Plaintiffs' prior implied-warranty claims required privity of contract; (2) Plaintiffs' assertion of the claims amounted to a judicial admission; and (3) Plaintiffs failed to provide a satisfactory explanation for removing their implied-warranty claims in the SAC, thereby failing to remedy the judicial admission.

In the context of breaches of warranty, the Tennessee Court of Appeals has noted that "a plaintiff may not maintain a claim for purely economic losses absent contractual privity with the party charged with responsibility for those losses." *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 463 (Tenn. Ct. App. 2003).[17] However, Tennessee Code

---

[17] The Court notes that in citing cases herein to identify or explain its view as to what Tennessee law is on a particular topic or issue, the Court is mindful of the so-called *Erie* doctrine, whereby the Court should not necessarily accept that a court's prior statement of Tennessee law accurately reflects current Tennessee law. (Notably, at times the Court cites cases that purport to state Tennessee law, but does so for some purpose other than to identify or explain *the Court's view* as to what current Tennessee law is—for example, in order to note a particular view of some aspect of Tennessee law that is held by some courts but not necessarily by other courts and not necessarily by the undersigned judge of this Court.)

   The *Erie* doctrine was announced in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). "Under the *Erie* doctrine, a federal court sitting in diversity applies 'the substantive law of the forum state and federal procedural law.'" *Bonasera v. New River Elec. Corp.*, 518 F. Supp. 3d 1136, 1151 (S.D. Ohio 2021) (quoting *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)).

   The Sixth Circuit has explained:

> In diversity cases such as this, [the *Erie* doctrine requires that] we apply state law in accordance with the controlling decisions of the state supreme court. If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [state] Supreme Court would decide otherwise."

*Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (citations and footnote omitted) (quoting *Kingsley Assoc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir.1995)). Herein, when the Court cites a decision of the Tennessee Court of Appeals (or, for that matter, a decision of the Tennessee Supreme Court or a federal court purporting to state Tennessee law), it does so with confidence that the Tennessee Supreme Court today would not decide differently with respect to the cited statements(s).

Annotated section 29-34-104 provides as follows as to causes of action that do not involve purely economic losses:

> In all causes of action for personal injury or property damage brought on account of negligence, strict liability or breach of warranty, including actions brought under the provisions of the Uniform Commercial Code, privity shall not be a requirement to maintain such action.

(Tenn. Code Ann. § 29-34-104); *see Messer*, 131 S.W.3d at 463. Therefore, the relevant inquiry is whether the action seeks recovery for "economic loss damages" only or also "property damages." *See Hatley v. Crossville BNRV Sales, LLC*, No. 2:14-CV-24, 2016 WL 11508058, at *2 (E.D. Tenn. Mar. 3, 2016). "The Tennessee Court of Appeals has held that the 'cost of repair' and the 'replacement of defective goods' are 'economic damages.'" *Id.* (citing *McCrary v. Kelly Tech. Coatings, Inc.*, 1985 WL 75663, at *1 (Tenn. Ct. App. Aug. 28, 1985)); *accord Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 489 (Tenn. 2009) ("Two types of economic loss, direct and consequential, occur when a defective product is damaged. Direct economic loss may be measured by the defective product's cost of repair or replacement. Consequential economic losses, such as lost profits, result from the product owner's inability to use the product." (internal quotation marks and citations omitted)).

Here, Plaintiffs' original and first amended complaints allege damages, *inter alia*, in the form of repair and replacement costs for the PEX itself. (*See, e.g.,* Doc. No. 1 ¶ 42; Doc. No. 19 ¶¶ 128, 134; *see also id.* ¶ 123 (incorporating damages alleged elsewhere into the implied warranty claim)). Thus, these prior pleadings allege economic losses, at least in part, meaning that the exception to the privity requirement of Tennessee Code Annotated section 29-34-104 is not entirely applicable

Plaintiffs, however, also argue that privity is not required for an implied-warranty claim if the product at issue is unreasonably dangerous when it leaves the defendant's control. (*See* Doc.

No. 72 at 17). Indeed, privity is not required when "the product is defective so that it is unreasonably dangerous to the user or to its property" at the time it leaves the hands of the manufacturer. *See Leach v. Wiles*, 58 Tenn. App. 286, 305 (1968); *Charter Oak Fire Ins. Co. v. Broan Nutone, LLC*, No. 05-2428 MA/P, 2006 WL 8435269, at *5 (W.D. Tenn. Sept. 28, 2006).[18]

Both prior pleadings in the present case allege that the PEX was unreasonably dangerous at the time it left Defendants' control. (*See* Doc. No. 1 ¶ 71; Doc. No. 19 ¶ 99). On this basis, the Court finds that the implied-warranty claims did not require privity. *See Americoach Tours, Inc. v. Detroit Diesel Corp.*, No. 04-2016 B/V, 2005 WL 2335369, at *7 (W.D. Tenn. Sept. 23, 2005) ("had the plaintiff's declaration alleged, in addition to her physical injuries, that the product was in a defective and unreasonably dangerous condition at the time it left the hands of the manufacturer . . . privity would not have been required"). And because a requirement of privity is an essential element of judicial estoppel as to implied-warranty-claims under the circumstances here, the Court rejects Defendants' judicial-estoppel argument, without needing to examine the other two essential elements.

C.    Assignment

Next, Defendants argue that Plaintiffs are assignees of the warranty because "it is the regular practice of home builders to assign the warranties of products incorporated into newly constructed homes to the home purchasers." (Doc. No. 67-1 at 12). In support of their argument, Defendants assert that the Contractor "constructed the Properties for the express benefit of Plaintiffs." (*Id.*). For the reasons below, the Court rejects this argument.

---

[18] There is no indication—nor do Defendants argue—that this rule is related to the one that the Tennessee Supreme Court rejected in *Lincoln*, 293 S.W.3d at 490 (rejecting exception to economic loss rule for unreasonably dangerous products that cause damage to *themselves* during sudden, calamitous events).

Under Tennessee law, "assignment refers to the act by which an assignor transfers a contract right to an assignee." *Collier v. Greenbrier Devs., LLC*, 358 S.W.3d 195, 201 (Tenn. Ct. App. 2009). "To make an effective assignment of a contract right, the owner of that right must manifest an intention to make a present transfer of the right without further action by the owner or by the obligor. Whether the owner of a right has manifested such an intention depends on both the words used and the parties' conduct." *Productive MD, LLC v. Aetna Health, Inc.*, 969 F. Supp. 2d 901, 917 (M.D. Tenn. 2013) (citing *Collier* 358 S.W.3d at 201) (internal citations omitted).

Plaintiffs respond that the Contractor had never been aware of the existence of the Warranty and that it never manifested an intention to transfer rights thereunder. (*See* Doc. No. 72 at 18–19). Plaintiffs support their argument with a declaration by the Contractor, stating under penalty of perjury that it had never knew about the Warranty, never knew that plumbers installed PEX into Plaintiffs' homes, and "never transferred any warranties" to Plaintiffs. (*See generally* Doc. No. 72-5). Defendants do not reply to Plaintiffs' argument or rebut the Contractor's declaration in their Reply. Without more, the Court must reject Defendants' assignment argument.

In light of the above, the Court will not compel arbitration at this time.

### IV. 12(b)(6) Arguments[19]

Defendants make two arguments for dismissal under Rule 12(b)(6). First, they argue that the economic loss rule bars the SAC's negligence and strict-liability claims. (*See* Doc. No. 67-1 at 14–18). Second, Defendants argue that the SAC fails to adequately plead causation. *See id.* at 18–20). The Court will address these arguments in turn.

A. Economic Loss Rule

---

[19] Plaintiffs incorporate by reference, into their Oppositions to UNA's and UC's Motions, the 12(b)(6) arguments from their Opposition to UI's Motion. (*See* Doc. No. 73 at 1–2; Doc. No. 75 at 1). UNA and UC do likewise in their Replies. (*See* Doc. No. 80 at 1 n.1; Doc. No. 81 at 1 n.1). Accordingly, the Court will treat all Defendants as one entity for purposes of ruling on the 12(b)(6) arguments.

Defendants argue that the economic loss rule bars the SAC's claims under the theory that the PEX was part of Plaintiffs' homes, making the homes themselves the defective product. (*See* Doc. No. 67-1 at 15–18; Doc. No. 79 at 4–10). Plaintiffs counter that the SAC sufficiently alleges damages to other property because the defective product was the PEX and not Plaintiffs' entire homes. (*See* Doc. No. 72 at 20–22, 24–28). Plaintiff also counter that the economic loss rule does not apply because (according to Plaintiffs) Plaintiffs did not enter into contracts for sales of goods with Defendants and because (according to Plaintiffs) purchasing a home is not a business transaction. (*Id.* at 22–24, 26–28). The Court will address these arguments in turn.

1. The "Product"

Tennessee law follows the *East River* approach, which "precludes recovery in tort when a product damages itself without causing personal injury or damage to other property." *Lincoln*, 293 S.W.3d at 489 (citing *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 870 (1986)); *see also Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 151–52 (Tenn. 2021) (discussing the scope of the Tennessee economic loss rule). In other words, "[a] defective product causes a purely economic loss [for which recovery cannot be had in tort] when the product causes no personal injuries and damages no property other than the 'product itself.'" *Americoach*, 2005 WL 2335369 at *2.

> In this context, economic loss is defined generally as the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold. Two types of economic loss, direct and consequential, occur when a defective product is damaged. Direct economic loss may be measured by the defective product's cost of repair or replacement. Consequential economic losses, such as lost profits, result from the product owner's inability to use the product.

*Lincoln*, 293 S.W.3d at 489 (internal quotation marks and citations omitted); *see also City of Franklin v. W.L. Hailey & Co.*, 634 S.W.3d 16, 24 (Tenn. Ct. App. 2019) (same; further noting that the parties agreed that damage to a sewer pipe was a purely economic loss); *Hatley*, 2016 WL

11508058 at *2 ("costs of repair" and "replacement of defective goods" are "economic damages" (citing *McCrary v. Kelly Tech. Coatings, Inc.*, 1985 WL 75663, at *1 (Tenn. Ct. App. Aug. 28, 1985)).

Pursuant to Defendants' argument, the question for the Court is whether (a) the PEX pipes were the "product," or (b) Plaintiffs' entire homes were instead the "product."[20] If the former, that would support Defendants' argument for precluding recovery in tort under the *East River* approach; if the latter, that would support Plaintiffs' Opposition. Whether homes can be the "product" in context like the instant one appears to be an issue of first impression under Tennessee law. The Court will therefore make a so-called *Erie* guess as to how the Tennessee Supreme Court would decide the issue.[21]

Courts applying Tennessee law have defined the defined the "product" as the item "placed in the stream of commerce" and sold to the initial user. *See Messer* 131 S.W.3d at 464 (citing

---

[20] The pertinent question here is what is the "product," rather than what is the "product itself." This is consistent with the kind of verbal formulation of the economic loss rule used in cases like *Americoach*: "[a] defective product causes a purely economic loss [for which recovery cannot be had in tort] when the product causes no personal injuries and damages no property other than the 'product itself.'" *Americoach*, 2005 WL 2335369 at *2. Once the Court answers that question and determines what "the product" is, the upshot is that the economic loss bars recovery in tort for damages that are solely to the "product itself" rather than to some "other property." But this does not mean that the proper verbal formulation of the question is, "what is the product *itself*?" The question is, "What is the *product*?" But it is proper (indeed necessary) for courts to focus on, and speak in terms of, whether *the damage* was to "the product itself"—meaning damage to the "product" and not to any other property.

The Court's discussion will reflect this terminology, even when paraphrasing cases that might have suggested that the question is, "What is the product itself?" However, when quoting other courts that used the term "product itself," the Court of course will use this term even where the Court would have omitted the "itself."

The Court notes that even a court that seems to refer to the applicable question as being what is the "product itself," *e.g., Mt. Lebanon Personal Care Home, Inc. v. Hoover Univ., Inc.*, 276 F.3d 845, 850 (6th Cir. 2002), well may ultimately understand that actually the applicable question is what is "the relevant product[.]" *Id.* at 851

[21] An "*Erie* guess," the name of which unsurprisingly is derived from the (above-referenced) *Erie* doctrine, is "an informed prediction as to how the state's court of last resort, 'if presented with the issue, would resolve it.'" *Generation Changers Church v. Church Mut. Ins. Co.*, 693 F. Supp. 3d 795, 808 (M.D. Tenn. 2023) (quoting *In re Fair Fin. Co.*, 834 F.3d 651, 671 (6th Cir. 2016) (quoting *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358 (6th Cir. 2013))).

*Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 879 (1997)); *Tennessee Farmers Mut. Ins. Co. v. Ford Motor Co.*, No. W200100046COAR3CV, 2002 WL 1332492, at *5 (Tenn. Ct. App. June 17, 2002). However, when a defective component is sold to the initial user as part of a an "integrated package," it is properly regarded a s a "single unit." *Messer* 131 S.W.3d at 464; *see, e.g., East River*, 476 U.S. at 867 (entire propulsion turbines and not components thereof were the product because the defendant supplied the turbines as an integrated package); *Americoach*, 2005 WL 2335369 at *3 (tour bus and not heater was the "product" where the manufacturer "sold the heater to an initial user as a component part of the tour bus" or, in other words, sold the tour bus "as an integrated package of component parts," including the heater); *Tennessee Farmers*, 2002 WL 1332492 at *6  ("a vehicle constitutes the 'product itself' when a defective component part destroys the entire vehicle"; collecting cases).[22] The rationale supporting this rule is that "all but the very simplest of machines have component parts." *Tennessee Farmers*, 2002 WL 1332492 at *6 (quoting *East River*, 476 U.S. at 867).

"In finding damage to 'other property,' rather than to an integrated 'product itself,' courts have looked to whether the defective product is an addition or a modification of the damaged property, rather than a central mechanical component critical to the functioning of the entire

---

[22] Plaintiffs cite *Ratner v. Norcold, Inc.*, No. 3:10-00524, 2011 WL 1789967, at *3 (M.D. Tenn. May 10, 2011). (*See* Doc. No. 72 at 22). In that case, the court found that a refrigerator, supplied by the defendant to a manufacturer of RVs, was the product despite being a component part of the RV. *See id.* at *3. This finding, however, could fairly be understood as dictum, inasmuch as the plaintiffs had also alleged personal injuries and damages to personal property located in the RV. In addition, in a related opinion, the court implied that the refrigerator was not a component part and/or that the plaintiffs had property rights in the RV prior to its installation. *See Ratner v. Norcold, Inc.*, No. 3:10-0524, 2011 WL 94421, at *2 (M.D. Tenn. Jan. 11, 2011) ("Defendant manufactured the refrigerator. Although Defendant classifies the refrigerator as a 'component' of Plaintiffs' RV, the complaint alleges that the Defendant's product was also 'installed' into *their* RV.) (emphasis added). Further, courts applying Tennessee law have subsequently noted or implied—contrary to part of the May 10, 2011, *Ratner* opinion cited by Plaintiffs, that if something is a component part, it is not "the product." *See, e.g., Sullivan v. Panther Petroleum, LLC*, No. 119CV01259STAJAY, 2020 WL 1550230, at *2 (W.D. Tenn. Mar. 31, 2020); *Hannah Int'l Foods, Inc. v. House of Thaller, Inc.*, No. 3:18-CV-361, 2019 WL 11273268, at *5 (E.D. Tenn. Dec. 19, 2019).

product." *Charter Oak Fire*, 2006 WL 8435269 at *4 (quotation marks omitted). For instance, in *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 884 (1997),[23] the Supreme Court noted "a distinction between the components added to a product by a manufacturer before the product's sale to a user and those items added by a user to the manufactured product[.]" (citations omitted). On this basis, the Supreme Court found that damage to "skiff, nets, spare parts, and miscellaneous equipment . . . added to [a] ship by a user after an initial sale to that [i]nitial [u]ser, are not part of the product (the original ship with the defective hydraulic system) that itself caused the harm." *Id.* at 885. Similarly, where the defendants supplied defective carbon dioxide, which the plaintiff subsequently mixed with beverages, the "product "was the carbon dioxide because "the soft drink was not an integrated unit supplied by [defendant]." *Messer*, 131 S.W.3d at 464; *see also Christmas Lumber*, 2020 WL 1189927 at *9 (economic loss rule did not apply where "new equipment that Defendant installed caused damage to the existing equipment").

In a somewhat analogous case from the Western District of Tennessee, a building burned down due to a defective bathroom exhaust fan, purchased from a retailer by a contractor "hired to do the heating and electrical work when the [b]uilding was constructed." *See Charter Oak Fire*, 2006 WL 8435269 at *1. The court, applying Tennessee law, examined whether the building was "other property" or was instead part of an "integrated package" with the fan. In relevant part, the court concluded:

> A bathroom fan is not an integrated component of the entire Building. It is not a mechanical part of the Building that is critical to its function. Instead, it is an addition, separate from the Building, which independently constitutes 'other property.' Unlike the hydraulic system on a vessel or a component of an engine or the steering column on a vehicle, an

---

[23] Saratoga is a Supreme Court case that did not apply Tennessee law. However, it has been cited favorably by courts applying Tennessee law, including Tennessee Courts. *See, e.g., Messer*, 131 S.W.3d at 463–5; *Tennessee Farmers*, 2002 WL 1332492 at *5–6; *Christmas Lumber Co., Inc. v. NWH Roof & Floor Truss Sys.*, LLC, No. 3:19-CV-55-HBG, 2020 WL 1189927, at *8 (E.D. Tenn. Mar. 12, 2020); *Hannah*, 2019 WL 11273268 at *4 (stating that "Tennessee courts have followed the reasoning of" *Saratoga*); *Charter Oak Fire*, 2006 WL 8435269 at *4; *Americoach*, 2005 WL 2335369 at *4.

exhaust fan in a bathroom is not so mechanically intertwined with a building as to form an integrated package. In this case, the exhaust fan was not critical to the Building's function.

(*See id.* at *5).

The parties' filings bring to the Court's attention multiple cases that, although not decided under Tennessee law, are analogous. For instance, the parties discuss *Mt. Lebanon*, 276 F.3d 845. There, the plaintiff hired contractors to build a nursing home facility. *Id.* at 847. After structural failures occurred due to a defect in fire retardants present in the wood used in the construction, the plaintiff filed suit against the manufacturer of the chemicals. *Id.* Applying Kentucky law, the Sixth Circuit found that the entire nursing home—and not the defective wood—was the "product." *See id.* at 851. In response to the plaintiff's argument that the manufacturer placed the wood in the stream of commerce, rather than the nursing home, the Sixth Circuit reasoned:

> [Plaintiff] argues that the treated wood is the product. This theory has serious problems. If the product is to be defined as the item placed in the stream of commerce, then any component part of a product is a product itself because all component parts are placed into the stream of commerce at some point. As the Supreme Court stated in *East River*, such a finding would obliterate 'the distinction between warranty and strict products liability.' With the understanding that there must be some limit to the degree to which a unit may be broken down into multiple parts when attempting to define what constitutes a product for purposes of the economic loss rule, we predict that the Supreme Court of Kentucky would hold that the wood used in the trusses in this case is not the product. While the wood used in the nursing home is not irreducible—it consists of wood and fire retardant—it is so rudimentary that, if we were to hold that it is the product for economic loss rule purposes, nearly any component part would be a product and we would, as a result, effectively eviscerate the distinction between contract and tort law.

*Id.* at 850 (citations omitted).

Defendants also cite a case in which the District of Pennsylvania has held that a condominium damaged by leaky sliding doors and windows was the "product." *See Longport Ocean Plaza Condo., Inc. v. Robert Cato & Assocs., Inc.*, No. CIV. A. 00-CV-2231, 2002 WL 436742, at *5 (E.D. Pa. Mar. 18, 2002). There, the court reasoned that "[i]n determining whether a product has injured only itself in an action in which a component part manufactured by a

defendant causes injury to the product of which it is a part, a court should look not to the product manufactured by the defendant, but the product purchased by the plaintiff . . . . to the extent products used in construction prove defective and result in harm to a building itself, these damages should not be considered damage to 'other property.'" *Id.* Other jurisdictions applying a variation of the *East River* rule have also found that a residential building damaged by a component part is "the product," at least when the plaintiff purchased the building as a finished product. *See, e.g., Linden v. Cascade Stone Co.*, 699 N.W.2d 189, 198 (2005); *Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, Inc.*, 659 A.2d 267, 271 (Me. 1995) ("The plaintiffs here purchased finished condominium units, not individual components of the units. Because the windows were integrated into the finished product purchased by the plaintiffs, the damages caused by any defects in the windows constituted damage only to the product itself, not damage to 'other property.'"); *Casa Clara Condo. Ass'n, Inc. v. Charley Toppino & Sons, Inc.*, 620 So. 2d 1244, 1247 (Fla. 1993) (finding that "one must look to the product purchased by the plaintiff, not the product sold by the defendant"; further finding that "the economic loss rule applies to the purchase of houses"); *King v. Hilton-Davis*, 855 F.2d 1047, 1051 (3d Cir. 1988) ("We conclude that [when applying *East River*,] one must look to the product purchased by the plaintiff."); *accord Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 155 (Ind. 2005) ("'product'" is the product purchased by the plaintiff, not the product furnished by the defendant"); *Easling v. Glen-Gery Corp.*, 804 F. Supp. 585, 590 (D.N.J. 1992) ("The plaintiffs purchased a completed apartment complex. They did not purchase a load of bricks from the defendant."); *Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F.2d 925, 930 (5th Cir. 1987) ("the product in this context means the finished product bargained for by the buyer rather than components furnished by a supplier").

Plaintiffs, on the other hand, cite a case by the California Court of Appeal, part of a line of California cases holding that, for purposes of the California economic loss rule, a house damaged by a component is not the "product itself." *See Vacaville Quail Run v. Gable Plastics, Inc.*, No. A092651, 2002 WL 120808, at *5 (Cal. Ct. App. Jan. 30, 2002); *see also Stearman v. Centex Homes*, 78 Cal. App. 4th 611, 623 (2000) ("we reject defendant's strained argument that for purposes of product liability law, a home is the equivalent of, for instance, a toaster which, when it catches fire due to faulty wiring, can be said to have injured only itself"); *Jimenez v. Superior Ct.*, 29 Cal. 4th 473, 483 (2002) ("California decisional law has long recognized that the economic loss rule does not necessarily bar recovery in tort for damage that a defective product (*e.g.*, a window) causes to other portions of a larger product (*e.g.*, a house) into which the former has been incorporated.").

Jurisdictions that share California's narrow view of when an entire building, rather than something installed in or attached to the building, is the "product" have been described as a "minority." *See Dean v. Barrett Homes, Inc.*, 406 N.J. Super. 453, 469 (App. Div. 2009), *rev'd on other grounds*, 204 N.J. 286, 8 A.3d 766 (2010). But the Court was able to locate other cases in which the court at least suggested that under the particular facts at issue, the entire building was not the "product." For instance, applying Michigan law, the Sixth Circuit considered whether the secondhand owner of an apartment building damaged by defective, leaky pipes could bring a tort (products-liability) suit against the manufacturer for damages to other parts if the building, including "carpeting, floor boards, and ceiling tiles." *See Crossing at Eagle Pond Apartments, LLC v. Lubrizol Corp.*, 790 F. App'x 775, 776–77 (6th Cir. 2019). The court at least implied that these other parts of the building were "other property." *See id.* at 781–82. Underlying the court's rationale is that "Michigan cases have looked to the defendant's sale—not the plaintiff's

purchase—when deciding whether to apply the [economic loss] doctrine." *Id.* at 780. In *Dean v. Barrett Homes, Inc.*, 204 N.J. 286, 775 (2010), the Supreme Court of New Jersey examined whether exterior insulation, "affixed to the exterior walls to create a moisture barrier, much like exterior vinyl siding," was an "integrated product" with the plaintiff's home. The court concluded that "it did not become an integral part of the structure itself, but was at all times distinct from the house. It remained, therefore, a separate product[.]" *Id.*

In light of the above, the Court finds that three questions are relevant to its inquiry. First, whether the Tennessee courts carved out an exception (to the otherwise applicable principles for what is the "product") for residential structures, similarly to California courts. Second, whether the Tennessee Supreme Court would specify the "product" by what the plaintiff purchased or, instead, by what the defendant sold. Third, whether the PEX piping was an addition or a modification of the damaged property or, instead, an integrated, central mechanical component critical to the functioning thereof and intertwined therewith.

As for the first factor, the Tennessee Supreme Court does not appear to have carved out an exception (to the otherwise applicable principles for what is the "product") for purchases of a home.[24] As for the second factor, the Court finds that the Tennessee Supreme Court would likely join the majority of jurisdictions, whose economic loss doctrine is based on *East River*, in finding that the "product" is determined by what the plaintiff has purchased (rather than by what the defendant sold). *See Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 155 (Tenn. 2021) (citing approvingly a Utah Supreme Court case holding that parties should be held to the

---

[24] However, the Tennessee Supreme Court has held that the economic loss rule only applies to product-liability actions, not contracts for services, including construction contracts. *See, generally, Com. Painting Co. Inc. v. Weitz Co. LLC*, 676 S.W.3d 527, 533 (Tenn. 2023). Justice Campbell, joined by Justice Bivins, authored a dissent, noting that a decision by the Wisconsin Supreme Court "has been subject to criticism" for having found that a contract for the construction of a home was predominately a sales contract and, thus, subject to the economic-loss doctrine. *See id.* at 554.

damages that they bargained for); *see also Milan Supply Chain Sols. Inc. v. Navistar Inc.*, No. W201800084COAR3CV, 2019 WL 3812483, at *4 (Tenn. Ct. App. Aug. 14, 2019) (describing the economic loss rule as being "based upon and flow from the purchaser's loss of the benefit of his bargain and his disappointed expectations as to the product he purchased"), *aff'd in part on other grounds*, 627 S.W.3d 125 (Tenn. 2021); *accord Americoach*, 2005 WL 2335369 at *5 (in a diversity case applying Tennessee law, looking at the "object purchased or bargained for" by the plaintiff).

As for the third factor, the SAC alleges that the PEX piping is "behind the walls of the homes and other structures of Plaintiffs." (Doc. No. 65 ¶ 79). The SAC further alleges that the PEX is part of the "potable water plumbing system." (*Id.* ¶¶ 36–37, 60). Accordingly, the Court finds that the PEX piping is integral to and intertwined with Plaintiffs' homes—more so than the external layer of insulation in *Dean*.[25] The Court also finds that, unlike the bathroom fan in *Charter Oak Fire*, a potable water plumbing system is a "central mechanical component critical to the functioning" of a modern-day primary home, at least in present day Hendersonville, Tennessee, where the properties at issue are located. (*See id.* ¶¶ 2–3). Overall, the Court finds that the Tennessee Supreme Court would likely find that homes containing PEX piping—such as Plaintiffs'—rather than the PEX piping itself, are the "product" *if purchased with the PEX already installed*.

Nonetheless, at this stage, the Court cannot make a conclusive finding regarding *Plaintiffs' homes in particular* because the SAC is silent on critical issues. Among those critical issues is whether the PEX was an addition or modification to Plaintiffs' homes and other structures, *i.e.*, whether the PEX was installed before or after Plaintiffs purchased their homes. Also among those

---

[25] This is not to say that an external layer of insulation could not be integral to a building under Tennessee law.

critical issues is whether the allegedly damaged items were originally part of Plaintiffs' properties or added thereto after Plaintiffs' initial purchase. (*Cf. id.* ¶¶ 53, 62 (alleging, *inter alia*, damages to flooring, insulation, baseboards, structural wood, ceilings, shelving and gas fireplaces, walls, and plumbing systems)). Thus, at this stage of the litigation, the Court cannot conclusively determine that Plaintiffs' homes are "the product"; nor can it determine whether the items allegedly damaged were part of the homes at the time of purchase, as opposed to modifications or additions. On the other hand, the Court will disregard (as being merely conclusory) allegations in the SAC (*see id.* ¶¶ 38, 43, 45, 53, 62, 64) that the PEX damaged "other property" in the homes. *See Klein v. Voyageur Press, Inc.*, No. 1:07-CV-568, 2008 WL 11450703, at *1 (S.D. Ohio May 20, 2008) ("A court, however, will not accept conclusions of law or unwarranted inferences that are presented as factual allegations.") (citing *Blackburn v. Fisk Univ.*, 443 F.2d 121, 124 (6th Cir. 1971)).

Accordingly, the Court cannot grant Defendants' Motions based upon the economic loss rule at this juncture.

### 2. Consumer Transactions and Sale of Goods

For the sake of narrowing issues in this case, the Court will also examine the parties' remaining arguments regarding the economic loss rule. Specifically, the Court will analyze Plaintiffs' argument that the economic loss rule does not apply because (according to Plaintiffs) it is limited to business purchases and because Plaintiffs did not enter into contracts for sale of goods with Defendants. (*Id.* at 22–24, 26–28).

In support of their argument that the economic loss rule applies only to business purchases, Plaintiffs rely on a line of cases standing for the proposition that Kentucky law "limit[s] the application of the economic loss rule to only business product purchases, as opposed to consumer product purchases." (Doc. No. 72 at 26 (citing *Rodrock v. Gumz*, No. 4:11CV-00141-JHM, 2012

WL 1424501, at *3 (W.D. Ky. Apr. 24, 2012)). However, Plaintiffs fail to cite any authority showing that the same rule applies under Tennessee law. And, although not venturing to make an *Erie* guess on this issue at this time, the Court had no difficulty finding authority to the contrary. *See Tennessee Farmers*, 2002 WL 1332492 at *4 ("[W]e . . . conclude that the economic loss doctrine as described in *East River* applies in cases involving consumer transactions as well as commercial transactions); *Charter Oak Fire*, 2006 WL 8435269 at *5 ("The same legal rules apply in tort actions brought by consumers and those brought by purchasers in commercial transactions."). Without more, the Court rejects this argument.

Plaintiffs also argue that the economic loss rule does not apply because they did not enter into contracts for sale of goods with Defendants. (*See* Doc. 72 at 22–24). However, courts have applied the economic loss rule in products-liability cases where the plaintiff and the defendant were not in privity. *See, e.g., Messer*, 131 S.W.3d at 464 (applying the economic loss rule in a products-liability case where the parties were not in privity); *Charter Oak Fire*, 2006 WL 8435269 at *3–4 (discussing the economic loss rule in a products-liability case where the parties were not in privity). In addition, courts have often found that "[a]t the pleading stage, a determination cannot be made whether [the] transaction [at issue] . . . had as its predominant purpose . . . the sale of goods . . . . The record must be further developed and argued before such determination can be made." *See, e.g., Christmas Lumber*, 2020 WL 1189927 at *8; *America's Collectibles Network, Inc. v. Sterling Com. (Am.), Inc.*, No. 3:09-CV-143, 2011 WL 2118574, at *5 (E.D. Tenn. May 26, 2011) (same).[26] The Court therefore rejects this argument.

---

[26] The Court notes that Plaintiffs argue merely that the economic loss rule is inapplicable because they did not enter into contracts for the sale of goods with Defendants. Plaintiffs do not argue that the economic loss rule is inapplicable because (i) they purchased their homes in a real estate transaction, to which the UCC and its remedies do not apply, (ii) UCC remedies must be available to a plaintiff against a defendant for the rule to apply, and (iii) such remedies are not otherwise available to them. This argument has been raised

B.    Causation

Next, Defendants argue that the SAC fails to adequately plead causation. (*See* Doc. No. 67-1 at 18–20). Specifically, Defendants argue that the allegations linking the manufacturing process of the PEX to the leaks are speculative and thus fall short of *Iqbal*'s plausibility standard. (*See id.*). The Court disagrees.

"[U]nder Tennessee law, establishing a *prima facie* products-liability claim requires that the plaintiff . . . show: (1) the product was defective and/or unreasonably dangerous, (2) the defect existed at the time the product left the manufacturer's control, and (3) the plaintiff's injury was proximately caused by the defective product." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (quotation marks omitted). Put simply, "[a] plaintiff must show that there was something wrong with the product, and trace the plaintiff's injury to the specific defect." *King v. Danek Med., Inc.*, 37 S.W.3d 429, 435 (Tenn. Ct. App. 2000) (internal citation omitted).

Here, the SAC details the distinctive, high-temperature manufacturing process at issue and explains in detail how it altered the chemical structure of the PEX, causing its premature degradation. (*See* Doc. No. 65 ¶¶ 43–48, 64–65). The SAC also alleges that the PEX was defective and unreasonably dangerous due to this manufacturing process when it left Defendants' control. (*Id.* ¶¶ 97, 103, 114). Finally, the SAC alleges that the defective PEX was installed in Plaintiffs' homes and that its defectiveness caused the leaks. (*Id.* ¶¶ 53, 60–67, 71, 82, 106, 112, 115, 122,

elsewhere. *See America's Collectibles Network*, 2011 WL 2118574 at *5 (predicting that the Tennessee Supreme Court would not apply the economic loss rule in lawsuits not involving UCC remedies)*; Lott v. Swift Transp. Co.*, 694 F. Supp. 2d 923, 931 (W.D. Tenn. 2010) (same); *Ham v. Swift Transp. Co.*, 694 F. Supp. 2d 915, 923 (W.D. Tenn. 2010) (same); *Broadnax v. Swift Transp. Co.*, 694 F. Supp. 2d 947, 954 (W.D. Tenn. 2010) (same); *see also Corso Enterprises, Inc. v. Shop at Home Network, Inc.*, No. 3:04-0260, 2005 WL 2346986, at *7 n.8 (M.D. Tenn. Sept. 26, 2005) (no UCC-based economic loss rule where the UCC was inapplicable); *Commercial Painting*, 676 S.W.3d at 554 (noting that real-estate transactions are not protected by the UCC, which has led to criticism against the application of the economic loss rule to a contract for the construction of a home) (Campbell & Bivins, JJ., dissenting). But because Plaintiffs have not raised this issue, the Court will not analyze it.

128). The Court finds that these allegations—and especially the detailed allegations regarding the manufacturing process and chemical alteration of the PEX—amply meet *Iqbal*'s plausibility standard by plausibly suggesting the existence of each element of a products-liability claim. Accordingly, the Court rejects Defendants' causation argument.

## V. <u>Class Allegations</u>[27]

Defendants ask that the Court strike class allegations because (according to Defendants) the proposed class is overbroad and not ascertainable. (*See* Doc. No. 67-1 at 20–23). Specifically, Defendants argue the proposed class encompasses owners "who have experienced leaks regardless of whether the leaks were actually caused by . . . [Defendants]." (*Id.* at 20). Defendants also argue that ascertaining the class members would require "a deep-dive into the unique condition of each owner's PEX and property, as well as the nature of each owner's interactions, if any, with [Defendants]." (*Id.* at 21). Defendants further argue that determining whether leaks were caused by defects in the pipes or defects in installation would require individualized findings. (*Id.* at 22 (citing *City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 653 (S.D. Fla. 2010) (denying class certification because individualized issues regarding, *inter alia*, the installation, maintenance, and environmental conditions affecting allegedly defective pipes defeated the predominance and superiority requirements))). Finally, Defendants argue that conclusively ascertaining whether putative class members' homes contain PEX would require "invasive/destructive work on a residence-by-residence basis." (*Id.* at 22 (citing *Adams Pointe I, L.P. v. Tru-Flex Metal Hose Corp.*, No. 2:16-CV-00750-CB, 2020 WL 4199557, at *7 (W.D. Pa.

---

[27] Plaintiffs incorporate by reference, into their Oppositions to UNA's and UC's Motions, the arguments regarding their request to strike class allegations from their Opposition to UI's Motion. (See Doc. No. 73 at 1–2; Doc. No. 75 at 1). UNA and UC do likewise in their Replies. (See Doc. No. 80 at 1 n.1; Doc. No. 81 at 1 n.1). Accordingly, the Court will treat all Defendants as one entity for purposes of ruling on the 12(b)(6) arguments.

July 17, 2020) (recommending denial of class certification on the grounds of, *inter alia*, lack of ascertainability where determining which putative members' homes contained the product at issue would require relying on affidavits), *report and recommendation adopted*, No. CV 16-750, 2020 WL 4937455 (W.D. Pa. Aug. 24, 2020), *aff'd*, No. 20-3528, 2021 WL 3612155 (3d Cir. Aug. 16, 2021)).

In response, Plaintiffs argue that striking class allegations before the filing of a motion for class certification is a rare and disfavored remedy, and one that requires showing that certifying the class as alleged is impossible. (*See* Doc. No. 72 at 31–32 (citing *Fishon*, 501 F. Supp. 3d at 575 ("The moving party has the burden of demonstrating from the face of the . . . complaint that it will be impossible to certify the class as alleged, regardless of the facts plaintiffs may be able to prove.")). Plaintiffs also point out that discovery conceivably could establish that class members and their respective damages are ascertainable. (*See id.* at 33–35). Finally, Plaintiffs argue that the class is not overbroad and that, in any event, the Court can refine the class to eliminate overbreadth and ascertainability issues. (*Id.* at 34 citing *Friedman v. Dollar Thrifty Auto. Grp., Inc.*, 304 F.R.D. 601, 607 (D. Colo. 2015); *and Davoll v. Webb*, 194 F.3d 1116, 1146 (10th Cir. 1999)).

The Court agrees with Plaintiffs that it would be premature at this stage to strike the class allegations on grounds of lack of ascertainability. However, Plaintiffs' Opposition and the authority it cites fail to address Defendants' predominance argument. *Cf. Friedman v.*, 304 F.R.D. 601, 607 (denying class certification based on predominance where individualized inquiries would have interfered with common issues)). "If the complaint shows that individual questions will necessarily predominate, the court can strike the class allegations." *Bearden v. Honeywell Int'l, Inc.*, No. 3:09-01035, 2010 WL 1223936, at *9 (M.D. Tenn. Mar. 24, 2010) (striking class allegations on predominance grounds); *see, e.g., Pilgrim v. Universal Health Card, LLC*, 660 F.3d

943, 949 (6th Cir. 2011) (affirming decision to strike class allegations on predominance grounds where establishing the claims would necessarily have required individualized inquiries); *Smith v. Cash Am. Int'l, Inc.*, No. 1:15-CV-00760-MRB, 2019 WL 2352921, at *4 (S.D. Ohio June 4, 2019) (striking class allegations on predominance grounds where establishing the claims would necessarily have required individualized inquiries); *Oom v. Michaels Companies Inc.*, No. 1:16-CV-257, 2017 WL 3048540, at *6 (W.D. Mich. July 19, 2017) (striking class allegations on predominance grounds where the complaint's "general hypothesis [was] not subject to common proof," meaning that "similar facts particular to each individual would have [had] to be presented again and again"); *Rikos v. Procter & Gamble Co.*, No. 1:11-CV-226, 2012 WL 641946, at *7 (S.D. Ohio Feb. 28, 2012) (striking class allegations on predominance grounds); *see also Green v. Liberty Ins. Corp.*, No. 15-10434, 2016 WL 1259110, at *6 (E.D. Mich. Mar. 30, 2016) (striking class allegations on commonality and typicality grounds because "given the broad description of the class as a whole, the validity of each class member's claim would hinge on the specific details of his or her individual contract and the circumstances surrounding each incident").

As Defendants note, determining whether defects in the PEX installed in the putative members' homes, as opposed to faulty installation or other problems, caused the leaks would require individualized inquiries. (*See* Doc. No. 79 at 11–12 (citing *City of St. Petersburg*, 265 F.R.D. at 641 ("[E]ven if Plaintiffs were able to demonstrate that FlexPipe had a general defect, it would not assist Plaintiffs in meeting their burden of showing that that particular defect was the legal cause of each class member's harm."); *and In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*, 321 F.R.D. 430, 443–44 (N.D. Ga. 2017) ("[E]ven if the Plaintiff proves a common defect existed in the Shingles, each class member cannot recover damages based on that fact alone. The class members also must prove that the alleged defect caused their roof to prematurely fail.

For the class members who have already had their roofs replaced or repaired, this will be an especially fact-intensive inquiry. . . . [A]ffirmative defenses that are coupled with several other individual questions could defeat predominance. Such is the case here.")). The specific alleged facts of this case will almost necessarily require individual inquiries not only into causation, but also into how putative members procured the PEX and whether the Warranty applies to them.[28] The Court therefore finds that the SAC's class definition, as presently alleged, is overbroad and, because no amount of discovery could cure this defect, cannot meet the predominance requirement for class certification.

Before striking class allegations, however, the Court will examine whether narrowing the class definition could cure the defects. *See Sherrod v. Enigma Software Grp. USA, LLC*, No. 2:13-CV-36, at *5 (S.D. Ohio Jan. 4, 2016) (striking class allegations where, *inter alia*, amending the class definition would have been futile); *see also Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) ("district courts have broad discretion to modify class definitions"); *Jackson v. Cuyahoga Cnty.*, No. 1:20-CV-02649, 2021 WL 3679507, at *3 (N.D. Ohio Aug. 19, 2021) ("The Court concludes that [Defendant] fails to show that Plaintiffs' class allegations suffer from an *irreparable* defect that renders class certification inappropriate."). the Court finds that drastically narrowing the class definition could hypothetically cure the defect, although that currently seems unlikely. Such narrowing might ultimately be fatal to class certification due to lack of numerosity and/or ascertainability, but the Court will consider arguments on this issue at the class certification stage.

---

[28] Similarly, unless the Court ultimately rules that the economic loss rule does not apply, an individualized inquiry will be necessary to determine whether the PEX in each putative member's home as well as the allegedly damaged items therein were originally part of the home or rather an addition thereto or modification thereof.

In sum, the Court will not certify the class under its current definition, and the SAC's class allegations are on thin ice. However, the Court will not strike them at this juncture.

<u>CONCLUSION</u>

For the reasons discussed herein, UI's Motion (Doc. No. 67), UNA's Motion (Doc. No. 68), and UC's Motion (Doc. No. 69) will be denied.

An appropriate accompanying order will be entered.


*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE