**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **BRIAN CARRICO; KACIE CARRICO;** | ) |
| **DON GATLIN; and DORA GATLIN;** | ) |
| **individually and on behalf of all others** | ) |
| **similarly situated,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| | ) |
| **vs.** | ) |
| | ) **NO. 3:23-CV-00497** |
| | ) **JUDGE RICHARDSON** |
| **UPONOR, INC.;** | ) **MAGISTRATE JUDGE** |
| **UPONOR NORTH AMERICA, INC.;** | ) **FRENSLEY** |
| **UPONOR CORPORATION; and** | ) |
| **DOES 1 through 100, inclusive, whose** | ) **JURY DEMAND** |
| **true names are unknown,** | ) |
| | ) |
| **Defendants.** | ) |

<u>**FOURTH AMENDED CLASS ACTION COMPLAINT**</u>
<u>**AND DEMAND FOR JURY TRIAL**</u>

Plaintiffs Brian Carrico, Kacie Carrico, Don Gatlin, and Dora Gatlin, (collectively hereinafter "Plaintiffs"), on behalf of themselves and all persons similarly situated ("the Class"), by and through their attorneys, hereby file this Fourth Amended Class Action Complaint and allege as follows.

## I. INTRODUCTION

1.      This is a class action for damages and other relief asserted pursuant to Federal Rule of Civil Procedure 23 on behalf of all persons similarly situated related to blue and red colored cross-linked polyethylene tubing ("PEX") manufactured and/or distributed by Defendants Uponor, Inc., Uponor North America, Inc., and Uponor Corporation (collectively "Uponor" or "Defendants") which suffers from design and/or manufacturing defects that cause premature damage, degradation, deterioration, and failure (hereinafter "Uponor PEX").

## II. THE PARTIES

2.      Plaintiffs Brian Carrico and Kacie Carrico (collectively hereinafter "Carrico Plaintiffs") are individuals residing at all relevant times at 1203 Center Point Road, Hendersonville, Tennessee 37075 ("Carrico Plaintiffs' Home").   Carrico Plaintiffs are citizens and residents of Tennessee.

3.      Plaintiffs Don Gatlin and Dora Gatlin (collectively hereinafter "Gatlin Plaintiffs") are individuals residing at all relevant times at 1543 Anderson Road, Hendersonville, Tennessee 37075 ("Gatlin Plaintiffs' Home").  Gatlin Plaintiffs are citizens and residents of Tennessee.

4.      Carrico Plaintiffs' Home and Gatlin Plaintiffs' Home are collectively hereinafter referred to as "Plaintiffs' Homes."

5.      Defendant Uponor, Inc. ("Uponor Inc.") is an Illinois corporation with its principal place of business located at 5925 148th Street West, Apple Valley, Minnesota 55124.

6.      Defendant Uponor North America, Inc. ("Uponor NA") is a Delaware corporation with its principal place of business located at 5925 148th Street West, Apple Valley, Minnesota 55124.

7.      Defendant Uponor Corporation ("Uponor Corp.") is a Finnish corporation with its principal place of business located at Ilmalantori 4, 00240 Helsinki, Finland.  Uponor Corp. also has a corporate office at Äyritie 20 01510 Vantaa, Finland.

8.      Defendants shall, at times below, be referred to collectively as "Uponor."

## III. JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action in which the matter in controversy exceeds $5 million, exclusive of interest and costs, and members of the Class are citizens of states different than Defendants.

10.     This Court has personal jurisdiction over Defendants because, among other things, Defendants conduct substantial business in Tennessee, have sufficient minimum contacts in Tennessee, and intentionally avail themselves of the consumers and markets within Tennessee through the promotion, advertising/marketing, partnership agreements, supply agreements, sales, and distribution of its products, including Uponor PEX.

11.     At all relevant times herein, Uponor designed, manufactured, marketed/advertised, sold, and/or distributed Uponor PEX for use in water plumbing systems in residences and other structures throughout the United States, including Tennessee, by and through their entities, employees, agents, predecessors-in-interest, and/or other representatives.

12.     The Court has jurisdiction of Uponor Corp., Uponor NA, and Uponor Inc. because Uponor Corp. is the ultimate parent company for both Uponor NA and Uponor Inc.  Uponor Inc. operates as an extension of the business of Uponor Corp. and Uponor NA.  Uponor Inc. is a subsidiary of Uponor NA, which is a subsidiary of Uponor, NA Holding, Inc., and Uponor, NA Holding, Inc. is a subsidiary of Uponor Corp.  *See* Business Entity Disclosure Form for Uponor, Inc. (ECF #15).  Each company in the chain wholly owns the company beneath it.  Thus, there is no dilution in ownership between Uponor Corp., Uponor NA, and Uponor Inc.

13.     Uponor Corp.'s 2022 Annual Review Report ("Report") demonstrates that the Uponor entities view themselves as a single enterprise divided by geographic reporting regions, with Uponor Corp. at the head.  In its Report, Uponor Corp. refers to itself and its subsidiaries as the "Uponor Group," a single business enterprise engaged in selling plumbing and infrastructure products worldwide.  Uponor Corp. treats North America as simply one region of its worldwide plumbing business called "Building Solutions—North America."

14.     The Uponor Corp. Report

   (i)     outlines "Group strategy" (p. 2);

3

(ii)　states that Uponor Group (not individual companies) "employs about 4,000 professionals in 26 countries in Europe and North America" (p. 4);

(iii)　states that "In Building Solutions—North America, we [Uponor Corp.] continued to make inroads into the commercial market and to leverage on our global offerings and brought new, innovative products to the local market" (pp. 6 & 10);

(iv)　states that Uponor "aims to create a new Uponor-wide operating model" (p. 7);

(v)　states that "Uponor has two manufacturing facilities in North America, making it one of Uponor's manufacturing strongholds" (p. 15);

(vi)　highlights Uponor Group work (including PEX piping) at a high-rise project in Orlando, Florida called Society Orlando (p. 16);

(vii)　states that Uponor Corp. has on its executive committee the "President, Building Solutions—North America" and not an officer of Uponor NA or Uponor Inc. (p. 20);

(viii)　states that "the President and CEO [of Uponor Corp.] *is in charge of the Group's day-to-day management*" (p. 28);

(ix)　states that "The [Uponor] Group *aims to embed control in the daily operations" of all Uponor companies* (p. 32);

(x)　states that "Assessment of risks regarding financial reporting is part of the Group's overall internal control and risk management framework" (p. 33);

(xi)　states that "Uponor is a global company that employs 4214 professionals in 27 countries in Europe and North America" (p. 40);

(xii)　states regarding Personnel that "the Uponor Group" had 4234 employees in full-time employment as of the end of December 2021 (p. 49);

(xiii)　refers to Uponor in North America as a division of Uponor Corp. by saying that "The Building Solutions—North America *division* serves local markets with PEX plumbing" (p. 50);

(xiv)　states that "Common people, brand, technology, sustainability, innovation, R&D and IT matters *are managed at Group level* in order to benefit from global presence and maximum global synergies" (p. 53);

(xv)　states that *Uponor Group* "has 16 manufacturing facilities in Europe and North America, *which exposes the company [Uponor Corp.]* to possible environmental risks" and that "Approximately 60% of Uponor's net sales were generated in countries other than the euro" (p. 56); and

(xvi) refers to "Uponor's segments" as its "reporting divisions . . . Building Solutions—Europe, Building Solutions—North America and Uponor Infra" (p. 75).

(emphasis added). Uponor Corp. claims Building Solutions-North America's sales, profits, and liabilities as its own. Report at 46-47. In 2022, Uponor Corp. claimed that 35% of its net sales and 57% of its operating profits were from its Building Solutions—North America division. *Id.*

15. The website for Uponor Corporation is www.uponorgroup.com. The address for Uponor Group at the website is Uponor Corporation, Ilmalantori 4, 00240 Helsinki, Finland. The domain name for emails of employees of Uponor Corp., Uponor NA, and Uponor Inc. is uponor.com.

16. The employee handbook for Uponor employees in the United States provides that "Uponor Corporation . . . is a publicly traded company and operates throughout Europe and the North America."

17. Uponor Corp. has written promotions (e.g., press releases or statements to stockholders) of it being involved in and working on projects in states including Florida, California, and Nevada.

18. The Court has jurisdiction over Uponor Corp., Uponor NA, and Uponor Inc. because Uponor Corp. exercises a sufficient degree of control and domination over Uponor Inc. through Uponor NA to meet personal jurisdiction standards. Uponor Corp. conducts its United States operations through Uponor NA and Uponor Inc. as Uponor Corp.'s "Building Solutions—North America" division. The presence and activities of a subsidiary in a forum confers jurisdiction on a parent company if the parent company exerts so much control over the subsidiary that the two essentially operate as one entity. Jurisdiction over Uponor Corp. is directly related to Uponor NA and Uponor Inc.'s activities in Tennessee. Uponor Inc. and Uponor NA function as Uponor Corp.'s representatives and agents in that Uponor Inc. and Uponor NA perform services

5

that are significantly important to Uponor Corp. such that if Uponor Corp. did not have Uponor Inc. and Uponor NA to perform them, Uponor Corp. would undertake to perform substantially similar services itself. It certainly would do so given that its Building Solutions—North America division generates 57% of Uponor Corp.'s operating profits.

19.    Other federal courts have exercised personal jurisdiction over Uponor Corp. in other actions in the United States including *George v. Uponor Corp.*, 988 F. Supp.2d 1056 (D. Minn. 2013), and *Slaughter v. Uponor Corp.*, 2:08-CV-01223 (D. Nev.), Order of 11/19/09. In that Order entered in the *Slaughter* case, Judge Jones found that "Uponor Corp.'s connection to Uponor, Inc. is more than investment or licensing of its trademark . . . . Uponor Corp. has purposely sold, through its subsidiaries, products in Nevada such that it should reasonably be expected to be hauled into a Nevada court if those activities result in alleged harm."

20.    Uponor NA is part of Uponor Corp.'s Building Solutions—North America division. The Court has jurisdiction over Uponor NA through Uponor Corp. as well as through Uponor NA's own activities.

21.    Uponor NA has admitted in judicial pleadings in courts in the United States that it—Uponor North America, Inc.—manufactures, markets, and sells various plumbing products including PEX piping for residential and commercial spaces throughout the United States including in Tennessee.

22.    Uponor NA has admitted in judicial pleadings in courts in the United States that it is subject to personal jurisdiction in various states, including Tennessee, Alabama, Oklahoma, California, Minnesota, Nevada, Pennsylvania, and Colorado, by not challenging the exercise of personal jurisdiction over it in those states. This includes a very similar case to this one filed in Colorado federal court against Uponor NA and Uponor Inc. in 2021 styled *Matzdorf v. Uponor North America, Inc. and Uponor, Inc.*, D. Col. Case No. 21-cv-2157.

6

23.     Uponor NA has obtained and secured commercial general liability (CGL) insurance for the operations of itself and its subsidiaries throughout the United States, including in Tennessee, to cover activities including the manufacture, marketing, distribution, and sale of plumbing piping.  The CGL policy is issued to Uponor North America, Inc. as the named insured. The CGL policy provides coverage for Bodily Injury and Property Damage Liability as well as Products/Completed Operations.  Indeed, a declaration (both ECF #10-2 & #13-1) has been submitted by Defendants in this action from Stacey Beissel as the "Manager, Claims, Risk and Insurance, for Uponor North America, Inc. and its subsidiaries, including Uponor, Inc."  That declaration is by a Uponor NA employee and alleges facts about the marketing and sale of PEX piping and operations of Uponor related to such PEX piping.  Ms. Beissel is a Uponor NA employee who is the person proffered by Defendants as having knowledge of the PEX piping marketing, warranty, and sale operations of Uponor.  This confirms that Uponor NA does work regarding the marketing, distribution, and sale of Uponor PEX.

24.     At Uponor North America's section of the Uponor Corporation website located at www/uponor.com/en-us, Uponor NA makes repeated admissions of its actions in marketing and selling plumbing products throughout the United States.  At that website, Uponor NA (i) admits that it was asked to help with the design and guidance of a project in California; (ii) states that "Uponor North America has manufacturing in Apple Valley [Minn] as well as Hutchison, Minn"; (iii) states that "[i]n late November 2021, Uponor North America reached a staffing milestone at its Hutchison, Minn. production facility"; (iv) states that the address "where to buy" Uponor products is "Uponor North America, 5925 148th Street West, Apple Valley, MN  55124"; (v) states that Uponor NA owns part of a joint venture that designs PEX products in California; and (vi) states at the bottom of the webpage that the webpage and copyright owner is "Uponor North America."

25.     The above allegations make a *prima facie* showing that personal jurisdiction exists over Uponor Corp., Uponor NA, and Uponor Inc.  Defendants have purposefully availed themselves of the privilege of marketing, distributing, and selling PEX piping in Tennessee (and profiting from such sales), Plaintiffs' claims arise from Defendants' activities in marketing, distributing, and selling PEX piping in Tennessee, and Defendants' actions of marketing, distributing, and selling PEX piping in Tennessee has a substantial enough connection with Tennessee to make the exercise of jurisdiction over the Uponor Defendants reasonable.

26.     Venue is proper in this Court because at all relevant time Plaintiffs resided in Sumner County, Tennessee, and pursuant to 28 U.S.C. § 1391(a)(2) a substantial part of the acts giving rise to Plaintiffs' claims occurred within Sumner County, Tennessee.

## IV.  NATURE OF DEFENDANTS' TRADE AND COMMERCE

27.     Defendants designed, manufactured, advertised/marketed, distributed, and/or sold Uponor PEX for use in water plumbing systems in residences and structures throughout the United States, including but not limited to Plaintiffs' Homes, the homes and other structures owned by other members of the Class, and all other similarly situated homes and structures.

28.     Defendants designed, manufactured, advertised/marketed, distributed, and/or sold Uponor PEX for use in potable water plumbing systems throughout the United States.

29.     PEX stands for cross-linked polyethylene.  PEX is a popular product because of its purported flexibility and ease of installation.   Uponor PEX is a plastic potable water supply piping product that is manufactured in three colors:  red, white, and blue, all of which are the subject of this lawsuit.

30.     Uponor PEX includes red and blue PEX pipe manufactured between approximately 2009 and 2021 and white PEX pipe manufactured between 2009 and the present.  On information and belief, Defendants discontinued the manufacture of red and blue PEX in 2021.

8

31.     All Uponor PEX, whether red, white or blue produced between approximately 2009 and 2021 was produced using the identical formula and extrusion process.

32.     Defendants have repeatedly represented that consumers should trust Defendants to provide the highest quality PEX tubing because the company has many years of industry experience and is an industry leader in the manufacture of PEX tubing.

33.     Until approximately 2021, Defendants designed, manufactured, advertised/marketed, distributed, and/or sold the Uponor PEX at issue.  Defendants' sales catalog advertised that, *inter alia*, its Uponor PEX was the highest quality PEX tubing available, and that its cross chemical bonding process gave it "superior characteristics."

34.     In promotional and instructional materials, Defendants maintained that Uponor PEX is superior to other types of PEX pipe and is durable, reliable, and safe.  Defendants have not corrected their representations about Uponor PEX's characteristics in the face of many complaints about defective and failed Uponor PEX.

35.     At the following website, https://www.uponor-usa.com/en/customer-support/faq#:~:text=Uponor%20PEX%20will%20not%20corrode,fit%20that%20type%20of%20connection, Defendants represent that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion."  Defendants made this representation at that website at all relevant times from 2009 to the present.  That website, at all relevant times and to the present, further represents that Uponor PEX "lasts the life of the structure."  That website also maintains that Uponor PEX "has superior mechanical, chemical and thermal properties which provide dimensional stability in demanding applications, including areas of high stress, heat and moisture."

36.     Defendants claim and advertise that Uponor PEX has a life expectancy of at least 50 years.  Defendants also claim that Uponor PEX holds the unofficial world record for long-term testing at elevated temperatures and pressure.  Defendants further claim that their testing data indicate a life expectancy of well over 100 years.

37.     As of 2016, Defendants represented that they had produced over five billion feet of Uponor PEX and were responsible for approximately one-third of all PEX sold in the United States.  Defendants, on information and belief, were responsible for approximately one-third of all PEX sold in the United States between 2016 and 2021.

38.     As of 2016, Defendants did business with all of the top ten homebuilders in the United States and had exclusivity agreements with three of them.  Defendants, on information and belief, did business with all of the top ten homebuilders in the United States and had exclusivity agreements with some of them between 2016 and 2021.

39.     As of 2016, among the top ten homebuilders in the United States, Defendants claimed to have a 60% share of the plumbing installed in those homebuilders' housing starts.  Defendants, on information and belief, claim to have a 60% share of the plumbing installed in the housing starts of the top ten homebuilders between 2016 and 2021.

40.     Consumers expect that a residential potable water piping system will last the lifetime of a home or structure.  This is consistent with Defendants' claim that Uponor PEX will last 50 to 100 years.

41.     In reality, Uponor PEX will fail, crack, and leak starting within three to five years after installation and is subject to multiple and continuing cracks and failures.

## V. FACTUAL ALLEGATIONS

42.     Carrico Plaintiffs' Home was built by Hannah Custom Homes, LLC, was substantially completed in February of 2017, and was originally constructed with Uponor PEX in the potable water plumbing system.

43.     Gatlin Plaintiffs' Home was built by Hannah Custom Homes, LLC, was substantially completed in June of 2014, and was originally constructed with Uponor PEX in the potable water plumbing system.

44.     The Uponor PEX in Plaintiffs' Homes has prematurely degraded and deteriorated and, as a result, has suffered microcracking causing water leaks from the Uponor PEX which result in damages to other property in Plaintiffs' Homes.

45.     The initial leaks in the Carrico Plaintiffs' Home were in 2021 and the initial leaks in the Gatlin Plaintiffs' Home were in 2019, although Plaintiffs did not know that Defendants were the cause of the leaks until just prior to filing the initial complaint.  Other leaks have occurred in the Plaintiffs' Homes since the initial leaks, and leaks continue to occur in Plaintiffs' Homes from failures of the Uponor PEX. The leaks in the Uponor PEX in Plaintiffs' Homes have caused substantial damages to Plaintiffs' Homes other than the leaking PEX itself, which have caused Plaintiffs to pay substantial sums to repair such damages.  Such damages continue to occur because the Uponor PEX in Plaintiffs' Homes continues to have leaks.

46.     Uponor PEX includes red, white, and blue pipe manufactured between approximately 2009 and 2021.   On information and belief, Defendants discontinued the manufacture of red and blue PEX in 2021.

47.     All Uponor PEX, whether red, white or blue produced between approximately 2009 and 2021 was produced using the identical formula and extrusion process.

48.     Polyethylene is vulnerable to oxidation.  When oxygen combines chemically with PEX as occurs naturally due to the interaction of air and PEX, the PEX will oxidize and degrade.

49.     Antioxidant stabilizers are necessary to achieve the flexibility of PEX tubing, maintain ductility, and protect against embrittlement and cracking.

50.     Unlike Uponor, most PEX manufacturers add antioxidant stabilizers to the plastic formulation during the extrusion process (when the tubing is formed) and prior to cross-linking, which adds color evenly throughout the tubing wall and does not degrade the PEX.

51.     To prevent premature degradation, Defendants blend antioxidant additives with the polyethylene during production.  These antioxidants are intended to scavenge free radicals and protect the polymer chains.  This is to prevent damage to the PEX from oxidation.

52.     However, unlike other PEX manufacturers, between approximately 2009 and 2021, Defendants manufactured PEX tubing and then, after extrusion, added a coating to the tubing's outside surface.  Coatings do not stick to PEX, so Defendants patented a process to coat their PEX tubing.   Defendants' patented process involves conveying the PEX tubing "through an oxidizing step in which at least the outer surface of the base pipe is oxidized, through a coating step in which a pre-polymer system is applied to the outer surface of the base pipe and through a curing step in which the pre-polymer is cured to form a layer of the pipe." Uponor Innovation AB, Fristad (SE), Appl. No. 12/572,683, Filed Oct. 2, 2009.

53.     This means that in order to get the coating to stick to the outside surface of the Uponor PEX tubing, Defendants run the tubing through a furnace/flame treatment that oxidizes/burns the outside of the pipe. While the furnace/flame treatment improves adhesion qualities of polymers prior to the application of coatings and adhesives, it is an oxidation process that destroys the antioxidants from the outside of the Uponor PEX tubing, subjecting the tube to actual damage and premature failure in the form of, among other things, oxidative degradation,

microcracking, cracking, through-wall cracking, and leaks, which leaks cause substantial property damage to other property in the structures where the Uponor PEX tubing is used.

54. Defendants method of PEX production between 2009 and 2021 did not mix the antioxidants uniformly with the polyethylene which led to a lack of homogeneity with the distribution of the antioxidants and causes the PEX to suffer from a defect.

55. Lack of homogeneity resulted in the outer surface of the PEX having less antioxidant protection. This led to oxidation of the PEX. This is the defect that leads to cracks and leaks.

56. The below photograph depicts the difference between Uponor PEX, displaying the coating only on the tube's exterior surface, and other manufacturers' PEX, displaying the color through the entire tube.



57. Because the outside surface of Uponor PEX is depleted of antioxidants after the flame treatment, the outside surface prematurely becomes brittle and develops microcracks when the tubing is expanded during installation. The embrittlement and microcracks constitute damage to the tubing and the cracks continue to grow and spread over time, eventually propagating through the PEX, causing resultant leaks, significant damage to other property, loss of use of the plumbing system, and/or preventing the plumbing system from functioning as intended.

58.     Contrary to the affirmative statements made by Defendants as set out in Section IV above, Uponor PEX suffers from design and/or manufacturing defects causing damages.

59.     Specifically, and as a result of such defects, Uponor PEX is predisposed to premature oxidative failure, microcracking, through-wall cracking, leaks, loss of use, and other failures and damages. These defects cause the Uponor PEX to crack, fail to perform when put to its intended use, leak, and substantially reduce its normal useful life.

60.     Pieces of Uponor PEX piping manufactured by Defendants which have failed have been inspected and tested by experts in PEX piping, and the microcracking caused by the Defendants' furnace/flame treatment process has been documented as the cause of the failure and leaks of the PEX piping.

61.     Before designing, manufacturing, advertising/marketing, distributing, and/or selling Uponor PEX, Defendants failed to take appropriate steps to ensure that its products were safe for their intended use.

62.     Defendants failed to disclose this material information about defects in Uponor PEX to Plaintiffs, other members of the Class, and the public.

63.     Defendants have long been aware of the process of oxidation of the Uponor PEX and the cause of such oxidation and defect, but intentionally failed to disclose the defects to consumers, distributors, contractors, plumbers, installers, and building officials.

64.     Defendants knew or should have known that Uponor PEX was not suitable for use within water plumbing systems and that Uponor PEX suffered from the defects and caused damages as alleged herein.

65.     The Uponor PEX has caused damage to, and failure of, plumbing systems, which has caused and will continue to cause Plaintiffs and the Class to incur damages to their homes and structures as alleged herein through no fault of their own.

66.     Damages caused by leaks from defects in Defendants' Uponor PEX to property at Plaintiffs' homes include, but are not limited to, the following:

- Destruction or damages of plywood, various types of flooring (including hardwood, carpet, and vinyl areas), and subflooring;

- destruction of substantial amounts of insulation;

- destruction or damages of molding and baseboards;

- destruction or damages of structural wood;

- destruction or damages of ceiling areas including coffered ceilings;

- destruction or damages to other property including shelving and gas fireplaces;

- water infiltration and saturation of property located in areas that are difficult to see or reach including behind walls and in crawl spaces, which has caused fungus or mold in walls and crawl spaces, and, after discovery of the leak, required substantial and difficult drying and fungus/mold removal activities; and

- loss of use of plumbing systems or prevention of plumbing systems from functioning properly or as intended.

Other Class members have also suffered similar damages to property in their homes and other structures.

67.     Beginning in or around 2021, Defendants discontinued their manufacture, distribution, and sale of the defective Uponor PEX because of the defects with the product. However, Defendants misrepresented that the defective Uponor PEX was being "suspended," not "discontinued," and instead concealed that Uponor discontinued the product due to the defects and premature failures and damages. On information and belief, the new PEX produced and sold by Defendants since 2021 is not manufactured using the furnace/flame treatment and, because such treatment is not used, does not suffer the same oxidative deterioration, degradation, microcracking, failures, and leaks as the defective Uponor PEX manufactured between 2009 and 2021.

15

68.     Even though Defendants discontinued their manufacture, distribution, and sale of the defective red and blue Uponor PEX in or around 2021 because of the defects with the product, Defendants failed to (1) notify Plaintiffs, other members of the Class or the public of any defects or problems with Uponor PEX, or (2) fully or adequately compensate property owners, including, but not limited to, Plaintiffs and other members of the Class, who have been injured from leaks as a result of the defective Uponor PEX.

69.     At no time did Defendants or any of their agents, dealers or other representatives inform Plaintiffs, other members of the putative class or the public of Defendants' acts and/or omissions related to defects in Uponor PEX.

70.     Plaintiffs and other members of the putative class have suffered an ascertainable loss as a result of Defendants' acts and/or omissions associated with Uponor PEX, including Defendants' non-disclosures about the product defects and discontinuing/suspending the manufacture, distribution, and sale of the defective red and blue Uponor PEX.

71.     Plaintiffs seek relief for damages alleged herein sustained by Plaintiffs and the other Class members that Defendants' proximately caused by the use of Defendants' Uponor PEX in Plaintiffs' and putative class members' homes and other structures.

72.     Plaintiffs seek relief to remedy Defendants' strict products liability violations, negligence, fraudulent concealments, negligent misrepresentations, and Tennessee Consumer Protection Act violations

## VI.  DAMAGES WERE CAUSED BY DEFECTIVE UPONOR PEX

73.     The Uponor PEX in Plaintiffs' Homes and the homes and structures owned by other members of the putative class has malfunctioned, cracked, leaked, and caused damages to property of Plaintiffs and the other members of the putative class other than the defective PEX itself.

74.     The overarching defect in the Uponor PEX pipe is caused by oxidative degradation in the pipe.

75.     Several methods exist to crosslink polyethylene to manufacture PEX pipe. These methods create PEX pipe with very different properties.

76.     Uponor manufactures PEX piping using the Engle method of crosslinking the polyethylene. The Engel method is a hot crosslinking process. When using the Engle method, the pipe is extruded while cross-linking is actively taking place. Specifically, the polyethylene used to manufacture the Uponor PEX pipe is exposed to high temperatures and oxygen during the manufacturing process.

77.     High heat and reactive chemistry during extrusion of the Uponor PEX pipe consumes antioxidants prematurely. The initial manufacturing process subjects the polymer to high heat when the polyethylene reacts with oxygen creating oxidized polyethylene. This creates imperfections on the inside surface of the Uponor PEX.

78.     Furthermore, because portions of the pipe become oxidized, the surface no longer resembles polyethylene, but becomes a new polymer surface known as oxidized polyethylene.

79.     This new material has different properties than polyethylene. It has different physical and chemical properties, and it has a different surface tension and a different density.

80.     The oxidized polyethylene begins to shrink and develop surface imperfections, similar to the "mud cracking" that forms after a puddle dries in the sun. Those imperfections or microcracks result in stress concentrations and form cracks that ultimately propagate through the wall of the PEX.

81.     The oxidation of the Uponor PEX pipe is caused by a chemical reaction when oxygen molecules interact with the polyethene, causing the material to break down and degrade. This leads to brittleness and loss of material properties including strength and flexibility.

82. This condition causes the Uponor PEX pipe to prematurely age through introduction of oxygen into the molecular structure. Once initiated, this process of oxidative degradation is significantly accelerated by exposure to normal hot water temperatures, and air, which accelerates the oxidative process and embrittles the pipe causing it to lose mechanical properties and crack.

83. The oxidative degradation in the Uponor PEX pipe is compounded in the red and blue pipe. With the red and blue pipe, Uponor applies a lacquered coating to provide color over the PEX layer of pipe. To improve the ability of the lacquer coating to adhere, the pipe is run through a furnace at high temperatures.

84. As a result of subjecting the pipe surface to the flame treatment and resulting high temperatures, the outside surface of the Uponor PEX prematurely becomes brittle and develops microcracks in the exterior wall of the pipe.

85. The embrittlement and microcracks cause damage to the pipe, and the cracks continue to grow and spread over time, progressively propagating through the wall of the pipe, causing resultant leaks, and resulting property damage.

86. Uponor refers to the coating process as a lacquer coating. This process was discontinued in 2021, at which time Uponor ceased the manufacture and sale of red and blue PEX pipe.

87. The oxidative degradation defect is further exacerbated by Uponor's fitting installation design system. The Uponor installation design system requires that the inside diameter of the pipe be expanded while the pipe is cold (cold-expanded) and stretched with a tool in order to insert the fittings.

88. When the pipe retracts over the fittings, the fittings remain larger than the inside diameter of the pipe, and therefore, the pipe does not return to its original size.

18

89.     This creates stress concentration at the edge of the reinforcement ring that is installed over the fittings.  Years after installation, this stress leads to through-wall cracks in the pipe just outside the reinforcement rings and causes leaks and resulting property damage.

90.     Because Uponor utilizes a defective manufacturing process for its pipe, latent defects are manufactured into all Uponor PEX pipe.

91.     These defects lead to leaks and resulting property damage, and present serious health and safety risks including mold, bacteria, dropped ceilings due to water absorption and damage to building foundations and footings.

92.     The Uponor-method of pipe production does not produce consistent, uniform and evenly cross-linked PEX pipe and the antioxidants in the pipe formula are not blended homogenously throughout the pipe.

93.     The Uponor PEX is uniformly defective when it leaves Uponor's manufacturing plant and starts failing approximately three to five years after installation.

94.     The common failure modality in Uponor PEX pipe is caused by oxidative embrittlement and degradation of the inside surface of the Uponor PEX pipe as a consequence of poor distribution and extraction of  protective antioxidants resulting in material degradation and oxidation of the inside wall of the pipe.

95.     Antioxidants protect the pipe from oxidation by scavenging free radicals.  Once the antioxidants are depleted, the surface of the pipe progressively undergoes oxidative embrittlement.

96.     This condition is compounded and made worse in the red and blue pipe.  Uponor's patent application of the color coating uses a flame treatment which destroys antioxidants on the outside surface of the Uponor PEX pipe.

97.     The color coated surface of the pipe experiences extensive embrittlement evidenced by mud cracking, pitting, and crazing which produces a network of fine cracks on the surface of the pipe.

98.     Because of the oxidative degradation and embrittlement, the Uponor PEX pipe is unable to withstand the strain of the expansion process specified in Uponor fitting installation design system.

99.     With the red and blue Uponor PEX pipe, the failures are initiated by oxidative embrittlement and degradation on the outside surface of the pipe.

100.    The Uponor PEX pipe fails outside-in, and oftentimes at a location adjacent to the compression ring of the expansion fitting.

101.    The surface underneath the brittle coating is also brittle and experiences incipient cracks.

102.    The causes of the surface defects, both inside and outside the pipe transform over time into incipient cracks, which then propagate by normal use of the potable water system.

103.    Plaintiffs and other members of the Class have suffered actual and substantial damages to property in their homes and other structures, other than the Uponor PEX itself, caused by leaks from the Uponor PEX in the potable water systems in Plaintiffs' Homes and the homes and structures owned by other members of the Class.

104.    As a result of Defendants' conduct, Plaintiffs and the putative Class have suffered ascertainable losses in the form of damages to their homes and other structures caused by leaks from the defective Uponor PEX.

105.    The leaks in the Uponor PEX cause property damage to, among other things, drywall, insulation, paint and flooring.

106.     Damages caused by leaks from defects in Defendants' Uponor PEX to property at Plaintiffs' Homes include, but are not limited to, the following:

- Destruction or damages of plywood, various types of flooring (including hardwood, carpet, and vinyl areas), and subflooring;

- destruction of substantial amounts of insulation;

- destruction or damages of molding and baseboards;

- destruction or damages of structural wood;

- destruction or damages of ceiling areas including coffered ceilings;

- destruction or damages to other property including shelving and gas fireplaces;

- water infiltration and saturation of property located in areas that are difficult to see or reach including behind walls and in crawl spaces, which has caused fungus or mold in walls and crawl spaces, and, after discovery of the leak, required substantial and difficult drying and fungus/mold removal activities; and

- loss of use of plumbing systems or prevention of plumbing systems from functioning properly or as intended.

Other putative Class members have also suffered similar damages to property in their homes and other structures.

107.     The leaks and damages in Plaintiffs' Homes and in the homes and structures owned by other members of the Class were caused solely by the defects in the Uponor PEX discussed above.  The furnace/flame treatment used by Defendants destroyed the antioxidants from the outside of the Uponor PEX tubing, subjecting the tube to actual damage and premature failure in the form of, among other things, oxidative degradation, microcracking, cracking, through-wall cracking, and leaks, which leaks cause substantial property damage to other property in the structures where the Uponor PEX tubing is used.

108.     Forensic testing has been conducted on portions of the failed Uponor PEX pipe. Uponor PEX piping manufactured by Defendants which have failed have been inspected and tested by experts in PEX piping, and the microcracking caused by the Defendants' furnace/flame treatment process has been documented as the cause of the failure and leaks of the PEX piping.

109.     Defendants' acts and omissions as alleged herein caused Plaintiffs' and other Class members' injuries, including the amount of out-of-pocket losses from damages to Plaintiffs' and the other Class members' homes and other structures, businesses, and personal property from water leaks including the cost to repair or replace personal and/or real property damaged from the leaks from the defective Uponor PEX.

110.     Uponor's manufacturing process caused inherent defects in the Uponor PEX, including but not limited to oxidative degradation, microcracking, cracking,  through-wall cracking, leaks, and other damages to the PEX, which has caused premature degrading, deteriorating, and/or failing plumbing systems in Plaintiffs' Homes and in the homes and structures owned by other members of the Class which have resulted in leaks and damages in those homes and structures.

111.     Defects in the Uponor PEX and Defendants' related acts and omissions have proximately caused and/or will cause substantial damages to property other than the PEX piping itself in the homes and other structures of Plaintiffs and other Class members.

112.     Installation practices do not cause the Uponor PEX defects or the cracking and leaks.  Installation does not, and cannot, cause the oxidative degradation failures of the Uponor PEX, which is solely created by Uponor's defective manufacturing process.

113.     Defendants are well aware that the failures of the Uponor PEX pipe at Plaintiffs' Homes are not related to installation problems or improper use by Plaintiffs.  The leaks at Plaintiffs' Homes are solely attributable to defects in the Uponor PEX pipe.

114. Plaintiffs' Uponor PEX pipe and the Uponor PEX pipe of the putative class members have built-in defects that cannot be caused by installation practices or use of the Uponor PEX by the owners of the properties at issue.

115. Any errors in installation will not and do not cause the defects in the Uponor PEX. Conversely, perfect installation practices will not prevent the defects in the Uponor PEX from causing failure and leaks of the Uponor PEX.

116. Uponor certifies and qualifies plumbers to install Uponor PEX. This means that plumbers who install Uponor PEX are trained and approved before installing any Uponor PEX system.

117. On information and belief, even though the plumbers have been certified by Uponor as being qualified and competent to install the Uponor PEX tubing and fittings, Uponor has advanced the false narrative of "blame the plumber" to deny legitimate consumer complaints against Uponor who have experienced failed pipe with resulting property damage.

118. However, plumbers who install Uponor PEX are certified by Uponor as an authorized and trained installer of Uponor PEX systems. Such plumbers also are experienced in installing PEX piping.

119. The leaks in the Uponor PEX at the homes and structures of Plaintiffs and other putative class members had nothing whatsoever to do with the installation practices. For example, there were no plumbing installation errors at Plaintiffs' Homes.

120. To the extent Uponor asserts there were installation errors, installation of the Uponor PEX cannot and did not cause the oxidative degradation failures of the Uponor PEX, which is solely related and unique to the defective manufacturing process and is the cause of the cracks and leaks.

121. There is nothing that a plumber installing Uponor PEX does or can do in the course of installing the Uponor PEX tubing that can cause oxidation of the exterior wall of the pipe.

122. Failures from oxidation degradation are unique and uniform in appearance and cause. Poor installation, no matter how unlikely, cannot cause the signature failure modality of cracking in the wall of the Uponor PEX.

123. Similarly, perfect installation will not prevent the defects from manifesting. These defects are solely due to the defective manufacturing process.

124. On information and belief, Uponor has falsely claimed to putative class members or their installers that water temperature and water pressure are the causes of failures in Uponor PEX.

125. However, the failures in the Uponor PEX have nothing to do with the temperature of the water or the water pressure – another false narrative often employed by Uponor as a sham defense to cover up the defects in the Uponor PEX.

126. The Uniform Plumbing Code is a comprehensive and efficient plumbing code developed by the International Association of Plumbing and Mechanical Officials (IAPMO), a global leader in water conservation and plumbing quality.

127. The Uniform Plumbing Code requires that all plumbing materials be listed with a third-party certification body before the product can be sold.

128. Uponor is listed with IAPMO for its Crosslinked Polyethylene Water Distribution System (PEX).

129. The IAPMO Research and Testing, Inc. Certificate of Listing provides as follows:

CHARACTERISTICS:

Cross-linked polyethylene, plastic, hot and cold water distribution system and/or hydronic radiant heating system made in one standard dimension ration and intended for a maximum 100 psi water service up to and including a maximum working temperature of 180° F.

24

Components are comprised of tubing and/or fittings. (emphasis added)

130.     Uponor's website cited above states that Uponor PEX is rated for the following temperatures and pressures:

200°F (93.3°C) at 80 psi (5.5 bar)

180°F (82.2°C) at 100 psi (6.9 bar)

131.     The markings on the outside of Uponor PEX uniformly state the pipe is manufactured to 80 PSI at 200°F.

132.     All Uponor PEX pipe is IAPMO listed to tolerate 100 PSI. This is 20 PSI in excess of the PSI used at residential properties.

133.     All Uponor PEX pipe is IAPMO listed to tolerate 180°F, a full 60° in excess of the standard 120° F used in residential properties.

134.     Uponor PEX piping is specifically approved for hot water recirculation systems including timed, sensor- activated, self-activated or continuous hot-water circulation systems operating at temperatures up to and including 140° F.

135.     Uponor represents in its Residential Plumbing Installation Guide that its PEX pipe is designed to tolerate excessive temperature and pressure capability in accordance with ASTM F876. This standard requires that Uponor PEX maintain its integrity for a period of 720 hours (30 days) at 210° F and 150 PSI.

136.     Uponor claims that, if installed as directed, Uponor pipe will withstand these conditions.

137.     The water temperature of residential properties is set at 120° or below with rare, if ever, irrelevant exceptions.

138.     The Uponor PEX used in residential applications is also approved and used in commercial applications.  Commercial hot water PEX systems typically operate at temperatures higher than 140° for dishwasher and related equipment.

139.     In the highly unlikely event that residential properties' water pressure exceeds 80 PSI or temperature in excess of 120°, those conditions will not cause the pipe to fail as Uponor PEX is expressly manufactured and IAPMO listed to tolerate 100 PSI at 180° F.

140.     All Uponor PEX pipe contains a print line throughout the length of the pipe which identifies the pipe as Uponor, and among other things, reads "80 PSI 200°F".  This is the long-term pressure rating for the pipe at various temperatures and is far in excess of the typical residential water pressure at 80 PSI or water temperature 120°F.

141.     Uponor PEX is designed to bend and such bending does not cause it to crack or leak.

142.     Uponor PEX pipe is flexible and designed to bend for ease of installation, and is advertised as such.  In fact, Uponor PEX is packaged from the manufacturing plant coiled like a garden hose and is designed, distributed and sold in this condition.

143.     Uponor PEX is designed to facilitate 90° bends.

144.     The failures of the Uponor PEX leading to cracks and leaks have nothing to do with purported overbending the Uponor PEX.

145.     Plaintiffs will prove at trial, based upon a preponderance of established and reliable scientific evidence, that the Uponor PEX will continue to deteriorate and develop leaks.  The defects are continuing and progressive and cannot be reversed or corrected.

146.     Because Defendants manufactured defective Uponor PEX that is causing continuing failures, leaks, and damages, Plaintiffs reasonably decided that the Uponor PEX in

their homes had to be removed and replaced to avoid further leaks and resulting property damage. Accordingly, Plaintiffs replaced the Uponor PEX in their residences.

147.     Plaintiffs' damages include out of pocket expenses for the labor and materials necessary to remove and replace all Uponor PEX pipe (other than the cost of the replacement PEX itself), reinforcement rings and fittings and drywall in their homes, and to restore walls and other areas after replacement of the PEX to their original condition including restoration of walls and repainting the repaired rooms. Repainting is necessary in order to properly match all of the repaired areas with the rest of the ceiling and walls.

148.     Plaintiffs and all putative class members must remove and replace the defective Uponor PEX plumbing systems in their homes. The work needed to be done to replace the Uponor PEX pipe is the only means to mitigate further property damage from the defective Uponor PEX.

## VII.  FRAUDULENT CONCEALMENT AND STATUTES OF LIMITATIONS/REPOSE TOLLING

149.     Plaintiffs' claims and all Class members' claims are brought within the applicable statutes of limitations for product liability, negligence, fraudulent concealment, and negligent misrepresentation claims.

150.     Plaintiffs' and Class members' claims are not barred by any statute of limitation or statute of repose because Defendants actively and fraudulently concealed from the public including Plaintiffs and other Class members and their construction professionals (i) the defects in the PEX piping, (ii) Defendants' actions in creating the defect, and (iii) the cause of Plaintiffs' and other Class members' injuries and damages.

151.     Consumers expect that a residential potable water piping system will last the lifetime of their homes and other structures.

152.     The Uponor PEX contained design and manufacturing defects at the times the Uponor PEX left Defendants' control and at the times Plaintiffs' builder and installers purchased such Uponor PEX. At the time of purchase, Plaintiffs and, in turn, all putative class members reasonably expected that Uponor PEX would reliably function as water supply pipe and had no way of knowing that it contained defects that would cause the pipe to crack, leak and fail prematurely.

153.     Uponor concealed the existence of the defects in the Uponor PEX from all putative class members, including Plaintiffs.

154.     Plaintiffs and the putative class and their builders and installers would not have purchased the Uponor PEX if Uponor had not concealed material information about the defects.

155.     Plaintiffs did not know or learn of Plaintiffs' claims and could not reasonably have known of such claims until the leaks and damages occurred and Plaintiffs learned that Defendants' actions and inactions caused the leaks.  Plaintiffs did not discover that Defendants' actions and inactions caused the leaks until shortly before the filing of their initial Complaint.

156.     Defendants knew that the Uponor PEX was defective and caused leaks and damages between 2009 and 2021.  After Defendants started using the furnace/flame treatment process described in Paragraph 43 above in 2009, Defendants learned from property owners, contractors, plumbers, and others that defects in Uponor PEX piping was causing it to suffer leaks and cause damages.  Defendants investigated and learned that they caused the defects in the Uponor PEX piping through Defendants' flame/furnace treatment.

157.     At all relevant times, Defendants were aware and knew that the defects in the Uponor PEX had caused microcracking to occur causing leaks and that, where such leaks had not yet occurred, the Uponor PEX had the potential to fail and cause such leaks.  Defendants learned and knew of that specific microcracking problem in the Uponor PEX from reports and claims

made to Defendants about failure of the Uponor PEX due to this reason, from Defendants' own testing of the Uponor PEX piping manufactured between 2009 and 2021, and from Defendants' investigation of the cause of the failures of the Uponor PEX. Such testing and investigation showed to Defendants that the Uponor PEX to which the flame/furnace treatment had been applied had the microcracks that cause failure and leaks. Defendants had this knowledge prior to the sales of defective Uponor PEX that affected Plaintiffs and other Class members. In fact, it was Defendants' knowledge of the specific defect that led Defendants to cease using the flame/furnace treatment in 2021.

158. Instead of disclosing the defects in the Uponor PEX, Uponor has repeatedly touted the durability and reliability of the Uponor PEX pipe and assured all developers, builders, installers, building officials and consumers that they could reply upon the Uponor PEX being of high quality.

159. Uponor has long been aware of these defects and their root causes, but intentionally failed to disclose the defects to consumers, distributors, contractors, installers or building officials.

160. Defendants are further aware of thousands of failures in the Uponor PEX Pipe that have resulted in leaks and resulting property damage.

161. Before Plaintiffs and other Class members purchased their homes and other structures, Defendants learned of the defects in the Uponor PEX through 1) reports and claims from property owners, plumbers, and others that defects in Uponor PEX piping was causing it to suffer leaks and cause damages, 2) repair and replacement work done by Defendants, and 3) Defendants' investigation and testing of the cause of the failures of the Uponor PEX.

162. At all relevant times and specifically while Defendants' website was representing that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-

cracking during expansion," Defendants had a duty to disclose enough information about the defects in the Uponor PEX piping and Defendants' actions in creating the defect to prevent Defendants' statements from being misleading.

163. At all relevant times and specifically while Defendants' website was representing that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion," Defendants had a duty to disclose the defects in the Uponor PEX because Defendants knew or should have known that the microcracking defects rendered the Uponor PEX defective and potentially dangerous.

164. At all relevant times and specifically while Defendants' website was representing that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion," Defendants had a duty to disclose the basic and material information to existing and potential buyers and users of the Uponor PEX because Defendants knew or should have known that such buyers and users, in making such purchases and in using the Uponor PEX, acted or were about to act without knowledge of the information about the defects and without reasonable means to acquire the information themselves because such buyers and users had no means to access such information since the information was held and known by Defendants alone.

165. On information and belief, Defendants have known for many years that the Uponor PEX is defective. Defendants have full knowledge of the defects, and of the risk to consumers of property damage and nonetheless continued to sell the red and blue pipe until 2021, and continues to sell the white pipe at this time.

166. On information and belief, Uponor stopped selling the red and blue Uponor PEX because it was well aware that its patented flame treatment prior to the application of the coating created a defect which further predisposed the pipe to premature failure. Uponor was aware of this defect long before it ceased selling the red and blue Uponor PEX.

30

167. Uponor's decision to continue selling its PEX pipe demonstrates its continued and conscious disregard of its long standing knowledge of the defects and reliable scientific evidence demonstrating the high probability of ongoing pipe failures causing resulting property damage and loss of use to consumers.

168. Uponor has continued to accrue knowledge of the defects in the Uponor PEX and their serious consequences over the course of many years. Indeed, Uponor has known about, investigated, and litigated numerous cases to develop full knowledge of the defects, supported by internal investigation and testing both inside the company and with the use of outside laboratories. These lawsuits and claims have caused Uponor to develop a clear factual foundation to know without question that there are defects in the Uponor PEX.

169. Despite obvious signs of known and dangerous defects and associated risks, Uponor concealed claims and scientific findings of Uponor PEX defects from consumers, distributors, contractors, installers and building officials.

170. To date, Uponor has taken no serious corrective action to pay for the removal and replacement of the defective Uponor PEX and pay for all other damages or to address these defects or to otherwise notify its distributors, builders, installers, building officials or consumers of the defects and high probability of failure.

171. For all consumers, including Plaintiffs, durability, reliability and safety of potable water systems are important factors when buying a home or other structure, or selecting pipe when replacing one's potable water supply system. Uponor capitalized on this fact in advertising about the Uponor PEX and touted the superior qualities of the Uponor PEX through marketing including durability, reliability and safety.

31

172. Defendants have represented that Uponor PEX pipe has superior resistance to stress-crack corrosion and that the pipe would not experience micro-cracking during expansion. These representations are material and deliberately false and misleading.

173. Uponor's knowledge of the defects is based on scientific evidence generated by Uponor and independent laboratories, as well as experts employed or retained by Uponor, or which Uponor learned of through lawsuits and independent reports of failed pipe and its own investigations.

174. Plaintiffs and putative class members, through their builders and installers, were exposed to these advertisements and promotional materials and representations prior to purchasing the Uponor PEX. The misleading statements about the durability and safety of the Uponor PEX in Uponor's advertisements and promotional materials, as well as Uponor's omission of the truth about the Uponor PEX defects, influenced Plaintiffs and putative class members through their builders and installers to decide to purchase the Uponor PEX.

175. Despite their knowledge of the Uponor PEX defects and the impact on reliability, Defendants have concealed the defects and failed to replace the Uponor PEX, and have thereby avoided the significant costs, inconveniences, and reputational harms of recalling millions of feet of defective pipe.

176. Defendants have hidden the defects despite their obligation to disclose those defects, misrepresented the Uponor PEX to be reliable and safe, and continued to sell Uponor PEX to contractors and plumbers who installed the defective Uponor PEX on behalf of consumers.

177. Despite full knowledge of the problems with its pipe, Defendants have failed to correct the defects and, on information and belief, continues to market the defective pipe.

178.    Instead of disclosing information about the defects in the Uponor PEX and taking corrective actions, Defendants knowingly, affirmatively, and actively concealed and failed to disclose relevant information to Plaintiffs and members of the putative class related to the defective nature of Uponor PEX.

179.    Defendants affirmatively concealed the injuries to Plaintiffs and other putative class members by concealing that Uponor PEX has defects that cause leaks and/or failing to disclose material facts regarding the defects in the Uponor PEX piping when Defendants had a duty to disclose such information to the public who was reasonably expected to have plumbing installed in their homes or structures and/or to builders and plumbers who were reasonably expected to use such Uponor PEX, based on (1) Defendants' superior and sole knowledge related to the defects, and (2) Defendants' continuous statements to the public, builders, and plumbers about the quality of Uponor PEX.

180.    Between 2009 and 2021, Defendants made public statements and publicly maintained that Uponor PEX was the highest quality PEX tubing available, that its cross chemical bonding process gave it "superior characteristics," that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion," and that consumers should trust Defendants to provide the highest quality PEX tubing because the company has many years of industry experience and is an industry leader in the manufacture of PEX tubing. These statements to the public were affirmative acts of concealment of the defects in the Uponor PEX, of which Defendants were aware.

181.    Defendants' representations were and are false and misleading because of what they fail to say: that the Uponor PEX pipe was and remains predisposed to premature failure due to oxidative degradation, and that the defects are progressive in nature and cannot be corrected.

33

182. On information and belief, for many years, Defendants have generated their own test results that determined through scientific testing the root cause of the defects in Uponor PEX and in Uponor's fitting installation system.

183. Defendants nonetheless continued to sell the defective Uponor PEX knowing that it would have serious consequences to Plaintiffs and putative class members in the form of failed pipe, resulting property damage, and the need to replace their plumbing system.

184. Before manufacturing advertising/marketing, distributing and selling Uponor PEX, Defendants failed to take appropriate steps to design and manufacture its product to be free from defects.

185. To the extent that Defendants made any changes to any formula or processing between 2009 and the present in manufacturing the Uponor PEX, those changes did not correct or eliminate the defects in the Uponor PEX. The defects remain uniform to all Uponor PEX.

186. Defendants knew or should have known that the Uponor PEX as designed and manufactured was not suitable for use in potable water supply systems.

187. Defendants have long been aware of these defects and their root causes, but intentionally failed to disclose the defects to consumers, distributors, contractors, installers or building officials.

188. Defendants have for many years been on notice of the Uponor PEX defects and the resulting property damage from consumer and installer reports of leaks.

189. On information and belief, thousands of pipe failures have been reported to Defendants by installers and property owners who have reported cracked and failed Uponor PEX pipe with resulting property damage.

190. On information and belief, Defendants monitor these reports of Uponor PEX failures.

191.     Moreover, in many of these reports of failed Uponor PEX, it is expressly clear that Uponor was directly informed of and investigated the leaks in question.  While Uponor has had access to the full body of these complaints for many years, it has failed and continues to refuse to warn its property owners or its installers or distributors of the known defects or to reasonably disclose the defects that repeatedly and perniciously manifest in the Uponor PEX.

192.     Defendants fraudulently concealed the information about the defects in Uponor PEX that was known by Defendants.

193.     Between 2009 and 2021, Defendants did not notify the public of defects in the Uponor PEX, but affirmatively conducted a plan to conceal claims of property owners. Defendants conducted a plan to (i) continue making public statements about the Uponor PEX being of highest quality, and (ii) do repairs of faulty and failed Uponor PEX on a case-by-case basis only when a failure was reported instead of notifying potential owners, builders, and plumbers of the defects in the Uponor PEX.

194.     Defendants engaged in a scheme to cover up evidence of premature deterioration and failure of Uponor PEX by making spot repairs of the Uponor PEX when leaks were reported and not notifying all potentially affected persons of such deterioration and failure of Uponor PEX.

195.     Defendants' actions and statements concealed the fact of the defects in the Uponor PEX and were intended by Defendants to exclude suspicion and prevent inquiry regarding defects in the Uponor PEX.

196.     Plaintiffs and other putative class members had no way to know of the defects in the Uponor PEX because the PEX piping and its defects are latent by being within the Uponor PEX piping which is itself behind the walls of the homes and other structures of Plaintiffs and other putative class members.

197. If Defendants had disclosed the truth about the defects to its developers, contractors and installers, Plaintiffs and putative class members would have been informed about the defects and would not have purchased or had the defective pipe installed in their homes or other structures.

198. Plaintiffs and other putative class members could not have discovered the defects or the identity of the wrongdoer once the leaks occurred despite reasonable care and diligence because the leaks were in PEX piping not visible by Plaintiffs and other putative class members. Because the defects in Uponor PEX are latent, Plaintiffs and members of the class could not have reasonably discovered the true nature of the defects or the cause of the leaks until shortly before the filing of the initial Complaint.

199. Defendants concealed material information about the existence of the defects in the PEX piping from Plaintiffs and other putative class members by withholding information from Plaintiffs and other putative class members in order to exclude suspicion of Uponor PEX as being defective and to prevent inquiry by Plaintiffs and other putative class members.

200. Defendants knew, but covered up, the defects in the PEX piping when Defendants were aware of such defects and that such defects cause leaks and damages in homes and other structures and concealed from the public, including Plaintiffs and other putative class members, the Uponor PEX defects and Defendants' knowledge of such defects in an attempt to avoid liability for damages caused by the defective Uponor PEX.

201. Plaintiffs and other putative class members and the persons and entities who constructed their homes and other structures would not have selected Uponor PEX as the plumbing piping used in their structures had they received accurate information setting forth the defects in the Uponor PEX. When decisions to use Uponor PEX as the plumbing in applicable structures were made by contractors and subcontractors who constructed Plaintiffs and other

36

Class members' homes and other structures, Plaintiffs and other putative class members relied on the Defendants' affirmative statements about the Uponor PEX indirectly through their contractors and subcontractors who would have received or seen such misrepresentations and who would have received or seen the information about the defective Uponor PEX had Defendants disclosed that information.

202. Accordingly, the actions of the Defendants were actions that would deceive a reasonably diligent plaintiff and did deceive the Plaintiffs and other putative class members from having any knowledge about the defects in the Uponor PEX until failure occurred of such Uponor PEX.

203. Any applicable statute of limitation or statute of repose was tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.

## VIII. CLASS ACTION ALLEGATIONS

### A. Class Bases and Definition

204. This action is brought on behalf of Plaintiffs, individually and as a class action, pursuant to FED. R. CIV. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

205. Plaintiffs seek relief for damages sustained by Plaintiffs and the putative class that Defendants proximately caused by the defects, sales, distributions, misrepresentations, concealments, and unfair acts and practices related to the Uponor PEX.

206. This case is about Uponor's legal responsibility for its knowledge, conduct, and defective products. The proposed putative class members' claims all derive directly from a single course of conduct by Uponor. The objective facts are the same for all putative class members.

Within each Count asserted by Plaintiffs on behalf of themselves and the proposed putative class, the same legal standards govern in Tennessee.

207. This class action for damages and other relief is asserted pursuant to Federal Rule of Civil Procedure 23 on behalf of all putative class members in Tennessee whose properties contain Uponor PEX pipe.

208. Plaintiffs assert these claims individually and on behalf of a class of owners of homes and other structures in Tennessee with Uponor PEX produced by Defendants using the flame/furnace treatment.

209. The putative class consists of owners of homes or other structures in Tennessee that contain or contained the Uponor PEX red, white, and/or blue piping manufactured and installed from 2009 to the present.

210. The Uponor PEX pipe was typically sold by Uponor to plumbing distributors who in turn sold to plumbers or contractors who purchased and installed the Uponor PEX pipe on behalf of Plaintiffs and the putative class.

211. The information presently available to Plaintiffs show that Uponor continued to manufacture and sell the defective white pipe from 2009 through the present and reveal that Uponor discontinued the manufacture and sale of the defective Uponor PEX red and blue pipe in approximately 2021.

212. The precise production period for the Uponor red, white and blue PEX pipe is uniquely in the Defendant's hands, as only Uponor possesses the information about the exact date of manufacture of the Uponor PEX pipe. Uponor has further information that will demonstrate the presence of the defects in the Uponor PEX pipe and when and how it was designed and manufactured. Plaintiff and putative class members are unable to obtain precise information on their own from information publicly available.

213.     The putative class consists of:

All persons and entities who own or owned homes, businesses, or other structures in Tennessee with Uponor PEX used as the lines and components of a potable water plumbing system where the Uponor PEX was produced using Uponor's patented flame/furnace treatment..

214.     Excluded from the putative class are:

a.       All owners or former owners of properties in Tennessee with Uponor PEX installed who have asserted a claim pursuant to the requirements and terms of Uponor's Express Warranty;

b. Defendants' officers, directors and employees; Defendants' affiliates and affiliates' officers, directors, and employees; Defendants' distributors and distributors' officers, directors, and employees; and

c.       Judicial officers and their immediate family members and associated court staff assigned to this case.

215.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

216.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Fed. R. Civ. P. 23.

**B.     Cognizable Injury**

217.     All putative class members have suffered cognizable injury.

218.     All putative class members suffered the same harm and injuries as estimated through the inflated market price of the homes and structures, the costs to repair the damages caused by the defects and the work needed to replace the defective Uponor PEX, and/or the diminished resale value of the homes and other structures.

39

219.    Many putative class members have suffered cognizable injury through cracks and leaks causing damages to their property in their homes.

220.    However, the alleged defects in the Uponor PEX do not have to manifest through leaks and resulting damages for all class members to have cognizable injuries.

221.    Because the Uponor PEX is defective and will be shown to be such through evidence, even if defects have not yet manifested through leaks and damages, such leaks and damages are likely to develop at some point.  The claims here are based on the presence of the defect regardless of manifestation into cracks and leaks.

222.    Overpaying for defective Uponor PEX which has diminished value in their homes and structures sufficiently shows cognizable injury of Plaintiffs and the putative class members.

223.    All members of the putative class overpaid for their homes and structures because of the defective Uponor PEX.  All members of the putative class have diminished value in their homes and structures because of the defective Uponor PEX.

**C.    Ascertainability**

224.    Plaintiffs have adequately and objectively defined the class so the Court will be able to use the class definition to determine the class members.  Defendants' records, as well as records of third parties, will reveal the identities of class members.   A brief inspection will show which homes and other structures have lines and components of the potable water plumbing system with Uponor PEX.  Therefore, the putative class is ascertainable.

225.    Defendants, on information and belief, did business with all of the top ten homebuilders in the United States and had exclusivity agreements with some of them between 2009 and 2021.  Defendants have the names of such homebuilders and can identify sales of Uponor PEX to such homebuilders in Tennessee and can produce those names and sales through discovery.  Those homebuilders can then identify homes and structures they built in Tennessee

40

using Uponor PEX. This will identify most putative class members as defined in the class definition above.

226. In addition, Uponor has records showing distributors in Tennessee to whom it sold the Uponor PEX and can produce those in discovery. Those distributors can identify who the Uponor PEX was sold to in Tennessee and, using such discovery, home builders and plumbers who used the Uponor PEX in homes and structures can be further identified.

227. Also, established and Court-approved class notice methodologies and programs can be used to notify owners of properties to easily determine if they are class members

228. There are well known and Court-accepted notice plans that can identify and inform consumers if they have the defective Uponor PEX in their home or structure.

229. The ability of a putative class member to determine whether Uponor PEX has been installed in a building is simple, with a very high degree of accuracy with no requirement for destructive testing to the building. The Uponor PEX is also date coded and thus, the date of manufacture can be determined. This ease of determining whether a property has the Uponor PEX is based on the following facts.

230. Uponor's IAPMO Certificate of Listing requires that all PEX be marked with the manufacturers name, size of pipe, and code number identifying the compound and date of manufacture.

231. In compliance with the Certificate of Listing, Uponor PEX pipe is continuously labeled on the outside of all of its pipe. The markings are clear and easily readable. Uponor PEX will be either in the crawl space or attic of homes and structures and can easily be verified as Uponor PEX by the marking showing the manufacturers name, size of pipe, and code number.

232. In addition, any putative class member whose existing potable system was replaced would have personal knowledge that the replaced pipe was manufactured by Uponor.

41

233. Also, if the home or structure of the putative class member was originally constructed with a Uponor system, that information would be readily available to the putative class member by contacting their builder or installer and inquiring about what pipe was used for the potable water system. .

234. Plaintiffs reserve the right to amend the putative class definitions if discovery and further investigation reveal that any putative class should be expanded, reduced, divided into additional subclasses under Rule 23(c)(5), or otherwise modified.

### D. Numerosity (Fed. R. Civ. P. 23(a)(1)).

235. The members of the class defined herein are so numerous and geographically dispersed that individual joinder of all class members is impracticable. The proposed class contains thousands of individuals and entities who own or owned homes or other structures in Tennessee with Uponor PEX installed which Uponor PEX was produced using Uponor's patented flame/furnace treatment. .Plaintiffs' claims are typical of the claims of the members of the class. Plaintiffs own homes with Uponor PEX in Tennessee. Plaintiffs seek to assert the claims as alleged in this Fourth Amended Complaint that are typical of the claims that would be asserted by the members of theclass. The disposition of the class members' rights with respect to the alleged defects, as described in this Fourth Amended Complaint, is a benefit to all parties and to the Court.

236. Putative class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

### E. Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23 (b)(3)).

237. This action has been brought and may be properly maintained as a class action because there is a well- defined community of interest in the litigation and the proposed Class is

numerous and ascertainable, and the common questions of law and fact predominate over any questions affecting solely individual members of the Class.

238. "Even a single common question will" satisfy commonality, but there are many common questions that can be decided "in one stroke" in this case and such common questions predominate over individual questions to be answered in this case. Common questions of law and fact that exist as to all members of the class include but are not limited to:

i. Whether defects exist in the Uponor PEX manufactured using Uponor's patented flame/furnace treatment?

ii. Whether Uponor PEX manufactured using Uponor's patented flame/furnace treatment has defects that render it unsuitable for ordinary use as a potable water systems in homes and other structures?

iii. Whether the defects in the Uponor PEX manufactured using Uponor's patented flame/furnace treatment are inherent in the design of the Uponor PEX?

iv. Was Uponor PEX manufactured using Uponor's patented flame/furnace treatment defectively designed and/or defectively manufactured for its intended purpose as the plumbing for potable water systems in homes and other structures?

v. Whether Uponor PEX manufactured using Uponor's patented flame/furnace treatment is prematurely failing, degrading, and/or deteriorating?

vi. Whether Uponor PEX manufactured using Uponor's patented flame/furnace treatment is subject to premature failure, degradation, and/or deterioration?

vii. Whether the defects in the Uponor PEX manufactured using Uponor's patented flame/furnace treatment pose a risk of failure causing leaks and damages?

viii. At the time the Uponor PEX left the control of Defendants, was it defective in design and manufacture and unreasonably dangerous to Plaintiffs and the other members

of the Class who might reasonably be expected to use it in the plumbing systems in their homes and other structures?

ix.     Did Defendants owe a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, advertising/marketing, distribution, and/or sale of Uponor PEX that was manufactured using Uponor's patented flame/furnace treatment?

x.     Did Defendants exercise reasonable care in the design, testing, manufacture, advertising/marketing, distribution, and/or sale of Uponor PEX that was manufactured using Uponor's patented flame/furnace treatment?

xi.     Did Defendants breach their duties to Plaintiffs and the Class?

xii.     Did Defendants cause damages to the homes and structures of Plaintiffs and the Class from leaks in the Uponor PEX?

xiii.     Are Defendants liable to Plaintiffs and the Class to repair damages caused by leaks in the Uponor PEX that was manufactured using Uponor's patented flame/furnace treatment?

xiv.     Whether and when Defendants knew of the defects?

xv.     Whether Defendants knew that Uponor PEX manufactured using Uponor's patented flame/furnace treatment is inherently defective and substantially certain to fail and leak during its useful life?

xvi.     Whether Defendants knew about the defects in the Uponor PEX and concealed those defects from purchasers and users of the Uponor PEX as well as purchasers of homes and other structures where the Uponor PEX was installed?

xvii.     Whether Defendants concealed the defects?

xviii.     Whether Defendants had exclusive knowledge of the defects which knowledge was not known or reasonably accessible to Plaintiffs and the putative class members?

44

xix.    Did Defendants fail to warn consumers that Uponor PEX that was manufactured using Uponor's patented flame/furnace treatment is subject to premature failure, degradation, and/or deterioration?

xx.    Did Defendants make misleading statements in connection with the advertising/marketing and/or sale of Uponor PEX that was manufactured using Uponor's patented flame/furnace treatment?

xxi.    Did Defendants omit material information when they advertised/marketed and/or sold Uponor PEX that was manufactured using Uponor's patented flame/furnace treatment?

xxii.    Whether there is proof of intentional concealment or deception by defendants concerning their knowledge of the defects in the Uponor PEX?

xxiii.    Whether the defects were material?

xxiv.    Whether accurate information about the defects in the Uponor PEX withheld by Defendants would have been material to an objectively reasonable purchaser/consumer/property owner deciding whether to purchase or use the Uponor PEX?

xxv.    Whether Defendants' concealment and failure to disclose the defects at the point of sale misrepresented the quality of the Uponor PEX being sold, inflated the price of the Uponor PEX, and diminished the values of the homes and other structures of putative class members?

xxvi.    Did Defendants' conduct constitute willful misconduct and/or fraudulent concealment such that statutes of limitation and statutes of repose are tolled during the pendency of such conduct?

xxvii.    Did Defendants violate Tennessee laws including, without limitation, the Tennessee Consumer Protection Act?

xxviii. Whether Defendants engaged in unfair, deceptive, unlawful, and/or fraudulent acts or practices, in trade or commerce, by failing to disclose that the Uponor PEX was defective as designed, manufactured and sold;

xxix. Whether Defendants' concealment of the true defective nature of the Uponor PEX caused its market price to incorporate a premium reflecting the assumption by consumers that the Uponor PEX was not defective and was fully functional for use in residential properties and, if so, the market value of that premium;

xxx. What is the aggregate economic harm caused to the putative class by the defects?

xxxi. Whether Plaintiffs and the other putative class members are entitled to damages, including punitive damages, and other monetary or restitutionary relief and, if so, in what amount; and

xxxii. Whether Plaintiffs and other putative class members are entitled to an order enjoining the Defendants from further deceptive distribution and sales practices with respect to the Uponor PEX.

These and other common questions of law and fact predominate over any questions affecting solely individual members of the putative class.

**F. Typicality (Fed. R. Civ. P. 23(a)(3)).**

239. Plaintiffs' claims are typical of the claims of the putative class relating to Uponor PEX. Plaintiffs and the putative class have been injured by the same wrongful practices of Defendants. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of the putative class and are based on the same legal theories.

240. Plaintiffs' claims are typical of the claims of putative Class members whom they seek to represent under Fed. R. Civ. P. 23(a)(3), because Plaintiffs and each putative class member own a property in which the defective Uponor PEX was installed, or owned a property in which

46

failed Uponor PEX pipe was removed and replaced, and were comparably injured through Defendants' wrongful conduct as described above. Plaintiff and the other putative class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other putative class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other putative class members.

### G. Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)).

241. Plaintiffs will fairly and adequately represent and protect the interests of all members of the Class. Plaintiffs own homes with Uponor PEX in Tennessee and are adequate representatives of the Class as they have no interests which are adverse to the interests of the Class that they seek to represent. The interests of the Class will be fairly and adequately represented and protected by Plaintiffs and their counsel. Plaintiffs intend to prosecute this action vigorously.

242. Plaintiffs' interests do not conflict with the interests of the putative class members. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other putative class members. Therefore, the interests of the putative class members will be fairly and adequately protected.

243. Plaintiffs have retained attorneys that have experience in the prosecution of defective product consumer protection class action litigation.

### H. Class Action Status (Fed. R. Civ. P. 23(b)(1)).

244. Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would

47

create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interest.

## I.     Declaratory and Injunctive Relief (Fed. R. Civ. P. 23(b)(2)).

245.     Certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the putatve class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole. This relief includes entry of an order (i) declaring that Defendants have engaged in deceptive acts and practices by marketing, selling, and distributing defective Uponor PEX and (ii) enjoining Defendants from further deceptive marketing, distribution, and sales practices with respect to the defective Uponor PEX.

## J.     Superiority (Fed. R. Civ. P. 23(b)(3)).

246.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  The disposition of their claims in this case and as part of a single class action lawsuit, rather than thousands of individual lawsuits, will benefit the parties and greatly reduce the aggregate judicial resources that would be spent if this matter were handled as hundreds or thousands of separate lawsuits.  Furthermore, given thelikelihood for extraordinary expenses and burdens in conducting the discovery and presentation of evidence regarding the inherent defects in Uponor PEX and the relatively small damages amount suffered by individual members of the putative class, the burden of individual litigation would make it impracticable, if not impossible, for individual members of the Class to seek redress for the wrongs asserted herein, while an important public interest will be served by addressing the matter as a class action.  Moreover, separate prosecution by thousands of individual members of the Class

would likely establish inconsistent standards of conduct for the Defendants and result in the impairment of and potential harm to the Class members' rights and the disposition of their interests through actions to which they were not parties.

247.     Individualized litigation would also undermine judicial economy and raise the prospect of inconsistent or contradictory judgments, increase the likelihood of delay, and generate additional expenses for all parties and the court system.   The class action device, on the other hand, presents far fewer management challenges and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

248.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

249.     Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final relief with respect to the Class as a whole.

**K.      Alternatively, the Court Should Certify an Issue Class**

250.     If the Court deems a 23(b)(1), 23(b)(2) or 23(b)(3) class is not viable, the Court should certify class- wide adjudication under Rule 23(c)(4) of the following issues: 1) whether defects exist in the Uponor PEX; 2) whether the defects are material; 3) whether and when Defendants knew about the defects; 4) whether Defendants concealed the defects, and 5) the aggregate economic harm from the concealed defects.   Trying these common issues would materially advance the litigation and resolve the most expensive issues requiring experts.   *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 416 (6th Cir. 2018).

## IX.  CLARIFICATION OF RELIEF NOT SOUGHT

251.     In the claims made herein and the causes of action pled below, Plaintiffs are not making any express or implied warranty claim and are not seeking any relief or remedy provided for in Defendants' alleged express warranty or under an implied warranty claim.   This is

consistent with that fact that Plaintiffs never knew of any alleged express warranty until after this action was filed and only learned of it because Defendants made defensive allegations about it. Plaintiffs note that Uponor's alleged express warranty does not apply to them because they never knew of it or made any claims under it and are not making any implied warranty claim. However, Plaintiffs do intend to seek for themselves and the putative class members the costs associated with the removal and replacement of all of the Uponor PEX in their homes and structures in order to avoid further leaks and resulting property damage. Such damages include expenses for the labor and materials necessary to remove and replace all Uponor PEX pipe (other than the cost of the replacement PEX itself)

## X.  CAUSES OF ACTION

### COUNT I - STRICT PRODUCT LIABILITY
**(Plaintiffs, on behalf of themselves and all others similarly situated, Against All Defendants)**

252.    Plaintiffs repeat and re-allege all prior and subsequent paragraphs and incorporate them as if repeated in full herein.

253.    At all times material to this action, Defendants were in the process of designing, engineering, developing, testing, approving, manufacturing, fabricating, equipping, inspecting, repairing, labeling, advertising, promoting, marketing, distributing, selling, and supplying Uponor PEX throughout the United States, including Tennessee.

254.    At the time the Uponor PEX left the control of Defendants, it was defective in design and manufacture and unreasonably dangerous to Plaintiffs and the other members of the Class who might reasonably be expected to use it in the plumbing systems in their homes and other structures. These defects include, but are not limited to, the conditions described in this Fourth Amended Complaint.

255. The Uponor PEX was expected by Defendants to reach, and did reach, property owners/end users without substantial change in the condition in which it was placed on the market and was expected to be installed in the homes and other structures of Plaintiffs and other members of the Class.

256. Plaintiffs and the other members of the Class are persons and entities who would reasonably be expected to be owners who have Uponor PEX as a water plumbing system installed in their homes and other structures. This reasonable expectation of Plaintiffs and other Class members to be potential owners of homes or other structures in which builders and plumbers might install Uponor PEX does not mean—and Plaintiffs do not admit—that Plaintiffs and other Class members (i) knew of Defendants' existence or that Defendants made PEX piping at the times the homes and other structures were built, (ii) knew what PEX piping was at the times their homes or other structures were built, (iii) knew that PEX piping was used in their homes or other structures, (iv) entered into any contract with any of the Defendants at any time, (v) knew that any contract related to Uponor PEX piping existed related to the construction of their homes or other structures, (vi) were third-party beneficiaries of any contract related to Uponor PEX piping, (vii) knew of the existence of any alleged warranty related to Uponor PEX piping at the times their homes or other structures were built, (viii) visited or even knew of any website related to Uponor PEX piping at the time their homes or other structures were built, (ix) assented to any part of an alleged warranty at the time their homes or other structures were built, or (x) asserted any warranty claim related to the Uponor PEX piping at any time.

257. The defects in Uponor PEX caused by Defendants were a direct and proximate cause of damages suffered by Plaintiffs and the other members of the Class, which damages include costs to repair damages to the homes and other structures and property of Plaintiffs and the Class caused by the leaks.

258.     Defendants are strictly liable to Plaintiffs and the Class for the damages alleged herein caused by the defects and inadequacies in the design and manufacturer of Uponor PEX.

## COUNT II - STRICT PRODUCT LIABILITY FOR DESIGN DEFECT
### (Plaintiffs, on behalf of themselves and all others similarly situated, Against All Defendants)

259.     Plaintiffs repeat and re-allege all prior and subsequent paragraphs and incorporate them as if repeated in full herein.

260.     Defendants are liable to Plaintiffs and the Class for the injuries and damages alleged herein sustained by Plaintiffs and the Class pursuant to Tennessee common law and/or the Tennessee Product Liability Act due to the defective design and/or formulation of Uponor PEX.

261.     At all times material to this action, Defendants designed, formulated, manufactured, distributed, supplied, and/or sold Uponor PEX.

262.     Defendants, as the designers and manufacturers of Uponor PEX, are held to the level of knowledge of an expert in the field of the design and manufacture of PEX plumbing including any cracking, microcracking, oxidative degradation, deterioration, weakening, failure or leaks caused by a furnace/flame treatment and/or the application of coatings and adhesives to the PEX.

263.     The Uponor PEX used in the homes and other structures of Plaintiffs and other members of the Class was defective in design and/or formulation in the following respects.

264.     Between 2009 and 2021, in order to get a red or blue coating to stick to the outside surface of the Uponor PEX tubing, Defendants ran the tubing through a furnace/flame treatment that oxidizes/burns the outside of the pipe.  While the furnace/flame  treatment improves adhesion qualities of polymers prior to the application of coatings and adhesives, it is an oxidation process that destroys the antioxidants from the outside of the Uponor PEX tubing, subjecting the tube to actual damage and premature failure in the form of, among other things, oxidative degradation,

microcracking, cracking, through-wall cracking, and leaks, which leaks cause substantial property damage to real and personal property in the structures where the Uponor PEX tubing is used.

265.     At the time the Uponor PEX left the control of Defendants, it was defective in design and manufacture and unreasonably dangerous to Plaintiffs and the members of the Class who might reasonably be expected to use it in the plumbing systems in their homes and other structures.  These defects include, but are not limited to, the conditions described in this Fourth Amended Complaint.

266.     The Uponor PEX installed in the homes and structures of Plaintiffs and the other members of the Class was installed therein without any change in the condition of the Uponor PEX from its condition when it left the control of Defendants.

267.     Plaintiffs and the other members of the Class were persons who would be expected to use PEX as the potable water systems in their homes and other structures.

268.     The defects in the Uponor PEX used in the homes and other structures of Plaintiffs and the other members of the Class were a direct and proximate cause of the injuries and damages alleged herein sustained by Plaintiffs and the members of the Class.

## COUNT III - NEGLIGENCE
### (Plaintiffs, on behalf of themselves and all others similarly situated, Against All Defendants)

269.     Plaintiffs repeat and re-allege all prior and subsequent paragraphs and incorporate them as if repeated in full herein.

270.     Defendants owed Plaintiffs and the other members of the Class a duty to exercise reasonable and ordinary care in the testing, design, manufacture, distribution, advertising/marketing, and/or sale of the Uponor PEX.

271.     Defendants negligently, carelessly, tortiously, and/or wrongfully failed to use reasonable care in the testing, design, manufacture, distribution, advertising/marketing, and/or sale

of the Uponor PEX in the homes and other structures owned by Plaintiffs and the other members of the Class.

272. Defendants knew or should have known that owners of homes and other structures with Uponor PEX, including Plaintiffs and the other members of the Class, would be substantially damaged thereby, as alleged herein.

273. The use of Uponor PEX has resulted in or will result in foreseeable damage as alleged herein which damages include costs to repair damages to the homes, businesses, and other structures of Plaintiffs and the Class caused by leaks.

274. Defendants were under a duty to exercise ordinary care to avoid reasonably foreseeable injury to users and purchasers of homes and other structures, and knew or should have foreseen with reasonable certainty that purchasers and/or end users would suffer the damages set forth herein if Defendants failed to perform their duty to cause the Uponor PEX to be tested, designed, manufactured, distributed, advertised/marketed, and/or sold in a non-defective manner.

275. Defendants failed and neglected to properly test, design, manufacture, distribute, advertise/market, and/or sell Uponor PEX in that each Defendant so negligently, carelessly and in an unworkmanlike manner performed the aforesaid work such that Uponor PEX was tested, designed, manufactured, distributed, advertised/marketed, and/or sold improperly, negligently, carelessly and/or in a defective and unworkmanlike manner.

276. Plaintiffs and the other members of the Class are lay people and lack the knowledge, understanding, and ability to inspect their homes or other structures for Uponor PEX and understand whether the lines and components of the plumbing systems have any defects. Plaintiffs and the other members of the Class lack the ability to test the Uponor PEX to know whether a defect exists.

277. Defendants' negligence is a substantial factor in causing the damages as alleged

herein.

278.     As a direct and proximate result of the conduct described herein, Plaintiffs and the members of the Class have suffered damages, including damages to property other than the Uponor PEX, in an amount precisely unknown, but believed to be within the jurisdiction of this Court as alleged in this Fourth Amended Complaint and incorporated herein, and according to proof at trial.

279.     As a direct and proximate result of Defendants' negligence, carelessness, and breaches of their duty of reasonable and ordinary care, Plaintiffs and the Class have been caused to suffer losses and damages, including damage to their homes, businesses, and personal property due to leakage from the defective Uponor PEX, interruption of their businesses and home life, and other incidental and consequential expenses associated with the failure of Uponor PEX, all of which damages were foreseeable by Defendants.

## COUNT IV – FRAUDULENT CONCEALMENT
### (Plaintiffs, on behalf of themselves and all others similarly situated, Against All Defendants)

280.     Plaintiffs repeat and re-allege all prior and subsequent paragraphs and incorporate them as if repeated in full herein.

281.     A seller of a product must disclose material information about its product. Restatement (Second) of Torts § 551; *Bearden v. Honeywell Intern., Inc.*, 720 F. Supp.2d 932 (M.D. Tenn. 2010).

282.     At all relevant times, Defendants knew of the specific defect of microcracking caused by the Defendants' flame/furnace treatment.

283.     At all relevant times, Defendants were aware and knew that the defects in the Uponor PEX had caused microcracking to occur causing leaks and that, where such leaks had not yet occurred, the Uponor PEX had the potential to fail and cause such leaks. Defendants learned

and knew of that specific microcracking problem in the Uponor PEX from reports and claims made to Defendants about failure of the Uponor PEX due to this reason, from Defendants' own testing of the Uponor PEX piping manufactured between 2009 and 2021, and from Defendants' investigation of the cause of the failures of the Uponor PEX. Such testing and investigation showed to Defendants that the Uponor PEX to which the flame/furnace treatment had been applied had the microcracks that cause failure and leaks. Defendants had this knowledge prior to the sales of defective Uponor PEX that affected Plaintiffs and other Class members. In fact, it was Defendants' knowledge of the specific defect that led Defendants to cease using the flame/furnace treatment in 2021.

284. Before Plaintiffs and other Class members purchased their homes and other structures, Defendants learned of the defects in the Uponor PEX through 1) reports and claims from property owners, plumbers, and others that defects in Uponor PEX piping was causing it to suffer leaks and cause damages, 2) repair and replacement work done by Defendants, and 3) Defendants' investigation and testing of the cause of the failures of the Uponor PEX.

285. Defendants had specific knowledge of the facts giving rise to the cause of action by Plaintiffs and the other members of the Class but concealed material facts from them by withholding information and misleading the Plaintiffs and other members of the Class that the defect did not exist and by failing to disclose information when Defendants had the duty to disclose the information about the defect. Defendants actively concealed such information by instead stating on its website at all relevant times that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion."

286. Defendants owed Plaintiffs and the other members of the Class a duty to disclose such defect.

287.     At all relevant times and specifically while Defendants' website was representing that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion," Defendants had a duty to disclose enough information about the defects in the Uponor PEX piping and Defendants' actions in creating the defect to prevent Defendants' statements from being misleading.

288.     At all relevant times and specifically while Defendants' website was representing that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion," Defendants had a duty to disclose the defect in the Uponor PEX because it knew or should have known that the microcracking defect rendered the Uponor PEX defective and potentially dangerous.

289.     At all relevant times and specifically while Defendants' website was representing that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion," Defendants had a duty to disclose the basic and material information to potential buyers of the Uponor PEX because it knew or should have known that such buyers, in making such purchases, were about to act without knowledge of the information about the defect and were without reasonable means to acquire the information themselves because such buyers and users had no means to access such information since the information was held and known by Defendants alone.

290.     Defendants knowingly, affirmatively, and actively concealed and failed to disclose relevant information to Plaintiffs and members of the Class related to the defective nature of Uponor PEX.

291.     Instead of disclosing the specific defect to Plaintiffs and the other members of the Class, Defendants took affirmative action to conceal the cause of action and remained silent and failed to disclose material facts despite their duty to disclose such defect. Defendants, at all times,

knowingly maintained their statements to the public that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion" when Defendants knew that this statement was not true or accurate.

292.    Plaintiffs and the other members of the Class could not have discovered the defects in the Uponor PEX or the cause of the leaks from the Uponor PEX prior to installation in their homes and other structures despite exercising reasonable care and diligence because Plaintiffs and the other members of the Class and the construction professionals who constructed their structures never had cause to perform any testing or inspection of the Uponor PEX prior to its use in their homes and other structures.

293.    Plaintiffs and the other members of the Class and their respective contractors and subcontractors would not have used the defective Uponor PEX in their homes and other structures had Defendants disclosed the defect in the Uponor PEX piping.  Plaintiffs and the other members of the Class and their respective contractors and subcontractors reasonably relied on Defendants' statements about Uponor PEX to the public.

294.    As a result, Defendants are liable to Plaintiffs and the other members of the Class for Defendants' fraudulent concealment of the defects in the Uponor PEX and for all damages Plaintiffs and the other members of the Class have suffered as a result of the defective Uponor PEX.

### COUNT V – NEGLIGENT MISREPRESENTATION
**(Plaintiffs, on behalf of themselves and all others similarly situated, Against All Defendants)**

295.    Plaintiffs repeat and re-allege all prior and subsequent paragraphs and incorporate them as if repeated in full herein.

296.     A seller of a product must disclose material information about its product. Restatement (Second) of Torts § 552; *Bearden v. Honeywell Intern., Inc.*, 720 F. Supp.2d 932 (M.D. Tenn. 2010).

297.     At all relevant times, Defendants knew of the specific defect of microcracking caused by the Defendants' flame/furnace treatment.

298.     At all relevant times, Defendants were aware and knew that the defects in the Uponor PEX had caused microcracking to occur causing leaks and that, where such leaks had not yet occurred, the Uponor PEX had the potential to fail and cause such leaks. Defendants learned and knew of that specific microcracking problem in the Uponor PEX from reports and claims made to Defendants about failure of the Uponor PEX due to this reason, from Defendants' own testing of the Uponor PEX piping manufactured between 2009 and 2021, and from Defendants' investigation of the cause of the failures of the Uponor PEX. Such testing and investigation showed to Defendants that the Uponor PEX to which the flame/furnace treatment had been applied had the microcracks that cause failure and leaks. Defendants had this knowledge prior to the sales of defective Uponor PEX that affected Plaintiffs and other Class members. In fact, it was Defendants' knowledge of the specific defect that led Defendants to cease using the flame/furnace treatment in 2021.

299.     Before Plaintiffs and other Class members purchased their homes and other structures, Defendants learned of the defects in the Uponor PEX through 1) reports and claims from property owners, plumbers, and others that defects in Uponor PEX piping was causing it to suffer leaks and cause damages, 2) repair and replacement work done by Defendants, and 3) Defendants' investigation and testing of the cause of the failures of the Uponor PEX.

300.     Defendants had specific knowledge of the facts giving rise to the cause of action by Plaintiffs and the other members of the Class but concealed material facts from them by

59

withholding information and misleading the Plaintiffs and other members of the Class that the defect did not exist and by failing to disclose information when Defendants had the duty to disclose the information about the defect. Defendants actively concealed such information by instead stating on its website at all relevant times that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion."

301. Defendants owed Plaintiffs and the other members of the Class a duty to disclose such defect.

302. Defendants failed to exercise reasonable care in making statements about the Uponor PEX to the public including persons who planned to use and did use the Uponor PEX in the construction of the Plaintiffs and other Class members' homes and other structures. Defendants failed to use such reasonable care because Defendants continued to make false and misleading statements to the public even after Defendants learned that such statements were false, misleading, and inaccurate.

303. At all relevant times and specifically while Defendants' website was representing that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion," Defendants had a duty to disclose enough information about the defects in the Uponor PEX piping and Defendants' actions in creating the defect to prevent Defendants' statements from being misleading.

304. At all relevant times and specifically while Defendants' website was representing that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion," Defendants had a duty to disclose the defect in the Uponor PEX because it knew or should have known that the microcracking defect rendered the Uponor PEX defective and potentially dangerous.

305. At all relevant times and specifically while Defendants' website was representing that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion," Defendants had a duty to disclose the basic and material information to potential buyers of the Uponor PEX because it knew or should have known that such buyers, in making such purchases, were about to act without knowledge of the information about the defect and were without reasonable means to acquire the information themselves because such buyers and users had no means to access such information since the information was held and known by Defendants alone.

306. Defendants negligently misrepresented and failed to disclose relevant information to Plaintiffs and members of the Class related to the defective nature of Uponor PEX by maintaining their statements to the public that Uponor PEX has "superior resistance to stress-crack corrosion" and will suffer "no micro-cracking during expansion" when Defendants knew that this statement was not true or accurate.

307. Instead of disclosing the specific defect to Plaintiffs and the other members of the Class, Defendants negligently misrepresented that such defects did not exist and remained silent and failed to disclose material facts despite their duty to disclose such defect.

308. Plaintiffs and the other members of the Class could not have discovered the defects in the Uponor PEX or the cause of the leaks from the Uponor PEX prior to installation in their homes and other structures despite exercising reasonable care and diligence because Plaintiffs and the other members of the Class and the construction professionals who constructed their structures never had cause to perform any testing or inspection of the Uponor PEX prior to its use in their homes and other structures.

309. Plaintiffs and the other members of the Class and their respective contractors and subcontractors would not have used the defective Uponor PEX in their homes and other structures

had Defendants disclosed the defect in the Uponor PEX piping. Plaintiffs and the other members of the Class and their respective contractors and subcontractors reasonably relied on Defendants' statements about Uponor PEX to the public.

310. As a result, Defendants are liable to Plaintiffs and the other members of the Class for Defendants' negligent misrepresentations related to the defects in the Uponor PEX and for all damages Plaintiffs and the other members of the Class have suffered as a result of the defective Uponor PEX.

## COUNT VI – TENNESSEE CONSUMER PROTECTION ACT CLAIM
### (Plaintiffs, on behalf of themselves and all others similarly situated, Against All Defendants)

311. Plaintiffs repeat and re-allege all prior and subsequent paragraphs and incorporate them as if repeated in full herein.

312. The Tennessee Consumer Protection Act (TCPA) "protect[s] consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state." T.C.A. § 47-18-102(2),

313. Plaintiffs and putative class members are consumers within the meaning of T.C.A. § 47-18-103(2).

314. Uponor PEX sold and distributed by Defendants are goods within the meaning of T.C.A. § 47-18-103(7) because Uponor PEX pipes are tangible chattels bought or otherwise obtained for use for household purposes.

315. Defendants engaged in unfair or deceptive acts or practices when, in the course of their business they, among other acts and practices, intentionally and knowingly made materially false representations regarding the reliability and performance of the Uponor PEX as detailed above.

316. Specifically, by misrepresenting the Uponor PEX as reliable and/or free from defects, and by failing to disclose and actively concealing the risk of premature failure posed by the Uponor PEX, Defendants engaged in one or more of the following unfair or deceptive business practices:

    a. Representing that the Uponor PEX had characteristics, uses, benefits, and qualities which it does not have.

    b. Representing that the Uponor PEX is of a particular standard, quality, and grade when it is not.

317. Defendants' knowing and intentional conduct described in this Complaint constitutes unfair and deceptive acts and practices in violation of the TCPA. Specifically, Defendant's conduct is unlawful, fraudulent, and unfair in at least the following ways:

    a. by designing and manufacturing the Uponor PEX to contain a design and manufacturing defects causing the Uponor PEX to crack and leak and prematurely fail contrary to what was disclosed and represented to consumers and/or installers who purchased Uponor PEX

    b. by marketing Uponor PEX as possessing a functional, safe, and defect-free water supply system; and

    c. by knowingly and intentionally concealing from Plaintiff and putative class members that the Uponor PEX suffers from defects while obtaining money from the putative class members through the sale of the Uponor PEX.

318. Additionally, in the various channels through which Defendants sold and marketed Uponor PEX, Defendants failed to disclose material information concerning the Uponor PEX, which they had a duty to disclose. Defendants had a duty to disclose the defects because, as detailed above: (a) Defendants knew about the defects in the Uponor PEX; (b) Defendants had

63

exclusive knowledge of material facts not known to the general public or the other putative class members; and (c) Defendants actively concealed material facts concerning the Uponor PEX defects from the general public, Plaintiffs, and putative class members.

319. Defendants' unfair or deceptive acts or practices, including their misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the builders and installers for Plaintiffs and putative class members, about the reliability of Uponor PEX, the quality of the Uponor PEX, and the true value of the Uponor PEX.

320. Plaintiffs and the other putative class members have suffered injury in fact and actual damages resulting from Defendants' material omissions.

321. Defendants' misrepresentations, omissions, and concealment were material to the Plaintiffs and putative class members, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that consumers would rely on the misrepresentations, concealment, and omissions.

322. Defendants' material misrepresentations and omissions alleged herein caused the builders and installers for Plaintiffs and the putative class members to make their purchases of the defective Uponor PEX. Absent those misrepresentations and omissions, Plaintiffs and putative class members would not have purchased homes with the defective Uponor PEX.

323. Accordingly, Plaintiffs and putative class members have suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

324. Defendants' violations present a continuing risk to Plaintiffs and putative class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

325. Plaintiffs request that this Court enter an order enjoining Defendants from continuing its unfair, unlawful, and/or deceptive practices and for such other relief set forth below.

## XI.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request, on behalf of themselves and members of the Class, that this Court:

A. determine that the claims alleged herein may be maintained as a class action under Rule 23(a), (b)(1), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure and issue an order certifying the Class as defined above and designating Plaintiffs' counsel as counsel for the Class, and making such further orders for the protection of the putative class members as the Court deems appropriate under Fed. R. Civ. P. 23;

B. award Plaintiffs and the certified Class all actual general, special, incidental, statutory, punitive, and/or consequential damages to which Plaintiffs and the other members of the Class are entitled and seek in this action including, without limitation, costs, restitution, compensatory damages, out-of-pocket costs, damages, and punitive, treble, and exemplary damages under applicable law, all in amounts to be determined at trial;

C. award pre-judgment and post-judgment interest on such monetary relief;

D. award Plaintiffs and the certified Class any applicable statutory and civil penalties;

E.    enjoin Defendants to desist from further deceptive distribution and sales practices with respect to the Class Pipe and such other injunctive relief that the Court deems just and proper;

F.    declare that Defendants are financially responsible for all putative class notice and the administration of putative class relief;

G.    award Plaintiffs and the certified Class all costs of suit, costs of notice, forensic investigation and analysis costs, and fees of experts, including engineering, design, formulation, PEX, testing, and construction experts.  This relief may include, without limitation, any remediation, inspection, notice, and/or other necessary steps to be undertaken with respect to putative Class members and Class members.;

H.    award  Plaintiffs and the certified Class attorney fees and costs as provided for by applicable statute or law including as allowed under the Tennessee Consumer Protection Act; and

I.    grant Plaintiffs and the certified Class such further and other relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the class members, demand a trial by jury on all issues so triable.

Respectfully submitted,

*/s/Andrew J. Pulliam*
Andrew J. Pulliam (Tenn. BPR No. 016863)
James C. Bradshaw III (Tenn. BPR No. 013170)
J. Graham Matherne (Tenn. BPR No. 011294)
Ann Weber Langley (Tenn. BPR No. 038070)
**WYATT, TARRANT & COMBS, LLP**
333 Commerce Street, Suite 830
Nashville Tennessee 37201
Telephone: (615) 244-0020

66

Fax: (615) 256-1726
Email: apulliam@wyattfirm.com
Email: jbradshaw@wyattfirm.com
Email: gmatherne@wyattfirm.com
Email: alangley@wyattfirm.com

*Attorneys for Plaintiffs and Class Representatives, on behalf of themselves and all others similarly situated*

## CERTIFICATE OF SERVICE

I hereby certify that on July __, 2025, a true and correct copy of the foregoing was served

via the Court's ECF System on the following:

M. Andrew Pippenger, Esq.
PURYEAR LAW GROUP
735 Broad Street, Suite 214
Chattanooga, TN 37402

_____

Andrew J. Pulliam

101995196.3